# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| LARRY LABUL, Individually and on Behalf of All Others Similarly Situated,<br><br>                  Plaintiff,<br><br>    v.<br><br>XPO LOGISTICS, INC., BRADLEY S. JACOBS, and JOHN J. HARDIG,<br><br>                  Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Larry Labul ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding XPO Logistics, Inc. ("XPO" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a federal securities class action on behalf of all persons and entities who purchased or otherwise acquired XPO securities between February 26, 2014, and December 12, 2018, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      XPO provides transportation and logistics services in the United States, North America, France, the United Kingdom, Spain, Europe, Asia, and internationally, through its Transportation and Logistics segments.  The company offers its services to customers in various industries, such as retail, e-commerce, food and beverage, manufacturing, technology and telecommunications, aerospace and defense, life sciences, healthcare, medical equipment, and agriculture.  XPO's stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "XPO".

3.      The Company was formerly known as Express-1 Expedited Solutions, Inc. ("Express-1").  On September 2, 2011, Defendant Bradley S. Jacobs ("Jacobs"), through an equity investment led by Jacobs Private Equity, LLC, acquired a 71% ownership interest in Express-1. Jacobs assumed the roles of Chairman of the Board of Directors and Chief Executive Officer ("CEO") and renamed the Company "XPO Logistics, Inc."   XPO has completed seventeen acquisitions since Jacobs took control of the Company, deploying $6.1 billion of capital.

4.      Prior to acquiring XPO, Jacobs had leadership roles in several other companies, having, *inter alia*, founded United Waste Systems, Inc. ("UWS") in 1989 and co-founded United

Rentals, Inc. ("URI") in 1997, which eventually collapsed after an accounting scandal under Jacobs' leadership.

5.      Jacobs's tenure at XPO has been characterized by an aggressive mergers and acquisitions ("M&A") strategy.  After Jacobs took control of the Company, *Fortune Magazine* noted that XPO "has grown from $177 million in sales in 2011 to $17 billion today, thanks largely to an incredible run of acquisitions."  On August 2, 2017, Jacobs announced plans to earmark up to $8 billion for additional acquisitions.

6.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) XPO's highly touted aggressive M&A strategy had yielded only minimal returns to the Company; (ii) XPO was utilizing improper accounting practices to mask its true financial condition, including, *inter alia*, under-reporting of bad debts and aggressive amortization assumptions; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

7.      On December 12, 2018, Spruce Point Capital Management ("Spruce Point") published a report regarding XPO, entitled "Trucking Ridiculous; End of the Road".  The Spruce Point report asserted that a "forensic investigation" into XPO had revealed "financial irregularities that conveniently cover [the Company's] growing financial strain and inability to complete additional acquisitions despite repeated promises."  Spruce Point reported that it had uncovered, among other issues, "concrete evidence to suggest dubious tax accounting, under-reporting of bad debts, phantom income through unaccountable M&A earn-out labilities, and aggressive amortization assumptions: all designed to portray glowing 'Non-GAAP' results."  The Spruce Point report further stated that "XPO insiders have aggressively reduced their ownership interest

in the Company since coming public, and recently enacted a new compensation structure tied to 'Adjusted Cash Flow Per Share'—defined in such a non-standard way that it is practically meaningless."  Spruce Point also reported that "[i]n our opinion, XPO has used a nearly identical playbook from [URI] leading up to its SEC investigation, executive felony convictions, and share price collapse."

8.     Following publication of the Spruce Point report, XPO's stock price plunged $15.77 per share, or 26.17%, to close at $44.50 on December 13, 2018.

9.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

12.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  XPO is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

13.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited

to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

14.    Plaintiff, as set forth in the attached Certification, acquired XPO common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

15.    Defendant XPO is a Delaware corporation with its principal executive offices located at Five American Lane, Greenwich, Connecticut 06831.  XPO's common stock trades in an efficient market on the NYSE under the ticker symbol "XPO".

16.    Defendant Jacobs has served at all relevant times the Chairman and CEO of XPO.

17.    Defendant John J. Hardig has served at all relevant times as the Chief Financial Officer ("CFO") of XPO.

18.    The Defendants referenced above in ¶¶ 16-17 are sometimes referred to herein collectively as the "Individual Defendants."

19.    The Individual Defendants possessed the power and authority to control the contents of the Company's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were

then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

20.     XPO provides transportation and logistics services in the United States, North America, France, the United Kingdom, Spain, Europe, Asia, and internationally, through its Transportation and Logistics segments.  The company offers its services to customers in various industries, such as retail, e-commerce, food and beverage, manufacturing, technology and telecommunications, aerospace and defense, life sciences, healthcare, medical equipment, and agriculture.

21.     The Company was formerly known as Express-1 Expedited Solutions, Inc.  On September 2, 2011, Defendant Jacobs, through an equity investment led by Jacobs Private Equity, LLC, acquired a 71% ownership interest in Express-1.  Jacobs assumed the roles of Chairman and Chief Executive Officer and renamed the Company "XPO Logistics, Inc."  XPO has completed seventeen acquisitions since Jacobs took control of the Company, deploying $6.1 billion of capital.

22.     Prior to acquiring XPO, Jacobs had leadership roles in several other companies, having, *inter alia*, founded UWS in 1989 and co-founded URI in 1997, which eventually collapsed after an accounting scandal under Jacobs' leadership.

23.     Jacobs's tenure at XPO has been characterized by an aggressive M&A strategy. After Jacobs took control of the Company, *Fortune Magazine* noted that XPO "has grown from $177 million in sales in 2011 to $17 billion today, thanks largely to an incredible run of

acquisitions." On August 2, 2017, Jacobs announced plans to earmark up to $8 billion for additional acquisitions.

**<u>Materially False and Misleading Statements Issued During the Class Period</u>**

24.     The Class Period begins on February 23, 2015, when XPO filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 31, 2014 (the "2014 10-K"). For 2014, XPO reported a net loss of $63.6 million, or $2.00 per diluted share, on revenue of $2.36 billion, compared to a net loss of $48.53 million, or $2.26 per diluted share, on revenue of $702.3 million for 2013.

25.     In the 2014 10-K, XPO touted the purported benefits of its acquisitions, describing it as one of the "three main components" of the Company's corporate strategy:

- ***Acquisitions.*** We take a disciplined approach to acquisitions: we look for companies that are highly scalable and are a good strategic fit with our core competencies. When we acquire a company, we seek to integrate it with our operations by moving the acquired operations onto our technology platform that connects our broader organization. We gain more carriers, customers, lane histories and pricing histories with each acquisition, and some acquisitions add complementary services. We use these resources company-wide to buy transportation more efficiently and to cross-sell a more complete supply chain solution to customers. In 2012, we completed the acquisition of four non-asset, third-party logistics companies. We acquired another six companies in 2013, including 3PD, the largest non-asset, third-party provider of last mile logistics for heavy goods in North America, and National Logistics Management ("NLM"), the largest provider of web-based expedited transportation management in North America. On March 31, 2014, we acquired Pacer, the third largest provider of intermodal transportation services in North America. On July 28, 2014, we acquired last mile logistics company ACL. We completed our acquisition of contract logistics company New Breed on September 2, 2014. On February 9, 2015, we acquired substantially all of the assets of last mile logistics company UX Specialized Logistics ("UX"). We have an active pipeline of key targets, and we plan to continue acquiring quality companies that fit our strategy for growth.

26.     In the 2014 10-K, XPO represented that "[t]he following table outlines the Company's debt obligations as of December 31, 2014 and December 31, 2013 (in millions):"

| | Interest rates | Term (months) | As of December 31, 2014 | As of December 31, 2013 |
|---|---|---|---|---|
| Senior notes due 2019 | 7.88% | 60 | $ 500.0 | $ — |
| Convertible senior notes | 4.50% | 60 | 106.8 | 133.7 |
| Revolving credit facility | 4.38% | 60 | — | 75.0 |
| Notes payable | N/A | N/A | 1.8 | 2.2 |
| Capital leases for equipment | 14.22% | 59 | 0.2 | 0.2 |
| Total debt | | | 608.8 | 211.1 |
| Less: unamortized discount on convertible senior notes | | | (14.9) | (27.4) |
| Less: current maturities of long-term debt | | | (1.8) | (2.0) |
| Total long-term debt, net of current maturities | | | $ 592.1 | $ 181.7 |

27.   In the 2014 10-K, XPO also represented that "[e]stimated future amortization expense for amortizable intangible assets for the next five years is as follows (in millions):"

| | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|
| Estimated future amortization expense | $ 66.0 | $ 52.2 | $ 41.3 | $ 38.8 | $ 37.1 |

Actual amounts of amortization expense may differ from estimated amounts due to changes in foreign currency exchange rates, additional intangible asset acquisitions, impairment of intangible assets, accelerated amortization of intangible assets and other events.

28.   Appended as exhibits to the 2014 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), in which each of the Individual Defendants "certif[ied], based on my knowledge, that the Annual Report on Form 10-K of the Company for the year ended December 31, 2014 . . . fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934 and that the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

29.   On February 29, 2016, XPO filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 31, 2015 (the "2015 10-K").  For 2015, XPO reported a net loss of $191.1 million, or $2.65 per diluted share, on revenue of $7.62 billion, compared to a net loss of $63.6 million, or $2.00 per diluted share, on revenue of $2.36 billion for 2014.

30.   In the 2015 10-K, XPO represented that "[t]he following table outlines the Company's debt obligations as of December 31, 2015 and December 31, 2014:"

| (Dollars in millions) | Stated Interest Rates | Initial Term (months) | As of December 31, 2015 | As of December 31, 2014 |
|---|---|---|---|---|
| ABL Facility | 2.64% | 60 | $ — | $ — |
| Senior Notes due 2022 | 6.50% | 84 | 1,600.0 | — |
| Senior Notes due 2021 | 5.75% | 72 | 544.4 | — |
| Senior Notes due 2019 | 7.88% | 60 | 900.0 | 500.0 |
| Senior Notes due 2018 | 7.25% | 120 | 265.8 | — |
| Term loan facility | 5.50% | 72 | 1,600.0 | — |
| Senior Debentures due 2034 | 6.70% | 360 | 300.0 | — |
| Convertible senior notes | 4.50% | 60 | 52.3 | 106.8 |
| Euro Private Placement Notes due 2020 | 4.00% | 84 | 13.1 | — |
| Asset financing [a] | 1.38% | 67 | 262.5 | — |
| Notes payable | Various | Various | 3.5 | 1.8 |
| Capital leases for equipment | 1.40% | 70 | 59.1 | 0.2 |
| Total debt | | | 5,600.7 | 608.8 |
| Plus: unamortized premium on Senior Notes due 2019 | | | 13.2 | — |
| Plus: unamortized fair value premium on Senior Notes due 2018 | | | 2.4 | — |
| Plus: unamortized fair value premium on Euro Private Placement Notes | | | 1.4 | — |
| Less: unamortized fair value discount on Senior Debentures due 2034 | | | (101.0) | — |
| Less: unamortized discount on convertible senior notes | | | (4.3) | (14.9) |
| Less: unamortized discount on term loan facility | | | (31.5) | — |
| Less: current maturities of long-term debt | | | (135.3) | (1.8) |
| Less: debt issuance costs | | | (73.0) | $ (11.8) |
| Total long-term debt, net of current maturities | | | $ 5,272.6 | $ 580.3 |

[a] The stated interest rate and initial term (in months) for the asset financing is the weighted-average stated interest rate and initial term (in months), respectively.

31.     In the 2015 10-K, XPO also represented that "[e]stimated future amortization expense for amortizable intangible assets for the next five years is as follows:"

| (Dollars in millions) | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|
| Estimated amortization expense | $ 201.3 | $ 187.4 | $ 179.0 | $ 172.7 | $ 166.6 |

Actual amounts of amortization expense may differ from estimated amounts due to changes in foreign currency exchange rates, additional intangible asset acquisitions, impairment of intangible assets, accelerated amortization of intangible assets and other events.

32.     Appended as exhibits to the 2015 10-K were signed certifications pursuant to SOX by the Individual Defendants, substantively identical to those referenced *supra* at ¶ 28.

33.     On February 28, 2017, XPO filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 31, 2016 (the "2016 10-K").  For 2016, XPO reported net income of $69 million, or $0.53 per diluted share, on revenue of $14.62 billion, compared to a net loss of $191.1 million, or $2.65 per diluted share, on revenue of $7.62 billion for 2015.

34.     In the 2016 10-K, XPO represented that "[t]he following table summarizes the primary terms for components of debt, along with the valuation of financial liabilities within the fair value hierarchy:"

| | December 31, 2016 | | | | December 31, 2015 | | | |
| | | | Fair Value | | | | Fair Value | |
| (In millions) | Principal Balance | Carrying Value | Level 1 | Level 2 | Principal Balance | Carrying Value | Level 1 | Level 2 |
|---|---|---|---|---|---|---|---|---|
| ABL Facility | $    30.0 | $    30.0 | $    — | $    30.0 | $    — | $    — | $    — | $    — |
| Senior Notes due 2023 | 535.0 | 527.1 | 560.4 | — | — | — | — | — |
| Senior Notes due 2022 | 1,600.0 | 1,579.9 | 1,689.4 | — | 1,600.0 | 1,577.0 | 1,479.8 | — |
| Senior Notes due 2021 | 527.1 | 520.7 | 546.0 | — | 544.4 | 536.6 | — | 507.5 |
| Senior Notes due 2019 | — | — | — | — | 900.0 | 900.4 | 920.3 | — |
| Senior Notes due 2018 | 265.8 | 267.1 | 274.0 | — | 265.8 | 268.2 | — | 271.0 |
| Term loan facility | 1,481.9 | 1,439.2 | — | 1,507.1 | 1,600.0 | 1,540.3 | — | 1,590.0 |
| Senior Debentures due 2034 | 300.0 | 200.8 | 241.6 | — | 300.0 | 199.0 | — | 201.0 |
| Convertible senior notes | 49.4 | 47.1 | 129.8 | — | 52.3 | 46.8 | 89.1 | — |
| Euro private placement notes due 2020 | 12.6 | 13.7 | — | 14.0 | 13.1 | 14.5 | — | 13.9 |
| Asset financing | 145.0 | 145.0 | 145.0 | — | 266.0 | 266.0 | 266.0 | — |
| Capital leases for equipment | 97.4 | 97.4 | — | 97.4 | 59.1 | 59.1 | — | 59.1 |
| Total debt | $ 5,044.2 | $ 4,868.0 | | | $ 5,600.7 | $ 5,407.9 | | |
| Current maturities of long-term debt | 138.9 | 136.5 | | | 133.9 | 135.3 | | |
| Long-term debt | $ 4,905.3 | $ 4,731.5 | | | $ 5,466.8 | $ 5,272.6 | | |

The Level 1 debt was valued using quoted prices in active markets. The Level 2 debt was valued using bid evaluation pricing models or quoted prices of securities with similar characteristics. The fair value of the asset financing arrangements approximates carrying value since the debt is primarily issued at a floating rate, may be prepaid any time at par without penalty and the remaining life is short term in nature.

35.     In the 2016 10-K, XPO also represented that "[e]stimated future amortization expense for amortizable intangible assets for the next five years is as follows:"

| (In millions) | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|
| Estimated amortization expense | $    161.0 | $    153.5 | $    147.4 | $    141.4 | $    134.1 |

Actual amounts of amortization expense may differ from estimated amounts due to changes in foreign currency exchange rates, additional intangible asset acquisitions, impairment of intangible assets, accelerated amortization of intangible assets and other events.

36.     Appended as exhibits to the 2016 10-K were signed certifications pursuant to SOX by the Individual Defendants, substantively identical to those referenced *supra* at ¶ 28.

37.     On February 12, 2018, XPO filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 31, 2017 (the "2017 10-K").  For 2017, XPO reported net income of $340.2 million, or $2.45 per diluted share, on revenue of $15.38 billion, compared to net income of $69 million, or $0.53 per diluted share, on revenue of $14.62 billion for 2016.

38.     In the 2017 10-K, XPO represented that "[t]he following table summarizes the primary terms for components of debt, along with the valuation of financial liabilities within the fair value hierarchy:

| (In millions) | December 31, 2016 | | | | December 31, 2015 | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Fair Value | | | | Fair Value | |
| | Principal Balance | Carrying Value | Level 1 | Level 2 | Principal Balance | Carrying Value | Level 1 | Level 2 |
| ABL Facility | $ 30.0 | $ 30.0 | $ — | $ 30.0 | $ — | $ — | $ — | $ — |
| Senior Notes due 2023 | 535.0 | 527.1 | 560.4 | — | — | — | — | — |
| Senior Notes due 2022 | 1,600.0 | 1,579.9 | 1,689.4 | — | 1,600.0 | 1,577.0 | 1,479.8 | — |
| Senior Notes due 2021 | 527.1 | 520.7 | 546.0 | — | 544.4 | 536.6 | — | 507.5 |
| Senior Notes due 2019 | — | — | — | — | 900.0 | 900.4 | 920.3 | — |
| Senior Notes due 2018 | 265.8 | 267.1 | 274.0 | — | 265.8 | 268.2 | — | 271.0 |
| Term loan facility | 1,481.9 | 1,439.2 | — | 1,507.1 | 1,600.0 | 1,540.3 | — | 1,590.0 |
| Senior Debentures due 2034 | 300.0 | 200.8 | 241.6 | — | 300.0 | 199.0 | — | 201.0 |
| Convertible senior notes | 49.4 | 47.1 | 129.8 | — | 52.3 | 46.8 | 89.1 | — |
| Euro private placement notes due 2020 | 12.6 | 13.7 | — | 14.0 | 13.1 | 14.5 | — | 13.9 |
| Asset financing | 145.0 | 145.0 | 145.0 | — | 266.0 | 266.0 | 266.0 | — |
| Capital leases for equipment | 97.4 | 97.4 | — | 97.4 | 59.1 | 59.1 | — | 59.1 |
| Total debt | $ 5,044.2 | $ 4,868.0 | | | $ 5,600.7 | $ 5,407.9 | | |
| Current maturities of long-term debt | 138.9 | 136.5 | | | 133.9 | 135.3 | | |
| Long-term debt | $ 4,905.3 | $ 4,731.5 | | | $ 5,466.8 | $ 5,272.6 | | |

The Level 1 debt was valued using quoted prices in active markets. The Level 2 debt was valued using bid evaluation pricing models or quoted prices of securities with similar characteristics. The fair value of the asset financing arrangements approximates carrying value since the debt is primarily issued at a floating rate, may be prepaid any time at par without penalty and the remaining life is short-term in nature.

39.     In the 2017 10-K, XPO represented that "[e]stimated future amortization expense for intangible assets for the next five years is as follows:"

| (In millions) | 2017 | 2018 | 2019 | 2020 | 2021 |
| --- | --- | --- | --- | --- | --- |
| Estimated amortization expense | $ 161.0 | $ 153.5 | $ 147.4 | $ 141.4 | $ 134.1 |

Actual amounts of amortization expense may differ from estimated amounts due to changes in foreign currency exchange rates, additional intangible asset acquisitions, impairment of intangible assets, accelerated amortization of intangible assets and other events.

40.     Appended as exhibits to the 2017 10-K were signed certifications pursuant to SOX by the Individual Defendants, substantively identical to those referenced *supra* at ¶ 28.

41.     The statements referenced in ¶¶ 24-40 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) XPO's highly touted aggressive M&A strategy had yielded only minimal returns to the Company; (ii) XPO was utilizing improper accounting practices to mask its true financial condition, including, *inter alia*, under-reporting of bad debts and aggressive amortization assumptions; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times

**The Truth Begins to Emerge**

42.     On December 12, 2018, Spruce Point published a report regarding XPO, entitled "Trucking Ridiculous; End of the Road". The Spruce Point report included, *inter alia*, the following assertions:

- **A Value Destructive Roll-Up, Covering Financial Strain and Dependent On Financing For Survival:** XPO has completed 17 acquisitions since Jacobs took control in 2011 and deployed $6.1 billion of capital. Yet *by our calculations, the Company has generated $73m of cumulative adjusted free cash flow in an expansionary economic period. In our view, this is indicative of a failed business strategy yielding a paltry 1.2% return on invested capital. XPO is dependent on external capital, asset sales, and factoring receivables to survive and is covering up a working capital crunch that can beenseen by bank overdrafts* . . . . As credit conditions tighten, cost of capital increases, and XPO's business practices come under greater scrutiny (eg. U.S. Senate), its share price could swiftly collapse in Enron-style fashion.

- **Dubious Financial Presentation And Aggressive Accounting:** In our opinion, *XPO has used a nearly identical playbook from United Rentals leading up to its SEC investigation, executive felony convictions, and share price collapse. We find concrete evidence to suggest dubious tax accounting, under-reporting of bad debts, phantom income through unaccountable M&A earn-out liabilities, and aggressive amortization assumptions: all designed to portray glowing "Non-GAAP" results.* Additionally, we provide evidence that its "organic revenue growth" cannot be relied upon, its free cash flow does not reflect its fragile financial condition, and numerous headwinds will pressure earnings.

(Emphases added.)

43.     The Spruce Point report presented a detailed breakdown of the various financial and accounting issues its investigation of XPO had uncovered, noting the extent to which they "mirrored" the issues at URI, Jacobs' previous company:

| Concern | Evidence | Impact and Implication | URI Playbook |
|---|---|---|---|
| Non-Economic Value Destructive Roll-Up | Seventeen acquisitions since Jacobs took control of XPO, $6.1 billion of capital deployed, and generated just $73m of cumulative adjusted free cash flow = a failed business strategy yielding a 1.2% return on capital investment | To continue its growth, XPO will be dependent on larger acquisitions and more external capital Rising interest rates and cost of capital will lower economic returns to the strategy | YES |

| Depending On Banks To Survive | XPO has raised $5 billion of debt and equity capital, and is resorting to increased asset sales and factoring of accounts receivables to bridge the financing gap | $190m of financing costs to Wall Street, not including M&A advisory fees<br>Can create incentives to appease banks before shareholders (evidence: forward equity sale) | YES |
|---|---|---|---|
| Growing Working Capital Crunch + Persistently Out of Cash | Moving to more capital intensive businesses (trucking/warehouses)<br>XPO has repeatedly reported bank overdrafts and stopped reporting quarterly details in current liabilities<br>Working capital to sales ratio climbs every quarter, while difference between DSO and DPOs contracting >>> Started factoring European accounts receivable in Q4'17 | We believe XPO will be forced to continue to raise additional debt or equity capital<br>A likely factor why XPO has failed to complete an acquisition in 2018 despite headlines in 2017 of its "$8 billion" capacity for deals | |
| Organic Revenue Growth Not Reliable | Inability to reconcile XPO's historical stated organic growth, including calculation discrepancy in XPO's 2017 organic result<br>Questionable Non-GAAP adjustment to FX impact<br>Despite H1'18 10% organic growth, cash flow was down 9% | The CEO has stressed organic sales growth is one of the biggest factors that investors use to value XPO. This creates possible incentives for XPO to inflate this metric | |
| Adj. EBITDA And Earnings Quality Concerns Make XPO More Levered Than It Appears | XPO has repeatedly stretched out amortization assumptions<br>Reports significantly increased non-operating pension gains<br>Labels recurring M&A and restructuring costs as EBITDA add-backs despite these being material costs of executing its roll-up strategy<br>Includes 100% of XPO Europe as EBITDA despite owning 87%<br>Dependence on operating leases will move on balance sheet in 2019<br>In Q3'18, XPO shifted gains and losses on asset sales from "other income" into operating results, without providing $ details | EBITDA is another important financial metric investors focus on. We estimate leverage of Net Debt/AdjEBITDAR is close to 3x<br>**URI case cited improper accounting for customer relationships, while we observe XPO consistently stretching out assumptions for customer relationship** | YES |
| A/R Bad Debt Manipulation | • Post Q2'15 acquisitions, XPO's allowance for bad debt as a % of gross receivables materially declined despite Norbert carrying a higher % of allowances, and has been growing every quarter<br>• XPO just started disclosing bad debt in Q3'18 MD&A | • XPO could have flushed bad debts and labelled them as acquisition costs to be ignored. **URI case cited improper A/R reserve manipulation to boost net income** | YES |
| Phantom Income Potential Through Unaccountable M&A Earn-Out Liability | • XPO created a $29m earn-out liability on June 30, 2015 despite not disclosing any earn-out compensation for the three | • IF XPO followed standard earn-out accounting, it would reverse the liability and book $29m of income. | YES |

| | | | |
|---|---|---|---|
| | acquisitions during that period: UX Logistics, ND, or BTT<br>• The liability was reduced to zero, but XPO did not disclose cash payments or share issuance to satisfy the liability | • **URI case cited improper acquisition reserves to offset expenses** | |
| Large Discrepancy Between Income Statement And Cash Tax Expense | • XPO has recognized a cumulative income tax benefit of $132m since Jacob's joined, while paying $182m in actual cash taxes | • The discrepancy makes XPO's GAAP EPS less meaningful. We estimate the cumulative earnings benefit has been $1.55/share<br>• The URI case cited improper tax accounting | YES |
| Obscure Diluted Share Count | • The perpetual preferred stock is convertible at $7/share, making it deeply in-the-money. In Q1'16 XPO stopped giving a clear picture to investors about the sources of potentially diluted securities –including 10.2m shares from the preferred stock | • Sell-side analysts have incorrectly modelled the share count, making XPO's valuation look cheaper than economic reality | |
| Unjust Enrichment on Questionable Metrics | • XPO uses a non-standard definition of "adjusted cash flow per share" to earn significant bonus compensation<br>• The calculation ignores any measure of return on invested capital, which is common in the transportation/logistics industry | • XPO management enriching itself for non-economic value-added investing inc. special bonuses for completing deals (part of its job!). Employees and Unions (Teamsters) already calling out XPO management's greed | |

44.     Following publication of the Spruce Point report, XPO's stock price plunged $15.77 per share, or 26.17%, to close at $44.50 on December 13, 2018.

## **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

45.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired XPO securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate

families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

46.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, XPO securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by XPO or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

47.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

48.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

49.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of XPO;

- whether the Individual Defendants caused XPO to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of XPO securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

50.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

51.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- XPO  securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold XPO securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

52.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

53.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

54.     Plaintiff repeats and reallege each and every allegation contained above as if fully set forth herein.

55.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

56.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of XPO securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire XPO securities

and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

57.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for XPO securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about XPO finances and business prospects.

58.      By virtue of their positions at XPO , Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

59.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of XPO, the Individual Defendants had knowledge of the details of XPO internal affairs.

60.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of XPO.  As officers and/or directors of a publicly-held Company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to XPO businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of XPO securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning XPO business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired XPO securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

61.     During the Class Period, XPO securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of XPO securities at prices artificially inflated by Defendants' wrongful conduct.   Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of XPO securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of XPO securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

62. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

63. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

64. Plaintiff repeats and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

65. During the Class Period, the Individual Defendants participated in the operation and management of XPO, and conducted and participated, directly and indirectly, in the conduct of XPO business affairs.  Because of their senior positions, they knew the adverse non-public information about XPO misstatement of income and expenses and false financial statements.

66. As officers and/or directors of a publicly owned Company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to XPO financial condition and results of operations, and to correct promptly any public statements issued by XPO which had become materially false or misleading.

67. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which XPO disseminated in the marketplace during the Class Period concerning

XPO results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause XPO to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of XPO within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of XPO securities.

68.     Each of the Individual Defendants, therefore, acted as a controlling person of XPO. By reason of their senior management positions and/or being directors of XPO, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, XPO to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of XPO and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

69.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by XPO.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  December 14, 2018

Respectfully submitted,

**LEVI & KORSINSKY, LLP**

*/s/ Shannon L. Hopkins*
Shannon L. Hopkins (CT Bar No. 435545)
733 Summer Street, Suite 304
Stamford, Connecticut 06901
Telephone: (203) 992-4523
Facsimile: (212) 363-7171
Email: shopkins@zlk.com

**POMERANTZ LLP**
Jeremy A. Lieberman
J. Alexander Hood II
Jonathan Lindenfeld
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
ahood@pomlaw.com
jlindenfeld@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:   (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*