# UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **LARRY LABUL, Individually and on Behalf of All Others Similarly Situated,** | ) ) ) | **No. 3:18-cv-02062-VLB** |
| | ) | <u>**CLASS ACTION**</u> |
| **Plaintiff,** | ) ) | |
| | ) | **CONSOLIDATED CLASS ACTION** |
| **vs.** | ) ) | **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| | ) | |
| **XPO LOGISTICS, INC., BRADLEY S. JACOBS, JOHN J. HARDIG and SCOTT B. MALAT,** | ) ) ) ) | **June 3, 2019** |
| | ) | |
| **Defendants.** | ) ) | <u>**DEMAND FOR JURY TRIAL**</u> |

# TABLE OF CONTENTS

Page

I.    NATURE OF ACTION ............................................................................ 1

II.    JURISDICTION AND VENUE .............................................................. 6

III.    PARTIES .............................................................................................. 7

IV.    SUBSTANTIVE ALLEGATIONS ........................................................ 10

    A.    Company Background ............................................................. 10

    B.    In 2016, Amazon Pushes XPO Past Its "Positive Inflection" Point, but XPO Represents Itself to Investors as a Well Diversified Company that Exposed Investors to Minimal Customer "Concentration Risk" ........................................... 10

    C.    In 2018, After Enjoying Years of Above-Industry Growth Rates Thanks to Amazon, XPO "Rings the Opening Bell" at the NYSE to Announce Its Decision to Compete Directly with One of Amazon's Most Important Businesses ................................. 15

    D.    Around the Time that XPO Launches a Business Competing with Amazon, Amazon Accelerates Its Wind Down of XPO Business .................................................................................. 19

    E.    XPO Tells Investors that "Nothing Has Slowed Down," Despite Knowing Its Top Customer Had "Slowed Down" ................................ 27

    F.    Amazon Continues to Wind Down Its Business with XPO During Amazon's Mission-Critical Summer of 2018 "Prime Week" as XPO's Chief Financial Officer Resigns ............................. 39

    G.    Feeling the Effects of Amazon's Departure, XPO Misleadingly Blames a "Rounding Error" UK Customer for "Missing" Third Quarter Financial Targets - and XPO's Chief Strategy Officer Resigns ................................................................................... 40

    H.    Just as XPO Was "Very Close" to Closing a Deal that Would "Double" Its Size and Bury the Amazon Problem, Executives Let Slip Material Non-Public Information on December 11, 2018 that Triggered a Trading Halt on the NYSE And Forced XPO to Disclose Yet Another Amazon-Related "Miss" ................................. 48

    I.    After Failing to Find a Merger Partner Who Would Cover Up the Loss of Amazon in 2018, XPO Is Forced to Admit that It Lost Its "Largest Customer" (Amazon) and Always Knew that Amazon Was Going to Leave .............................................................. 54

**Page**

V.  **DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS** ................................................... 57

VI.  **DEFENDANTS FAILED TO DISCLOSE INFORMATION REQUIRED UNDER ITEM 303 OF SEC REGULATION S-K** ............................... 75

VII.  **SCIENTER** ..................................................................... 78

VIII.  **LOSS CAUSATION** ....................................................... 79

    A.  **XPO Discloses Missed Third-Quarter Results, Purportedly from a Single UK Customer's Bankruptcy, and the Resignation of Its Chief Strategy Officer** ......................... 80

    B.  **XPO Is Next Forced to Disclose a Major Amazon-Related Miss After Coming "Very Close" to Closing a Deal That Would Have Doubled Its Size and Buried the Amazon Problem** .......................... 81

    C.  **XPO Finally Discloses the Truth That It Lost Its "Largest Customer" (Amazon) And Knew From The Start That Amazon Was Going to Leave** ............................................... 83

IX.  **NO SAFE HARBOR** ....................................................... 86

X.  **APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE** .................................... 86

XI.  **CLASS ACTION ALLEGATIONS** ................................. 87

XII.  **CAUSES OF ACTION** ..................................................... 89

    **COUNT I** ....................................................................... 89

        **Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder** ............................................... 89

    **COUNT II** ..................................................................... 90

        **Violation of §20(a) of the Exchange Act** .......................... 90

    **COUNT III** ................................................................... 91

        **Violation of §11 of the Securities Act** ............................... 91

    **COUNT IV** ................................................................... 93

**Page**

Violation of §15 of the Securities Act ................................................... 93

XIII.   PRAYER FOR RELIEF ....................................................................... 94

XIV.   JURY DEMAND ................................................................................. 94

Lead Plaintiffs Local #817 IBT Pension Fund ("Local #817"), Local 272 Labor-Management Pension Fund ("Local 272"), and Local 282 Pension Trust Fund and Local 282 Welfare Trust Fund ("Local 282"), as well as named plaintiff Norfolk County Retirement System ("Norfolk") (collectively "Plaintiffs"), allege the following based upon the investigation of Plaintiffs' counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by XPO Logistics, Inc. ("XPO" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, interviews with former employees of XPO, and media reports about the Company.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

I.      **NATURE OF ACTION**

1.      This is a federal securities class action brought on behalf of a proposed class (the "Class") of all purchasers and acquirers of XPO common stock between August 3, 2016 through and including February 14, 2019 (the "Class Period"), including those who purchased or otherwise acquired XPO common stock issued in or traceable to XPO's July 20, 2017 Secondary Offering ("Secondary Offering"), against XPO and certain of its senior officers and directors seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act") and the Securities Act of 1933 (the "Securities Act").

2.      Headquartered in Greenwich, Connecticut, defendant XPO is a publicly-traded transportation and logistics company.  Prior to the second quarter of 2016 ("2Q16") XPO consistently lost money and failed to grow profits.  That all changed

when XPO, through its acquisition of another company, inherited a lucrative business relationship with one of the largest companies in the world.

3.      XPO kept the importance of this single customer hidden from the market.  The customer was Amazon.

4.      From August 2016 into 2018, defendant XPO and certain of its executive officers concealed the Company's secret growth ingredient from investors – instead proclaiming that an investment in XPO gave them exposure to broad-based growth. That growth, according to Defendants, rested on "a diversified customer base that minimize[d] concentration risk."

5.      Yet Defendants knew that Amazon, not a diversified customer base, was materially responsible for XPO's above-industry growth rates during the Class Period and, critically, that the Company's Amazon-induced growth rates were going to come to an end.  XPO knew that its growth rates were unsustainable because Amazon informed XPO that it was not going to do business with the Company over the long term.  Despite possessing this critical information, Defendants misled investors during the Class Period, publicly telling the market that they were not aware of any "unsustainable" business conditions contributing to XPO's newfound profitability.

6.      In or around April 2018, however, XPO's underlying operating conditions started to stall.  XPO's core business started to slow because, at the time, Amazon had begun acting on its stated business plans to leave XPO.  Famously competitive, Amazon accelerated its departure right around the time that XPO took actions that conflicted with Amazon's business interests.  First, on April 23, 2018, XPO announced that it had hired away one of Amazon's top executives to serve as

- 2 -

XPO's new Chief Operating Officer ("COO"), and then, the next day, XPO rang the New York Stock Exchange ("NYSE") opening bell to announce a new service that competed directly with one of Amazon's core business offerings.

7.     Amazon clearly took notice.  It started lowering the amount of freight that it shipped via XPO and similarly started shutting down XPO fulfillment centers that otherwise would have continued to handle logistics for Amazon deliveries to end-customers.  Amazon's gradual departure began to depress the volume of freight that XPO shipped in its transportation networks.  Amazon's methodical exit likewise lowered the volume of goods that XPO processed at the order fulfillment centers that XPO ran exclusively for Amazon.   These declining operating activities were essentially the beginning of the end of Amazon's business relationship with XPO.

8.     Despite the fact that losing Amazon caused severe operational and strategic problems for XPO, Defendants successfully concealed those problem from investors.  To that end, XPO publicly represented to investors that lower shipping volumes were part of a supposed "strategy" or "decision" by XPO to improve the profitability of its transportation business.  Behind the scenes, however, XPO was scrambling unsuccessfully to find new customers who could fill the hole left by Amazon.

9.     As Amazon started to leave, XPO similarly began suffering declines in its logistics business.  Around the April 2018, Amazon began pulling material concentrations of business from fulfillment centers that XPO operated exclusively for Amazon, with Amazon ultimately winding down its logistics business over the summer of 2018.

10.     Although XPO felt the effects of Amazon's exit by the summer 2018, Defendants tried to hide from the public that the Company's secret growth ingredient was going away.  When Amazon had taken sufficient business away from XPO that it materially contributed to an "earnings miss" in the third quarter of 2018 ("3Q18"), for example, Defendants publicly (and misleadingly) blamed the miss on a customer in England whom XPO labelled a "rounding error."   In fact, Amazon was a material contributing factor to the third quarter earnings miss and was the polar opposite of a "rounding error" customer.  Amazon was, at the time, XPO's largest customer by revenue, generating above-average earnings margins that had historically propelled XPO's premium growth rates.  Amazon was also essential to those growth rates because Amazon itself was growing at over 45% during 2016-2018 alone, meaning its key vendors could also grow at significant rates – assuming those vendors could hold onto Amazon.

11.     As Defendants continued to conceal Amazon's departure from investors during the summer of 2018, XPO made unexpected announcements that its Chief Financial Officer ("CFO") (defendant John J. Hardig ("Hardig")) and its Chief Strategy Officer ("CSO") (defendant Scott B. Malat ("Malat")) would be resigning.  Those two executives had appeared with XPO's Chairman and Chief Executive Officer ("CEO"), defendant Bradley S. Jacobs ("Jacobs") for years to make reports to investors and answer their questions during earnings calls.  They were essentially the face of the Company from the market's point of view.  But in the summer and fall of 2018, they left Jacobs to face investors alone.

12.     Defendant Jacobs concocted a plan around this time that would hide the loss of XPO's largest customer, Amazon.  As defendant Jacobs attempted to blame

- 4 -

the entirety of XPO's third quarter of 2018 miss on the "rounding error" customer, he also told investors that XPO had decided to re-engage in active discussions with potential merger partners.

13.     By December 2018, XPO was indeed close to completing a merger that would have purportedly "doubled" XPO's size, according to defendant Jacobs.  If XPO had succeeded in completing this merger, the new, combined company would have filed combined or "consolidated" financial statements for the year, making it nearly impossible for investors to see the toll that losing Amazon's business had taken on XPO as a standalone company.

14.     But that plan fell apart when XPO management let slip negative financial information to a few investors during trading hours at a private lunch meeting on December 11, 2018.  Trading authorities caught wind of the leak on December 12, 2018, and halted trading until XPO disclosed the negative information to the entire market.  XPO then reported materially lower growth rates and financial performance for 2018 and beyond, reflecting the evaporation of XPO's secret growth ingredient, Amazon.  That negative financial information immediately depressed XPO's stock value and scuttled merger discussions for the rest of 2018.

15.     Having failed to complete the merger, XPO had no place left to hide the Amazon loss by the time it filed its 2018 SEC Form 10-K ("10-K") and publicly gave financial guidance to the market in February 2019.

16.     Thus, on February 14, 2019, XPO publicly revealed that it had lost its "largest customer."  XPO employees revealed the identity of that customer to the press – it was Amazon.  Even as XPO management admitted that XPO was losing its largest customer, management *still* maintained that the loss was a complete

- 5 -

surprise.  Defendant Jacobs claimed that Amazon had left "quickly" and "abruptly."
Nothing could have been further from the truth: Amazon had in fact told XPO that it
was not going to stick around over the long term and had actually started acting on
that decision approximately ten months before Jacobs's feigned surprise
announcement in February 2019.

17.    Throughout the Class Period, Amazon's actions materially affected
XPO's operations, results and prospects as the Company grew.  Consequently,
XPO's largest customer also had a material financial impact on XPO's operations,
results and prospects as Amazon started to cut its business ties with the Company.
Given how important Amazon was to XPO as a customer, Defendants knew or
reasonably should have known these material facts.  XPO's concealment of these
facts rendered numerous public statements by Defendants materially false and/or
misleading.  Similarly, Defendants' repeated material omissions of these facts from
XPO's Class Period quarterly and annual SEC filings also violated their disclosure
obligations under 17 C.F.R. §229.303 ("Item 303").[1]

II.    JURISDICTION AND VENUE

18.    The claims asserted herein arise under and pursuant to §§11 and 15 of
the Securities Act, 15 U.S.C. §§77k and 77o, and §§10(b) and 20(a) of the Exchange

---

[1]    Item 303 helps to ensure that issuers provide investors with information that
might reveal material problems, including adverse trends or changes in financial
condition and results of operations.  In effect, the Item 303 disclosures in Regulation
S-K required Defendants to: (1) ensure that the information exists; (2) confirm it is
accurate; (3) determine whether and how to disclose it, including ensuring sufficient
disclosure; and (4) disclose the information.  As alleged in more detail *infra* (*see*
¶¶229-236), Defendants' material omissions and failures to include adequate
disclosures as required by Item 303 rendered XPO's quarterly and annual SEC filings
materially false and misleading.

Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

19.     This Court has jurisdiction over this action pursuant to §22 of the Securities Act, 15 U.S.C. §77v, §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1331.

20.     Venue is properly laid in this District pursuant to §22 of the Securities Act, §27 of the Exchange Act, and 28 U.S.C. §1391(b) and (c).  XPO's corporate headquarters is in this District and many of the acts and conduct complained of herein occurred in substantial part within this District.

21.     In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications and the facilities of the NYSE, a national securities market.

III.    PARTIES

22.     Lead Plaintiff Local #817 purchased shares of XPO common stock during the Class Period, as set forth in its certification previously filed with the Court and incorporated herein by reference, and was damaged thereby.[2]

23.     Lead Plaintiff Local 272 purchased shares of XPO common stock during the Class Period, as set forth in its certification previously filed with the Court and incorporated herein by reference, and was damaged thereby.[3]

---

[2]    An updated certification reflecting Local #817 IBT Pension Fund's relevant transactions in XPO common stock with respect to the operative Class Period is attached hereto as Exhibit A.

[3]    An updated certification reflecting Local 272 Labor-Management Pension Fund's relevant transactions in XPO common stock with respect to the operative Class Period is attached hereto as Exhibit B.

24.     Lead Plaintiff Local 282 purchased shares of XPO common stock during the Class Period, as set forth in its certification previously filed with the Court and incorporated herein by reference, and was damaged thereby.[4]

25.     Named plaintiff Norfolk purchased shares of XPO common stock issued in or traceable to XPO's Secondary Offering.[5]

26.     Defendant XPO is a Delaware corporation with its principal place of business in Greenwich, Connecticut.  The Company trades on the NYSE stock exchange under the ticker symbol "XPO."  XPO claims that it is "is a top ten global logistics provider of cutting-edge supply chain solutions to the most successful companies in the world."

27.     Defendant Jacobs has been the Chairman and CEO of XPO since September 2, 2011.  Jacobs is also the managing director/member of Jacobs Private Equity, LLC, which, according to SEC filings made by XPO between 2016 and 2019, was either the largest or the second largest Company shareholder.  According to an Annual Proxy Statement filed by XPO on April 18, 2018, Jacobs possesses an "[i]n-depth knowledge of the company's business resulting from his years of service with the company as its Chief Executive Officer."

28.     Defendant Hardig was XPO's first CFO, and served in that position from February 13, 2012 until August 15, 2018.

---

[4]     An updated certification reflecting Local 282 Pension Trust Fund's and Local 282 Welfare Trust Fund's relevant transactions in XPO common stock with respect to the operative Class Period is attached hereto as Exhibit C.

[5]     A certification reflecting Norfolk County Retirement System's relevant transactions in XPO common stock is attached hereto as Exhibit D.

29.     Defendant Malat was the CSO from July 9, 2012 until December 8, 2018. Malat first joined XPO on October 20, 2011 as its senior vice president-strategic planning.

30.     Collectively, Jacobs, Hardig and Malat are referred to throughout this Complaint as the "Individual Defendants."  Together, the Individual Defendants and defendant XPO are referred to throughout this Complaint as the "Defendants."

31.     The Individual Defendants, because of their positions at the Company, possessed the power and authority to control the content and form of the Company's annual reports, quarterly reports, press releases, investor presentations, and other materials that XPO provided to the SEC, securities analysts, money and portfolio managers and investors, *i.e.*, the market.   Certain of the Individual Defendants authorized the publication of certain documents, presentations and materials alleged herein to be misleading before they were made public and had the ability and opportunity to prevent the issuance of these false or misleading materials, or to cause them to be corrected.   Because of their positions with the Company and access to material non-public information available to them but not to the public, the Individual Defendants knew or should have known that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were false and/or misleading.   The Individual Defendants are liable for the false and/or misleading statements and omissions pled herein.

IV.   **SUBSTANTIVE ALLEGATIONS**

A.   **Company Background**

32.   **XPO raises money in the public equities market and trades publicly on the NYSE under the "XPO" symbol.  XPO provides transportation and logistics services and has corresponding "transportation" and "logistics" SEC reporting segments.**

33.   **In its transportation or freight segment, XPO manages a transportation network that offers customers various means of transporting their goods.  Some of the Company's service offerings in the transportation segment include freight brokerage, less-than-truckload ("LTL"), and "last mile" services.  The Company uses trucks to move most of its freight, and uses a blended model of owned, contracted, and brokered capacity to provide truck transportation services.**

34.   **In its logistics segment, XPO provides services that help fulfill orders of goods that are purchased on the internet.  XPO provides a number of other services in its logistics segment, including warehousing and distribution services.  XPO sometimes refers to its logistics segment as the supply chain or contract logistics segment.**

B.   **In 2016, Amazon Pushes XPO Past Its "Positive Inflection" Point, but XPO Represents Itself to Investors as a Well Diversified Company that Exposed Investors to Minimal Customer "Concentration Risk"**

35.   **A money-losing enterprise for years, XPO began growing profits and revenue in 2016 at rates that exceeded its industry peers and made it the darling of Wall Street in its industry during the Class Period.**

36.   **The second quarter of 2016 was the first time that XPO reported a profit. XPO published its results to the market on August 3, 2016, and the following day,**

told the market that the Company had passed a positive inflection point in its growth story during its earnings call with analyst and investors.  During a conference call with analysts and investors on August 4, 2016, defendant Jacobs assured investors that the Company was generating record financial growth from a well diversified base of business, concluding the call as follows:

> We started the call with saying that we're at a positive inflection point in the evolution of our Company.  And that we are reaping the rewards of the last five years.  We have built *a very well diversified*, well-functioning global business that provides significant value to our customers.
>
> The proof is in the pudding.  Look at the numbers this quarter. We had record EBITDA, way above expectations.  We had record cash flow from ops, way above expectations.  Record free cash flow.  *We have a clearly defined action plan to go from $1.265 billion of EBITDA this year to our $1.7 billion target in 2018*.

37.    Industry publications and Wall Street analysts rejoiced that XPO had reported a "dream quarter" and was finally on the road to growth.  For example, in an August 4, 2016 report, an analyst from Deutsche Bank Securities Inc. ("Deutsche Bank") wrote that, "[y]esterday after the close, XPO reported Q2 adjusted EBITDA of $354.9 million which was well above our estimate of $340.8 million and Consensus of $316.9 million."  Additionally, an analyst from Barclays Capital Inc. ("Barclays") that same day wrote, "XPO results surprised to the upside and importantly also delivered cash flow commensurate with adjusted earnings, dispelling some of the most bearish views on the company."

38.    Defendant Jacobs goaded these growth expectations during the earnings call by touting the Company's "clearly defined action plan" to grow earnings nearly 35% over the 2016 through 2018 period.

39.     From 2016 through part of 2018, Amazon materially contributed to XPO's favorable growth trajectory.  It is possible to estimate, in retrospect, Amazon's contributions based on certain facts and reasonable inferences.  XPO did not identify Amazon as its largest customer until much later, but as a frame of reference, according to the Company's 2014 10-K, XPO's then-largest customer accounted for $117 million in revenue for the calendar year 2014.  In 2015, the Company combined its financial statements with Con-Way in XPO's annual report on account of the late-2015 merger of those companies under the XPO name.  According to XPO's 2015 10-K, the combined financial statements showed XPO's largest customer accounted for $267 million in revenue in 2015.  That figure rose to $438 million in 2016 with Amazon as XPO's largest customer.[6]  Amazon contributed approximately $848 million to XPO's revenue in 2017.[7]

---

[6]  XPO did not identify Amazon as the largest customer at the time, but, in the Company's 2016 10-K, it reported that its "largest customer" accounted for 3% of $14.6 billion in revenue.

[7]   This estimate of Amazon's revenue contribution to XPO for the 2017 calendar year rests on the following facts.  Jacobs told investors on February 15, 2019 that XPO's largest customer (*i.e.*, Amazon) had grown XPO "a lot" over the past few years.  ¶148.  This admission shows Amazon contributed increasing amounts of revenue in 2016, 2017 and 2018; thus, the 2017 calendar year revenue contribution is somewhere between the revenue it contributed in 2016, and the amount of revenue that Amazon contributed to XPO in 2018 of about $900 million (although expected revenues were materially higher that year). *See* ¶150.  During a May 2, 2019 conference call with analysts and investors, defendant Jacobs referred to Amazon as getting "a little more than 1/2" of "about 11%" revenue previously.  In its 2017 10-K, XPO stated that it had "a diversified customer base that minimizes our concentration risk: in 2017, approximately 10% of our revenue was attributable to our top five customers," and that revenue for the year was $15.38 billion.  Assuming Amazon accounted for "a little more than 1/2" of the 10% figure cited in XPO's 2017 10-K, it is possible to estimate it contributed 5.5% to revenue that year or approximately $845 million in revenue.  This figure is consistent with Jacobs' later admission that the Company grew "a lot" with Amazon over the prior few years because it is higher than 2016 revenue but still about $100 million smaller than the greater-than-$950 million in

- 12 -

40.     Amazon thus grew from a $438 million annual revenue customer in 2016 to a customer that was supposed to generate over $900 million in 2018 – a 105% increase at highly material levels to XPO's overall revenue, earnings, and cash flow results.  Amazon materially contributed to XPO's above-industry growth rates during this time.

41.     All the while, Defendants knew that XPO's above-industry growth rates were unsustainable given Amazon's stated business plans.  Specifically, Amazon told XPO that it was going to cease its business relationship with XPO over the long term.

42.     Yet Defendants said nothing about Amazon's role in growing the Company as that growth occurred.  As Amazon's infusion of revenue into XPO generated favorable growth results through the second quarter of 2018 ("2Q18"), analysts asked whether XPO's growth was sustainable over the long term.  On a May 4, 2017 conference call with analysts and investors, defendant Jacobs responded to one such question during an XPO quarterly earnings call:

> [KeyBanc Capital Markets Inc. ("KeyBanc") analyst:] Let me ask it this way, is there *anything in the first quarter that you view as being unsustainable* or anything that kind of helped you if it was fuel trends in the LTL business *or something that you're watching that, that may not repeat* in the first quarter as you think about the progression through the year?
>
> [Jacobs:] *I don't,* Todd.  I think the first quarter was a quarter where we had to work hard.  And we had some headwinds, we had some tailwinds.  But internally, as an organization, it's really jelling.  And people are very focused on the right levers in order to improve both the profitability of the company and customer service at the same time.  *And it's broad-based by our different business lines and by our*

revenue that XPO had projected for 2018, and less than the approximately $900 million in revenue that Amazon ultimately contributed to 2018.

*geography.*  So I am optimistic about the year, starting off on a very good foot.

43.     Defendant Jacobs's assurances that XPO provided investors with access to a company that enjoyed broad-based growth are consistent with his and XPO's other statements assuring investors throughout the Class Period that their investment capital did not expose them to too much customer "concentration risk." ¶¶4, 45.

44.     As XPO's customer concentration risk increased in tandem with Amazon's growing importance to the Company, Defendants made disclosures that reasonable investors would interpret to mean that XPO had actually lowered its dependence upon any single customer.  Throughout its existence, XPO encouraged investors to compare its activities on a year-over-year or quarter-over-quarter basis. A reasonable investor comparing relevant disclosures from XPO's 2017 10-K with its 2016 10-K would reasonably understand that no single customer accounted for more than 3% of XPO's revenue in 2017 given the specific changes that XPO made year-over-year to its customer concentration risk disclosure.

45.     In fact, XPO purposely *deleted* the passage that had previously disclosed the size of its largest customer while making an otherwise substantially-identical disclosure in its 2017 10-K.  The following demonstrative comparison of the two provisions reveals this deletion:

Customers, Sales and Marketing

Our Company provides services to a variety of customers-, ranging in size from small, entrepreneurial organizations to ~~multi-national~~ Fortune 500 companies and global industry leaders. *We have a diversified customer base that minimizes our concentration risk*: in ~~2016~~2017, approximately $~~8~~10% of our revenue was attributable to our top five ~~clients, with our largest customer accounting for approximately 3% of revenue~~customers.

- 14 -

46.     As the comparison between XPO's 2016 and 2017 customer concentration statements shows, Defendants made a conscious choice in 2017 to remove information that would have revealed a dramatic increase in its reliance on its largest customer.  Considered in light of the text immediately preceding it about having a diverse customer base "that minimizes our concentration risk," a reasonable investor would conclude that XPO had lowered or at least maintained its customer concentration risk; not that Amazon had substantially increased XPO's customer concentration risk.  The risk was particularly material because Amazon informed XPO that its business plans were to cease business operations with XPO over the long term.  The very risk that customer concentration creates in an investment is that a big customer might leave the company and, in this case, Amazon already told XPO that it was going to leave.  *See* ¶149.

C.     **In 2018, After Enjoying Years of Above-Industry Growth Rates Thanks to Amazon, XPO "Rings the Opening Bell" at the NYSE to Announce Its Decision to Compete Directly with One of Amazon's Most Important Businesses**

47.     Nobody except for XPO and Amazon knew: (1) how important Amazon was to XPO in 2018; and (2) that Amazon's stated business plan was to leave XPO. Amazon accelerated its decision to leave XPO around the time that the Company decided to take aggressive competitive actions against one of Amazon's most important business lines: Fulfilment By Amazon ("Amazon FBA").

48.     Amazon FBA is a warehousing and distribution service that drove billions of dollars' worth of business to Amazon and is one of Amazon's central strategic initiatives because it increased the amount of money that Amazon made by selling third parties' goods on its platform.  It supported companies that wanted to

do e-commerce business but that lacked the infrastructure or expertise to run that kind of business.

49.     Sometime in 2018, XPO decided to copy Amazon FBA.  XPO called its new competing business "XPO Direct," and offered it out to all businesses that wanted to do e-commerce, which, of course, included Amazon's customers.  XPO announced the competing service on April 24, 2018, in a press release titled "XPO Logistics Launches New Flexible Distribution Model for Omnichannel Retail and E-Commerce Customers."  XPO's press release proudly announced that: (1) "'XPO Direct' speeds shipments to consumers using shared network capacity," and (2) "XPO to mark launch *by ringing Opening Bell* at New York Stock Exchange on April 25."  The announcement and ringing of the NYSE opening bell sent a clear message that XPO intended to take Amazon head-on in one of its key business lines.

50.     XPO Direct did in fact compete against Amazon FBA.  In its April 2018 press release, Defendants elaborated on XPO Direct's features.  The service put customers' goods within two days' delivery of nearly the entire U.S. population, enabling retailers and e-commerce retail businesses to store their goods close to end customers and to fulfill the end customers' orders within two days "at a fraction of the usual cost," according to XPO's April 24, 2018 press release.  In other words, XPO promoted the idea that XPO Direct was cheaper than the usual cost incurred at competing services, like Amazon FBA.

51.     A Deutsche Bank analyst later observed in a February 18, 2019 report that XPO Direct was very "similar, if not exactly like, Fulfillment by Amazon," and a comparison of the two services shows this observation was well-founded.  Amazon maintained a description of its Amazon FBA services on one of its websites in early

2018, before XPO launched XPO Direct.  There, Amazon explained that it offered its service to third parties who "sell on Amazon," just as XPO offered out its XPO Direct to third party "retail and e-commerce customers." [8]  Amazon explained that Amazon FBA "stores your products" (*i.e.*, third parties' products) at its fulfillment centers or warehouses in much the same way that XPO Direct "warehouses and last mile hubs serve as flexible stockholding sites" for third parties' products.  Amazon's website explained that it would ship "products to customers from our network of fulfillment centers" just as XPO Direct stated that sellers' "[t]ransportation needs are supported by [XPO's] brokered, contracted and owned" transportation services.  Amazon also described on its website how sellers who used Amazon FBA enjoyed access to Amazon's free "Two Day Shipping" service that its "Prime members love."[9]  XPO Direct similarly offered "broad North American footprint can position goods within two days' delivery of 95% of the U.S. population and in close proximity to retail stores for inventory replenishment."

52.    By creating a service that was "very similar, if not exactly like, Fulfillment by Amazon," XPO was taking on an Amazon business that, as evidenced by Amazon's public filings, was important to Amazon because it drove billions of dollars' worth of Amazon sales.[10]

---

[8]   *Fulfillment by Amazon*, Amazon.com, https://web.archive.org/web/20180419134422/https:// www.amazon.com/fulfillment-by-amazon/b?ie=UTF8&node=13245485011 (last checked on June 3, 2019).

[9]   *Fulfillment by Amazon – Benefits*, Amazon.com, https://web.archive.org/web/20180317230514/https://services.amazon.com/fulfillment-by-amazon/benefits.htm (last checked June 3, 2019).

[10]   According to Amazon's 2018 10-K, Amazon made net sales of $97.6 billion during 2016-18 on its third-party seller services that included Amazon's FBA's core features: "commissions and any related fulfillment and shipping fees, and other

53.     XPO took more action in April 2018 that strengthened its ability to compete against Amazon.  A day before it announced the launch of XPO Direct, the Company publicly announced in a press release on April 23, 2018 that it had recruited one of Amazon's top executives, Kenneth Wagers III ("Wagers"), to serve as XPO's new COO.  XPO said that Wagers would oversee XPO's operations in 32 countries and that he would take over that role "effective immediately."  Defendant Jacobs welcomed Wagers's "e-commerce" experience to XPO and lauded him as a prominent executive in the industry.  The April 23, 2018 press release highlighted that XPO had hired Wagers away from Amazon, stating:

> Wagers' career in the supply chain sector includes senior positions with three global leaders: Amazon.com, Dr. Pepper Snapple Group and UPS.  He was *most recently with Amazon*, where he had executive oversight of Amazon's Worldwide Transportation and Logistics business (last mile, middle mile, and air and ocean cargo), as well as Amazon China operations, Prime Now and Amazon Fresh operations.

54.     Amazon's competitive zeal is famous, and it was not happy about XPO's decisions to launch XPO Direct and hire Wagers away.  Indeed, as a Deutsche Bank analyst who had access to private meetings with senior XPO management during the relevant period observed in a February 18, 2019, report, the recruitment of Wagers from Amazon involved "teams of lawyers on both sides."  XPO ultimately won the recruiting battle, extending a substantial compensation package to Wagers.[11]  XPO

---

third-party seller services."  These net sales grew as a percentage of Amazon's overall annual net sales over the same period from 25%, to 29% to 34%.

[11]   According to an April 24, 2018 SEC Form 8-K ("8-K") that the Company filed with the SEC, Wagers served in senior positions at Amazon over the preceding five years and held senior positions at other companies before becoming a senior executive at Amazon.  The report also stated that XPO management had agreed to pay Wagers a $525,000 base salary with a target bonus of another $525,000, a cash signing bonus of $285,000, and 105,000 shares of stock to vest in equal installments over ten years.

succeeded in securing a non-compete provision from Wagers, which effectively barred him from returning to work for Amazon for a number of years given XPO's decision to launch XPO Direct a day after hiring him.  One industry source revealed that Amazon had asked XPO, in 2018, to "reconsider" its decision to recruit Wagers from Amazon.  Other former XPO employees reported hearing rumors that Amazon left XPO because of Wagers.

55.    Facts allow a reasonable inference that Amazon had already decided to stop doing business with XPO even before it decided to compete with one of Amazon's top businesses.  Most importantly, as defendant Jacobs would admit later, XPO knew that Amazon was not going to do business with XPO over the long term.  This admission shows there was no single event in 2018 that prompted Amazon to leave XPO.  Rather, Amazon's 2018 actions were consistent with the business plans that it had revealed to XPO all along.

56.    For example, according to a February 20, 2019, online *FreightWaves.com* article, Amazon reportedly stated that it was "'ridiculous'" to say that Amazon would purposely attempt to injure XPO as "revenge" for hiring Wagers.  Amazon's actions following XPO's announcements that it was going to compete with Amazon directly, however, do lead to the strong inference that XPO's competitive activities were at least an important factor that Amazon considered when determining *when* to leave XPO.

D.    **Around the Time that XPO Launches a Business Competing with Amazon, Amazon Accelerates Its Wind Down of XPO Business**

57.    There are several examples demonstrating that Amazon began acting on its plans to leave XPO sometime around April 2018.

58.     As one illustration, Amazon began shutting down its business with XPO at a fulfillment center that XPO ran for Amazon in the Kansas City area.  Given its location in the middle of the United States and its transportation infrastructure, Kansas City is an important logistics hub.  According to a March 1, 2019, *Logistics Management* article, one industry executive explained to the monthly publication that Kansas City's "'central location, highway and rail infrastructure as well as our air cargo capabilities allow us to reach 85% of the U.S. population in two days or less,'" and many "'companies such as Amazon, Jet.com, Overstock.com, CVS, Turn 5 and others have selected KC in the last few years to take advantage of this market reach.'"  According to a January 29, 2019, article in the *Kansas City Business Journal*, this location served as the site of XPO's "Edgerton" fulfillment center that XPO ran for Amazon since 2016.

59.     A former XPO Edgerton XPO warehouse employee ("FE-1") confirmed that the warehouse managed only Amazon business.[12]  This former employee chose to leave XPO after observing "red flags," including the slowing down of in-bound Amazon merchandise, as well as a concurrent slowing down of outbound merchandise, neither of which he said boded well for the warehouse's prospects.  According to FE-1, inbound and outbound Amazon activity definitely began declining around the end of March and/or beginning of April 2018.  FE-1 said that in the May-July 2018 time frame, the amount of outbound goods being shipped to customers from Edgerton went from around 1,100 – 1,200 a day *to 750 units* a day.  During the peak season, the amount of outbound goods could be as high as 2,800 units a day

---

[12]   FE-1 worked at XPO as a PIT Operator, Order Picker Trainer, Put-Away Routing Specialist, and Receiving Dock Unloader from November 2017 – July 2018.

and even in January and February 2018 the daily shipments could be around *1,800 – 2,200* units a day.

60.     Another former XPO employee who worked at the Edgerton warehouse ("FE-2") explained that the Edgerton fulfillment center started slowing down in 2018. As early as April/May 2018, FE-2 began seeing warehouse racks that typically store Amazon goods "getting pretty empty."[13]   And, according to FE-2, as 2018 went along, there were clear signs of activity at the center beginning to slow down.  That the activity was not picking up in the July/August 2018 timeframe (or thereafter) was "not right" because this period was the beginning of the peak season months. Furthermore, by August/September 2018, which usually was the time when the inbound receiving personnel at the plant should have been getting busy as peak season got underway, these personnel sometimes had so little to do that they were reassigned to the shipping department so that they got enough hours to work.  FE-2 suspected "something" had been "going on" with the center, and believed the suspicion was confirmed by XPO's eventual announcement that it would close the Edgerton warehouse.

61.     Yet XPO waited until 2019 to announce the fact that it was closing the facility, and this triggered a requisite notice pursuant to the Worker Adjustment and Retraining Notification Act of 1988 ("WARN") that predictably led to press reports, like a January 29, 2019, article in the *Kansas City Business Journal* about XPO's closing the facility.  The slowdown in business at XPO's Edgerton facility should have *at the very least* been a "red flag" to Defendants that Amazon was starting to act on its stated business plans to wind down the business it gave to XPO.  More

---

[13]   FE-2 worked at XPO as a Pit Operator beginning in October 2017.

plausibly, it was an action that Amazon took after simply telling XPO that it had decided to start acting on its plans to wind down its business with the Company.

62.     Other witness accounts corroborate FE-1's and FE-2's observations, showing Amazon started to pull its business from XPO by the end of March or early April 2018.  Specifically, in the first quarter of 2018 ("1Q18"), an Amazon Area Manager ("Amazon Manager") started seeing fewer XPO trailers at five different Amazon warehouses that he visited as part of his job.  "When that happened all the XPO trailers disappeared from the yard," the Amazon Manager explained.  The Amazon Manager elaborated, "that's when you noticed" the decline, "when there's 400 trailers sitting out there and you use to see XPO all the time and then all of a sudden there's none, you know it's an obvious sign."

63.     The Amazon Manager had previously worked for XPO and was in position to observe trends as a result of visits to the five different Amazon warehouses.  These observations are consistent with the slowdown that FE-1 and FE-2 witnessed.  Importantly, those two accounts related to XPO's "logistics" segment, while the Amazon Manager's accounts relate to XPO's "transportation" segment.  Altogether, these facts demonstrate that Amazon was slowing the amount of business it gave to XPO in both of its major segments at about the same time.

64.     Notwithstanding the warning signs that Amazon had started putting into motion its stated business plans of leaving XPO, in May 2018, XPO *re-affirmed* the 2018 financial guidance that it had given on February 7, 2018, before Amazon had begun acting on its plans to leave XPO.  In a May 2, 2018, 8-K press release, presentation, and slides publicly filed with the SEC, XPO "reaffirmed both targets in [its] outlook: adjusted EBITDA of *at least $1.6 billion* for full year 2018, and 2017 –

- 22 -

2018 cumulative free cash flow of *approximately $1 billion*."  Previously, on February 7, 2018, XPO reported in an 8-K that for "2018, [XPO] reaffirmed [its] target for adjusted EBITDA of at least $1.6 billion, and raised [its] 2017-2018 cumulative free cash flow target to approximately $1 billion, from approximately $900 million."

65.     In other words, Defendants' 2018 financial guidance from May 2, 2018 (and repeated the next day) was exactly the same as the financial guidance that Defendants gave to the market on February 7, 2018.  This guidance was false (or at the very least misleading) because it included Amazon projections that defendant Jacobs knew or should have known could not come to fruition when Amazon had already started to leave XPO.  The Amazon departure would have (and should have) changed projections in the ordinary course because, as defendant Jacobs admitted, XPO generated the numbers following a "bottoms up" process.  Building forecasts in that manner necessarily would consider the Company's *top customer*.

66.     XPO's May 2, 2018 financial guidance was all the more misleading because defendant Jacobs had previously promised investors that he would let them know if there were any changes to the Company's internal numbers that would affect guidance.  On February 8, 2018, Jacobs told analysts and investors during a conference call:

> So the way we get those numbers is *we do it bottoms up*.  So we have every part of our organization, pressure test its best-case scenario, its worse-case scenario, its likely-case scenario, and we aggregate all that, and that comes to *$1.6 billion* or more of EBITDA in this year.  *So we're sharing with you the same internal numbers that we have, and those are the numbers*.  We feel very good about growing EBITDA another 17% in 2018 over 2016 (sic) [2017], and we feel very good about generating about $1 billion of free cash flow over 2017 and 2018, and *those are the numbers that we internally have.  If, for some reason, those change over the course of year, we'll let you know that when they change*.  But we're not going to change them just because people want us to change them.  Those are the numbers, and they're really good ones.

67.     Unfortunately for the Company, between February 2018, when Jacobs discussed XPO's 2018 guidance, and May 2, 2018, when XPO reaffirmed guidance, the risks of Amazon taking business away from XPO had increased and started to materialize around the time XPO recruited Wagers away from Amazon and the Company launched XPO Direct.  Defendant Jacobs could have easily conveyed this information to investors at the time and made appropriate adjustments to the Company's growth plans.

68.     Instead, when XPO held a conference call with analysts and investors on May 3, 2018, defendant Jacobs reaffirmed XPO's full-year guidance, and worse, told investors that there was *no reason* to think the business would slow relative to what XPO management had planned in February 2018.   Defendant Jacobs's reassurances assumed that Amazon would *not* start pulling business at any point in 2018 when the opposite was true:

> [Deutsche Bank analyst:] *[I]s there any kind of reason to think the revenue and EBITDA growth* of the business is actually very strong, not even just the 11% or the 10.4% you did last quarter, but really kind of even within that high single-digit framework that you provided. *Is there any reason to think kind of that type of revenue growth and EBITDA growth that you're achieving even this year slows*? If you can just help us think about that as you look at the pipeline of new business, because that is kind of top of mind right now, especially in the transportation segment?
>
> [Jacobs:] *Sure.  There is no reason to think it's going to slow*, and I don't know that we're in any better position than everyone else to predict what the economy is going to do over the next few years. . . . So for the time being and for the foreseeable future, absent some geopolitical events, *life looks good, at least from our point of view just looking at our customers and seeing what our customers are doing and saying*.

69.     This statement was materially misleading at the time because Amazon's actions demonstrated that it had started to act on its previously-stated intention to

stop doing business with XPO.  Amazon was XPO's largest customer, but, as the entire world knew at the time (including defendant Jacobs), Amazon also represented one of the most important players in the e-commerce market as a whole. No reasonable executive in Jacobs's shoes could have believed there was "*no reason*" to think the Company would not meet the revenue and earnings growth that XPO had planned at the beginning of the year, given that: (1) XPO internally *projected* Amazon would generate over $950 million in revenue for 2018 in February 2018; (2) Amazon's stated business plans were to leave XPO over the long term; and (3) Amazon started leaving XPO in the March/April 2018 time frame.  As Jacobs knew or should have known, these conditions meant that XPO was losing an important customer and business partner that gave XPO access to the e-commerce market.

70.    Analysts rejoiced after the call where Defendants: (1) reaffirmed XPO's full year guidance; and (2) emphasized that XPO remained confident in its guidance despite starting to compete against Amazon.  For example, in a May 4, 2018 report, Morgan Stanley credited Jacobs's comments that "life looks good" with regard to XPO's projected earnings and revenue growth, explaining that:

> We see little to no threat of new entrants being able to make a mark quickly in the last mile space despite recent headlines and we believe CL [contract logistics] remains one of the last businesses to be 'Amazon-ized' as XPO's large retail and industrial customers are likely unwilling to hand over their entire supply chains to AMZN to control.

In that same report, Morgan Stanley also credited XPO's story that its customers kept giving XPO positive reviews to the Company in the wake of its Amazon-related announcements, and reaffirmed its price targets on the present value of increasing earnings, showing that "[o]ur 2018-2020 EBITDA estimates are relatively unchanged at $1.6 bn, $1.8 bn, and $2.0 bn, respectively, and our PT stays at $125."

- 25 -

71.     Amazon is well-known for its aggressive, competitive approach to business after having originally disrupted the "bricks and mortar" bookstore industry and applied that approach to other areas of the global economy ever since. The apparent fact that Amazon was not affirmatively taking away any of XPO's business following XPO Direct's debut (reflected in XPO's decision to *reaffirm* 2018 guidance) reassured the market.  Yet the public did not know that Amazon was XPO's largest customer at the time, accounting for more than $950 million in projected revenue for 2018 alone.  As a result, investors had no reason to doubt that the $950-plus million revenue stream that XPO management had budgeted into its internal 2018 forecast in February 2018 would continue into 2019.

72.     Moreover, to the extent that any investors had any concerns about XPO's relationship with Amazon, defendant Jacobs reassured them that they had nothing to worry about.  On or around May 9, 2018, Jacobs appeared on the *CNBC* television show "Mad Money" hosted by Jim Cramer ("Cramer") to that end.  The show's host noted how XPO and Amazon had recently "blown away the numbers" and that XPO and Amazon were "synergistic" in some ways.  Jacobs responded:

> [Jacobs:] Amazon's growing so much faster than we are.  We're proud that we grew 11% (organically) in the first quarter, so compared to other transportation companies, we're at the top.  Amazon grew 45%.

> [Cramer:] That's true.

> [Jacobs:] They are twice the size of themselves every two years.

> [Cramer:] But you play a big role in trying to get bigger . . . packages to people[] everywhere.

> [Jacobs:] Absolutely.  And we have Amazon as *a customer* and we have *many other ecommerce players* as a customer.  We're *facilitating their growth*.

73.     Between May 3 and 8, 2018, the market responded favorably to XPO's many assurances.  On May 3, 2018, defendant Jacobs told the market (before it opened) that he had no reason to think the Company's outlook would change and that "life looks good" based upon what its customers were saying and doing, which, as he knew (or should have known), included its biggest customer Amazon.

74.     Yet Defendants knew that their new XPO Direct business could not come even close to replacing the business that XPO was losing and would keep losing from Amazon.

75.     Defendants leaked this fact in a private meeting with analysts from Deutsche Bank.  Deutsche Bank then issued a public report after the meeting, commenting in a July 19, 2018 report that XPO "expected [XPO Direct] to be a $1B revenue business in a 'few years' – from $0 last year."  This demonstrates that Defendants understood that any new revenue from XPO Direct could not offset the lost revenue from Amazon.  XPO's declining tonnage numbers showed the same thing, as discussed below.

E.     XPO Tells Investors that "Nothing Has Slowed Down," Despite Knowing Its Top Customer Had "Slowed Down"

76.     XPO historically tracked "tonnage" or the amount of weight shipped by its transportation segment as an important metric that helped the Company determine how to allocate resources and also to determine underlying operating growth trends.  Defendants Jacobs reviewed tonnage reports in the ordinary course of business and reported tonnage statistics to investors during the Class Period.

77.     By way of background, XPO regularly tracks tonnage, and bases its resource needs on these reports.  The tonnage reports are generated and reviewed daily.  The reports are not customer specific, but when tonnage numbers are down,

District Managers could reach out to the sales department to learn why the numbers dipped and what could be done to reverse this decline.  XPO sales reports would break down tonnage on a per-customer basis.  Employees at the Director level and above had access to sales reports, but it was easier for a District Manager to simply call a sales director to ascertain what was generating lower tonnage numbers.  XPO had Quarterly Business Reviews (QBRs) where the Director of Operations and Director of Sales would present their regional numbers on a quarterly basis.  Jacobs attended these meetings from time to time.

78.     Moreover, according to a February 14, 2018 letter from XPO to the SEC, defendant Jacobs conducted one-on-one weekly meetings with the head of the transportation segment during the Class Period, and such meetings included discussions about "customers won, lost" and potential new customers.  Such discussions clearly would have covered negative developments with the Company's largest customer, Amazon.

79.     The tonnage and sales reports show Amazon's decision to leave XPO continued to impact XPO during the May / June 2018 period, as facts provided by a former XPO employee ("FE-3") demonstrate.  FE-3 had a role in selling XPO's services to other businesses during this time frame.[14]  While still employed by XPO, FE-3 heard "that Amazon left."  Shortly before FE-3 left XPO in summer 2018, FE-3 and others received a "tonnage report" showing "tonnage" was down in various territories and regions *because of a drop in tonnage from Amazon*.  FE-3's team was asked to try to replace some of that business by selling more tonnage to other

---

[14]  FE-3 was an Account Executive in XPO's sales division for a number of years leading up to May 2018.

customers.  FE-3 did not believe that Amazon had fully left prior to FE-3's review of the tonnage reports (shortly before June 2018), but recalled that Amazon had gradually started to slow down its business with XPO.

80.     The Amazon Manager referenced above, *see* ¶62, who served in that role during the Class Period, also witnessed events consistent with FE-3's recollection. The Amazon Manager worked in the LTL side of the transportation business, corresponding to XPO's LTL business line in its transportation segment.  The term "LTL" refers to "less-than-truckload," and is a common business term in the freight business.  XPO explains in its SEC filings that LTL refers to the transportation of a quantity of freight that is larger than a parcel, but too small to require an entire truck, and is often shipped on a pallet. It further explains that an LTL carrier typically operates a hub-and-spoke network that allows for the consolidation of multiple shipments in different trucks.  Consistent with XPO's LTL description, the Amazon Manager explained that XPO had been transporting Amazon merchandise between Amazons fulfillment centers and also delivered LTL deliveries to Amazon retail customers.

81.     The Amazon Manager explained that Amazon "dropped" the XPO LTL business prior to summer 2018.  In 1Q18 or 2Q18, the Amazon Manager recalled reading a story on an internal Amazon intranet newsletter that related to XPO.  The internal Amazon newsletter stated that Amazon was dropping XPO LTL.  This information is significant because it corroborates FE-3's accounts about "tonnage" reports, which measure LTL shipments.

82.     Defendants' public admissions further corroborate those of the Amazon Manager and former XPO employees.  They demonstrate that XPO did in fact track

- 29 -

LTL "tonnage," that senior management reviewed (and reported) LTL "tonnage" figures, and that tonnage was going down.

83.     Unfortunately, Defendants chose to mislead the market about *why* those tonnage trends had changed.  In the time period leading up to May/June 2018, XPO reported tonnage figures that were consistently increasing throughout the 2017 period then started to decline in the quarter ending March 2018 (by 1.1%) and continued falling throughout 2018 at levels that are material when compared to the tonnage growth levels that XPO enjoyed while its business with Amazon grew in 2017.  The increasing figures in 2017 are consistent with defendant Jacobs's later admissions that Amazon grew XPO "a lot" during this time frame and are consistent with the tonnage reports demonstrating that Amazon (by itself) could materially affect the amount of tonnage that XPO managed on a company-wide basis.  The declining figures in 2018 are consistent with FE-3's and the Amazon Manager's accounts that Amazon had started to leave XPO in the first or second quarters of 2018.[15]

84.     Reports that Amazon was lowering its business with XPO during the first half of 2018 are consistent with other examples of how that decision unfolded at particular warehouse facilities that were dedicated to serving only Amazon.  Thus, Defendants could not have been confused at the time about whether it was Amazon or some other customer lowering its business with XPO.  One of those warehouses served Amazon's end customers in Baltimore, Maryland and was known internally as

---

[15]  The tonnage statistics increased in daily tonnage throughout 2017: +4.8% (1Q17); +7.1% (2Q17): +5.6% (3Q17): and +2.9% (4Q17).  Then, in 2018, they started declining throughout the year relative to 2017, as the Company reports statistics based on a year-over-year changes: -1.1% (1Q18); -0.6% (2Q18); -1.5% (3Q18); -1.1% (4Q18).

the "AZM" warehouse.  Another former XPO employee who worked at the AZM warehouse as a planning analyst between the spring of 2017 and the fall of 2018 ("FE-4"), knew by June 2018 that Amazon was leaving.  FE-4 also saw a June 2018 email from Jeffrey Kenyon ("Kenyon"), XPO's Vice President of Supply, to Thomas Matte ("Matte"), the Director of AZM, stating as much.

85.     FE-4 recalled that Kenyon's June 2018 email indicated that the Amazon contract was ending in September 2018, and that local management should not let any of the other employees know about it.  FE-4 further recounted how it was "exactly" right to understand the email in substance to mean that XPO was losing Amazon and "they knew it," referring to XPO management.  The June 2018 email from Kenyon indicated that management would try to get an extension, but this was a problem because, as FE-4 understood the email, it meant that XPO was not going to get a multi-year renewal of the business.  Although FE-4 could not recall the length of the extension, FE-4 did explain, "[i]t just said we are going to get an extension and don't worry about it, I don't know when the 6-month term actually came up, I actually personally thought they were only going to get 3 months . . . *it just said we are going to get an extension and we're going to wind down the warehouse.*"  Kenyon's June 2018 email told Matte not to inform other employees about the fact that Amazon was leaving – not to "panic" the employees.

86.     The substance of the June 2018 email from Kenyon to Matte is consistent with the actions that Amazon took at the Baltimore AZM fulfillment center around that time.  Around June 2018, FE-4 explained that the number of trucks delivering Amazon packages inbound to the AZM warehouse fell from about twelve full tractor trailers per day to about three or four per day.  The daily number of units

that XPO processed inside of the facility fell from the usual 5,000-6,000 to about 2,000 per day.  During that same time, inventory dwindled to 46%.  According to FE-4, "[t]hat's not normal for a warehouse that usually should be 80% to 90% stocked, and it kept getting worse," down to 40% by September 2018.  The department that received in-bound Amazon packages dropped from 21 to 10 employees in June 2018. "Something's wrong here," FE-4 explained, "*it's kind of like you walk into a store and the shelves are half empty.*"

87.     As another example, during the peak "Amazon Prime" season in July 2017, AZM processed approximately 11,000 to 12,000 packages per day, but during the next Prime season in July 2018, that number dropped by approximately two-thirds (*i.e.*, 4,000), according to FE-4.  When lower-level employees asked questions about whether Amazon was going to renew its contract with AZM, management told them it was going to get a renewal, knowing that XPO was only going to get a short extension as the June 2018 email and related actions demonstrated.

88.     Another former XPO employee who worked at the AZM fulfillment center between spring and fall 2018 ("FE-5") corroborated FE-4's account of events at that center.  FE-5 observed that there "wasn't much work coming in" to the facility during the summer of 2018 and that the number of products to "pick" for outbound delivery was getting "lower and lower" during this time.

89.     In April 2018, FE-5 worked around 40 hours per week (plus overtime) but, by August 2018, FE-5's hours were reduced to 32 hours per week with no overtime.  Consistent with FE-4, this former employee (*i.e.*, FE-5) also left XPO in fall 2018 because there was not enough work.  FE-5 similarly heard that Amazon was going to end its contract with XPO.

- 32 -

90.     Consistent with FE-4's account that Amazon was not going to renew its multi-year contract in September 2018 – and only gave XPO an extension lasting a period of three or six months to wind down the business – XPO provided employees a legally-required thirty day WARN notice in January 2019.  The press picked up on that event and reported it.

91.     As the *Baltimore Sun* reported in a January 29, 2019 article entitled, "XPO Logistics will close Harford County warehouse in March," XPO would close the 571,000 square foot warehouse "by the end of March [2019], a company spokesperson confirmed" – that is, six months after September 2018, reflecting the six-month extension to the multi-year contract that Amazon told XPO it was not going to renew.  Amazon acted on its decision not to renew its multi-year contract ending on September 31, 2018, telling XPO in June 2018 (at the latest) and beginning to act on that decision soon after.

92.     Amazon took similar actions at other XPO fulfillment centers.  FE-4 explained that XPO managed another fulfillment center in Texas for Amazon that XPO called "AZT."  That facility also began to wind down operations in the summer of 2018 with XPO providing a WARN notice of mass layoffs in August 2018 in advance of closing in October 2018.

93.     The warehouses were part of a program that Amazon developed with XPO whereby XPO would provide warehousing and logistics support to help fulfill Amazon orders.  Accounts by former employees about the Edgerton, Aberdeen, and Texas facilities demonstrate that Amazon was systematically lowering the amount of business that it did with XPO in 2018.  These reports relate to the "logistics" side of

XPO's business and are consistent with accounts about declining Amazon tonnage numbers on the other side of XPO's business – the "transportation" business.

94.     In short, by the end of the summer 2018, there was little doubt Defendants knew (or should have known) that Amazon was indeed acting on its stated business plan to leave XPO.  Despite this understanding, on August 2, 2018, XPO reported its quarterly results and *reaffirmed* full-year guidance of $1.6 billion in earnings and $1 billion in free cash flow.  Defendants gave these assurances to the market as the severity of XPO's tonnage statistics worsened in real terms (down 0.6% on the quarter) and relative terms (7.7 percentage points worse than the same quarter the prior year), and as its logistics relationship with Amazon continued to deteriorate, as evidenced by the drop in units shipped at the Aberdeen warehouse during Amazon Prime week in July 2018 to about 4,000 units per day from 11,000 to 12,000 units per day during Amazon Prime week in July 2017 and the stall at the Edgerton facility at the same time.  These circumstances unfolded while Amazon – as defendant Jacobs noted on "Mad Money" – continued its historic growth surge.

95.     The juxtaposition of Amazon's explosive growth against Amazon's declining business interest in XPO is telling.  Rather than simply explaining to the market that Amazon was lowering its business with XPO pursuant to Amazon's stated business plans, and that XPO was working hard to make up the slack, defendant Jacobs told analysts and investors during a conference call hosted by the Company on August 2, 2018, that XPO's "focus is not on tonnage growth" but on "selecting the right tonnage that matches our network and deselecting freight that doesn't match our network and to get the right price, the right yield for the premium service that we provide."

- 34 -

96.     During the August 2, 2018 conference call, defendant Jacobs stated in response to an analyst question that he "would not guide you to expecting some big tonnage increase" because "it's not what we're trying to do.  We're trying to get the right mix of tonnage."  Defendant Jacobs's assurance is misleading at best because a material concentration of the tonnage decline flowed from Amazon's declining business and XPO clearly was not "trying" to lose that business for any reason.  XPO was doing everything it could, internally, to make up for the lost Amazon tonnage but simply failed to do so because Amazon was too large to replace.

97.     This conference call was defendant Hardig's last.  XPO announced his abrupt departure the day before this call and gave no explanation whatsoever as to why Hardig was resigning without any notice.  XPO had no permanent CFO to replace Hardig at the time and therefore appointed another employee to serve on an interim basis.

98.     Hardig's resignation – the Company could not even feign he was "retiring" – was surprising at the time.  But, as J.P. Morgan wrote in an August 1, 2018 report, XPO had an acting CFO (*i.e.*, Sarah Glickman), and "CEO Jacobs and CSO Malat provide continuity with the investment community," so the news was not too disruptive at the time.

99.     Nor should it have been, considering the strong assurances that defendant Jacobs gave on August 2, 2018, that the Company was on track to make all of its financial targets for 2018.  In response to analyst questions, Jacobs reaffirmed and reassured investors that nothing had changed with respect to the Company's 2018 financial guidance.  With regard to XPO's revenue outlook for the rest of 2018:

- 35 -

[Citigroup analyst:] In terms of revenue [growth of 11% referenced in the analyst's prior question], does it feel like a decent run rate to think about for the back half.  Just trying to get a sense of how that looks?

[Jacobs:] Yes, in this range.  We've always been saying for the last few months, high single digits, low-double digits and *nothing's slowed down at all in terms of that guidance*.

100.    Defendant Jacobs's statement that nothing was slowing down "*at all*" in terms of the Company's historical and projected revenue growth was materially false and/or misleading at the time because it masked the fact that Amazon, a key part of XPO's growth engine, was, in fact, slowing down.  By the time he made that statement, Amazon had already started to wind down its business affairs with XPO.  Tonnage reports in XPO's transportation business showed declines that reflected Amazon starting to act on its stated plans to stop doing business with XPO over the long term.

101.    Contemporaneously, Amazon started shutting down warehousing and logistics support business that it gave to XPO's logistics segment.  These activities are more than "nothing" in terms of the financial effects on XPO and were highly material, *particularly* in light of Amazon's stated long-term business plans.  The Amazon decline also started around the time that XPO launched competing services and recruited one of Amazon's top executives to run the Company.  And the decline occurred while Amazon continued its meteoric growth, demonstrating that Amazon was not experiencing any larger business problems that would lower its ability to pay for XPO's services.  It simply was not true, as defendant Jacobs said, that "*nothing's slowed down at all*" with respect to the Company's revenue growth and consequent revenue projections.

102.    Defendant Jacobs made similarly false and/or misleading statements on the same August 2, 2018, earnings conference call about XPO's earnings and cash flow position.  At the time, XPO's cash flow outlook for 2017-2018 was that it would generate "approximately $1 billion."  *See* ¶64.  That meant the Company would generate approximately $625 million in free cash flow for 2018 because it had generated $375 million in free cash flow the prior year.  XPO's EBITDA outlook was "at least $1.6 billion" for 2018.  *See* ¶64.  Defendant Jacobs had previously told the market that these figures were the same as the Company's internal numbers and that he would let the market know if anything changed.  *See* ¶66.  Rather than admitting the Company's problems with Amazon, defendant Jacobs pretended they did not exist and instead reaffirmed XPO's full-year guidance during the Company's conference call on August 2, 2018:

> [Deutsche Bank analyst:] Just want to understand is kind of the 17% or mid-teens type *EBITDA growth* that *you're posting this year sustainable in your view*, as you look *through '19 and '20, given the book of business* and then, does the CapEx intensity change at all.  I think you're running about 2.8% of sales this year.  Does that actually go down as the sales growth, or should we expect that to kind of move up, given some of the initiatives that you're accelerating?

> [Jacobs:]  Sure.  So let's do all 3 lines.  Let's do organic *revenue growth, let's do EBITDA growth, let's go free cash flow/CapEx* since they're related to each other.  On the sales side, on the *revenue growth side*, very buoyant, that's partly because it's a good economy, it's a good market.  It's partly because we're doing a lot of company-specific things in terms of operational excellence, in terms of hitting on all 8 cylinders that customers are rewarding us with our greater-than-fair share of their wallet.  So I expect that organic revenue growth is going to stay in this high level, high single digits, low-double digits for the foreseeable future.  *I don't see any slowing down on that.*  EBITDA, we haven't done a bottoms-up budget yet at all, that process is just starting.  On a preliminary basis, yes, I think something in the *15% to 18% range is very reasonable* to assume for continued *EBITDA growth* for the foreseeable future.

In terms of free cash flow, we will generate more free cash flow next year than we did this year, even though we've generated very substantial amount of free cash flow this year.  And this year we'll have about 70-something percent more free cash flow than last year.  I don't think it's going to be 70% more, because I think there's going to be more opportunities for deploying CapEx, but it's way too early in this year to be giving specific guidance for CapEx for next year.  But I can tell you this: last week, we had about 45 of our top executives in for 3 days for quarterly operating review.  People are confident in their business.  Peoples' customers are confident in their business.

103.   Here, as before, Jacobs reassured the market "*I don't see any slowing down*" on the Company's revenue growth, and similarly told the market that that 15%-18% EBITDA was reasonable, which was significant at the time because XPO had reported 18% growth in the first quarter of the year, but lower growth of 16% growth in the second quarter of the year as Amazon continued to act on its "stated business plans," which, as Jacobs knew, meant Amazon business "was going to come to an end."   Defendant Jacobs's EBITDA statement – that it was "very reasonable to assume" 16%-18% earnings growth for the foreseeable future – was materially false or misleading at the time for these and other reasons underlying Amazon's declining business with XPO.

104.   Jacobs's assertions that XPO would generate even "more free cash flow" in 2019 as compared to 2018 and that "we'll have about 70-something percent more free cash flow [this year, 2018] than last year" were both false and misleading for similar reasons.  Jacobs knew that his guidance was misleading because it assumed that Amazon's business would continue growing XPO as it had over the past few years even though he knew or was reckless in not knowing that Amazon's business with XPO was "going to come to an end" and that the wind down process had already started.

**F.    Amazon Continues to Wind Down Its Business with XPO During Amazon's Mission-Critical Summer of 2018 "Prime Week" as XPO's Chief Financial Officer Resigns**

105.    Amazon's wind down of its business with XPO continued into 3Q18, as evidenced, in part, by even lower tonnage statistics and stark examples of Amazon's pull-back in the logistics business it gave to XPO.  Amazon's decision to cut its "Amazon Prime" week business with XPO during July 2018 is a good example.  That week has strategic importance to Amazon.

106.    Amazon shared business from that event with XPO in 2017, as reflected in XPO's favorable third quarter rising tonnage statistics of 5.6% (year-over-year) and unit shipments of some 11,000 to 12,000 per day at the Aberdeen warehouse.  3Q18 comparable statistics showed daily tonnage fall by 1.5% (year-over-year) and unit shipments out of Aberdeen fall by approximately 64%-67% (year-over-year) alongside similar declines in in-bound Amazon deliveries and inventory.  Qualitative facts show that other Amazon-related warehouses experienced similar declines during the summer and fall of 2018 (3Q18, *i.e.*, from July to September) as noted above.  XPO always knew that the Amazon business was "going to come to an end," as Jacobs later admitted and XPO continued to see the business actually "com[ing] to an end" in the 3Q18.

107.    On October 31, 2018, as Amazon's slowdown continued to affect XPO's operations, yet another senior XPO executive quit.  Before the summer of 2018, typically a trio of executives – the Individual Defendants – made reports to investors on quarterly conference calls and elsewhere.  Defendant Hardig resigned at the end of the second quarter, as noted above.  Now Malat also decided to quit.  Defendants Hardig and Malat quit just before the Company announced 2Q18 and 3Q18 results,

respectively, meaning that Defendants Hardig and Malat quit right around the time that they were working with defendant Jacobs to determine what they were going to tell the market about those quarters and related financial guidance for the rest of the year.

108.   Defendant Hardig's departure came as a shock to many in the market. Barclays commented in a November 2, 2018 report that "[t]he sudden and unexpected departure of Scott Malat, XPO's Chief Strategy Officer, did come as a shock to many in the market, especially following the recent departure of CFO John Hardig this summer."

### G.   Feeling the Effects of Amazon's Departure, XPO Misleadingly Blames a "Rounding Error" UK Customer for "Missing" Third Quarter Financial Targets - and XPO's Chief Strategy Officer Resigns

109.   On October 31, 2018, XPO also reported that it had missed 3Q18 earnings and revenue expectations and blamed the miss on one single customer, a department store in the United Kingdom (*i.e.*, House of Fraser).  XPO had repeatedly given annual revenue, earnings, and cash flow guidance to the market, which analysts then modeled and broke down into quarterly consensus estimates that they published.  For 3Q18, consensus adjusted earnings per share estimates were $0.98 per share and the consensus revenue estimates were $4.401 billion.  As a November 2, 2018 research brief from Stephens Inc. ("Stephens") reported, XPO reported $0.89 adjusted earnings per share and revenue of $4.335 billion, missing its consensus estimates in both categories.  XPO also reported free cash flow[16] of $173 million,

---

[16]   According to an October 31, 2018 8-K filed by the Company, XPO calculated free cash flow by taking its cash flow provided by operating activities, subtracting payment for purchases of property and equipment, and then adding proceeds from the sale of assets.

which, according to a November 4, 2018, analyst report by Credit Suisse, missed free cash flow estimates of $242 million for the quarter.

110. XPO's 3Q18 financial "misses" gave management yet another opportunity to tell the Company's investors that Amazon had started acting on its stated business plans to take its considerable business away from XPO. But management did no such thing. XPO blamed that quarter's operational issues (as reflected in the misses) on a small customer. It lowered the Company's earnings guidance for that purported reason alone, but reaffirmed its 2018 free cash flow guidance, as defendant Jacobs told investors on a November 1, 2018 earnings call:

> We generated [third quarter 2018] adjusted EBITDA of $415 million despite a $16 million headwind from a customer bankruptcy in Europe.
>
> *      *      *
>
> We've updated our full year 2018 target for adjusted EBITDA to approximately $1.585 billion. The revised target reflects the impact of the customer bankruptcy I mentioned earlier. And we've reaffirmed our target for approximately $1 billion of cumulative free cash flow over 2017 and '18.
>
> Given our strategic positioning, we expect to continue to outpace the market in any macro environment, and we're looking at some exciting opportunities to accelerate that growth through acquisitions. Now, as you saw from yesterday's release, Scott [Malat] will be leaving us in December.

111. Analysts asked Jacobs to elaborate on the customer bankruptcy that purportedly caused XPO to miss third quarter guidance and to take down adjusted EBITDA for the year:

> [KeyBanc analyst:] I guess, just maybe a housekeeping one to start. Brad [Jacobs], do you have – what is the annual EBITDA run rate from the customer bankruptcy that happened here in the quarter?
>
> [Jacobs:] It was mid – low single-digit millions EBITDA.

[KeyBanc analyst:] On a full year basis, it was a low single digits of EBITDA?

[Jacobs:] Yes, which is – which still really bothered us because here, we are, making low-single-digit millions in EBITDA, and we let our heart get ahead of our mind in trying to support a customer and ended up writing-off $16 million.  But c'est la vie.

[KeyBanc analyst:] Okay.  Got it.  And then – so we think about the growth rates going forward though it's not a huge comp to overcome that on an annual basis?

[Jacobs:] It's a rounding error, *but it made us miss the quarter*, which is something we work really hard not to do.  So on a long-term basis, it's really just – it's nothing.  It's a few million bucks.

112.   Defendant Jacobs's comments reassured analysts that the UK customer (House of Fraser) issue presented no systemic issues to the Company.  For example, in a November 1, 2018, report, J.P. Morgan noted that the Company provided "[a]dditional context on customer bankruptcy and risk controls in logistics.  The bankruptcy at House of Fraser cut $15.6mm from adjusted EBITDA in 3Q18 and brought down the full year guide, but we do not believe this event is a signal of a systemic risk."  The fact that defendant Jacobs reaffirmed full-year 2018 cash flow guidance was understood by analysts to mean that XPO was on track to a blockbuster fourth quarter because the incremental $410 million that XPO needed to generate to meet its full-year free cash flow guidance was about $40 million higher than it had generated over the entire 2017 calendar year and represented a 128% increase as compared to the fourth quarter's free cash flow in 2017.

113.   The size of the increase prompted some investor questions, as Stephens noted in a November 2, 2018 report that "XPO's 3Q18 results raised more questions in investors minds than it answered."  The same analyst asked, "if XPO has managed its earnings all year by reinvesting excess profits" back into the

- 42 -

business "so that it would earn '*at least*' $1.6 bil., *why does a relatively small write-off cause the Company to adjust guidance lower*?"

114.    In retrospect, the short answer to that question is "it doesn't," and management knew it (or at the very least should have known) at the time.  By the time that defendant Jacobs blamed the third quarter miss on the "rounding error" of a customer (House of Fraser), the largest e-commerce business in the history of the world (and XPO's largest customer) had taken material steps to exit its business relationship with XPO.  It was *that* change in business conditions that caused XPO to miss its 3Q18 consensus earnings expectations, which analysts calculated on the basis of XPO's earnings guidance for the 2018 calendar year.  The guidance was for "*at least* $1.6 billion" showing, as the Stephens analyst suggested, that XPO had budgeted for earnings in excess of the $1.6 billion level.  But by 3Q18, that cushion had diminished as Amazon started to wind down its business relationship with XPO.  Because that business was on the decline, all it took was a "rounding error" customer (in Jacobs's words) to trigger the third quarter miss.

115.    Traces of Amazon's effect on XPO's 3Q18 appear in particular admissions that Malat made during the third quarter earnings call:

> [Malat:] Our LTL *tonnage declined 1.5% due to our decision* to selectively target more profitable freight, partially offset by a 3% volume increase in higher-margin local freight.  We were able to further reduce our purchased transportation costs by increasing utilization of our owned trucks to offset inflation.  Purchased transportation made up 26% of our linehaul miles in the quarter versus 33% from a year ago.

116.    Defendant Jacobs made a similar statement in response to an analyst's question about the Company's ability to grow revenue:

> [Jacobs:] Tonnage was down, though. *Tonnage was down 1.5%*, which is *in-line with recent quarters* and consistent with *our strategy* of selectively targeting the more – the freight that fits our network the

- 43 -

best, more profitable freight.  And you mentioned the investment in the local sales force.  I'm very happy that we did that.  And the proof's in the pudding, where our *local tonnage was up 3%* in the third quarter.

117.    Defendants Jacobs's and Malat's reports that tonnage was continuing to decline on a company-wide basis but that "local" tonnage had increased, means that whatever additional tonnage XPO was shipping with local accounts was not sufficient to offset the tonnage that XPO lost from its largest national account – Amazon in particular.  The idea that XPO *wanted* to lower the tonnage that it shipped raised questions on the 3Q18 conference call.  An analyst pointed out that such a choice made little sense given favorable margins in that business:

> [BofA Merrill Lynch analyst:] So just – I wanted to say on the – this LTL point, you mentioned the strong incremental margins in that space.  And I'm wondering, you've gone – you've had the strategy for a long-term of kind of calling customer accounts and focusing on more regional freight, but *given the strong incremental margins, would it make sense strategically to maybe be looking to grow that business a little bit more aggressively?*  And *not seeing, kind of, the declines in shipments and tonnage that we've been seeing?*

> [Malat:] Absolutely.  That's one of the reasons why we added to our local account executive sales force.  We added over 200 sales and sales support to grow the business.

118.    This response is consistent with the events that a sales executive recounted occurring sometime in the May/June 2018 timeframe, when tonnage was down due to the "gradual" decline in Amazon business, giving XPO the chance to call smaller accounts to make up the difference.  But Defendants Jacobs's and Malat's statements about the reasons why tonnage was declining were misleading because, as they knew (or should have known), Amazon decreased the amount of tonnage it shipped with XPO in a gradual way as it acted on its stated plans to discontinue its business with XPO.  Amazon was too big to replace in 2018, and rather than simply telling investors that XPO had fallen on hard times because

- 44 -

Amazon was leaving, the Company chose to blame a UK "rounding error" customer (House of Fraser) for its diminished financial performance and then claimed XPO *wanted* tonnage to decline in the manner that it did.

119.   Amazon also significantly lowered the logistics-related business that if gave to XPO during the 3Q18, as its decision to wind down and then shut down operations at several XPO warehouses demonstrates.  "Amazon Prime" week occurred during 3Q18, but Amazon did not make the outstanding contributions to XPO's logistics business in 2018 that it made in 2017.  The material decline in units received and then shipped out of the XPO warehouses dedicated to Amazon translated to lower revenue, earnings, and cash flow for the quarter.

120.   As a result, XPO's SEC Form 10-Q ("10-Q") for 3Q18, XPO reported a significant drop in logistics operating revenue from $67.3 million in 2017 to $59.5 million in 2018 – an 11.59% decline, year-over-year.  These declining figures reflect Amazon acting on its decision to leave XPO as demonstrated by Amazon's actions in lowering the amount of logistics business that it did with XPO.

121.   Declining financial performance in XPO's logistics segment, like the tonnage statistics in transportation, clearly showed senior management that they needed to tell investors that Amazon was acting on its stated business plans to leave XPO.  But again, XPO blamed the UK customer for its lackluster *logistics* performance in 3Q18, as Malat said:

> Our operating income for logistics globally was $60 million compared with $67 million a year ago, and our adjusted EBITDA was flat.  These results reflect the bankruptcy charge from *the one large customer [House of Fraser] Brad referenced earlier*.

122.   Defendant Jacobs rephrased defendant Malat's "large customer" characterization later in the call by referring to that customer as simply a "rounding

error" to XPO.  Defendant Jacobs also blamed this one "rounding error" customer for XPO's problems in the quarter, leading to his conclusion that "*it made [XPO] miss the quarter.*"

123.    The misleading nature of that statement and others blaming House of Fraser for XPO's 3Q18 miss grows in light of the fact that Amazon's (missing) third quarter contributions to XPO's revenue would have translated into higher earnings and free cash flow as compared to the rest of XPO's book of business.  Defendant Malat's replacement as the Company's CSO later admitted this fact during a February 15, 2019 earnings call, explaining that Amazon's earnings margins were "slightly *higher than company average* EBITDA margin" at XPO.  In other words, the revenue that XPO was starting to lose from Amazon had larger, negative effects on XPO's earnings and free cash flow on a relative basis.

124.    Comparing the relatively inconsequential nature of House of Fraser with Amazon's importance to XPO's overall business further demonstrates that Defendants Jacobs and Malat misled investors about the reasons XPO missed its 3Q18 financial targets.  These Defendants did not want to mention Amazon because reasonable investors and analysts obviously would have asked similar questions on the conference call about *that* customer.  Further, because XPO could not have credibly labeled Amazon as a "rounding error," they chose to mislead investors by blaming the miss entirely on a relatively unimportant customer.

125.    Because Amazon was already acting on its stated plan to bring its business relationship with XPO to an end, it was just a matter of time before XPO ran out of "House of Frasers" to blame for the gaping revenue, earnings, and cash flow hole that would deepen as Amazon took more of its business away from XPO during

the fourth quarter of 2018 ("4Q18").  To conceal that problem, defendant Jacobs reintroduced XPO's plans to buy another company that was at least as big as XPO, which would allow XPO to consolidate the two companies' financial statements for 2018 and make it very difficult (if not impossible) to see the toll that Amazon took on XPO as a stand-alone company.  Jacobs put XPO's M&A plans back on the table on the November 1, 2018 call:

> [Jacobs:] The [M&A candidates] that we've got shortlisted right now, and we – if you recall, we shortlisted that from hundreds and hundreds of the ones that we looked at over the process – I like them all.  I mean, they're all really good deals.  You just got to get the right price and the right terms.  And we also have to have a willing seller.  So as soon as the stars line up on those scores, we'll do the deal, but it's not like, we're revisiting the whole list of one's that we rejected.
>
> [BofA Merrill Lynch analyst:] Got it.  But it's safe to say that you guys have *actively engaged* all of the people on that list in some form of dialogue?
>
> Is that correct?
>
> [Jacobs:] Correct.  That's correct.

126.   Defendant Jacobs's renewed interest in completing an M&A transaction sparked analyst interest following the call.

127.   On the same day as the call, J.P. Morgan analysts reported: "M&A back on the table as topic of discussion.  With strong organic growth, XPO's M&A strategy was put to the backburner as valuations did not meet expectations.  Following the recent pullback, however, XPO has re-engaged as valuations have fallen with public asset-light valuations down 13% on average and down ~15% for public asset-heavy comps."

128.   Despite having been named XPO's acting CFO on or about August 15, 2018, Sarah Glickman did not appear on the November 1, 2018 conference call.  This

was unusual considering that public companies almost always have their CFOs available to at least address analyst and investors questions during earnings calls.

129.   Following the November 1, 2018, conference call, trading commenced in XPO's stock and it fell 2.67% to $86.99 (as the S&P 500 rose 0.44% that day).  XPO's stock continued to decline as December approached.

H.   Just as XPO Was "Very Close" to Closing a Deal that Would "Double" Its Size and Bury the Amazon Problem, Executives Let Slip Material Non-Public Information on December 11, 2018 that Triggered a Trading Halt on the NYSE And Forced XPO to Disclose Yet Another Amazon-Related "Miss"

130.   By the second week of December 2018, XPO was purportedly close to buying another company.  Defendant Jacobs later told participants at an industry conference that the deal "would have effectively *doubled* XPO's $17 billion a year size '*in short order,*' before it shifted gears and launched a sizable stock repurchase plan to capitalize on the equity's low price levels."  Defendant Jacobs told other reporters that XPO was "'very close to doing an acquisition'" before December 13, 2018.  A transaction that "doubled" XPO's size would have given XPO the ability to largely bury the negative effects of Amazon's decision to leave XPO while providing Jacobs some basis to claim "doubled" growth as the 2019 calendar year unfolded.

131.   But XPO ultimately squandered its prospects to complete a merger. First, on December 11, 2018, defendant Jacobs, XPO's new CSO, and the Company's top information technology officer accidentally disclosed material non-public information during market hours to a select group of investors at a private lunch meeting on behalf of XPO.[17]

---

[17]   *See* December 12, 2018, Deutsche Bank, "Takeaways from mgmt. meeting and 8-k disclosures."

132.    Trading authorities quickly caught wind of XPO's leaked information. They halted trading of XPO stock on the NYSE when the market first opened on the following day, December 12, 2018, until XPO disclosed the leak to the rest of the market.

133.    XPO purported to comply with its disclosure obligations by filing the following message:

**Regulation FD Disclosure**

On December 11, 2018, XPO Logistics, Inc. (the "Company") met with a group of investors in the ordinary course of its investor relations activities.

At this meeting, the Company disclosed that it anticipates 12-15% year-over-year growth in adjusted EBITDA in 2019.  Adjusted EBITDA is a non-GAAP measure.

In addition, at this meeting, the Company reaffirmed that it remains on track to generate approximately $625 million of free cash flow for 2018, and expects to generate approximately $650 million of free cash flow for 2019.  Free cash flow is a non-GAAP measure.

On February 12, 2018, the Company disclosed in its annual report on Form 10-K for the year ended December 31, 2017 that, as of year-end, the Company had federal net operating losses for all U.S. operations of $188.1 million and federal tax credit carryforwards of $34.4 million.  The Company expects to utilize substantially all of its federal net operating losses for the 2018 tax year.

134.    This new information triggered a two-day decline that wiped out 33% of the Company's market value, as its per share stock price fell from $66.69 at the close of trading on December 11, 2018 to $44.50 at the close of trading on December 13, 2018, on heavy trading volume.

135.    Several aspects of the December 12th surprise announcement were negative and contributed to the sharp decline.  To start, the announcement revealed, in substance, that XPO was *not* going to make the $625 million in free cash flow

guidance.  In admitting that the Company needed to accelerate "substantially all" $188 million in tax benefits that were not even set to expire until 2024, XPO was, in essence showing that it could *not* generate $625 million in free cash flow in 2018 because, simply stated, it had not earned enough money from its "largest customer" to do so.  XPO made this concession despite: (1) having just reaffirmed that number in the context of lowering earnings guidance (purportedly) on account of the House of Fraser issue; and (2) claiming in the same surprise announcement that it was "on track" to make that *$625* million annual target by the end of the year.

136.    Some analysts noticed how the Company had originally included $110 million in tax payments the original budget it used to derive its $625 million free cash flow figure, but that XPO did not have enough cash to make any more tax payments than the $46 million it had paid through the third quarter of the year.  Deutsche Bank analysts, for example, wrote on the day of the announcement that "[h]igher cash taxes appears to reflect a push out from '18 into '19 . . . . This 'benefit' appears to be making up for higher than expected working capital investment to facilitate strong growth, which translates to *no change in 2018 free cash flow expectations of $625M despite much lower cash taxes.*"  The "push out" of 2018 taxes into 2019 similarly affected XPO's 2019 free cash flow guidance.

137.    In sum, Defendants attempted to partially plug XPO's 2018 free cash flow gap with a clever tax move – pulling in $188 million in tax benefits and thus assuring tax liabilities into 2019 – but the market saw through it.

138.    Not only did XPO lower, in substance, its guidance about the amount of free cash flow that it would generate in 2018, it simultaneously lowered its adjusted EBITDA guidance of the *entire* 2019 year.  The lowering of 2019 adjusted EBIDTA

- 50 -

guidance reflected XPO's inability to earn enough money in that period to meet its guidance and XPO's need to drag up to $188 million in tax benefits from 2019 and apply them all to 2018 to plug the earnings gap that Amazon created by leaving XPO over the course of 2018. The resulting lower free cash flow guidance for 2019 also surprised the market and significantly missed analysts' estimates. "The free cash flow guide for 2019 [of $650M] was disappointing relative to prior Wall Street estimates of $884MM," as Wells Fargo wrote on December 14, 2018. Those estimates, in turn, flowed from Defendants' most recent (misleading) statements following the purported House of Fraser "miss" and related statements, which XPO made to the market on November 1, 2018.[18]

139. The December 12, 2018, "trading halt" disclosures likewise partially corrected XPO's prior misleading statements masking the toll that Amazon's decision to start leaving XPO was actually having on the Company's operations and financial performance. For example, the disclosure revealed that XPO could not grow earnings at the "base-case" levels that defendant Jacobs had communicated to the market just six weeks prior to that date. That "base-case" assumed Amazon would keep growing the Company at levels that XPO had included in its "bottoms up" budgeting process at the beginning of the 2018. Amazon continued lowering the amount of business it gave to XPO throughout the year and XPO accidentally leaked new numbers – at least partially accounting for life without Amazon – at its lunch on December 11, 2018, as noted above.

---

[18] For example, Deutsche Bank modeled $800 million in free cash flow for 2019 following the XPO's most recent November 1, 2018 earnings call where the Company gave earnings guidance for 2019.

140.   Thus, the *only* reason the market learned of the partially corrected numbers on December 12th is because someone told the trading authorities about it, prompting a halt on trading that forced XPO to disclose the new, materially lower EBITDA numbers to the market.  These new numbers showed XPO could not make Jacobs's "*base-case*" earnings growth of 15%-18%.  The "base-case" would now be 12%-15%, which was a materially negative shift in the Company's growth rates.  This development also contributed to XPO's stock price decline.

141.   As investors continued to digest XPO's free cash flow and earnings disclosures, on December 13, 2018, a short seller, Spruce Point Capital Management ("Spruce Point"), published a negative report on the Company, titled "Trucking Ridiculous; End of the Road."  The report criticized XPO's management and the accuracy and clarity of XPO's disclosures to investors.  Analysts from Deutsche Bank published a report on December 13, 2018, criticizing one of the cash flow calculations that Spruce Point had made in its report and commented on XPO's falling stock price "in the context of the current tape *and lower guidance*."  Deutsche Bank further wrote that its cash flow calculations should have given XPO credit for the proceeds that XPO earned from selling assets like trucks and other equipment for $69 million in 2016 and $79 million in 2017.  Finally the Deutsche Bank analysts further concluded that the "*qualitative aspects of the report are not new.*"

142.   As the lower earnings and free cash flow guidance continued to flow through the market, XPO's common stock continued its fall from $66.69 per share at the close of trading on December 11, 2018 to $44.50 on December 13, 2018 – *a decline of 33%*.

143.    Incredibly, Defendants made *more* misleading statements in the context of responding to information in the recent Spruce Point report.  Defendants called the report old news, in substance, and then told the market that "XPO's long-term financial outlook remains positive."   This misleading statement appears in a December 14, 2018, *Comtex News Network* article that it published at 9:10 a.m. (EST).  The article specified the timing of XPO's statement and quoted its substance as follows:

> *This morning the company responded*: "Today's report from a short selling firm is intentionally misleading, with significant inaccuracies, and fails to reflect that XPO has delivered strong performance for its long-term shareholders.  The facts demonstrate that [Spruce Point's] *claims, most of which have been previously floated and refuted*, are largely baseless and an attempt to string together unrelated pieces of incorrect information to paint an inaccurate impression of the company.   Of particular note, our accounting practices are based on Generally Accepted Accounting Principles and are audited annually and reviewed quarterly by our independent auditors.  *XPO's long-term financial outlook remains positive*.  We will communicate directly with our investors and customers regarding [Spruce Point's] report."

144.    This statement was materially false and/or misleading at the time, because Defendants already knew (or should have known) that Amazon was always going to leave and had actually started to pack its bags in the spring or summer of 2018, as the facts show.  Even defendant Jacobs later claimed, in a February 15, 2019 earnings call, that it was very soon after December 11th or 12th of 2018 that Amazon kept lowering the amount of business it gave to XPO.   "Within a few days," defendant Jacobs said, "our postal injection business was significantly impacted by this customer's actions," referring to Amazon.  These facts add to the many others showing that Amazon continued to reduce the amount of business it gave to XPO throughout the course of 2018 in a manner that was neither abrupt nor quick, as

- 53 -

defendant Jacobs would later misleadingly complain in an attempt to address investors' disbelief.

145.    Having so devalued XPO's stock price and the Company's reputation through Defendants' December 11 accidental leak and subsequent partially-corrective disclosure, XPO's planned blockbuster merger was no longer a viable option.  The failure to complete the merger ultimately meant that XPO could not hide the Amazon loss after 2018 closed.

      I.    **After Failing to Find a Merger Partner Who Would Cover Up the Loss of Amazon in 2018, XPO Is Forced to Admit that It Lost Its "Largest Customer" (Amazon) and Always Knew that Amazon Was Going to Leave**

146.    XPO could not close its planned merger with a company that would have doubled XPO in size on account of the December 11, 2018 leak and the stock decline that followed.  On February 14, 2019, XPO thus had to file its *own* standalone financial statements for the quarter and year ending 2018, without the benefit of mixing XPO's financial statements with those of a company equal in size on a "consolidated" basis.

147.    After the market closed on that date, XPO filed several reports with the SEC, further revealing the effects that Amazon had on XPO's business.  Defendant Jacobs led a conference call the next day, February 15, 2019, by stating:

        Well, look, there's no other way to say it, *we missed the quarter*. We miscalculated the weakness in France and the U.K.  *And in December, our largest customer pulled back* their postal injection business, which is part of last mile.  *That affected our EBITDA in December.  This had a significant impact in December and in the quarter*.

148.    Defendant Jacobs admitted, in response to an analyst's question, that Amazon's business contributed materially to XPO's growth over the preceding few

years and that he knew the growth would come to end given Amazon's stated

business plans:

> [Seaport Global Securities analyst:] [M]y question is, had they always – had this large customer always been a customer of 3PD [an XPO-acquired company] or just recently have you – had you grown with them?
>
> [Jacobs:] I'm not 100% certain of that, but I think that they were not a customer of 3PD.  Or if they were, they were a small one.  So the more important part of your question is, have we grown with them?  *Yes, we grew a lot up with them over the last few years.*  And *we knew* that, *that business wasn't going to stay forever* and forever and ever and ever *because of that particular customer's stated business plans* and because that customer is transactional in some respect in terms of the nature that they have with their vendors.  And that's fair.  Customers can have any kind of approach they want with their vendors.  We didn't think it was going to come to end so quickly.  We didn't think it was going to come to an end so abruptly.  And it really hasn't come to an end.  It's been downsized.  We still have a chance to prove to them that maybe we should get a second chance and come back and do something that can help them.  And I don't rule out that we could possibly get some business back, but we're not counting on it.  We're counting on that they're going in a different direction for the most of their business.  And that we should be redeploying those resources for new customers.

149.  Analysts asked questions about this admission, demonstrating that

reasonable investors (including analysts who covered XPO) read the Company's

disclosures – and assurances about House of Fraser being a "one off" occurrence –

to mean that XPO did not expose shareholders to the kind of extreme customer and

market concentration that Amazon represented:

> [BofA Merrill Lynch analyst:] So I wanted to start talking about customer concentration.  One of the things that I think *XPO has touted as one of its strengths is that it's not overly focused on any particular customer*.  But here, we've seen kind of 2 quarters in a row where some disappointing news from a particular customer has really put a real dent in results.  And I want to talk about – I kind of want to get your thoughts on the extent to which maybe that perception is changing or how you manage your customer base maybe has shifted? . . .

- 55 -

[Jacobs:]  Well, in 2018, our top 5 customers represented about 11% of revenue, and you saw that in the K.  The largest customer, however, represented roughly about 4%, 5% of that.  2/3 of that business has gone away, *so that's a body blow*, no question about it.  Going forward, with that customer having downsized, we anticipate that our top 5 customers in 2019 will represent about 8% of revenue.  So customer concentration will be less.  But when you lose your – when you lose the majority of your top customer's business, that hurts.  Nothing you can do – there's nothing positive.  It's only negative.

150.    On this same subject defendant Jacobs later admitted:

I'd also talk to you about our customer concentration.  *Our customer concentration, it was too much*.  We made a mistake letting one customer get $900 million of business with us.  [It was] *just too much*.  [It was] *too much concentration*.  Previously, if you looked at our top 5 customers, it was about 11% of revenue and the biggest one was a little more than 1/2 of that, so *it was just too much concentration*.  Going forward, we're going to be much more diversified.  Our top 5 customers this year should be something around 7% of revenue and no customer will be more than 2% of revenue.

151.    Following the February 15, 2019, conference call that further revealed Amazon's strategic and financial importance to XPO, the Company's stock price fell from a close of $59.55 the day before to $51.97 at the close of trading, for a loss of 12.73%.

152.    Analysts reacted negatively.  For example, Barclays wrote in a report on the same day that it was "materially lowering our price target on XPO shares given a significant strategic shift and continuing earning headwinds," while noting the loss of "a large shipper (likely Amazon)."

153.    Barclays appeared to suspect that Jacobs still was not giving them the full story: "We believe the company was aware of the potential for losing a large piece of business late in 2018, right around the same time a now debunked but then impactful short seller report surfaced" on December 13, 2018.

154.    Those analysts' suspicions were correct in part – XPO truly *was* aware of its potential of losing Amazon, but it arrived at that awareness well before the middle of December 2018, as the facts show.   Unfortunately for Class Period investors, however, Defendants misleadingly concealed Amazon's effects on XPO while issuing a host of materially false and/or misleading statements that masked how important Amazon was to the Company's growth at above-industry levels, and ultimate reversion to materially lower growth rates.

V.    **DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS**

155.    A money-losing enterprise for years, XPO began growing profits and revenue in 2016 at rates that exceeded its industry peers and made it the darling of Wall Street in its industry during the Class Period.

<u>August 2016 Statements</u>

156.    On August 3, 3016, XPO publicly reported its financial results for 2Q16. This was the first time that XPO reported a profit.

157.    In connection with the press release announcing its 2Q16 financial results, XPO also put out a slide presentation and script (the "2Q16 Presentation"). The Company also stated that the slide presentation should be read together with XPO's SEC filings, including its 2Q16 10-Q.  As part of its 2Q16 Presentation, XPO publicly claimed that it was a "well diversified company" with a "highly diversified" customer base.

158.    The next day on August 4, 2016, XPO held a conference call to discuss its quarterly results and answer questions posed by analysts and investors.  During the call, defendant Jacobs spoke about how XPO reported "second-quarter results that confirmed that [the Company was] at a positive inflection point in the evolution

- 57 -

of [its] business." He touted how XPO was a "very well diversified, well functioning global business that provides significant value to [its] customers." The XPO chief executive also asserted that the Company has a "clearly defined action plan" to grow earnings nearly 35% over the 2016 through 2018 period.

159.   Defendant Jacobs assured investors that the Company was generating record financial growth from a well diversified base of business, concluding the call as follows:

> We started the call with saying that we're at a positive inflection point in the evolution of our Company. And that we are reaping the rewards of the last five years. We have built *a very well diversified*, well functioning global business that provides significant value to our customers.
>
>   The proof is in the pudding. Look at the numbers this quarter. We had record EBITDA, way above expectations. We had record cash flow from ops, way above expectations. Record free cash flow. We have a clearly defined action plan to go from $1.265 billion of EBITDA this year to our $1.7 billion target in 2018.

160.   Defendants' statements on August 3 and 4, 2016, about XPO being "very well diversified" with a "highly diversified" customer base were misleading at the time they were made because Defendants had knowingly (or at the very least recklessly) masked the effects that its largest customer, *i.e.*, Amazon, had on XPO's growth and the customer concentration risk that Amazon presented.

161.   On August 8, 2016, XPO publicly filed its 10-Q for 2Q16 with the SEC. This 10-Q incorporated risk factors previously laid out in XPO's SEC Form 10-K for fiscal 2015 ("2015 10-K"). One of those risk factors in XPO's 2015 10-K that remained unchanged in its 2Q16 10-Q, according to the Company, was that:

>   No single customer accounted for more than 2% of our consolidated pro forma revenue for 2015. *We do not believe the loss of any single customer would materially impair our overall financial condition or results of operations*; however, collectively, some of our

large customers might account for a relatively significant portion of the growth in revenue and margins in a particular quarter or year. Our contractual relationships with customers generally are terminable at will by the customers on short notice and do not require the customer to provide any minimum commitment. Our customers could choose to divert all or a portion of their business with us to one of our competitors, demand rate reductions for our services, require us to assume greater liability that increases our costs, or develop their own logistics capabilities. Failure to retain our existing customers or enter into relationships with new customers could materially impact the growth in our business and the ability to meet our current and long-term financial forecasts.

162.    This statement, incorporated into XPO's 2Q16 10-Q, that Defendants did not supposedly "believe the loss of any single customer would materially impair our overall financial condition or results of operations" was misleading because by August 2016, Defendants knew (or were reckless in not knowing) that if and when Amazon ceased being an XPO customer, its departure would have significantly negative ramifications for XPO financially.

163.    Both Defendants Jacobs and Hardig signed XPO's false and/or misleading 2Q16 10-Q.

164.    XPO's 2Q16 10-Q also contained the following false and/or misleading SOX certifications, signed by Defendants Jacobs and Hardig:

1.    I have reviewed this quarterly report on Form 10-Q of XPO Logistics, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

- 59 -

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions);

a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

**November 2016 Statements**

165.    On November 2, 2016, XPO issued a press release announcing its third quarter of 2016 ("3Q16") financial results.  Just as it did for the previous quarter, XPO released a slide presentation and script that repeated its previous proclamation that the Company was "well diversified" with a "highly diversified" customer base.

166.    The following day, November 3, 2016, the Company hosted a conference call with financial analysts and investors to discuss XPO's 3Q16 financial results. Similar to what he told analysts and investors in August 2016, Jacobs told them how the Company's 3Q16 results confirm that XPO has "reached a positive inflection point in the evolution of [its] business."

167.    Later during the November 3 call, a Barclays analyst asked about what macro risks (if any) XPO saw with respect to revenue growth.  As part of his response, XPO's CEO Jacobs stated that while there was some risk, he emphasized that the Company's "strategy has been to be very well diversified, well diversified by geography, *well diversified by type of customer*, well diversified by service offering."

168.    Defendants' November 2 and 3, 2016 statements about XPO's well diversified business and customer base were misleading at the time they were made because Defendants had knowingly (or at the very least recklessly) masked the effects that its largest customer, *i.e.*, Amazon, had on XPO's growth and the customer concentration risk that Amazon presented.

169.    On November 8, 2016, XPO publicly filed its 10-Q for 3Q16 with the SEC. This 10-Q incorporated risk factors previously laid out in XPO's 2015 10-K, including the representation that "[w]e do not believe the loss of any single customer would materially impair our overall financial condition or results of operations."  As

- 61 -

detailed previously in ¶¶161-163, this statement was misleading because by November 2016, Defendants knew (or were reckless in not knowing) that once Amazon ceased being an XPO customer, its departure would have a significantly negative impact on XPO's financial condition and/or results of operations.

170.   Both Defendants Jacobs and Hardig signed XPO's false and/or misleading 3Q16 10-Q.

171.   XPO's 3Q16 10-Q also contained false and/or misleading SOX certifications signed by Defendants Jacobs and Hardig that are nearly identical to the ones in the Company's 2Q16 10-Q.  *See* ¶164.

**February 2017 Statements**

172.   On February 21, 2017, XPO issued a press release announcing its financial results for its fiscal year 2016.  Just as it did for 2Q16 and 3Q16, XPO released a slide presentation and script reiterating that the Company was "well diversified" has a "highly diversified" customer base.

173.   On February 28, 2017, XPO publicly filed its 10-K for fiscal 2016 ("2016 10-K") with the SEC.  In this 2016 10-K, Defendants touted that they have a "*diversified customer base that minimizes our concentration risk*: in 2016, approximately 8% of our revenue was attributable to our top five clients, with our largest customer accounting for approximately 3% of revenue."

174.   Like those Class Period public statements made by Defendants in previous quarters, *see* ¶¶157-160, 165-168, Defendants' statements on February 21 and 28, 2017 were misleading at the time they were made because Defendants had knowingly (or at the very least recklessly) masked the effects that Amazon, its largest customer, had on XPO's growth and the customer concentration risk that

- 62 -

Amazon presented; especially in light of the fact that this Fortune 500 behemoth informed XPO that it was going to leave.

175.    Both Defendants Jacobs and Hardig signed XPO's false and/or misleading 2016 10-K.

176.    XPO's 2016 10-K also contained false and/or misleading SOX certifications signed by Defendants Jacobs and Hardig that are nearly identical to the ones in the Company's 2Q16 and 3Q16 10-Qs.  *See* ¶¶164, 171.

<u>May 2017 Statements</u>

177.    On May 3, 2017, XPO issued a press release announcing its financial results for the first quarter of 2017 ("1Q17").  Just as it did in previous quarters, XPO released a slide presentation and script reiterating that the Company was "well diversified" has a "highly diversified" customer base.

178.    The following day on May 4, 2017, the Company hosted a conference call with financial analysts and investors to discuss XPO's 1Q17 financial results. One important topic that came up during the call was the long term sustainability of XPO's growth: one analyst asked whether XPO's growth was sustainable over the long term.  Defendant Jacobs responded to one such question during an XPO quarterly earnings call:

> [KeyBanc analyst:] Let me ask it this way, is there *anything in the first quarter that you view as being unsustainable* or anything that kind of helped you if it was fuel trends in the LTL business *or something that you're watching that, that may not repeat* in the first quarter as you think about the progression through the year?
>
> [Jacobs:] *I don't*, Todd.  I think the first quarter was a quarter where we had to work hard.  And we had some headwinds, we had some tailwinds.  But internally, as an organization, it's really jelling. And people are very focused on the right levers in order to improve both the profitability of the company and customer service at the same time.  *And it's broad-based by our different business lines and by our*

*geography*.  So I am optimistic about the year, starting off on a very good foot.

179.   Defendant Jacobs's public assurances, that XPO gave investors exposure to a company that enjoyed broad-based growth, are consistent with his and XPO's other public statements assuring investors throughout the Class Period that their investment capital did not expose them to too much customer "concentration risk."

180.   On May 9, 2017, XPO publicly filed its 1Q17 10-Q with the SEC.  In this 10-Q, Defendants touted that XPO's "customers are also highly diversified across every major industry, with retail and e-commerce historically accounting for approximately a quarter of our revenue."

181.   These statements made by Defendants in May 2017 were misleading at the time they were made because Defendants knowingly (or at the very least recklessly) masked the effects that Amazon, its largest customer, had on XPO's growth and the customer concertation risk that Amazon presented; especially in light of the fact that this Fortune 500 behemoth informed XPO that it was going to leave.  Moreover, defendant Jacobs's assurances during the May 4, 2017 call response about how he did not see anything in 1Q17 as being "unsustainable," was misleading.  The reason: defendant Jacobs knew (or was reckless in not knowing) that in fact, XPO's growth rate was unsustainable because Amazon was driving growth and Defendants knew or recklessly disregarded that Amazon was going to leave as a customer because that was its "stated business plan[]" from the beginning.  *See* ¶148.

182.   XPO's 1Q17 10-Q also contained false and/or misleading SOX certifications signed by Defendants Jacobs and Hardig that are nearly identical to

the ones in the Company's previous quarterly and annual filings made with the SEC during the Class Period.  *See* ¶¶164, 171, 176.

July 2017 Statements

183.    On July 17, 2017, XPO announced that it planned to make an offering of 11,000,000 shares of its common stock in a registered underwritten offering.

184.    On or about July 20, 2017, XPO priced the 11,000,000 shares at $60.50. In connection with XPO's announcement of the Secondary Offering, the Company filed a Registration Statement on SEC Form S-3 (the "Registration Statement") and a Rule 424(b) Prospectus with the SEC.

185.    These filings were signed by Defendants Jacobs and Hardig and incorporated by reference, XPO's materially misleading: (1) 2016 10-K, *see* ¶¶173-176; and 1Q17 10-Q, *see* ¶¶180-182.

186.    The Registration Statement, including the Prospectus, was negligently prepared and, as a result, contained untrue statements of material fact and omitted material information that was required to be disclosed pursuant to the regulations governing its preparation.

187.    As detailed above, *see* ¶¶173-176, 180-182, each of the statements incorporated by reference into in the Registration Statement filed with the SEC was materially false and misleading for failure to disclose that XPO's growth was heavily dependent on Amazon business that was unsustainable because Amazon did not intend to be a long-term customer of XPO.

August 2017 Statements

188.    On August 2, 2017, XPO issued a press release announcing its financial results for the second quarter of 2017 ("2Q17").  Just as it did in previous quarters,

XPO released a slide presentation and script reiterating that the Company has a "highly diversified" customer base.

189.   On August 4, 2017, XPO publicly filed its 2Q17 10-Q with the SEC.  In this 10-Q, Defendants touted that XPO's "customers are also highly diversified across every major industry, with retail and e-commerce historically accounting for approximately a quarter of our revenue."

190.   Defendants' statements on August 2 and 4, 2017 were false and/or misleading at the time they were made because Defendants had knowingly (or at the very least recklessly) masked the effects that Amazon, its largest customer, had on XPO's growth and the customer concertation risk that Amazon presented; especially in light of the fact that Amazon had informed XPO that it was going to leave.

191.   XPO's 2Q17 10-Q also contained false and/or misleading SOX certifications signed by Defendants Jacobs and Hardig that are nearly identical to the ones in the Company's previous quarterly and annual filings made with the SEC during the Class Period.  *See* ¶¶164, 171, 176, 182.

<u>November 2017 Statements</u>

192.   On November 2, 2017, XPO issued a press release announcing its financial results for the third quarter of 2017 ("3Q17").  Just as it did in previous quarters, XPO released a slide presentation and script reiterating that the Company has a "highly diversified" customer base.

193.   On November 6, 2017, XPO publicly filed its 3Q17 10-Q with the SEC.  In this 10-Q, Defendants touted that XPO's "customers are also highly diversified across every major industry, with retail and e-commerce historically accounting for approximately a quarter of our revenue."

- 66 -

194.   Defendants' statements on November 2 and 6, 2017 were false and/or misleading at the time they were made because Defendants had knowingly (or at the very least recklessly) masked the effects that Amazon, its largest customer, had on XPO's growth and the customer concertation risk that Amazon presented; especially in light of the fact that Amazon had informed XPO that it was going to leave.

195.   XPO's 3Q17 10-Q also contained false and/or misleading SOX certifications signed by Defendants Jacobs and Hardig that are nearly identical to the ones in the Company's previous quarterly and annual filings made with the SEC during the Class Period.  *See* ¶¶164, 171, 176, 182, 191.

**February 2018 Statements**

196.   On February 7, 2018, XPO issued a press release announcing its financial results for its fiscal year 2017.  Just as it did in previous quarters, XPO released a slide presentation and script touting the Company's "highly diversified" customer base.

197.   On February 12, 2018, XPO publicly filed its 10-K for fiscal 2017 ("2017 10-K") with the SEC.  In this 10-K, Defendants touted that they have a "*diversified customer base that minimizes our concentration risk*: in 2017, approximately 10% of our revenue was attributable to our top five customers."

198.   Defendants' statements on February 7 and 12, 2018 were false and/or misleading at the time they were made because Defendants had knowingly (or at the very least recklessly) masked the effects that Amazon, its largest customer, had on XPO's growth and the customer concertation risk that Amazon presented; especially in light of the fact that Amazon had informed XPO that it was going to leave.

199.    Specifically, as to Defendants' statement in XPO's 2017 10-K regarding the Company's customer diversification, this nearly identical statement to the one made in the 2016 10-K, *see* ¶¶173-176, misleadingly omitted the disclosure of the size of XPO's largest customer (which was 3% of revenue in 2016).  Defendants' decision to knowingly (or at the very least recklessly) alter this disclosure in XPO's 2017 10-K was misleading because, as Defendants later admitted, Amazon boosted XPO's growth materially during 2016 and constituted more than 3% of the Company's revenue at the time.

200.    XPO's 2017 10-K also contained false and/or misleading SOX certifications signed by Defendants Jacobs and Hardig that are nearly identical to the ones in the Company's previous quarterly and annual filings made with the SEC during the Class Period.  *See* ¶¶164, 171, 176, 182, 191, 195.

**May 2018 Statements**

201.    On May 2, 2018, less than ten days after announcing the hiring of their new COO, Kenneth Wagers, who, prior to that date, also happened to be the former head of Amazon's finance of its worldwide transportation and logistics operation, XPO issued a press release announcing its financial results for 1Q18.

202.    Just as it did in previous quarters, XPO released a slide presentation and script.  However, unlike in prior reporting periods, XPO instead stated that its "markets" as opposed to "customers" were "highly diversified"; a phrase it repeated in its 1Q18 10-Q it filed with the SEC five days later on May 7, 2018.

203.    But there was a reason XPO stopped publicly telling investors that the Company's customer base was "highly diversified" by this time in May 2018: Defendants were well aware (or at least they should have been) that Amazon, their

largest customer and the one responsible for the material growth projections made by Defendants in prior quarters, had already put in motion its plans to end its business relationship in the coming months.  Therefore, Defendants hoped investors would not pick up on the new phraseology, and luckily for XPO, they did not.

204.   This was at least partially due to the fact that in XPO's press release announcing the Company's 1Q18 financial results, XPO *re-affirmed* the exact same 2018 financial guidance that it had given on February 7, 2018 – *i.e.*, before Amazon began acting on its plans to leave XPO.

205.   Specifically, the 1Q18 Company press release stated that XPO "reaffirmed both targets in [its] outlook: adjusted EBITDA of *at least $1.6 billion* for full year 2018, and 2017–2018 cumulative free cash flow of *approximately $1 billion.*"

206.   This guidance was materially false and/or misleading because it included Amazon projections that Defendants knew, or at the very least should have known, would not come to fruition because Amazon had already started to leave XPO.  *See* ¶237.

207.   During a call with analysts and investors hosted by XPO on May 3, 2018, defendant Jacobs reaffirmed that the Company remains "on track to deliver on [its] targets of at least $1.6 billion of adjusted EBITDA this year and approximately $1 billion of cumulative free cash flow for 2017 and 2018."

208.   Not only did he reaffirm the Company's materially misleading guidance, but defendant Jacobs told analysts and investors on the May 3 call there was *no reason* to think the business would slow relative to what XPO management had planned in February 2018, implicitly assuming Amazon would not start pulling business at any point in 2018:

- 69 -

[Deutsche Bank analyst:] *[I]s there any kind of reason to think the revenue and EBITDA growth* of the business is actually very strong, not even just the 11% or the 10.4% you did last quarter, but really kind of even within that high single-digit framework that you provided. *Is there any reason to think kind of that type of revenue growth and EBITDA growth that you're achieving even this year slows?* If you can just help us think about that as you look at the pipeline of new business, because that is kind of top of mind right now, especially in the transportation segment?

[Jacobs:] *Sure. There is no reason to think it's going to slow,* and I don't know that we're in any better position than everyone else to predict what the economy is going to do over the next few years. . . . So for the time being and for the foreseeable future, absent some geopolitical events, *life looks good, at least from our point of view just looking at our customers and seeing what our customers are doing and saying.*

209.   This statement by defendant Jacobs was materially misleading at the time because Amazon's actions showed that it had started to act on its previously-stated intention to stop doing business with XPO.  Amazon was XPO's largest customer, but, as the entire world knew at the time (including defendant Jacobs), Amazon also represented one of the most important players in the e-commerce market as a whole.

210.   No reasonable executive in the XPO CEO's shoes could have thought there was "*no reason*" to think the Company would not meet the revenue and earnings growth that XPO had planned at the beginning of the year, knowing what Jacobs actually knew about Amazon at the time, including that: (1) in February 2018 XPO internally *projected* Amazon would generate over $950 million per for 2018; (2) Amazon's stated business plans were to leave XPO over the long term; and (3) Amazon started leaving XPO in the March/April 2018 time frame, as reflected in XPO's lower tonnage and Edgerton warehouse activities, which continued to worsen.

211.   As defendant Jacobs understood, these conditions meant that XPO was losing an important customer and important business partner who gave XPO access to the e-commerce market.

212.   On or around May 9, 2018, defendant Jacobs went on the *CNBC* television show "Mad Money," hosted by Cramer, who told viewers: "To the extent that any investors had any concerns about XPO's relationship with Amazon, Jacobs reassured them that they had nothing to worry about."

213.   During the segment with the Company's CEO, Cramer noted how XPO and Amazon had recently "blown away the numbers" and that XPO and Amazon were "synergistic" in some ways.  Jacobs responded:

> [Jacobs:] Amazon's growing so much faster than we are.  We're proud that we grew 11% (organically) in the first quarter, so compared to other transportation companies, we're at the top.  Amazon grew 45%.
>
> [Cramer:] That's true.
>
> [Jacobs:] They are twice the size of themselves every two years.
>
> [Cramer:] But you play a big role in trying to get bigger . . . packages to people[] everywhere.
>
> [Jacobs:] Absolutely.  *And we have Amazon as a customer* and we have *many other ecommerce players* as a customer.  *We're facilitating their growth*.

214.   Defendant Jacobs's publicly aired statements on "Mad Money" were materially misleading because, although he told viewers that XPO was "facilitating [Amazon's] growth," he failed to mention was that this mammoth customer was simultaneously "facilitating" a slowdown at XPO by starting to unwind its business with the Company – exactly as Amazon told XPO it would do.

**August 2018 Statements**

215.    On August 1, 2018, XPO issued a press release announcing its financial results for 2Q18.  Like it did in the previous quarter, Defendants reaffirmed its guidance that XPO was "on track to deliver on [its] target of at least $1.6 billion of adjusted EBITDA this year, which reflects a 17% increase over 2017."

216.    This guidance was materially false and/or misleading because it included Amazon projections that Defendants knew, or at the very least should have known, would not come to fruition because Amazon had already started to leave XPO.  *See* ¶237.

217.    During a call with analysts and investors hosted by XPO on August 2, 2018, defendant Jacobs reaffirmed this materially misleading earnings and cash flow guidance.

218.    At the time, XPO's cash flow outlook for 2017-2018 was that it would generate "approximately $1 billion." ¶64.  That meant the Company would generate approximately $625 million in free cash flow for 2018 because it had generated $375 million the prior year.  XPO's EBITDA outlook was "at least $1.6 billion" for 2018. ¶64. Jacobs had previously told the market that these figures were the same as the Company's internal numbers and that he would let the market know if anything changed.  ¶66.  Rather than admitting the Company's problems with Amazon, he pretended they did not exist and reaffirmed the Company's full-year guidance:

> [Deutsche Bank analyst:] Just want to understand is kind of the 17% or mid-teens type *EBITDA growth* that *you're posting this year sustainable in your view*, as you look *through '19 and '20, given the book of business* and then, does the CapEx intensity change at all.  I think you're running about 2.8% of sales this year.  Does that actually go down as the sales growth, or should we expect that to kind of move up, given some of the initiatives that you're accelerating?

[Jacobs:] Sure.  So let's do all 3 lines.  Let's do organic *revenue growth, let's do EBITDA growth, let's go free cash flow/CapEx* since they're related to each other.  On the sales side, on the *revenue growth side*, very buoyant, that's partly because it's a good economy, it's a good market.  It's partly because we're doing a lot of company-specific things in terms of operational excellence, in terms of hitting on all 8 cylinders that customers are rewarding us with our greater-than-fair share of their wallet.  So I expect that organic revenue growth is going to stay in this high level, high single digits, low-double digits for the foreseeable future.  *I don't see any slowing down on that.*  EBITDA, we haven't done a bottoms-up budget yet at all, that process is just starting.  On a preliminary basis, yes, I think something in the *15% to 18% range is very reasonable* to assume for continued *EBITDA growth* for the foreseeable future.

In terms of free cash flow, we will generate more free cash flow next year than we did this year, even though we've generated very substantial amount of free cash flow this year.  And this year we'll have about 70-something percent more free cash flow than last year.  I don't think it's going to be 70% more, because I think there's going to be more opportunities for deploying CapEx, but it's way too early in this year to be giving specific guidance for CapEx for next year.  But I can tell you this: last week, we had about 45 of our top executives in for 3 days for quarterly operating review.  People are confident in their business.  Peoples' customers are confident in their business.

219.   Here, as before, Jacobs reassured the market "I don't see any slowing down" on the Company's revenue growth, and similarly told the market that that 15%-18% EBITDA was reasonable, which was significant at the time because XPO had reported 18% growth in the first quarter of the year, but lower growth of 16% growth in the second quarter of the year as Amazon continued to act on its "stated business plans" and, as Jacobs knew, the Amazon business "was going to come to an end."

220.   Defendant Jacobs's EBITDA statement – that it was "*very reasonable* to assume" 16%-18% earnings growth for the foreseeable future – was materially misleading at the time for these and other reasons underlying Amazon's declining business with XPO.

- 73 -

221.   Defendant Jacobs's assertion that XPO would generate even "more free cash flow" in 2019 as compared to 2018 and his statement that "we'll have about 70-something percent more free cash flow [this year, 2018] than last year" was materially misleading for similar reasons.

222.   Defendant Jacobs knew (or recklessly disregarded) that his guidance was misleading because it assumed that Amazon's business would continue growing XPO as it had over the past few years even though he knew that Amazon's business with XPO was "going to come to an end" and that the wind down process had already started.  *See* ¶237.

**October & November 2018 Statements**

223.   On October 31, 2018, XPO issued a press release announcing its financial results for 3Q18.  In the press release, the Company reported that it had missed earnings and revenue expectations due to a "customer bankruptcy."

224.   On November 1, 2018, XPO held a conference call with analysts and investors to discuss the Company's 3Q18 financial results.  During the call, defendant Jacobs chalked up the miss to a "rounding error" of a customer that made XPO "miss the quarter."

225.   These statements by Defendants were materially misleading because the "miss" XPO suffered in 3Q18, was not solely due to some "rounding error" and/or "customer bankruptcy," but was instead at least partially due to the significant slow-down in business from XPO's largest customer, Amazon.

226.   During the November 1 call, Defendants also misrepresented that XPO had made the decision – "our decision" or "our strategy," *see* ¶¶115-116, to

decrease its shipment tonnage, when, in fact, Amazon had made the decision and was having a material effect on tonnage.  *See* ¶¶79-83, 118.

227.   The same applies to XPO's statement that logistics operating income had fallen from $67 million to $60 million, purportedly as a result of the House of Fraser customer "rounding error."  *See* ¶¶109-110, 121.  As the material wind down in XPO's Amazon fulfillment centers shows, *see* ¶¶58-63, 79-94, a material portion of that $7 million drop came from Amazon, as further evidenced by XPO's admissions that Amazon's business represented a higher earnings "margin" than the rest of its customers on average.  *See* ¶¶115-117.

228.   Finally, at the same time, Defendants misleadingly "reaffirmed" 2018 free cash flow guidance and revised guidance of $1.585 billion in earnings for XPO's "full year 2018" targets, despite the fact that they knew (or at the very least should have known) by that point in time that the revised guidance did not merely "reflect[] the impact of the [House of Fraser] customer," *see* ¶110, because that quarter's performance was affected by Amazon, and the statement also failed to reflect Amazon's known downward trajectory toward its stated exit plans.  ¶148.

## VI.   DEFENDANTS FAILED TO DISCLOSE INFORMATION REQUIRED UNDER ITEM 303 OF SEC REGULATION S-K

229.   Defendants violated their duty under Item 303 of Regulation S-K, 17 CFR §229.30, to disclose XPO's unsustainable reliance on Amazon business in the "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A") sections of the following Form 10-K and 10-Q reports that it filed with the SEC during the Class Period: 2Q16 10-Q, 3Q16 10-Q, 2016 10-K, 1Q17 10-Q, 2Q17 10-Q, 3Q17 10-Q, 2017 10-K, 1Q18 10-Q, 2Q18 10-Q, and 3Q18 10-Q ("Class Period Form 10-Ks and 10-Qs").

230.   Among other things, Item 303 required XPO to disclose in the MD&A sections of its 10-K and 10-Q SEC filings "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

231.   There is no question that XPO violated Item 303 in failing to disclose known trends and uncertainties relating to Amazon.  As Defendants knew or (or should have known): (1) Amazon generated material and unsustainable growth for XPO during the 2016-2018 timeframe because – as Amazon told XPO – Amazon was going to stop doing business with XPO over the long term, *see* ¶148; and (2) Amazon acted on its stated business plans and started leaving XPO around April 2018, *see* ¶¶58-63, 79-94.

232.   And Defendants knowingly (or at least recklessly) failed to disclose: (1) Amazon's effect on XPO's operating metrics (*e.g.*, "tonnage" volumes); (2) Amazon's effect on XPO's reported results (*e.g.*, free cash flow, earnings and revenue); and (3) Amazon's effect on XPO's financial prospects (*e.g.*, its earnings and free cash flow guidance).  *See* ¶¶156-228.

233.   Defendants' Item 303 omissions were material.  They were quantitatively material because Amazon was XPO's largest customer and had a quantitatively material effect on its reported operating and financial metrics and prospects.  Individually, and in the aggregate, XPO's Item 303 omissions were material qualitatively because Amazon is one of the largest purchasers of transportation and logistics services in the world, has grown at rates over 45% during 2016-2018 alone, and represents one of the most promising transportation and logistics business

- 76 -

opportunities in the market.  In short, Amazon represented a major force in XPO's growth, future prospects and waning fortunes as it began leaving XPO.

234.   The SEC's Division of Corporate Finance Financial Reporting Manual ("SEC Manual") provides additional context to XPO's Item 303 obligations, further revealing XPO's disclosure violations.  The SEC Manual states that the purpose of the MD&A section "is [to provide] a narrative explanation of the financial statements and other statistical data that the registrant believes will enhance a readers' understanding of its financial condition, changes in financial condition and results of operation."  SEC Manual §9110.1.  The MD&A sections should strive:

> a.     To provide a narrative explanation of a company's financial statements that enables investors to see the company through the eyes of management;
>
> b.     To enhance the overall financial disclosure *and provide the context* within which financial information should be analyzed; and
>
> c.     To provide information about the quality of, and *potential variability of, a company's earnings and cash flow so that investors can ascertain the likelihood that past performance is indicative of future performance*.

SEC Manual §9110.2.

235.   Defendants did not, however, reveal that much of XPO's growth came from a single, unsustainable customer, even though Defendants were aware or were reckless in disregarding that XPO's heavy reliance on Amazon and Amazon's plan to stop doing business with XPO would have a material unfavorable financial impact on XPO's future growth.  Defendants omitted this information from XPO's Class Period 10-Ks and 10-Qs.

236.   Defendants therefore failed to provide the context within which XPO's financial information should be analyzed.   Defendants also failed to provide

information sufficient to allow investors to "ascertain the likelihood that past performance is indicative of future performance." As a result, Defendants violated their duty under Item 303 to disclose a known trend or uncertainty likely to have a "material . . . unfavorable impact on net sales or revenues or income."

## VII.   SCIENTER

237.   As alleged herein, Defendants acted with scienter during the Class Period in that:

(a)   Defendants had access to relevant information on tonnage and logistics, including information on fulfillment center closings resulting from Amazon's departure, and openly discussed this information while failing to disclose the Company's reliance on Amazon's short-term business (*see* ¶¶77-108);

(b)   Defendant Jacobs admitted to knowing that "we made a mistake" in becoming overly reliant on a single customer, Amazon, that had already told XPO it did not plan to be a long-term customer (*see* ¶150);

(c)   The Company provided employees with WARN notices that certain Amazon-dependent warehouses would be closing (*see* ¶¶61, 90, 92);

(d)   Defendants Hardig and Malat resigned abruptly and without explanation from their respective positions as CFO and CSO following disappointing quarterly results during the Class Period (*see* ¶¶97-98, 107-108);

(e)   Defendants Jacobs and Hardig repeatedly certified during the Class Period that they personally supervised and participated in the evaluation of XPO's financial controls and procedures and that the Company's financial disclosures fairly and accurately presented its financial condition (*see* ¶¶164, 171, 176, 182, 191, 195, 200);

- 78 -

(f)     Defendant Jacobs attempted to orchestrate a merger that would have obscured and prevented XPO from having to disclose the negative effects of XPO's loss of Amazon business (*see* ¶¶130-145); and

(g)     The ongoing fraudulent scheme described herein, given the importance of Amazon as a customer, could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of personnel at the highest levels of the Company, including the Individual Defendants (*see* ¶¶32-154).

## VIII.   LOSS CAUSATION

238.   The market for XPO's common stock was open, well-developed, and efficient at all relevant times.  Throughout the Class Period, XPO's common stock traded at artificially inflated prices as a direct result of Defendants' materially misleading statements and omissions of material fact, which were widely disseminated to the securities market, investment analysts, and the investing public. Plaintiffs and other members of the Class purchased or otherwise acquired XPO common stock relying upon the integrity of the market price for XPO's common stock and market information relating to XPO, and they have been damaged thereby.

239.   When the relevant truth became known and/or the materialization of the risk that had been concealed by Defendants occurred, the price of XPO's common stock declined immediately and precipitously because the artificial inflation was removed from the market price of the stock, causing substantial damage to the Plaintiffs and the Class.

240.   During the Class Period, Defendants made false and misleading statements that caused XPO stock to trade at artificially-inflated levels throughout

the Class Period.  *See* ¶¶156-228.  The stock price was inflated because XPO's above-industry levels of growth were not sustainable, despite Defendants' claims to the contrary, given that XPO was heavily reliant on a single customer (Amazon) that had already informed XPO of its intention to cease doing business with XPO.

241.  As the loss of Amazon business and its impact on XPO's financial results entered the market through a series of partial disclosures, detailed below, the price of XPO stock significantly dropped, reflecting the artificial inflation coming out of the price over time.

   A.   **XPO Discloses Missed Third-Quarter Results, Purportedly from a Single UK Customer's Bankruptcy, and the Resignation of Its Chief Strategy Officer**

242.  First, on October 31, 2018, XPO disclosed that Defendant Malat would be resigning and that the Company had missed its third-quarter financial targets due to a purported "rounding error" involving a single small customer in the United Kingdom.  *See* ¶¶105-129.  Although not disclosing XPO's heavy reliance on business from a single, unsustainable source (Amazon), this news partially disclosed the negative financial effects that Amazon's declining business was having on XPO.

243.  This news surprised analysts, including J.P. Morgan on November 1, 2018:

> XPO shares did not fully recover from the company's first miss and guidance reduction as two key concerns appeared to weigh on the stock – the recent departure of two C-suite executives in 90 days combined with implications for the rest of the contract logistics book and pipeline following a customer bankruptcy.

244.  XPO's stock price declined 2.67% on heavy trading volume in the wake of the third-quarter miss and Defendant Malat's surprise resignation.

- 80 -

**B.    XPO Is Next Forced to Disclose a Major Amazon-Related Miss
After Coming "Very Close" to Closing a Deal That Would Have
Doubled Its Size and Buried the Amazon Problem**

245.    By the second week of December 2018, XPO was close to buying
another company in a deal would have effectively *doubled* XPO's $17 billion a year
size.  *See* ¶130.  A deal of this size would have given XPO the ability to largely bury
the ongoing negative effects of Amazon's decision to leave XPO.

246.    But XPO ultimately squandered its prospects to complete a merger by
disclosing additional negative information related to its loss of Amazon business.
After letting slip material non-public information at private lunch with analysts, XPO
was forced on December 12, 2018, to reveal that: (1) XPO was not going to make its
2018 free cash flow guidance of $625 million without accelerating its use of nearly all
of the Company's $188 million in available tax benefits; (2) XPO would be lowering
its free cash flow guidance for the entire 2019 year; and (3) XPO would be revising its
"base-case" growth assumptions that defendant Jacobs communicated just six
weeks earlier, from 15%-18% growth down to 12%-15%.  *See* ¶¶133-140.  This news
directly implicated XPO's loss of Amazon business – having begun losing Amazon in
2018, the Company was unable to meet its free cash flow guidance, and the effects of
Amazon's departure meant XPO would not earn or grow as much in 2019 as it had
previously told the market.

247.    The negative news from XPO continued to ripple through the market as,
on the following day of December 13, 2018, a short seller (Spruce Point) published a
negative report that criticized XPO's management and the accuracy and clarity of
XPO's disclosures to investors.  Although analysts were highly skeptical of the

report, *see* ¶141, it nonetheless kept the market focused on XPO and its highly-disappointing December 12, 2018 disclosure.

248.    The market was indeed dismayed by XPO's surprise December 12 announcement.  Analysts from Wells Fargo, for example, wrote on December 14, 2018 that "[t]he free cash flow guide for 2019 [of $650M] was disappointing relative to prior Street estimates of $884MM." Analysts from J.P. Morgan stated on December 13, 2018 that "[w]e are lowering our estimates following [XPO's December 12, 2018] Reg FD filing that provided guidance below 2019 expectations . . . ."  J.P. Morgan also expressed continued concern: "[t]he stock appears completely disconnected from fundamentals as an opportunistically timed short report this morning targeted XPO . . . ."

249.    Roughly a month later, on January 22, 2019, J.P. Morgan summarized investor sentiment at the time of XPO's December 12 disclosure, noting that a "number of investors deeming the stock 'untouchable' after the recent C-suite turnover, earnings miss, and Reg FD disclosure were capped by [the short-seller] report."

250.    XPO's December 12 disclosure triggered a two-day decline that wiped out *33% of the company's market value* on heavy trading volume, as its per share stock price fell from $66.69 at the close of trading on December 11, 2018 to $44.50 at the close of trading on December 13, 2018.

251.    Analysts at the time noted XPO's lack of transparency.  For example, on December 12, 2018, Stephens analysts rated XPO "Equal-Weight given limited visibility into the drivers of [XPO's] business" and "limited commentary in the Company's 8K filing as to the drivers of the reduced adj. EBITDA growth outlook."

On December 17, 2018, a Barclays analyst recommended XPO "provide a more transparent income statement."  Thus, despite revealing Amazon-related misses, the December 12 announcement did not fully reveal the truth about Amazon's inevitable and ongoing departure from XPO.

252.   Without full transparency, analysts continued to believe XPO's claims about being well diversified and still predicted that XPO had good long-term growth potential.  For example, J.P. Morgan analysts reported on December 13, 2018 that "[l]ong-term growth potential and margin outlook remain intact," because "XPO has built a diverse transportation and logistics model that operated well in a strong freight market." That same day, Jeffries analysts predicted XPO having significantly higher EBIT growth than logistics peers because of XPO's "differentiated e-commerce logistics platform," and Morgan Stanley analysts remained favorable on XPO because, in part, "XPO is the most diversified company we cover." Analysts at the time thus viewed XPO's downward revision as "less about structural impairment in demand, but rather prudent conservatism given slowdown in Europe and trade concerns," as described by Deutsche Bank on December 12, 2018.

253.   But XPO would eventually be forced to reveal the truth about Amazon because the damage to XPO's stock price from the December 12 announcement meant that XPO's planned blockbuster merger was no longer a viable way for XPO to bury the Amazon problem.

C.   **XPO Finally Discloses the Truth That It Lost Its "Largest Customer" (Amazon) And Knew From The Start That Amazon Was Going to Leave**

254.   Because it failed to secure a merger partner, on February 14, 2019, XPO had to file its own standalone financial statements for the quarter and year ending

2018 without the benefit of mixing XPO's financial statements with those of a similarly-sized company on a "consolidated" basis.  After the market closed on that date, XPO filed several reports with the SEC that further revealed the effects that Amazon had on XPO's business.  And Jacobs led a conference call the next day by stating: "we missed the quarter. . . . *[a]nd in December, our largest customer pulled back* their postal injection business, which is part of last mile.  *That affected our EBITDA in December.  This had a significant impact in December and in the quarter.*"

255.    Jacobs then admitted that Amazon's business contributed materially to XPO's growth over the preceding few years and that he knew the growth would come to end given Amazon's stated business plans:

> [H]ave we grown with [our largest customer]?  *Yes, we grew a lot up with them over the last few years.*  And *we knew* that, *that business wasn't going to stay forever* and forever and ever and ever *because of that particular customer's stated business plans* and because that customer is transactional in some respect in terms of the nature that they have with their vendors.

256.    Analysts asked questions about this February 15, 2018 admission, demonstrating that reasonable investors (including analysts who covered XPO) read XPO's disclosures – and assurances about House of Fraser being a "one off" occurrence – to mean that XPO did not expose them to the kind of extreme customer and market concentration that Amazon represented:

> [BofA Merrill Lynch analyst:] So I wanted to start talking about customer concentration.  One of the things that I think XPO has touted as one of its strengths is that it's not overly focused on any particular customer.  But here, we've seen kind of 2 quarters in a row where some disappointing news from a particular customer has really put a real dent in results.  And I want to talk about – I kind of want to get your thoughts on the extent to which maybe that perception is changing or how you manage your customer base maybe has shifted? . . .

> [Jacobs:] Well, in 2018, our top 5 customers represented about 11% of revenue, and you saw that in the K.  The largest customer,

however, represented roughly about 4%, 5% of that. 2/3 of that business has gone away, so that's a body blow, no question about it. Going forward, with that customer having downsized, we anticipate that our top 5 customers in 2019 will represent about 8% of revenue. So customer concentration will be less. But when you lose your – when you lose the majority of your top customer's business, that hurts. Nothing you can do – there's nothing positive. It's only negative.

257.   On this same subject Jacobs later admitted:

I'd also talk to you about our customer concentration. *Our customer concentration, it was too much*. We made a mistake letting one customer get $900 million of business with us. [It was] *just too much*. [It was] *too much concentration*. Previously, if you looked at our top 5 customers, it was about 11% of revenue and the biggest one was a little more than 1/2 of that, so *it was just too much concentration*. Going forward, we're going to be much more diversified. Our top 5 customers this year should be something around 7% of revenue and no customer will be more than 2% of revenue.

258.   Analysts reacted negatively to the news that XPO had been overly reliant on a single, unsustainable customer whose business was already starting to go away. On February 15, 2019, Barclays wrote that they were "materially lowering our price on XPO shares given a significant strategic shift and continuing earning headwinds," while noting the loss of "a large shipper (likely Amazon)." And SunTrust analysts, on February 14, 2019, deemed the results "[h]eartbreaking."

259.   Following the February 15 conference call that revealed Amazon's strategic and financial importance to XPO (before the market opened), the Company's stock price fell from a close of $59.55 the day before to $51.97 at the close of trading, *for a loss of 12.73%*, on heavy trading volume.

260.   As a result of their purchases of XPO stock during the Class Period, the Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## IX.    NO SAFE HARBOR

261.    The statutory safe harbor provided for forward-looking statements under certain conditions does not apply to any of the allegedly false statements pled in this Complaint.  The specific statements pled herein were not identified as forward-looking statements when made.

262.    To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

263.    Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false or misleading forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false or misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of XPO who knew that those statements were false or misleading when made.

## X.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

264.    Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)    XPO's common stock traded in efficient markets;

- 86 -

(d)    The misrepresentations alleged herein would tend to induce a reasonable investor to misjudge the value of the XPO's common stock; and

(e)    Plaintiffs and other members of the Class purchased the Company's common stock between the time Defendants misrepresented or failed to disclose material facts and the time that the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

265.    At all relevant times, the markets for XPO's stock were efficient for the following reasons, among others: (i) the Company filed periodic public reports with the SEC; and (ii) XPO regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.  Plaintiffs and the Class relied on the price of XPO's common stock, which reflected all information in the market, including the misstatements by Defendants.

XI.    CLASS ACTION ALLEGATIONS

266.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Class.  The Class is defined as:

> All persons and entities who purchased or otherwise acquired XPO common stock between August 3, 2016 through and including February 14, 2019 (the "Class Period"), including those who purchased or otherwise acquired XPO common stock in or traceable to the Company's July 20, 2017 Secondary Offering.

267.    Excluded from the Class are Defendants herein, members of the immediate families of each of the Defendants, any person, firm, trust, corporation, officer, director, or other individual or entity in which any defendant has a controlling

interest or which is related to or affiliated with any defendant, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

268.   Because XPO has tens of millions of shares of common stock outstanding, and because the Company's shares were actively traded on the NYSE, members of the Class are so numerous that joinder of all members is impracticable. According to XPO's 2018 10-K, as of February 8, 2019 (shortly before the close of the Class Period), XPO had more than 109 million shares of common stock outstanding. While the exact number of Class members can only be determined by appropriate discovery, Plaintiffs believe Class members number at least in the thousands and that they are geographically dispersed.  Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiffs have retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intend to prosecute this action vigorously.

269.   Plaintiffs' claims are typical of the claims of the other members of the Class because Plaintiffs' and all the Class members' damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to Defendants.  Plaintiffs do not have any interests antagonistic to, or in conflict with, the Class.

270.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to seek redress for the

wrongful conduct alleged.  Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

271.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)   whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)   whether statements made by Defendants during the Class Period misrepresented and/or omitted material facts about XPO and its business;

(c)   whether the price of XPO common stock was artificially inflated during the Class Period; and

(d)   the extent of injuries sustained by members of the Class and the appropriate measure of damages.

## XII.   CAUSES OF ACTION

### COUNT I

### Violation of §10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder

272.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  This count is brought against all Defendants.

273.   During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

- 89 -

274.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon those who purchased or otherwise acquired the Company's common stock during the Class Period.

275.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock.  Plaintiffs and the Class would not have purchased the Company's common stock at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' false and/or misleading statements and omissions.

276.    By reason of the foregoing, Defendants violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### Violation of §20(a) of the Exchange Act

277.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

278.    During the Class Period, the Individual Defendants participated in the operation and management of XPO, and conducted and participated, directly and indirectly, in the conduct of XPO's business affairs.  Because of their senior positions, they knew the adverse non-public information about XPO's business practices.

279.    As officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to XPO's financial condition and results of operations, and to promptly correct any public statements issued by XPO that had become materially false or misleading.

280.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did control the contents of the various reports, press releases, and public filings that XPO disseminated in the marketplace during the Class Period concerning XPO's results and operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause XPO to engage in the wrongful acts complained of herein.  XPO, in turn, controlled the Individual Defendants and all of its employees.  Defendants, therefore, were "controlling persons" within the meaning of §20(a) of the Exchange Act.  In this capacity, they participated in the alleged unlawful conduct that artificially inflated the market price of XPO stock.

281.    By reason of the foregoing, Defendants violated §20(a) of the Exchange Act.

### COUNT III

### Violation of §11 of the Securities Act

282.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  With respect to this Count, Plaintiffs also exclude allegations that could be construed as alleging fraud or intentional misconduct, as this Count is based solely on claims of strict liability and negligence.

283.    This Count is brought against Defendants XPO, Jacobs, and Hardig on behalf of all proposed Securities Act Class members who purchased XPO's common

- 91 -

stock in or traceable to XPO's July 20, 2017 Secondary Offering detailed above and were damaged thereby.  As part of its Secondary Offering, XPO filed an SEC Form S-3 Registration Statement with the SEC on July 17, 2017.  For purposes of this Count, the Registration Statement incorporated by reference the following false and misleading SEC filings by the Company: (1) XPO's 2016 Form 10-K; and (2) XPO's 1Q17 Form 10-Q.  As set forth in ¶¶183-187, the Registration Statement issued in connection with the Secondary Offering was false and misleading in that the 2016 10-K and 1Q17 10-Q it incorporated omitted material facts required to be stated therein, contained untrue statements of material facts, and/or omitted facts necessary to make the statements made therein not misleading.

284.   XPO was the registrant for the Secondary Offering.  As the issuer of its common stock, XPO is strictly liable to Plaintiffs and the Class for the materially inaccurate statements in the Registration Statement and the failure of the Registration Statement to be complete and disclose the material information required pursuant to the regulations governing its preparation.

285.   Defendants Jacobs and Hardig were responsible for the contents and dissemination of the Registration Statement.  Defendants Jacobs and Hardig were signatories of the false or misleading Registration Statement.  Neither Jacobs nor Hardig made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true, did not contain omissions of any material facts, and were not misleading.

286.   At the time of their purchases of XPO shares, Plaintiffs and other members of the Class did not have knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior

to the disclosures herein.  Less than one year has elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiffs commenced this action.  Less than three years have elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiffs commenced this action.

287.   By reason of the foregoing, Defendants Jacobs and Hardig violated §11 of the Securities Act.

## COUNT IV

### Violation of §15 of the Securities Act

288.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  With respect to this Count, Plaintiffs also exclude allegations that could be construed as alleging fraud or intentional misconduct, as this Count is based solely on claims of strict liability and/or negligence.

289.   This Count is brought against Defendants Jacobs and Hardig.

290.   Defendants Jacobs and Hardig were each control persons of XPO at the time of XPO's July 20, 2017 Secondary Offering, in that they exercised actual power over the Company by virtue of their positions as directors and/or senior officers of XPO.  As the CEO and CFO of XPO, Defendants Jacobs and Hardig, respectively, were able to, and did influence, directly and indirectly, the contents of the Offering Documents.

291.   Each of the Defendants named herein was a culpable participant in the violation of §11 of the Securities Act alleged in Count III above, based on their having signed the Registration Statement and having otherwise participated in the process which allowed the Secondary Offering to be successfully completed.

- 93 -

292.    By reason of the foregoing, Defendants Jacobs and Hardig violated §15 of the Securities Act.

XIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action and designating Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such equitable/injunctive or other relief as may be deemed appropriate by the Court.

XIV.   JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED: June 3, 2019                ROBBINS GELLER RUDMAN
                                    & DOWD LLP
                                   JASON C. DAVIS (phv10099)


                                        s/ JASON C. DAVIS
                                   JASON C. DAVIS (phv10099)

                                   Post Montgomery Center
                                   One Montgomery Street, Suite 1800
                                   San Francisco, CA  94104
                                   Telephone:  415/288-4545
                                   415/288-4534 (fax)
                                   jdavis@rgrdlaw.com

- 94 -

**ROBBINS GELLER RUDMAN
 & DOWD LLP
SPENCER A. BURKHOLZ (phv01417)
MATTHEW I. ALPERT(phv10035)
ALEXI H. PFEFFER-GILLETT (phv10036)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone: 619/231-1058
619/231-7423(fax)
spenceb@rgrdlaw.com
malpert@rgrdlaw.com
agillett@rgrdlaw.com**

**Lead Counsel for Plaintiffs and the Class**

**IZARD, KINDALL & RAABE, LLP
ROBERT A. IZARD (ct01601)
CHRISTOPHER M. BARRETT (ct30151)
29 South Main Street, Suite 305
West Hartford, CT  06107
Telephone: 860/493-6292
860/493-6290 (fax)
rizard@ikrlaw.com
cbarrett@ikrlaw.com**

**Local Counsel**

**LABATON SUCHAROW LLP
JONATHAN GARDNER (*pro hac*
forthcoming)
ALFRED L. FATALE III (*pro hac*
forthcoming)
140 Broadway, 34th Floor
New York, NY  10005
Telephone: 212/907-0700
212/818-0477 (fax)
jgardner@labaton.com
afatale@labaton.com**

**Additional Counsel for Plaintiff Norfolk
County Retirement System**

<u>**CERTIFICATE OF SERVICE**</u>

**I hereby certify under penalty of perjury that on June 3, 2019, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.**

<u>   s/ JASON C. DAVIS                 </u>
**JASON C. DAVIS (phv10099)**

**ROBBINS GELLER RUDMAN**
   **& DOWD LLP**
**Post Montgomery Center**
**One Montgomery Street, Suite 1800**
**San Francisco, CA  94104**
**Telephone:  415/288-4545**
**415/288-4534 (fax)**

**E-mail:  jdavis@rgrdlaw.com**

**- 96 -**

# Mailing Information for a Case 3:18-cv-02062-VLB Labul v. XPO Logistics, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Matthew Isaac Alpert**
  malpert@rgrdlaw.com,kathyj@rgrdlaw.com,e_file_sd@rgrdlaw.com,kwoods@rgrdlaw.com,2127683420@filings.docketbird.com

- **Christopher M. Barrett**
  cbarrett@ikrlaw.com,7457869420@filings.docketbird.com

- **Spencer A. Burkholz**
  SpenceB@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Jason Davis**
  jdavis@rgrdlaw.com

- **Martin Flumenbaum**
  mflumenbaum@paulweiss.com,mao_fednational@paulweiss.com

- **James I. Glasser**
  jglasser@wiggin.com,akalinowski@wiggin.com,dcoppola@wiggin.com

- **J. Alexander Hood , II**
  ahood@pomlaw.com

- **Shannon L. Hopkins**
  shopkins@zlk.com,shalliday@zlk.com

- **Evan A. Kubota**
  EKubota@paulweiss.com,mao_fednational@paulweiss.com

- **Jeremy A. Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,lpvega@pomlaw.com

- **Brian P. Murray**
  bmurray@glancylaw.com,brian-murray-4237@ecf.pacerpro.com

- **William H. Narwold**
  bnarwold@motleyrice.com,mjasinski@motleyrice.com,vlepine@motleyrice.com,ajanelle@motleyrice.com

- **Alexi Pfeffer-Gillett**
  agillett@rgrdlaw.com

- **David R. Schaefer**
  dschaefer@bswlaw.com,dmurray@bswlaw.com,jrivera@bswlaw.com

- **Daniel Sinnreich**
  dsinnreich@paulweiss.com,mao_fednational@paulweiss.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`