UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| LARRY LABUL, Individually and on Behalf of All Others Similarly Situated, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>XPO LOGISTICS, INC., et al., )<br>)<br>Defendants. )<br>)<br>)<br>) | No. 3:18-cv-02062-SRU<br><br><u>CLASS ACTION</u><br><br>PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT<br><br>**August 23, 2019** |

**Oral Argument Requested**

# TABLE OF CONTENTS

**Page**

I.  Introduction ...........................................................................................................................1

II. Argument ...............................................................................................................................4

    A.    The Complaint Sufficiently Pleads Actionable Material Misrepresentations and Omissions .................................................................................................................4

        1.    Defendants Materially Misstated that XPO Reversed Its Downward Spiral by Developing a New, "Well Diversified" and "Sustainable" Growth Source ...................................................................4

        2.    Defendants Materially Misstated the Reasons Why XPO's Freight Tonnage Growth Numbers Started to Fall ...................................................7

        3.    Defendants Materially Misstated that XPO Was "on Track" and "Nothing's Slowed Down at All" to Making Its Double-Digit Growth Targets .........................................................................................12

        4.    Defendants Materially Misstated that XPO's Third-Quarter 2018 Earnings "Miss" Was the Sole Fault of One "Rounding Error"-Sized Customer .................................................................................................16

    B.    The Complaint Pleads Actionable Omissions Under Item 303 of SEC Regulation S-K ("Item 303") .................................................................................18

    C.    The Complaint Sufficiently Pleads Defendants' Scienter .....................................25

        1.    Defendants' Own Admissions to Analysts that "We Knew" the Amazon-Driven Growth "Wasn't Going to Stay" Because of Amazon's "Stated Business Plans" ..........................................................25

        2.    Defendants' Access to Internal Reports and Statements Showing Amazon Was "Dropping" XPO by the Spring and Summer of 2018 ........26

        3.    Defendants Hardig and Malat's "Shocking" Resignations After Amazon Dropped XPO's Tonnage Numbers and Dropped XPO from Its Strategic "Prime Week" ............................................................34

        4.    Defendants' Pursuit of a Merger that Would "Effectively Double" XPO's Size (and Issuance of Stock) Shows Motive ..................................35

    D.    The Complaint Sufficiently Pleads Loss Causation ...............................................37

    E.    The Complaint Pleads §§20(a) and 15 Control Person Violations .........................39

III. Conclusion ...........................................................................................................................40

Cases\4819-9949-0209.v1-8/23/19

# TABLE OF AUTHORITIES

**Page**

## CASES

*Acticon AG v. China N.E. Petroleum Holdings, Ltd.*,
    692 F.3d 34 (2d Cir. 2012)....................................................................................39

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)............................................................................................30

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
    750 F.3d 227 (2d Cir. 2014)................................................................................37

*Christine Asia Co. v. Alibaba Grp. Holding Ltd.*,
    192 F. Supp. 3d 456 (S.D.N.Y. 2016).................................................................24

*Christine Asia Co. v. Yun Ma*,
    718 F. App'x 20 (2d Cir. 2017) .....................................................................10, 24

*City of Providence v. Aeropostale, Inc.*,
    2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) ...................................16, 17, 33, 34

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005)......................................................................................37, 38

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
    270 F.3d 645 (8th Cir. 2001) ..............................................................................35

*Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*,
    268 F. Supp. 3d 526 (S.D.N.Y. 2017)............................................................11, 17

*Freudenberg v. E*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)..........................................................6, 8, 37, 38

*Hutchins v. NBTY, Inc.*,
    2012 WL 1078823 (E.D.N.Y. Mar. 30, 2012) .................................10, 12, 13, 14

*In re CannaVest Corp. Sec. Litig.*,
    307 F. Supp. 3d 222 (S.D.N.Y. 2018).................................................................39

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
    2018 WL 2382600 (S.D.N.Y. May 24, 2018) .....................................................27

*In re Dynex Capital, Inc. Sec. Litig.*,
    2009 WL 3380621 (S.D.N.Y. Oct. 19, 2009) .....................................................28

*In re Express Scripts Holdings Co. Sec. Litig.*,
    773 F. App'x 9 (2d Cir. 2019) ............................................................14, 15, 32, 33

- iii -

**Page**

*In re GE Sec. Litig.*,
    857 F. Supp. 2d 367 (S.D.N.Y. 2012)............................................................23, 31

*In re Guilford Mills, Inc., Sec. Litig.*,
    1999 WL 33248953 (S.D.N.Y. July 21, 1999) .......................................................37

*In re Hertz Glob. Holdings, Inc. Sec. Litig.*,
    2015 WL 4469143 (D.N.J. July 22, 2015)..............................................................33

*In re Hi-Crush Partners L.P. Sec. Litig.*,
    2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) ...................................................14, 31

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
    982 F. Supp. 2d 277 (S.D.N.Y. 2013)............................................................35, 37

*In re Prudential Sec. Ltd. P'ships Litig.*,
    930 F. Supp. 68 (S.D.N.Y. 1996) .........................................................................15

*In re Quintel Entm't Inc. Sec. Litig.*,
    72 F. Supp. 2d 283 (S.D.N.Y. 1999)......................................................................12

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001)..............................................................27, 29, 30, 35

*In re Scottish Re Grp. Sec. Litig.*,
    524 F. Supp. 2d 370 (S.D.N.Y. 2007).....................................................................34

*In re Sturm, Ruger & Co., Inc. Sec. Litig.*,
    2011 WL 494753 (D. Conn. Feb. 7, 2011) ..........................................................27

*In re Tempur Sealy Int'l, Inc. Sec. Litig.*,
    2019 WL 1368787 (S.D.N.Y. Mar. 26, 2019) .......................................................24

*In re Vivendi, S.A. Sec. Litig*,
    838 F.3d 223 (2d Cir. 2016)............................................................12, 13, 15, 39

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
    818 F.3d 85 (2d Cir. 2016).................................................................................6, 10

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009)..................................................................................23

*Litwin v. Blackstone Grp., L.P.*,
    634 F.3d 706 (2d Cir. 2011)..............................................................4, 10, 19, 21

Cases\4819-9949-0209.v1-8/23/19

**Page**

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir. 2008) .................................................35

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011).................................................4, 27

*Merrill Lynch & Co. v. Allegheny Energy, Inc.*,
    500 F.3d 171 (2d Cir. 2007).................................................19

*Meyer v. JinkoSolar Holdings Co.*,
    761 F.3d 245 (2d Cir. 2014).................................................4

*N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*,
    709 F.3d 109 (2d Cir. 2013).................................................30

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
    693 F.3d 145 (2d Cir. 2012).................................................19

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
    455 F. App'x 10 (2d Cir. 2011) .................................................29, 31, 34

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000).................................................*passim*

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
    830 F.3d 376 (6th Cir. 2016) .................................................39

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
    367 F. Supp. 3d 16 (S.D.N.Y. 2019).................................................11, 17, 31

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    __ U.S. __, 135 S. Ct. 1318 (2015).................................................6, 11, 16, 17

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
    681 F.3d 114 (2d Cir. 2012).................................................*passim*

*Patriot Expl., LLC v. Sandridge Energy, Inc.*,
    951 F. Supp. 2d 331 (D. Conn. 2013).................................................7

*Perez v. Higher One Holdings, Inc.*,
    2017 WL 4246775 (D. Conn. Sept. 25, 2017).................................................5, 12, 13, 25

*Pozniak v. Imperial Chem. Indus. PLC*,
    2004 WL 2186546 (S.D.N.Y. Sept. 28, 2004).................................................31

**Page**

*Reese v. Malone,*
    747 F.3d 557 (9th Cir. 2014) .........................................................................23, 31

*Ret Sys: of Gov't of the V.I. v. Blandord,*
    794 F.3d 297 (2d Cir. 2015)................................................................................31

*River Birch Capital, LLC v. Jack Cooper Holdings Corp.,*
    2019 WL 1099943 (S.D.N.Y. Mar. 8, 2019) ........................................................8

*Rothman v. Gregor,*
    220 F.3d 81 (2d Cir. 2000)................................................................................35

*Schoenhaut v. Am. Sensors,*
    986 F. Supp. 785 (S.D.N.Y. 1997) .....................................................................15

*SEC v. PIMCO Advisors Fund Mgmt. LLC,*
    341 F. Supp. 2d 454 (S.D.N.Y. 2004).................................................................11

*Sheet Metal Workers Local 32 Pension Fund v. Terex Corp.,*
    2018 WL 1587457 (D. Conn. Mar. 31, 2018) .............................................. *passim*

*Stratte-McClure v. Stanley,*
    776 F.3d 94 (2d Cir. 2015)...........................................................................18, 22

*Susie Ong v. Chipotle Mexican Grill, Inc.,*
    2017 WL 933108 (S.D.N.Y. Mar. 8, 2017) ........................................................24

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.,*
    531 F.3d 190 (2d Cir. 2008)...................................................................25, 29, 32

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007).......................................................................4, 25, 29, 34

*United States v. Ferguson,*
    553 F. Supp. 2d 145 (D. Conn. 2008)................................................................11

*Wallace v. IntraLinks,*
    2013 WL 1907685 (S.D.N.Y. May 8, 2013) .......................................................31

Page

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
  §77k..........................................................................................................4, 18, 39
  §77k(a) ...........................................................................................................4
  §77z-2(a) .......................................................................................................15
  §77z-2(c)(1) ...................................................................................................15
  §78j(b)...............................................................................................4, 16, 39
  §78o..............................................................................................................39
  §78t(a) ..........................................................................................................39
  §78u-5(a) .......................................................................................................15
  §78u-5(c)(1) ...................................................................................................15

Federal Rules of Civil Procedure
  Rule 10b-5...................................................................................................4, 18
  Rule 12(b)(6)...................................................................................................4

**SECONDARY AUTHORITIES**

Management's Discussion and Analysis of Financial Condition and Results of
  Operation; Certain Investment Company Disclosures, SEC Exchange Act
  Release No. 6835,
  1989 WL 1092885 (May 18, 1989) .........................................................18, 19, 20

## I.   Introduction

Throughout the August 3, 2016 through February 14, 2019 Class Period ("Class Period"), defendants XPO Logistics Inc. ("XPO" or the "Company") and XPO's Chief Executive Officer ("CEO") Bradley S. Jacobs ("Jacobs"), Chief Financial Officer ("CFO") John J. Hardig ("Hardig"), and Chief Strategy Officer ("CSO") Scott B. Malat ("Malat") made materially false and misleading statements about the source of XPO's newfound growth leading up to 2018, and then concealed the fact that its growth engine started to disappear in early 2018.  XPO is a trucking and warehousing company that was losing money for five years in a row until 2Q16.[1]  At that time, Defendants reported XPO's first profit and told the market XPO had hit a "positive inflection point" in the life of the business while forecasting double-digit growth.  The key to XPO's newfound success, according to Defendants, was that XPO was now a "very well diversified" business whose growth was sustainable because of its supposedly "broad based" business.  The *real* secret to XPO's success, however, was anything but diversification.  In reality, one single, secret customer accounted for XPO's transformation – that customer was Amazon.  By the end of 2017, Amazon accounted for all of XPO's growth but XPO continued to tout diversification.  As one stock analyst put it, "[o]ne of the things that I think XPO has touted as one of its strengths is that it's not overly focused on any particular customer."  ¶149.[2]

XPO's growth engine started to falter in early 2018, as hundreds of XPO tractor trailers started disappearing from Amazon shipping facilities and an internal Amazon newsletter recorded the fact that Amazon was "dropping" XPO.  ¶81.  One witness explained, "all the XPO trailers disappeared from the yard," pointing out that "when there's 400 trailers sitting out there and you use to see XPO all the time and then all of a sudden there's none, you know it's an obvious sign."  ¶62.

---

[1]   XPO's fiscal quarters are abbreviated throughout.  Thus, "2Q16" for example, represents the second quarter of 2016.

[2]   Unless otherwise noted, all "¶_" and "¶¶_" references are to the Consolidated Class Action Complaint for Violations of the Federal Securities Laws (ECF No. 102) ("Complaint").

Before the summer of 2018, XPO collected sales and transportation data and synthesized the data into "sales reports" and "tonnage reports" that showed XPO's trucking business was falling "because of a drop in tonnage from Amazon." ¶¶76-79. One Amazon manager agreed that Amazon "dropped" XPO prior to the summer of 2018. ¶81. An XPO Senior Vice President wrote an email to another manager at XPO in June 2018 recording the fact that XPO knew it was in the midst of losing Amazon. ¶85. Management tried to keep the departure a secret from workers so that they would not "panic." *Id.* Around this time, XPO started to wind down operations at three strategically important fulfillment facilities that it ran exclusively for Amazon, ¶¶58, 84, 92, and Amazon cut its crucial "Prime Week" business that it gave to XPO. ¶¶94, 119. XPO's Amazon-specific operations showed objective signs of distress: "Something's wrong here," as one witness put it, "it's kind of like you walk into a store and the shelves are half empty." ¶86.

As these facts unfolded, Defendants still held XPO out as a diversified growth story and made blatantly false statements about the reasons why XPO's key operating numbers ("tonnage" numbers) started to fall in 2018. Rather than telling the truth that the Company's largest customer, Amazon, was acting on its "stated business plans" of leaving XPO and that XPO was doing its best – but failing – to pick up the slack that Amazon was leaving behind, Defendants said the numbers were falling as part of some intentional "strategy" or "decision" by XPO – in other words, the numbers were falling because XPO had chosen a course of action that made them fall. Nothing could have been further from the truth: the numbers were falling because Amazon was leaving. As Amazon's actions started to weigh on XPO's financial results, XPO reported "misses" that it falsely attributed to a "rounding error"-sized customer when, in reality, one of the largest companies in the world – and XPO's number one customer – was leaving, thereby making it impossible to meet XPO's self-created double-digit growth targets. Amazon was the source of that growth all along. Defendants had access to all of this information. Rather than reveal the truth, they attempted to bury

the Amazon problem through a merger that CEO Jacobs admitted would have doubled XPO in size right at the end of 2018, thus creating a new entity with new "consolidated" financial reports that would obscure XPO-specific problems.  But it fell apart because XPO was required to disclose depressing financial performance at the end of 2018, making it impossible for XPO to use its inflated stock to complete its merger, which, as CEO Jacobs admitted, was "very close" to happening.  ¶130.

After the merger fell apart, there was nowhere left to hide the Amazon departure.  In February 2019, when Defendants finally revealed to the market that their largest customer was leaving, the market was stunned.  XPO's CEO Jacobs publicly admitted that the Company "knew" its largest customer was not going to stay for the long-term.  Defendant Jacobs also admitted that XPO had "made a mistake" by taking on "too much concentration" in its largest customer during the Class Period and that XPO experienced a "body blow" when that customer took away its business.  ¶¶149-150.  He never named the "largest customer," but XPO employees leaked that the customer was Amazon.  Defendants CFO Hardig and CSO Malat were nowhere to be found at the time, having quit XPO in the summer and fall of 2018, right as XPO was feeling increasing effects of the Amazon "body blow."  After Malat quit, a Barclays analyst commented, "[t]he sudden and unexpected departure of Scott Malat, XPO's Chief Strategy Officer, did come as a shock to many in the market, especially following the recent departure of CFO John Hardig this summer."  ¶108.

XPO's Amazon-driven double-digit growth story was over, as Defendants knew, by the spring of 2018.  Now Defendants attempt to avoid even answering the Complaint.  But their arguments fail at the threshold because they discount the Complaint's allegations and draw all inferences in Defendants' favor, which is exactly the opposite of the standard at the pleading stage. Defendants then argue that they made no false or misleading statements; or, if they did, they were not "material"; or if they were materially false and misleading, then Defendants had no access to information showing the truth, nor any motive to say anything but the whole truth.  Then they make

a last-ditch effort to avoid answering the Complaint by arguing it does not plead loss causation. All of these arguments lack merit. Because the Complaint readily pleads violations of the securities laws, the Court should deny Defendants' motions to dismiss.

## II.    Argument

Under Fed. R. Civ. P. 12(b)(6), the Court must "accept all factual allegations . . . as true," and construe them in the light most favorable to a plaintiff. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007).[3] In order to establish a violation of §10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, a plaintiff must plead "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011). "Section 11 of the Securities Act imposes liability on issuers and other signatories of a registration statement that, upon becoming effective, 'contain[s] an untrue statement of a material fact or omit[s] to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'" *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715 (2d Cir. 2011) (quoting 15 U.S.C. §77k(a)).

### A.    The Complaint Sufficiently Pleads Actionable Material Misrepresentations and Omissions

#### 1.    Defendants Materially Misstated that XPO Reversed Its Downward Spiral by Developing a New, "Well Diversified" and "Sustainable" Growth Source

It is well-settled within the Second Circuit that "[e]ven when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014). In this case,

---

[3]    All citations and footnotes are omitted and emphasis is added unless otherwise noted.

XPO had been in a downward, money-losing spiral for years until August 2016, when, all of a sudden, XPO reported its first profitable quarter. ¶¶35-46. Professional securities analysts cheered, calling 2Q16 a "dream quarter," while XPO's CEO, defendant Jacobs, referred to the quarter as a "positive inflection point" and connected "record" profits and growth "action plan" to a key source – XPO's "very well diversified" business. ¶¶36-37. On May 4, 2017, analysts asked whether Jacobs was aware of "anything" being "unsustainable" about XPO's growth, and he responded that he was not, while pointing to "broad based" growth. ¶178. Defendants continued to make statements like these throughout the Class Period, ¶¶4, 36, 39 n.7, 96, 157-159, 165-167, 172-173, 177, 180, 185, 188-189, 192-193, 196-197, 199, 202, and stock analysts took these statements to mean, as one analyst stated, that XPO's growth was "***not overly focused on any particular customer***." ¶149. These statements were materially false or misleading at the time.

In reality, as Jacobs admitted at the end of the Class Period, XPO's growth was overly focused on one particular – and secret – customer all along, and Defendants knew it. ¶149.[4] Responding to a stock analyst's post-Class Period question about how XPO acquired the secret customer and how material the customer was to XPO's ***growth***, Jacobs admitted, "So the more ***important part*** of your question is, have ***we grown*** with them? ***Yes, we grew a lot up*** with them ***over the last few years***. And ***we knew*** that, ***that business wasn't going to stay***." ¶148. Jacobs admitted that the business accounted for "a little more than 1/2" of 11% of XPO's revenues – or about 5.5%-6% – which, according to Jacobs, "was just too much concentration." ¶257. The overconcentration grew from $267 million in 2015, to $438 million in 2016, to $848 million in 2017, to a projected, but missed, revenue stream of more than $950 million in 2018. ¶¶39-40. The overconcentration

---

[4]    Defendants kept this ***one*** customer's name and impact on XPO's growth a secret, but some XPO employees leaked at the end of the Class Period that the customer was Amazon. ¶¶16, 39.

accounted for "a lot" of XPO's growth, to say the least – 100% of it in 2017 alone.[5]  These facts are "material" under the securities laws – or "important," as XPO's own CEO put it.[6]

As customer concentration risk heightened and then materialized toward the end of the Class Period in the form of financial "misses," ¶¶238-253, even some of XPO's most ardent supporters called out the deception: "*One of the things that I think XPO has touted as one of its strengths is that it's not overly focused on any particular customer*," as one stock analyst put it.  ¶149.

The Second Circuit does not permit publicly-traded companies to conceal "the true reasons for rising [revenue] levels" (here, Amazon) while "giving false explanations for its growth" (here, a well-diversified business).  *See Novak v. Kasaks*, 216 F.3d 300, 311-12 (2d Cir. 2000) (such statements are actionable); *see also Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, __ U.S. __, 135 S. Ct. 1318, 1331 (2015) (holding the securities laws prohibit defendants from "misleading investors by saying one thing and holding back another").  Defendants' contrary arguments fail since "misstatements regarding risk management . . . are not 'puffery' where, as alleged here, they were 'misrepresentations of existing facts.'"  *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 189-90 (S.D.N.Y. 2010) (defendants' alleged false claims of "'balanc[ing]' existing risks" were actionable and not puffery).  Defendants' statements here concerned "existing facts" of XPO's business composition.

XPO failed to "warn" that it *knew* it was going to lose its *top* customer (Amazon) at the same time that Amazon was secretly fueling XPO's growth.  To the contrary, Defendants point to boilerplate and unchanging generic "risk" disclosures that *any* customer *might* leave, which it cut-

---

[5]   XPO reported $14.6 billion in revenue in 2016, then reported $15.38 billion in revenue in 2017, for an increase of $780 million.  XPO's admissions demonstrate that Amazon accounted for approximately $848 million in 2017 alone, meaning that Amazon catapulted XPO past a decline in revenue to a massive increase in revenue.  ¶39.

[6]   Materiality "'is a mixed question of law and fact,'" and, as a result, a complaint cannot be dismissed on these grounds unless the alleged misstatements or omissions "'"are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."'"  *Ind. Pub. Ret. Sys. v. SAIC, Inc*., 818 F.3d 85, 96 (2d Cir. 2016).

and-pasted from one SEC filing to the next throughout the Class Period.  ECF No. 121-1 at 17-18;
*see Sheet Metal Workers Local 32 Pension Fund v. Terex Corp.*, 2018 WL 1587457, at *13 (D.
Conn. Mar. 31, 2018) (holding that "[w]arnings that demand ***could*** decline do not protect against
liability for failure to disclose that demand has ***already*** declined") (citing cases) (emphasis in
original); *Patriot Expl., LLC v. Sandridge Energy, Inc*., 951 F. Supp. 2d 331, 358 (D. Conn. 2013)
("'[B]oilerplate warnings will not suffice.'").  Defendants cannot knowingly mislead investors by
saying one thing while holding back another, and later publicly declare the withheld information to
have been "important," and then manufacture meritless puffery and warning arguments after the fact.

### 2.    Defendants Materially Misstated the Reasons Why XPO's Freight Tonnage Growth Numbers Started to Fall

XPO's Amazon-driven growth bubble started to burst in early 2018, but Defendants made
materially false and misleading statements to cover up that fact.  Throughout the Class Period, for
example, Defendants collected "tonnage" data, tracking the volume of freight that XPO transported,
synthesized the data internally into "sales reports" and "tonnage reports," and published aggregate
tonnage statistics to the market on a quarterly basis.  ¶¶76-83.  The published tonnage statistics
showed growth over the 2017 period that started to fall in 2018:

|  | 1Q | 2Q | 3Q | 4Q |
|---|---|---|---|---|
| 2017 | 4.80% | 7.10% | 5.60% | 2.90% |
| 2018 | -1.10% | -0.60% | -1.50% | -1.10% |
| Growth Change (Percentage Points) | 5.90 | 7.70 | 7.10 | 4 |

¶83 & n.15.  In 2Q18 and 3Q18, analysts asked why tonnage was falling.  ¶¶96, 98, 117.  Defendants
Jacobs and Malat told the market that they had purposely changed XPO's business strategy to move
away from growing tonnage.  ¶¶95-96, 115-117.  The truth was that the numbers were falling
because of Amazon's decision to leave, which lowered the amount of tonnage that Amazon shipped
via XPO.  ¶¶62, 76-79, 85.  The securities laws prohibit public companies from "giving false

explanations" for changes in their reported metrics, but this is exactly what defendants Jacobs and Malat did. *See Novak*, 216 F.3d at 312; *see also E\*Trade*, 712 F. Supp. 2d at 180 ("If a company . . . 'puts the topic of the cause of its financial success at issue, then it is obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would significantly alter the mix of available information.'").[7]  For example, on August 2, 2018, CEO Jacobs told the market XPO's growth numbers were falling because XPO was not focused on "tonnage growth" but on "selecting the right tonnage that matches our network and deselecting freight that doesn't match our network and to get the right price, the right yield for the premium service that we provide," and seeking out "the right mix of tonnage." ¶¶95-96.  He said he "would not guide [the market] to expecting some big tonnage increase" because "***it's not what we're trying to do***." *Id.*  Defendants Malat and Jacobs later told the market that "tonnage declined 1.5% due to ***our decision*** to selectively target more profitable freight" and that freight growth was down "***in-line with recent quarters*** and consistent with our strategy of selectively targeting" freight that was causing growth to drop.  ¶¶115-116.

Particularized facts from insiders at both Amazon and XPO demonstrate that the true reason why XPO's tonnage numbers were falling was that Amazon had begun ***acting*** on its stated business plans to leave XPO, and that XPO tried to make up for the falling tonnage numbers by selling the Amazon slack to other customers, but Amazon was simply too big to replace.  ¶118.  Notwithstanding Defendants' characterization of the Complaint's facts as "outlandish," the facts are true as a matter of law at the pleading stage.  ECF No. 121-1 at 1.  The facts show Amazon started to shut down operations with XPO on a systematic basis beginning in early 2018, causing XPO's

---

[7]    Defendants' reliance on *River Birch Capital, LLC v. Jack Cooper Holdings Corp.*, 2019 WL 1099943, at \*4 (S.D.N.Y. Mar. 8, 2019), is misplaced because that case involved no statements about changes in ***any*** reported financial metrics like the tonnage numbers at issue here, and, in the *River Birch* case, the statement at issue "predated alleged problems with and loss of large customer," as Defendants concede.  ECF No. 121-1 at 16 n.18.  By contrast, in this case, all of the above facts regarding declining demand from Amazon predate the August and November tonnage statements.

tonnage growth to decline, *before* Jacobs and Malat gave false explanations to the market about the reasons why tonnage was falling.  Starting in 1Q18, an Amazon manager began seeing fewer XPO tractor trailers at the five Amazon facilities in his purview.  The manager witnessed that "all the XPO trailers disappeared from the yard," and pointed out that "*when there's 400 trailers sitting out there and you use to see XPO all the time and then all of a sudden there's none, you know it's an obvious sign*."  ¶62.  Around this time, an Amazon manager witnessed an internal, written Amazon "newsletter" that "*stated that Amazon was dropping XPO*."  ¶81.

The facts from XPO match the facts from Amazon.  Around the same time that hundreds of XPO tractor trailers started disappearing from Amazon's operating facilities, an XPO sales executive learned that XPO's transportation business had fallen, as reflected in "tonnage reports" and related discussions "*because of a drop in tonnage from Amazon*."  ¶¶79, 83.  Amazon's departure became so obvious internally at XPO – due to the scale of the business – that XPO management had to *try* to prevent lower-level employees from learning about it.  In June 2018, for example, XPO's Vice President of Supply wrote an email to the director of an Amazon-focused fulfillment warehouse indicating that Amazon was leaving XPO.  ¶84.  In substance, the email stated *that XPO was losing Amazon and XPO's management "knew it*."  *Id.*  The email stated that management should try to keep the loss a secret and *not inform other employees about the fact that Amazon was leaving – not to "'panic' the employees*."  ¶¶84-85.  Similar to the five Amazon facilities that experienced the disappearance of XPO tractor trailers, one Amazon-dedicated XPO fulfillment center saw the number of inbound Amazon deliveries fall "from about twelve full tractor trailers per day to about three or four per day."  ¶86.  These conditions mirrored those unfolding at other strategically-important Amazon-dedicated facilities in completely different geographic areas, all at the same time.  ¶¶58-62, 92.  A witness to the decline recalled "*[s]omething's wrong here*," and that it was "*kind of like you walk into a store and the shelves are half empty*."  ¶86.  And in July 2018, Amazon

- 9 -

withdrew over 60% of the "Amazon Prime" business that it had given to XPO in 2017.  ¶87.  XPO suffered a particularly acute and noticeable slowdown as a result of losing business from the "Prime Week" promotional event.  ¶94.  These events unfolded while Amazon grew at a 45% rate, meaning Amazon needed more help than ever to deliver its goods – just not from XPO.  ¶213.

These and other facts demonstrate, contrary to Defendants' arguments, that defendants CEO Jacobs's and CSO Malat's false explanations for lower tonnage numbers were material.  The truth that Amazon was the cause of the falling numbers was not """"so obviously unimportant to a reasonable investor"""" that it can be dismissed on materiality grounds at the pleading stage (*SAIC*, 818 F.3d at 96) as further evidenced by the fact that the year-over-year change in 2Q17 tonnage ***growth*** declined by 7.7% compared to 2Q18, well in excess of the "presumptive 5% threshold of materiality."  *Litwin*, 634 F.3d at 719.  The reasons why tonnage was falling related directly to the actions that XPO's largest customer (Amazon) took to leave XPO, as Amazon told XPO it would in its  "stated business plans," and actions.  ¶¶62, 76-79, 85, 148, 255.  Amazon accounted for 100% of XPO's 2017 revenue growth[8] and more than 5% of its static revenue.  ¶39.  CEO Jacobs later admitted that XPO "grew a lot up" with Amazon's help, ¶255, and the declining tonnage numbers objectively demonstrate that the growth was coming to an end, further supporting materiality.  *See Hutchins v. NBTY, Inc.*, 2012 WL 1078823, at \*1-\*2, \*6 (E.D.N.Y. Mar. 30, 2012) (upholding statements about "sustainable" business metrics given impending customer departure).  Three financial "misses" and stock drops relating to Amazon's departure further support materiality.  *See infra.* §II.D.; *see also Christine Asia Co. v. Yun Ma*, 718 F. App'x 20, 22 (2d Cir. 2017) ("stock drop[]" shows materiality).  Analysts' point-blank questions about the reasons why the numbers were falling further show materiality because the questions demonstrate investor interest in the true

---

[8]     XPO reported $14.6 billion in revenue in 2016, then reported $15.38 billion in revenue in 2017, for an increase of $780 million.  XPO's admissions demonstrate that Amazon accounted for approximately $848 million in 2017 alone, meaning that Amazon catapulted XPO past a decline in revenue to a massive increase in revenue.  ¶39 & nn.6-7.

reasons.  *See Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 549-50 (S.D.N.Y. 2017) (investor interest supports materiality); *United States v. Ferguson*, 553 F. Supp. 2d 145, 153 (D. Conn. 2008) (same).  CEO Jacobs's later admissions that losing Amazon was a "body blow" likewise support materiality.  *SEC v. PIMCO Advisors Fund Mgmt. LLC*, 341 F. Supp. 2d 454, 464 (S.D.N.Y. 2004) (citing executive admissions that undisclosed "activities were disruptive" to support materiality).

In the face of all these facts and authorities, Defendants apparently argue that the securities laws can do nothing about their materially misleading reasons for falling tonnage numbers because the Complaint does not quantify Amazon's effect on its tonnage or revenue numbers and "no facts connect[] these matters to Amazon."  ECF No. 121-1 at 7, 14.  But this argument has three problems: (1) as summarized above, XPO and Amazon insiders confirmed large physical changes in strategic trucking and Amazon fulfillment operations as well as reports and discussions showing the reason the numbers fell was ***because*** Amazon was "dropping" XPO (thus accounting for 100% of the decline, even as XPO tried to raise the numbers); (2) the Second Circuit has repeatedly held that "materiality," like other aspects of the federal securities laws, "do[es] not turn on restrictive mechanical or quantitative inquiries" alone (*see, e.g.*, *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 122 (2d Cir. 2012));[9] and (3) Defendants chose to aggregate and publish their tonnage numbers to the market, and they cannot be heard to complain now that investors should not have cared about the true reasons why those numbers were falling.  *See Omnicare*, 135 S. Ct. at 1331 (securities laws prohibit defendants from "misleading investors by saying one thing and holding back another").  Defendants gave materially false reasons for their falling tonnage numbers.

---

[9]   *See also Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 31 (S.D.N.Y. 2019) ("A determination of how [an undisclosed inventory problem] precisely affects revenue growth is a factual inquiry inappropriate at the pleading stage.").

3.  **Defendants Materially Misstated that XPO Was "on Track" and "Nothing's Slowed Down at All" to Making Its Double-Digit Growth Targets**

Despite Amazon's materially negative effect on XPO's business, starting in the spring of 2018 throughout the rest of 2018, XPO made false and misleading statements to the market that there was **no reason** to think XPO's aggressive growth targets were unsustainable given what XPO's customers were supposedly doing and saying at the time.  *E.g.*, ¶¶66, 68, 218.  In reality, the **one** customer that drove XPO's aggressive growth (Amazon) had started acting on its stated business plans to sever business ties with XPO by the time that XPO made those statements.  *E.g.*, ¶¶76-98, 105-108.  XPO's statements are therefore actionable.  *See, e.g.*, *In re Vivendi*, *S.A. Sec. Litig*, 838 F.3d 223, 246-47 (2d Cir. 2016) (upholding falsity of statement that defendant was "'confident that we will meet the very aggressive growth targets we have set for ourselves both at the revenues and [earnings] levels'" given the existing "liquidity risk" that defendant faced at the time); *In re Quintel Entm't Inc. Sec. Litig.*, 72 F. Supp. 2d 283, 294 (S.D.N.Y. 1999) (claims sustained where defendants "painted a rosy picture of [defendant's] financial health . . . omitting information about [a partner's] scaling back"); *see also Hutchins*, 2012 WL 1078823, at *5 ("[D]efendants' positive statements about [the company's] business, gross margins and operating leverage and profitability during the class period were misleading because the information that [the company's] then-biggest wholesale customer[] was soliciting competitive bids for the first time in 10 years meant [the company's] current results were not indicative of its future performance.").  Amazon did far more than just ask for "bids" from XPO's competitors in this case.  *See Hutchins*, 2012 WL 1078823, at *5.

Specifically, Defendants set aggressive financial targets and periodically gave incremental updates confirming that no existing developments were hindering XPO's ability to meet its targets, while pointing to positive customer developments as the factual foundation.  In February 2018, for example, CEO Jacobs told the market that XPO generated aggressive financial targets by way of a

- 12 -

"bottoms up" process.  ¶66.  The financial targets were "the same internal numbers that we have," according to Jacobs, who promised the market that "[i]f for some reason, those change over the course of year, we'll let you know that when they change."  *Id.*  XPO continued to reaffirm those targets as the year unfolded.  On May 3, 2018, stock analysts asked CEO Jacobs for "***any reason*** to think kind of that type of [double-digit] revenue growth" would slow.  ¶68.  Jacobs responded that there "***is no reason to think it's going to slow***" because "life looks good, at least from our point of view just ***looking at our customers and seeing what our customers are doing and saying***."  *Id.*  On August 1, 2018, Defendants stated that XPO remained "on track" to deliver 17% growth for the year. ¶215. The next day, on a conference call, stock analysts again asked whether the "growth that you're posting this year [is] ***sustainable***," and, CEO Jacobs responded that XPO was "hitting on all 8 cylinders that ***customers are rewarding us***" and that "***I don't see any slowing down on*** on XPO's high "***revenue growth***."  ¶¶102, 218.  Regarding the continued viability of XPO's revenue growth projections, Jacobs confirmed  that "nothing's slowed down at all."  ¶99.

All of these statements are actionable, even if they have forward-looking components, because they include "embedded" statements about the existing state of customer affairs.  *Vivendi*, 838 F.3d at 246 ("'incremental'" factual updates "embedded" in revenue forecast updates are "present representations" that are actionable and not protected by the PSLRA safe harbor as "forward-looking").  The statements were materially false and misleading at the time because the ***one*** customer that actually fueled XPO's aggressive growth targets had started to systematically dismantle its business relationship with XPO – just as Amazon had previously told XPO that it would.  *E.g.*, ¶¶76-98, 105-108, 255.  Here, Amazon was, in fact, acting on its business plan to leave XPO ***before*** defendant Jacobs told the market that there was ***no reason*** to think that XPO's Amazon-driven growth targets were unsustainable – ***specifically*** (and falsely) because of what XPO's "customers" were "saying" and "doing" and "rewarding" XPO at the time.  ¶¶68, 218.

- 13 -

XPO thus affirmed its aggressive growth targets amidst an array of facts suggesting that things had "slowed down": (1) Amazon had already stopped accepting hundreds of XPO tractor trailers at 5 Amazon facilities; (2) Amazon had internally announced that it had "dropped" XPO business; (3) Amazon had started winding down 3 Amazon-centric XPO facilities; (4) XPO had management emailed about Amazon winding down business; (5) Amazon had cut XPO off from business during Amazon's key mid-summer "Amazon Prime Week" promotional event; (6) XPO's tonnage growth had plummeted *because* of Amazon and *despite* trying to raise the numbers by selling Amazon slack to other customers; and (7) Amazon had given XPO its "stated business plans" of leaving XPO. *See* §II.A.2. These facts contradict Defendants' public assertions that they had ***no reason*** to think that XPO's Amazon-driven growth was unsustainable based on what its customers were saying "and doing" with corresponding "rewards." ¶¶68, 218.

XPO had every objective reason to think that it was not going to make its aggressive growth targets, targets it indeed did miss or lower three times after Amazon's departure hit XPO like a "body blow," as CEO Jacobs belatedly admitted. ¶149. These facts are more egregious than those before the courts in other cases that sustained complaints against companies that issued statements omitting or misrepresenting large, negative developments with major customer accounts. *See, e.g.*, *Hutchins*, 2012 WL 1078823, at *5 (large customer taking action to leave defendant by soliciting "bids" from third parties and not protected by any specific cautionary language); *accord In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *14 (S.D.N.Y. Dec. 2, 2013) (disclosure triggered where company notified by large customer "via letter that it was terminating the agreement"). And the facts of this case are a far cry from the Second Circuit's unpublished decision in *In re Express Scripts Holdings Co. Sec. Litig.*, 773 F. App'x 9 (2d Cir. 2019). ECF No. 121-1 at 13. There, the challenged statements concerned defendants' failure to ***predict*** the ***potential*** loss of a customer's business due to a developing contract dispute in a case that started ***years*** before the

disputed contract *was even scheduled to expire*. *Express Scripts*, 773 F. App'x, at 13-14.  Here, the Complaint alleges that Defendants failed to disclose XPO's increasing reliance on a single short-term customer to propel its growth, and that single customer's *actual departure* (per its stated business plans) *before* Defendants made the challenged statements.[10]

Because, as in *Vivendi*, 838 F.3d at 246, there are present and historical statements of fact embedded in Defendants' challenged growth target statements, they do not enjoy Private Securities Litigation Reform Act ("PSLRA") protection.  The challenged statements also fall outside the PSLRA safe harbor because the statements must be "identified as a forward-looking statement, *and* [be] accompanied by meaningful cautionary statements."  15 U.S.C. §§77z-2(a), (c)(1), 78u-5(a), (c)(1).  Here, Defendants only claim that they warned "customers *may* decide to develop or expand internal capabilities for some of the services that we provide."  ECF No. 121-1 at 7.  This generic platitude warns of nothing specifically and is not a "meaningfully cautionary" statement under Defendants' own authorities.  *Id.*  But more importantly, in this case, *before* Defendants made the challenged statements, Amazon *had already* told XPO it would leave *and had already* taken aggressive, systematic action to that end.  "'The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.'"  *In re Prudential Sec. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996).  The risk of Amazon's departure had started to materialize *before* the challenged statements and *before* XPO supposedly cautioned investors that some customer "may" leave at some date in the perpetual "future."  Therefore, the

---

[10]    *Schoenhaut v. Am. Sensors*, 986 F. Supp. 785, 793 (S.D.N.Y. 1997), is also clearly distinguishable.  There, "*[a]s required by law*, [Defendants'] Prospectus disclosed" the identity of and amount of business from the company's largest customer – which XPO did not – and defendants did *not* make affirmative statements regarding the company's growth continuing apace, as XPO did after the force driving its growth (Amazon) started leaving.

PSLRA safe harbor does not apply and the Complaint need not satisfy the "actual knowledge" scienter standard, though it does that, too.  §§II.B.-II.C.[11]

### 4. Defendants Materially Misstated that XPO's Third-Quarter 2018 Earnings "Miss" Was the Sole Fault of One "Rounding Error"-Sized Customer

On October 31, 2018, XPO reported that it had missed 3Q18 earnings and revenue expectations.  ¶109.  XPO blamed the miss on the bankruptcy of one small customer, House of Fraser, a department store in the United Kingdom.  *Id.*  In reality, the seemingly-innocuous House of Fraser issue actually masked a much deeper and persistent problem that Amazon had begun, and would continue, dramatically scaling back its business with XPO.  ¶¶109-110.  Because XPO chose to speak on the cause of the earnings miss, Defendants assumed a duty to provide the whole picture: the miss was not caused solely by a tiny customer; the loss of Amazon business ***at least contributed to***, if not entirely caused, the miss.

Corporate defendants are liable under §10(b) for attributing disappointing financial results to "'missteps' . . . that would be resolved imminently," while failing to disclose "that the company anticipated that the problem might well extend into succeeding quarters (as it did)."  *City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at *6, *11 (S.D.N.Y. Mar. 25, 2013).  When XPO missed its third quarter forecasts, Defendants attributed the miss to an isolated event – the loss of a single small customer (House of Fraser) whose business, according to XPO's CEO Jacobs, represented the equivalent of a "rounding error."  ¶111; *see Aeropostale*, 2013 WL 1197755, at *11

---

[11]  The Court should likewise reject Defendants' argument that factual statements regarding XPO's current business standing were mere "opinions."  ECF No. 121-1 at 15-16.  Defendant Jacobs, for example, did not say he "thought" XPO's growth would not slow based on existing facts (like Amazon leaving), he said "***There is no reason to think it's going to slow***."  ¶68.  As the Supreme Court explained in *Omnicare*, there is a key difference between saying "the coffee is hot" (a statement of fact, even if "hot" is in the eye of the beholder) and "I ***think*** the coffee is hot."  135 S. Ct. at 1325; *see also id.* at 1326 ("[T]he words 'I believe' . . . preclud[e] liability for an untrue statement of fact.").  Jacobs's misrepresented not his personal opinion but whether there were existing factual reasons for concern about XPO's growth.  Even if Defendants' statements were opinions, the Complaint "call[s] into question the issuer's basis for offering the opinion" by pleading knowledge of contrary facts.  *See id.* at 1332; §II.C.  The misrepresentations are therefore actionable.

(finding actionable a clothing company's statements that poor quarterly sales were "'primarily impacted'" by unanticipated "'missteps'" during the quarter that the company had "'taken steps to rectify . . . to get [the] brand back on course,'" where the company allegedly knew the poor sales were caused by a larger, ongoing problem). Jacobs said XPO had made a mistake by "let[ting] our heart get ahead of our mind in trying to support [House of Fraser]." ¶111. He reassured investors that, "on a long-term basis, it's really just – it's nothing. It's a few million bucks," and the Company reaffirmed its 2018 free cash flow guidance. ¶¶110-111. Defendant Jacobs also announced at the same time that Malat would be resigning the next month. ¶110.

In reality, like in *Aeropostale*, XPO's problems went far deeper than a single, one-off mistake. Indeed, by the time XPO announced its missed 3Q18 results and blamed House of Fraser, XPO's largest customer had already begun to act on its stated plan of withdrawing its business. ¶¶58-61, 86-90, 92-94.[12] Having attributed the 3Q18 miss to a small, one-time mistake, Defendants publicly misled investors by representing that problems affecting 3Q18 results had already been resolved. Defendants' claims were undoubtedly material to the market, as evidenced by analyst focus on the causes of the miss. *See, e.g.*, ¶112 ("[W]e do not believe [the 3Q18 miss] is a signal of a systemic risk."); ¶113 ("[W]hy does a relatively small writeoff cause the Company to adjust guidance lower?"); *see also comScore*, 268 F. Supp. 3d at 549-50 (investor interest supports materiality). Defendants' failure to even mention the effect of losing Amazon's business, while putting all the blame for the 3Q18 miss on a single small customer, was materially misleading if not outright false. *Cf. Omnicare*, 135 S. Ct. at 1331 ("[L]iteral accuracy is not enough: An issuer must

---

[12]   Contrary to Defendants' characterization of the allegations as "*ipse dixits*," ECF No. 121-1 at 14, the Complaint pleads an array of facts evidencing that Amazon took material amounts of business away from XPO during 3Q18 and therefore at least partially caused the miss. Local #817 IBT Pension Fund, Local #282 Pension Trust Fund and Local 282 Welfare Trust Fund and Norfolk County Retirement System ("Plaintiffs") need not allege, at the pleading stage, the exact amount of revenues that XPO lost as a result of Amazon's 3Q18 scale-down. *See Lexmark*, 367 F. Supp. 3d at 31 ("[A] determination of how [an undisclosed inventory problem] precisely affects revenue growth is a factual inquiry inappropriate at the pleading stage.").

as well desist from misleading investors by saying one thing and holding back another."). And, as discussed above, Defendants' misrepresentations of past and present facts when discussing future prospects are not protected by the PSLRA's safe harbor. §II.A.3.

**B.**  **The Complaint Pleads Actionable Omissions Under Item 303 of SEC Regulation S-K ("Item 303")**

XPO filed ten quarterly or annual reports during the Class Period that were supposed to provide management's discussion and analysis ("MD&A") of specific aspects of the Company's business pursuant to Item 303 of Regulation S-K ("Item 303"). ¶¶229-236. Defendants XPO, Jacobs and Hardig had an obligation under Item 303(a)(3)(ii) to disclose Amazon's plan to leave XPO and the beginnings of its departure well before Amazon's dramatic wind-down of business throughout 2018. ¶¶58-63, 79-94.[13] Violations of Item 303 are actionable omissions in §11 and Rule 10b-5 cases like this one where, as here, Defendants failed to disclose "material" "known trends and uncertainties." ¶231.[14] The facts show "'a trend, demand, commitment, event or uncertainty [that was] both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations.'"[15] This information was material under the Second Circuit test, which balances both "'the ***anticipated magnitude*** of the event in light of the totality of the company activity'" and "'the ***indicated probability*** that the event will occur.'" *Stanley*, 776 F.3d at 102-03 (emphasis in original).

---

[13]  Defendant Malat did not sign the "MD&A" but is still responsible for the omissions as a "control person" as discussed below.

[14]  The Second Circuit repeatedly relies upon the SEC's interpretive guidance in construing the scope of Item 303 along with the regulation's text and instructions in cases like this one. *See Stratte-McClure v. Stanley*, 776 F.3d 94, 105 (2d Cir. 2015) (material information must be disclosed under Item 303 in Rule 10b-5 cases); *Panther Partners*, 681 F.3d at 120 (same, §11 case).

[15]  *Panther Partners*, 681 F.3d at 120 (quoting Management's Discussion and Analysis of Financial Condition and Results of Operation; Certain Investment Company Disclosures, SEC Exchange Act Release No. 6835, 1989 WL 1092885 (May 18, 1989) to construe Item 303 and reversing dismissal of complaint).

The anticipated magnitude of Amazon's departure was extraordinary and bears a strong resemblance to a textbook example of a mandatory Item 303(a)(3)(ii) disclosure from the SEC's interpretive release:

> The Company was advised in late June that Company A, its principal customer, which accounted for 28% and 30% of revenues for the last six months and prior fiscal year, respectively, intends to terminate all purchases effective during the third quarter, due to in-house capabilities recently developed by this customer. The Company is materially dependent on its business with this customer and anticipates upon such termination a material adverse effect on revenues and income. . . .[16]

Although Amazon accounted for a smaller share of overall revenue than "Company A" in the SEC's example, Amazon accounted for nearly *all* of XPO's meteoric *growth* during the Class Period – *100% of XPO's revenue growth in 2017 alone*.[17]  Risk-adjusted growth causes securities to rise in value,[18] which is the whole point of investing in the first place,[19] and shows both the "magnitude" of Amazon's importance to XPO and that Amazon's departure would be "reasonably likely" to have a large, negative impact on XPO.  Amazon also accounted for more than 5% of XPO's aggregate revenue during the Class Period thus surpassing the "presumptive 5% threshold of materiality." *Litwin*, 634 F.3d at 719 (materiality sufficiently alleged where lower than 5%).

Furthermore, "Item 303's disclosure obligations, like materiality under the federal securities laws' anti-fraud provisions, do not turn on restrictive mechanical or quantitative inquiries" alone. *Panther Partners*, 681 F.3d at 122.  In much the same way that the "jeopardized" relationship with

---

[16]   SEC Exchange Act Release No. 6835, 1989 WL 1092885, at *10.

[17]   XPO reported $14.6 billion in revenue in 2016, then reported $15.38 billion in revenue in 2017, for an increase of $780 million.  XPO's admissions demonstrate that Amazon accounted for approximately $848 million in 2017 alone, meaning that Amazon catapulted XPO past a decline in revenue to a massive increase in revenue.  ¶39.

[18]   *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 166 (2d Cir. 2012) (explaining how "basic securities valuation principles" work – namely, by "discounting future cash flows to their present value using a rate of interest reflecting the cash flows' risk").

[19]   *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 183 (2d Cir. 2007) ("[I]n securities cases there is a presumption that shares are purchased for the purpose of investment and their true value to the investor is the price at which they may later be sold.").

two top customers was the focal point of the Item 303(a)(3)(ii) inquiry before the Second Circuit in *Panther Partners* (*see id.* at 121), here defendant Jacobs admitted after the Class Period that XPO made a "mistake letting one customer get $900 million of business with us," which "[was] just too much concentration" and "a body blow, no question about it." ¶¶149-150.  And similar to the SEC's example above, in which an issuer "was advised" that its top customer was going to leave in this case, defendant Jacobs admitted that "*we grew a lot up with them* over the last few years" and "*we knew* that, *that business wasn't going to stay* forever and forever and ever and ever because of that particular customer's stated business plans and because that customer is transactional in some respect in terms of the nature that they have with their vendors." ¶255.

Defendants' attempt to sidestep this admission by speculating that Jacobs's admission was "not an admission of scienter, but simply reflects the *widely known reality* that Amazon had 'stated business plans' to increase its own shipping and logistics capabilities, and to take such matters *in-house* to reduce its reliance on outside providers (like FedEx and XPO)." ECF No. 121-1 at 32.  The SEC's textbook disclosure example for triggering liability, above, states that an issuer similar to XPO had learned that its top customer was not going to stay "due to *in-house* capabilities recently developed by this customer."[20]  In this textbook example, the issuer learned about its customer's in-house capabilities one quarter before the customer left.  *Id.*  According to Defendants in this case, the "widely known reality" that Amazon was going to leave XPO was apparent on the face of Amazon's public filings dating back to January 29, 2016.  ECF Nos. 121-1 at 32, 121-3 at 1.  The fact that Amazon was going to leave XPO – Defendants argue – also was "widely covered by media," and thus known *to Defendants*, dating back to February 17, 2015.  ECF Nos. 121-1 at 32, 121-4 at 1.

It is a stunning non-sequitur to argue, as Defendants do, that Amazon's "widely known" plans had major significance *to XPO's investors* during the Class Period for one simple reason:

---

[20]    SEC Exchange Act Release No. 6835, 1989 WL 1092885, at *10.

nobody, including Defendants, ever told XPO investors during the Class Period that Amazon was XPO's top customer and the primary driver of XPO's growth.  The closest that the XPO CEO (or anyone else at the Company) ever came to revealing Amazon's importance was on the television show "Mad Money."  ¶¶212-213.  There, defendant Jacobs stated that Amazon was "*a* customer." ¶213.  But XPO had "50,000 customers" at the time.  ECF No. 121-1 at 1.  Jacobs, Malat and Hardig – but not the market – knew that Amazon was the first customer and not the 50,000th.  This distinction makes all the difference to the Item 303(a)(3)(ii) analysis because it put the Defendants in a position to know the extent to which "widely known" trends would ***impact XPO***.

Defendants' "widely known" plans argument invites this Court to make the same kind of reversible error that the Second Circuit has already corrected.  The Second Circuit emphasized in both *Panther Partners* and *Litwin* that it is not the widely-known trend that requires disclosure but "***the manner in which those then-known trends, events, or uncertainties*** might reasonably be expected to materially impact [the defendant's] future revenues."  *Litwin*, 634 F.3d at 719; *see Panther Partners*, 681 F.3d at 120 (holding that trial court committed reversible error by conflating defendant's knowledge and disclosure of facts showing the existence of a trend "or uncertainty" with the defendant's obligation to disclose "***the manner in which uncertainty*** surrounding [the trend or uncertainty] might reasonably be expected to have a material impact on future revenues"); *accord Litwin*, 634 F.3d at 716 (defendants had duty to disclose "***the effect***" of downward trend that was "already known").  Investors in this case were unaware how Amazon's activities might reasonably be expected to impact XPO's future revenues because they did not know Amazon was XPO's largest customer and its growth source.  And, as in *Litwin*, Amazon "was not even mentioned in [XPO's MD&A] and thus cannot be considered part of the 'total mix' of information already available to investors."  *Id.* at 719.  Jacobs, Hardig and Malat knew how Amazon's "widely known" plans would impact XPO, because, as Jacobs admitted, they all knew that "***we grew a lot up with them over the***

- 21 -

*last few years*." ¶148.  So when the "body blow" came, Defendants were unsurprised, but the market fell 12.73%.

Having highlighted additional reasons why the Complaint adequately alleges Defendants violated Item 303(a)(3)(ii), Defendants try to avoid the Complaint by arguing they did not know the exact date when Amazon would leave.  ECF No. 121-1 at 21, 26.  In his public admission, XPO CEO Jacobs did say "*[w]e didn't think* it was going to come to end so quickly" and that "*[w]e didn't think* it was going to come to an end so abruptly." ¶148.  These admissions are at best direct evidence that management *were aware that it was going to come to an end*, but just didn't know the exact date when Amazon would leave.  Even assuming that Jacobs, Hardig and Malat had no idea *when* Amazon was going to start leaving, they still "knew," as Jacobs admitted, that Amazon would go.[21]  Because the probability that Amazon would leave was a near certainty and the magnitude of the impact was massive by any measure (a "body blow"), Item 303(a)(3)(ii) does not allow management to sit around and conceal those facts until they get an exact departure date.  *See Stanley*, 776 F.3d at 103 (balancing magnitude and probability).

Defendants' other principal argument is that steps Amazon started taking to leave XPO at least by April 2018 were not "uncertainties" in XPO's business because the Company supposedly was just experiencing a "seasonal" hiccup.  ECF No. 121-1 at 21-22; *see also* ECF No. 121-2 at 8 (statement in XPO annual report that "revenue and profitability are typically lower for the first quarter of the calendar year" – *ending March 31st* – "relative to the other quarters").  Defendants understand but apparently ignore that Plaintiffs' contention that Amazon wound down substantial amounts of its business in April 2018 and through the remainder of the year.  ECF No. 121-1 at 7.

---

[21]    The Complaint does not allege, as Defendants characterize it, that XPO violated a duty by leading the market to believe "that *any* customer, including Amazon, would *remain* an XPO customer or maintain the same volume of business *in perpetuity*" or that Defendants were under a duty to disclose that some arbitrary customers might leave at some point.  ECF No. 121-1 at 1.  Defendants violated their disclosure duty because they "*knew*" that a *specific* customer (who just happened to be XPO's largest) would *not remain* a customer.  ¶148.

April is after March.  Amazon thus *decreased* its business with XPO after the point in time when XPO expected an *increase* based on its own "seasonality" disclosures.

The data further undercuts Defendants' seasonality theory.  Tonnage statistics demonstrate that Amazon should have started accelerating the amount of business it did with XPO in 2018 at the very time that Amazon was leaving XPO.  For example, Amazon drove 100% of XPO's revenue growth in 2017, and XPO's calendar year "tonnage" metrics reflected this year-over-year growth.  ¶83.  The April through September 2017 timeframe (2Q and 3Q) saw tonnage growth *increases* in the 2017 period, but right after Amazon started to leave XPO in April 2018, tonnage growth *decreased*:

|  | 1Q | 2Q | 3Q | 4Q |
|---|---|---|---|---|
| 2017 | 4.80% | 7.10% | 5.60% | 2.90% |
| 2018 | -1.10% | -0.60% | -1.50% | -1.10% |
| Growth Change (Percentage Points) | 5.90 | 7.70 | 7.10 | 4 |

¶83 n.15.  This "tonnage" data comparing 2Q17 and 3Q17 with 2Q18 and 3Q18 traces Amazon's departure from XPO and contradict Defendant's "seasonality" theory.  Adjusted for seasonality, the numbers look worse.  ¶94.  As discussed above (*see* §II.A.2.), former employee accounts corroborate that the drop in business was highly surprising and not just a "seasonal hiccup."  ¶¶ 77, 81-86.  In this timeframe, Jacobs also publicly admitted having personal knowledge about the tonnage numbers and customer developments, stating "*[w]e're* trying to get the right mix of tonnage," ¶96, and that he knew "what our customers are doing *and saying*."  ¶68.  These admissions strongly support scienter and undercut Defendants' seasonality argument.  *See Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 269 (3d Cir. 2009) ("Among the facts alleged by Shareholders, the most powerful evidence of scienter is the content and context of [the CFO's] statements themselves.").[22]

---

[22]   *See also In re GE Sec. Litig.*, 857 F. Supp. 2d 367, 395-96 (S.D.N.Y. 2012) (finding it "highly improbable" that defendant who publicly described issuer's finances did not inquire into basis for his statements); *Reese v. Malone*, 747

Defendants' remaining arguments are of no moment.  Defendants cite two cases to support their theory that Jacobs, Hardig and Malat had to know Amazon's exact departure date before assuming a duty to tell investors anything.  ECF No. 121-1 at 22.  They argue that to qualify as an "uncertainty," Amazon's departure must be "imminent," *id.*, plucking that one word from *Susie Ong v. Chipotle Mexican Grill, Inc.*, 2017 WL 933108, at *17 (S.D.N.Y. Mar. 8, 2017).  The court in *Chipotle* cited to a district court decision, *Christine Asia Co. v. Alibaba Grp. Holding Ltd.*, 192 F. Supp. 3d 456, 477 (S.D.N.Y. 2016), for this "imminent" concept.  The Second Circuit *reversed* that decision in *Ma*, explaining that the defendant had been threatened two months before its IPO that if the defendant kept marketing "counterfeit goods," it would be subject to fines.  718 F. App'x at 22.  The Second Circuit never said the ultimate harm (fines) had to be "imminent" to trigger disclosure – the mere "threat" was sufficient.  *Id.* at 23.  The important event that was "imminent" was not imposition of the fines but rather the company's IPO, which required disclosure of the threat.  *Id.*  In this case, Jacobs, Malat and Hardig knew for "years" that Amazon was going to leave, Amazon started to leave in April 2018, and every MD&A filing that they made over those years (like the IPO in *Ma*) was "imminent" because Defendants are alleged to have contemporaneous knowledge that Amazon was going to leave or was in the process of leaving.[23]  The facts here are even stronger than in *Ma* because defendant Jacobs *admitted* that he and the rest of management knew Amazon would leave and that Amazon was responsible for XPO's growth.

---

F.3d 557, 572 (9th Cir. 2014) ("[T]he inference that [named defendant] did not have access to the corrosion data is directly contradicted by the fact that she specifically addressed it in her statement"; "the timing of the statements and the heighted significance of the [subjects at issue] also undermine it"; and "perhaps most importantly, [the named defendant] 'bridge[d] the [scienter] gap' herself by referencing the data directly"), *overruled in part on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017).

[23]    The other case that Defendants cite for the "imminent" concept is *In re Tempur Sealy Int'l, Inc. Sec. Litig.*, 2019 WL 1368787, at *4, *13 (S.D.N.Y. Mar. 26, 2019).  Footnote 125 in that case shows it drew its mistaken "imminent" concept from *Chipotle*, 2017 WL 933108, at *17, which, again, relied on a decision *reversed* by the Second Circuit in *Ma*, 718 F. App'x at 22.

Having alleged Defendants' knowledge of and failure to disclose the likely impact of material trends or uncertainties on XPO, the Complaint more than adequately pleads an Item 303(a)(3)(ii) violation.

### C.   The Complaint Sufficiently Pleads Defendants' Scienter

"The [scienter] inquiry is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Tellabs*, 551 U.S. at 310 (emphasis in original); *see also Perez v. Higher One Holdings, Inc.*, 2017 WL 4246775, at *8 (D. Conn. Sept. 25, 2017) ("'Ultimately, even if a plaintiff demonstrates only that an inference of scienter is at least as compelling as any nonculpable explanation for the defendant's conduct, the tie goes to the plaintiff.'").  "In addition to actual intent, the Second Circuit has also concluded that recklessness is a sufficiently culpable mental state in the securities fraud context."  *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc*., 531 F.3d 190, 194 (2d Cir. 2008) (citing *Novak*, 216 F.3d at 308-09).  Factual allegations and inferences showing "defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation" suffice.  *Novak*, 216 F.3d at 308.  Scienter can therefore be pleaded by alleging defendants "'knew facts or had access to information suggesting that their public statements were not accurate.'"  *Dynex*, 531 F.3d at 194.  The Complaint satisfies this test.

#### 1.   Defendants' Own Admissions to Analysts that "We Knew" the Amazon-Driven Growth "Wasn't Going to Stay" Because of Amazon's "Stated Business Plans"

By Defendants' own admissions immediately after the Class Period, they "knew" Amazon wasn't going to remain a customer and also knew that XPO had "grown a lot" with XPO.  This is strong support for scienter, as explained by the Second Circuit in *Novak*.  There, the court upheld allegations that "despite ***knowledge of the true reasons*** for rising inventory levels, the defendants

made repeated statements to the investment community either offering false reassurances that inventory was under control or giving false explanations for its growth." *Novak*, 216 F.3d at 311-12. The Second Circuit reversed the district court's finding that plaintiffs' scienter allegations were "'conclusory,'" noting that the company "'admitted to analysts that its inventories were too high'" before the inventory bubble popped in the form of write-downs in that case. *Id.* at 312-13; *cf.* ECF No. 121-1 at 27, 31-32 (repeatedly characterizing Plaintiffs' allegations as "conclusory").

Similar to the facts before the *Novak* court, defendant Jacobs's post-Class Period admissions to analysts in this case – that XPO had exposed investors to "just too much concentration" in one single customer, ¶150, support the allegation that he and XPO's other executives could easily see the problems that Amazon's short-term growth and departure presented to investors. *See Novak*, 216 F.3d at 309. The Complaint therefore does not allege that executives needed to "be clairvoyant" in predicting the harm that befell XPO when Amazon left. *Id.* Rather, Jacobs and his co-Defendants were simply "***responsible for revealing those material facts reasonably available to them***," *id.*, including the facts that, as Jacobs admitted, "we knew" Amazon "wasn't going to stay forever" because of "that particular customer's stated business plans" in the face of Defendants' understanding that Amazon propelled XPO's Class Period growth. ¶148 (Jacobs, admitting: "Yes, we grew a lot up with them over the last few years."). Both this case and *Novak* involve post-class admissions that bear heavily upon defendants' class period knowledge or at least recklessness. *Id.*

2.   **Defendants' Access to Internal Reports and Statements Showing Amazon Was "Dropping" XPO by the Spring and Summer of 2018**

The Complaint alleges that Defendants had access to numerous Class Period internal reports and statements that corroborate Jacobs's admissions that he and his co-Defendants (the Company's CFO and CSO) knew, or at the very least were reckless in not knowing that Amazon would leave during the Class Period. Allegations of Defendants' access to "daily, weekly and monthly" reports

- 26 -

that "painted a different picture" from Defendants' public statements are sufficient, on their own, to

plead an "inference of reckless intent." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir.

2001).  Courts regularly hold that defendants' access to adverse internal reports and statements

satisfies the recklessness scienter standard at the pleading stage.[24]

The relevant facts alleged here concern XPO's two major business segments – transportation

and logistics – and show Amazon began systematically withdrawing its business from both by the

spring of 2018.  ¶¶57-93.  The reports reflecting these facts include written XPO "sales reports" and

"tonnage reports" that showed exactly when Amazon was leaving XPO (*see* ¶¶77-79),

complemented by a written, internal Amazon "newsletter" stating Amazon was leaving XPO in

1Q18 or 2Q18 (*see* ¶81) and the extensive movement of materiel (hundreds of trucks) (*see* ¶62) all

showing the same thing – Amazon was taking systematic action to leave XPO by the spring of 2018

and into the summer of 2018.  An internal XPO email from June 2018 by an XPO Senior Vice

President corroborates these facts.  ¶¶84-86.  Reports that Amazon dropped XPO from its "Amazon

Prime Week" show the same thing, ¶87, as do eye witness accounts showing Amazon was winding

down its strategic fulfillment centers, ¶¶58-62, 84-91, during "peak season."  *E.g.*, ¶60.

These facts are not complex accounting or valuation-type judgment calls that require "high

level" knowledge to appreciate, as Defendants suggest, and courts routinely rely on "low level"

employee accounts to show scienter at the pleading stage in any event.  *Terex*, 2018 WL 1587457, at

*7 ("It is reasonable to infer that the CWs probably do have personal knowledge of the information

pleaded ***even if*** they were not involved in financial reporting and had little contact with the

individual defendants."); *In re Sturm, Ruger & Co., Inc. Sec. Litig.*, 2011 WL 494753, at *9 (D.

---

[24]     *See, e.g., Matrixx*, 563 U.S. at 49 (access to adverse reports establishes recklessness inference at pleading stage); *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *9 (S.D.N.Y. May 24, 2018) ("A plaintiff adequately pleads recklessness where it alleges that the defendant . . . had access to information contradicting its public statements . . . .").

Conn. Feb. 7, 2011) (scienter supported by former employee statements despite no direct contact with defendants); *In re Dynex Capital, Inc. Sec. Litig.*, 2009 WL 3380621, at *7, *13-*14 (S.D.N.Y. Oct. 19, 2009) (relying on "low-level" employees for scienter purposes).  Moreover, the Complaint alleges titles, dates of employment and positions for sources in greater detail than is necessary considering the rule that the Complaint need not name the sources at all.  *See* ¶59 n.12 (XPO FE-1), ¶60 n.13 (XPO FE-2), ¶79 n.14 (XPO FE-3), ¶84 (XPO FE-4), ¶88 (XPO FE-5), ¶62 (Amazon Area manager).  These facts are of "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."  *Novak*, 216 F.3d at 314 (crediting former employee witness accounts under such circumstances).

All that the Complaint must show at this stage is that Defendants "knew facts ***or had access to information suggesting*** that their public statements were not accurate."  *Novak*, 216 F.3d at 311. The Complaint readily satisfies this standard, and there are facts both corroborating all of the relevant information and showing Defendants had "access" to it, including Defendants own admissions.  For example, defendant Jacobs himself told the market in August 2018 – right as Amazon was ramping up its departure – that he had a special "focus" on tonnage numbers, specifically "selecting the right tonnage that matches our network and deselecting freight that doesn't match our network and to get the right price, the right yield for the premium service that we provide" and seeking out "the right mix of tonnage."  ¶¶95-96.  Defendants Malat and Jacobs continued to inform the market – in early November 2018 – about their ***awareness*** of tonnage and transportation information and about their ***personal efforts*** to "selectively target[] . . . the freight that fits our network the best."  ¶¶115-116.  In response to a reasonable analyst question suggesting that perhaps, in the face of declining tonnage numbers, it might "make [more] sense" to "grow that business a little bit more aggressively," Malat doubled down and added "***[we] added*** over 200 sales and sales support to grow the business."  ¶117.

XPO CEO Jacobs also personally attended "one-on-one weekly meetings" with management to address "customers won" and customers "lost," per XPO's *own* SEC filings.  ¶¶77-78.  When viewed "collectively" (*Tellabs*, 551 U.S. at 322-23) these facts show Defendants "'had access to [tonnage sales] information suggesting that their public statements were not accurate.'"  *Dynex*, 531 F.3d at 194.  Moreover, in April 2018, at the same time that Amazon was beginning to depart XPO, Jacobs announced to the entire world that XPO was going to try to take market share away from one of Amazon's most profitable businesses, called "Amazon FBA."  ¶47.  It is common knowledge that the richest person on Earth (Jeff Bezos) built Amazon from scratch on fiercely competitive business practices.  A reasonable, non-reckless CEO in Jacobs's position would therefore monitor Amazon's business closely after he "rang the New York Stock Exchange . . . opening bell to announce a new service that competed directly with one of Amazon's core business offerings" in April 2018.  ¶¶6-7, 47-56.  If Jacobs did not already know by this point that Amazon was leaving XPO, his decision to directly take on Amazon in another segment would have put him on notice that XPO's relationship with Amazon was deteriorating.  This context thus shows Jacobs, Hardig and Malat "would have been alert to information concerning [decreases] in the [Amazon business], a fact that reinforces the inference of scienter."[25]  Jacobs's admission that "we knew that, that [the Amazon] business wasn't going to stay" strengthens this inference because any executive in Defendants' positions would have closely monitored signs that Amazon was, in fact, leaving.  ¶148.

Beyond Defendants' access to and review of reports and data, the signs of XPO's over-reliance on Amazon and of Amazon's departure were blaring from multiple directions during the Class Period, as facts provided by XPO and Amazon employee witnesses show.  All of these

---

[25]   *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 (2d Cir. 2011) (reviewing and crediting facts provided by former employees in this context) (citing *Scholastic*, 252 F.3d at 76-77 (stating that pleaded facts establishing significance of inventory levels to company's financial performance supported allegation that defendants acted recklessly when they failed publicly to acknowledge company's decreased sales and increased returns)).

witnesses provide "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak*, 216 F.3d at 314; *see also N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 121 (2d Cir. 2013) (allegations based in part on accounts by former employees "all contain 'factual content,' which we must accept as true" (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007))).  For example, one XPO former employee ("FE-3") explained that there were discussions at XPO (by the May/June 2018 period) that Amazon was leaving as reflected in *XPO's own* "tonnage reports" and related information.  ¶¶77-79.  FE-3 was an Account Executive on XPO's sales team who reviewed a special "tonnage report" just prior to the summer of 2018; it showed "'tonnage' was down in various territories and regions *because of a drop in tonnage from Amazon*," so "FE-3's *team was asked to try to replace some of that business* by selling more tonnage to other customers."  ¶79.  FE-3 "recalled that Amazon had gradually started to slow down its business with XPO" at the time.  *Id.*

FE-3 is not alone in providing facts showing Amazon was leaving XPO in the late-spring and early-summer 2018 timeframe.  A current Amazon manager, who had previously worked for XPO and oversaw "five different Amazon warehouses that he visited as part of his job," witnessed XPO trailers suddenly "disappear[ing]" form Amazon's warehouses.  ¶¶61-63, 81.  As the Amazon manager explained: "when there's 400 trailers sitting out there and you use to see XPO all the time and then all of a sudden there's none, you know it's an obvious sign" that Amazon was dropping XPO business.  ¶62.  And, similar to FE-3's recollection of XPO reports, the Amazon manager saw internal *Amazon* reports confirming that "Amazon was dropping XPO" around this time.  ¶81.  These facts are significant to the holistic scienter analysis because they show Amazon was, in fact, leaving (consistent with Jacobs's February 2019 admissions) and they corroborate FE-3's recollection that Amazon started to leave XPO before the summer of 2018.  *See Novak*, 216 F.3d at 314; *see also Scholastic*, 252 F.3d at 73 (former employee facts credited where "the complaint gives

- 30 -

additional indications" to corroborate those facts); *Emps.' Ret Sys: of Gov't of the V.I. v. Blandord*, 794 F.3d 297, 307 (2d Cir. 2015) (rejecting argument "that confidential witnesses' statements must be linked to specific quarters to meet the pleading standard" because "the Second Circuit has held that allegations concerning activity in one period can support an inference of similar circumstances in a subsequent period" and one witness's "account of the fraudulent second quarter . . . order is closely linked to [the company's] misleading statements during the second quarter investor call").

Jacobs's and Malat's own admissions that they monitored tonnage and customers lost, ¶¶78, 115-117, corroborate FE-3's recollection that management told the salespeople to sell more to *replace* Amazon with sales to *other* customers. ¶79. Their admissions bridge any scienter gap standing alone, and they also permit an inference that *Defendants themselves* were the source of orders that trickled down to FE-3 to pick up increasing Amazon slack.[26] That inference is so pedestrian that courts routinely draw it in cases like this one,[27] and Jacobs and Malat practically admitted as much by discussing their efforts to increase sales staff efforts to "more aggressively" grow the tonnage business. ¶117. Defendants' suggested alternative inference "that Defendants did not know Amazon would leave as it did," ECF No. 121-1 at 26, is simply not plausible in the face of Defendants' access to reporting that showed Amazon departing and Defendants' *own admissions* that they "knew" Amazon would not stay forever (*i.e.*, they did know Amazon "would leave as it

---

[26]   *See, e.g.*, *Reese*, 747 F.3d  at 572 ("the inference that [named defendants] did not have access to the [Amazon tonnage and sales] data is directly contradicted by the fact that [they] specifically addressed it in [their] statement[s]"); *see also GE*, 857 F. Supp. 2d at 395-96 ("highly improbable" that defendant who publicly described issuer's finances did not access information underlying statements).

[27]   *See, e.g.*, *Hi-Crush*, 2013 WL 6233561, at *26 (finding scienter where executive-defendants "were intimately involved in the day-to-day operations" and "would naturally be apprised of important developments" in the agreement with company's major customer); *Wallace v. IntraLinks*, 2013 WL 1907685, at *9 (S.D.N.Y. May 8, 2013) (finding scienter based on allegations that executives were involved in customer contract decisions and that lost customer had been important to the company's core operations); *Pozniak v. Imperial Chem. Indus. PLC*, 2004 WL 2186546, at *7 (S.D.N.Y. Sept. 28, 2004) ("If, as plaintiffs allege, [a company] was actually losing and failing to replace major customers during the class period, a fact which would have been known to senior management, defendants' concealment of this fact and affirmative statements to the contrary would give rise to a strong inference of deliberate or reckless misrepresentation."); *see also Lexmark*, 367 F. Supp. 3d at 37 ("The inference of scienter is also buttressed by Plaintiffs' 'core operations' allegations.").

did"), that defendant Jacobs met weekly to discuss "customers lost," and that defendant Jacobs and Malat actively monitored the "mix" of tonnage customers right when Amazon was departing.

The question whether Jacobs, Hardig or Malat in fact had "knowledge" of Amazon's declining business is small cavil under Second Circuit authorities because, under *Novak*, the real question is whether defendants "***had access***" to the information. *See Novak*, 216 F.3d at 308, 311 ("[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts ***or access to information*** contradicting their public statements.").

Defendants' principal authorities in this case call for no other conclusion. ECF No. 121-1 at 13-14, 17, 19, 27. In one case, *Express Scripts*, the Second Circuit found scienter lacking where the class period ended on March 21, 2016 with allegations about a "ten-year agreement" that was not even set to expire until April 2019. In that case, March 21, 2016 was merely the date when the parties commenced litigation over a breach of the still-binding contract. *Express Scripts*, 773 F. App'x at 14-15. Unlike here, the CEO-defendant in *Express Scripts* never said that he always "knew" that the company's top customer was going to leave. Quite the contrary: that CEO had secured a written agreement setting his expectations that the customer would stay. *Id.* And the issue here is completely different from "negotiations" that could eventually result in the loss of a customer. Defendants "knew" Amazon was going to leave, had access to reports and statements showing Amazon's departure, and continued making misrepresentations ***after*** Amazon ***had begun*** leaving. *Cf. Dynex*, 531 F.3d at 196 (remanding with leave to replead where, unlike here, defendants said nothing about what they knew during the class period, and the sole scienter facts before the *Dynex* court consisted of allegations about "raw data" without reference to "***any*** reports or statements ***that would have come to light in a reasonable investigation*** and that would have demonstrated the falsity of the allegedly misleading statements").

Defendants' other principal case, *In re Hertz Glob. Holdings, Inc. Sec. Litig.*, 2015 WL 4469143 (D.N.J. July 22, 2015), similarly involved a defendant-executive who had no reason to believe that the alleged risk would materialize because she had secured a written contract to recover all losses from a third party who "would be responsible for payment" of any losses involving the company's sale of a large fleet of cars – ergo, she would "always be made whole on the sale of ***any*** . . . vehicle." *Id.* at *16.  The executives in *Express Scripts* and *Hertz* cases had, unlike here, negotiated contractual rights that protected investors from the kind of financial "body blow" that XPO incurred.  In this case, Defendants concede that Jacobs and Hardig signed SEC filings showing they knew some customers signed contracts that "generally [were] ***terminable at will*** by the customer[] on short notice," ECF No. 121-1 at 6, and, as a result, Defendants should have known Amazon's business could and did go away without any protection for XPO – hardly a ten-year, written agreement that would always make XPO whole.

Collectively, the facts in this case permit the plausible inference that the Amazon "body blow" started around April 2018, and that the Defendants knew or should have known it.  Contrary to Defendants' suggestions, Plaintiffs do not need to allege that the "'real time' data available to Defendants was . . . a 'magic black box' that could perfectly predict performance." *Aeropostale*, 2013 WL 1197755, at *19.  The *Aeropostale* court held "that need not be the case in order for Plaintiff to raise a strong inference of scienter" because

> access to real time data, at a minimum, bolsters Plaintiff's allegation that Defendants were aware of the severity of the ***"inventory crisis,"*** *as recounted by the* ***confidential witnesses*** (in addition to and separate from the witnesses' reports that Defendants attended various meetings and were aware of the inventory problems).  ***And the bevy of information provided by those witnesses suggests that the crisis*** ***was severe and that it would not abate***

going into the future. *Id.*  The Complaint here likewise alleges a "body blow" crisis from the loss of Amazon's business, as corroborated by confidential witnesses who witnessed "severe" problems that

did "not abate," and in addition to separate allegations that "Defendants attended various meetings and were aware of the [tonnage and logistics] problems."  *See id.*

### 3. Defendants Hardig and Malat's "Shocking" Resignations After Amazon Dropped XPO's Tonnage Numbers and Dropped XPO from Its Strategic "Prime Week"

The peculiar timing and surprising resignations of defendants Hardig and Malat provide additional facts supporting the collective scienter analysis.  *Celestica*, 455 F. App'x at 14 n.3 ("removal of [the company's] executives can provide supplemental support for allegations of scienter").  The resignations were "surprising" because Malat and Hardig had conveyed no plans to retire to the market beforehand and because XPO had no full-time replacements lined up when they quit.  On August 2, 2018, XPO announced that defendant Hardig would be resigning immediately from the position of CFO.  ¶¶97-98.  The announcement came just after XPO's undisclosed loss of Amazon's "Prime Week" business and on *the same day* that XPO claimed to be "on track" and "nothing's slowed down" while discussing 2Q18 results.  ¶¶97-101, 107.  Then, on October 31, 2018, *the same day* that XPO revealed its disappointing 3Q18 results that were apparently the result of a small customer's bankruptcy, XPO announced that defendant Malat would also be resigning from the position of CSO.  ¶107.

Analysts picked up on the suspicious nature of these resignations, with Barclays noting: "the sudden and unexpected departure of Scott Malat, XPO's Chief Strategy Officer, *did come as a shock to many in the market*, especially following the recent departure of CFO John Hardig this summer." ¶108; *see In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 394 n.176 (S.D.N.Y. 2007) (suspicious resignations "add to the overall pleading of circumstantial evidence of fraud").  The sudden, shocking departures of Malat and Hardig are additional facts in the "collective" scienter analysis that favor finding Defendants knew or should have known that Amazon was leaving XPO, rendering their Class Period statements misleading.  *See Tellabs*, 551 U.S. at 322-23.

- 34 -

### 4.    Defendants' Pursuit of a Merger that Would "Effectively Double" XPO's Size (and Issuance of Stock) Shows Motive

Another way that "[p]laintiffs can plead scienter" is by "alleging facts demonstrating that defendants had both the motive and an opportunity to commit fraud." *Scholastic*, 252 F.3d at 74. Defendants clearly "had access to insider information and thus had an opportunity to commit fraudulent acts," *id.*, as discussed above (*see infra*, §II.C.2.) and, in any event, courts presume an opportunity to commit fraud is always present in cases like this one. *See In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 306 (S.D.N.Y. 2013) ("The opportunity to commit fraud is generally assumed where the defendant is a corporation or corporate officer."). Defendants had plenty of motives to perpetrate the fraud.

To start, Defendants masked the fact that Amazon was largely responsible for XPO's short-lived growth in profitability through the summer of 2017 when XPO issued several hundred million dollars' worth of new, inflated stock. ¶184. Even more tellingly, the facts show Jacobs, Malat and Hardig had strong economic motives to pump up XPO's stock value and dilute the effect of the Amazon problem in the merger-of-equals that Jacobs said he "actively engaged" in pursuing, ¶¶125-126, 130-131, right after Hardig quit and just when Malat quit, and just after Amazon dropped its tonnage numbers and ejected XPO from its "Prime Week" event. ¶¶94, 97, 105-107. Even ignoring the collective facts already cited, the Second Circuit "has ruled that, in some circumstances, the artificial inflation of stock price in the acquisition context may be sufficient for securities fraud scienter." *Rothman v. Gregor*, 220 F.3d 81, 93 (2d Cir. 2000). It is no answer to argue that Jacobs, Malat, Hardig or even XPO failed to actually sell more shares ***before*** the merger happened given the peculiar way it fell apart. *See Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 662 (8th Cir. 2001) ("The ultimate profitability of a course of conduct is not conclusive of intent. Just as we cannot countenance pleading fraud by hindsight, neither can we infer innocence by hindsight because the alleged misdeeds did not pay off."); *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513

- 35 -

F.3d 702, 710 (7th Cir. 2008) ("The fact that a gamble – concealing bad news in the hope that it will be overtaken by good news – fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble.").

Indeed, Defendants pursued a multi-billion-dollar merger that "would have effectively doubled" the value of XPO stock in December 2018, but accidental leaks about Amazon's effects on the business "squandered" the merger.  ¶¶125, 130-131.  This merger would have allowed XPO to bury the effects of Amazon's departure in 2018 by blaming any issues on the new, "consolidated" entity and thereby making it *impossible* to know whether the Amazon problem emanated from XPO or the company buying XPO.  ¶130.  The blockbuster merger thus gave Jacobs, Malat and Hardig both a financial motive to pump up XPO's stock value and an opportunity to get away with covering up the Amazon problem.  ¶130.  Consistent with that motivation, defendant Jacobs announced his merger plan *a day after* XPO falsely and misleadingly attributed its earnings miss to a "rounding error" sized customer.  ¶¶109, 125, 130-131.  This kneejerk reaction – quickly seeking a large merger partner, in the wake of what XPO publicly claimed was a very minor "rounding error" that would not repeat itself – suggests that Defendants were aware of a more significant and enduring problem in XPO's operations.  Defendants' advance the common sense notion that it would be tough to "have concealed the Amazon issue from its [merger] counterparty," ECF No. 121-1 at 30, but the merger fell apart "[w]ithin a few days" of a highly irregular selective disclosure to a third party that revealed more negative effects of the Amazon loss; it is probable that XPO's merger target was the third party who saw the Amazon-driven negative financial results, refused to be acquired with inflated XPO stock and gave XPO no choice but to disclose the negative results to the market.  ¶¶130-145.  And to execute the "$17 billion" merger that Jacobs discussed, ¶130, XPO would have had to have sold far more than the $1 billion that Defendants *argue* XPO *said* it would repurchase, someday.  In other words, even accepting Defendant's "repurchase" argument at face value, XPO

was "net short" its own stock, if anything.  Moreover, *if* XPO bought some of its shares after the potential merger fell apart, that would not undermine the allegations of scienter as a matter of law. *See MF Glob.*, 982 F. Supp. 2d at 320 (holding that the purchase of stock cannot in and of itself "counteract the circumstantial evidence of fraudulent intent" because "such a rule would create incentive for corporate officers to insulate themselves from liability by purchasing stock merely to negate an inference of fraud"); *In re Guilford Mills, Inc., Sec. Litig.*, 1999 WL 33248953, at *5 (S.D.N.Y. July 21, 1999) ("Buying back stock . . . does not in and of itself refute the strong inference of scienter raised by plaintiffs' other allegations of motive and opportunity.").

Collectively, the facts show Jacobs, Hardig and Malat had a motive and opportunity to commit fraud by inflating XPO's stock to execute a blockbuster merger that would have blunted Amazon's impact on the "consolidated" entity's performance, and made it impossible to discern which original company had been responsible for the gap left by Amazon.  All of the above facts alleged strongly support finding scienter in this case.

### D.      The Complaint Sufficiently Pleads Loss Causation

To plead loss causation, a plaintiff need only allege "a causal connection between the material misrepresentation and the loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). At the pleading stage, a complaint must "'provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind.'" *Terex*, 2018 WL 1587457, at *8 (quoting *Dura*, 544 U.S. at 347).  However, a plaintiff "need not demonstrate on a motion to dismiss that the corrective disclosure was the *only* possible cause for decline in the stock price." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 233 (2d Cir. 2014) (emphasis in original). Moreover, "neither the Supreme Court in *Dura*, nor any other court addressing the loss causation pleading standard require a corrective disclosure be a 'mirror image' tantamount to a confession of fraud." *E*Trade*, 712 F. Supp. 2d at 202; *see also Terex*, 2018 WL 1587457, at *9 ("An admission

- 37 -

of guilt is not necessary: 'the "relevant truth" required under *Dura* is not that a fraud was committed

per se, but that the "truth" about the company's underlying condition, when revealed, causes the

"economic loss."'") (quoting *E*Trade*, 712 F. Supp. 2d at 202).

The Complaint alleges that XPO's common stock price was inflated by Defendants' repeated

material misstatements of present fact and omissions concerning Amazon's effects on the business,

and that XPO's common stock price continued to trade at artificially inflated prices throughout the

Class Period as a result of Defendants' material misrepresentations and omissions.  Defendants'

underlying fraud started to come to light on October 31, 2018, when, in a Company-issued press

release, XPO misleadingly blamed missing 3Q18 earnings and revenue expectations on a "rounding

error" involving the bankruptcy of a single small customer and announced the sudden resignation of

XPO's CSO, defendant Malat (just over two months after the Company's CFO, defendant Hardig,

resigned).  ¶¶105-129, 242-244.  Following this partial disclosure, XPO's stock price declined nearly

3%.  ¶244.  On December 12-13, 2018, XPO was forced to disclose facts showing the "rounding

error" customer was not the real source of its problems, but that it was continuing to experience the

"significant[] impact[]" from Amazon's departure that accounted for lower growth, ¶¶135, 144, and

caused a 33% decline in XPO's stock price.  ¶142.  Then, on February 14, 2019, after the merger fell

apart, XPO had to announce its standalone financial results and told the market that it lost a material

amount of business from its "largest customer," Amazon, which triggered another 13% decline

XPO's stock value.  ¶¶147, 149-150, 151, 254, 257, 259.  These facts are sufficient to plead loss

causation per the authorities cited above.

Contrary to Defendants' suggestions, the fact that Defendants did not come out and publicly

admit the totality of the fraud does not vitiate the Complaint's loss causation allegations.  *See Terex*,

2018 WL 1587457, at *9 ("Defendants' theory of loss causation would have the effect of insulating

from liability defendants who, as alleged here, inflate a company's sales data, correct the data over

time, and never admit that earlier data was inflated.") (citing cases); *see also Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 385 (6th Cir. 2016) ("We are mindful of the dangerous incentive that is created when the success of any loss causation argument is made contingent upon a defendant's acknowledgement that it misled investors. Our sister circuits are too and have recognized that defendants accused of securities fraud should not escape liability by simply avoiding a corrective disclosure."). In the Second Circuit, "a plaintiff need not show that a 'specific corrective disclosure . . . exposed the precise extent of [the] alleged fraud,' so long as the plaintiff's 'theory of loss causation nevertheless rest[s] on the revelation of the truth.'" *Terex*, 2018 WL 1587457, at *9 (quoting *Vivendi*, 838 F.3d at 261). As in *Terex*, Defendants partial disclosures here "'constructively disclos[ed] the fraud.'" *Id*. Therefore, the Complaint sufficiently pleads loss causation.[28]

### E. The Complaint Pleads §§20(a) and 15 Control Person Violations

Because the Complaint sufficiently pleads that Defendants violated §10(b), and details how defendants Jacobs, Hardig and Malat, as top ranking executives at XPO, were meaningfully, culpable participants in the fraud, an actionable violation of §20(a) is also pleaded. *See* ¶¶277-281. Similarly, because the Complaint sufficiently pleads that defendants Jacobs and Hardig violated §11 (*see* ¶¶184-187, 282-287), the Complaint also alleges an actionable violation of §15 by XPO's CEO and former CFO. *See* ¶¶288-292.

---

[28]    It is also irrelevant to the analysis of loss causation (or damages for that matter) at the pleading stage that XPO's stock price was higher on the day Defendants filed their motion to dismiss (*i.e.*, August 2, 2019) than on February 14, 2019. *See Acticon AG v. China N.E. Petroleum Holdings, Ltd.*, 692 F.3d 34, 39-40 (2d Cir. 2012); *see also In re CannaVest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 247-48 (S.D.N.Y. 2018) (rejecting defendants' loss causation arguments and relying upon *Acticon*).

## III.   Conclusion

The Court should deny Defendants' motions to dismiss.

DATED:  August 23, 2019                          Respectfully submitted,

                                                 ROBBINS GELLER RUDMAN
                                                   & DOWD LLP
                                                 JASON C. DAVIS (phv10099)


                                                 _____s/ JASON C. DAVIS_____
                                                        JASON C. DAVIS

                                                 Post Montgomery Center
                                                 One Montgomery Street, Suite 1800
                                                 San Francisco, CA  94104
                                                 Telephone:  415/288-4545
                                                 415/288-4534 (fax)
                                                 jdavis@rgrdlaw.com

                                                 ROBBINS GELLER RUDMAN
                                                   & DOWD LLP
                                                 SPENCER A. BURKHOLZ (phv01417)
                                                 MATTHEW I. ALPERT (phv10035)
                                                 ALEXI H. PFEFFER-GILLETT (phv10036)
                                                 655 West Broadway, Suite 1900
                                                 San Diego, CA  92101
                                                 Telephone:  619/231-1058
                                                 619/231-7423 (fax)
                                                 spenceb@rgrdlaw.com
                                                 malpert@rgrdlaw.com
                                                 agillett@rgrdlaw.com

                                                 Lead Counsel for Lead Plaintiff

                                                 IZARD, KINDALL & RAABE, LLP
                                                 ROBERT A. IZARD (ct01601)
                                                 CHRISTOPHER M. BARRETT (ct30151)
                                                 29 South Main Street, Suite 305
                                                 West Hartford, CT  06107
                                                 Telephone:  860/493-6292
                                                 860/493-6290 (fax)
                                                 rizard@ikrlaw.com
                                                 cbarrett@ikrlaw.com

                                                 Local Counsel

LABATON SUCHAROW LLP
JONATHAN GARDNER (phv10178)
ALFRED L. FATALE III (phv09098)
140 Broadway, 34th Floor
New York, NY  10005
Telephone:  212/907-0700
212/818-0477 (fax)
jgardner@labaton.com
afatale@labaton.com

Additional Counsel for Plaintiff

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on August 23, 2019, I authorized the electronic

filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send

notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I

hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the

non-CM/ECF participants indicated on the attached Manual Notice List.

s/ JASON C. DAVIS
JASON C. DAVIS

ROBBINS GELLER RUDMAN
&amp; DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  JDavis@rgrdlaw.com

# Mailing Information for a Case 3:18-cv-02062-SRU Labul v. XPO Logistics, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Matthew Isaac Alpert**
  malpert@rgrdlaw.com,kathyj@rgrdlaw.com,e_file_sd@rgrdlaw.com,kwoods@rgrdlaw.com,2127683420@filings.docketbird.com

- **Martin J. Auerbach**
  auerbach@mjaesq.com

- **Christopher M. Barrett**
  cbarrett@ikrlaw.com,7457869420@filings.docketbird.com

- **Spencer A. Burkholz**
  SpenceB@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Jason Davis**
  jdavis@rgrdlaw.com

- **Martin Flumenbaum**
  mflumenbaum@paulweiss.com,mao_fednational@paulweiss.com

- **James I. Glasser**
  jglasser@wiggin.com,akalinowski@wiggin.com,dcoppola@wiggin.com

- **J. Alexander Hood , II**
  ahood@pomlaw.com

- **Shannon L. Hopkins**
  shopkins@zlk.com,shalliday@zlk.com

- **Jeremy A. Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,lpvega@pomlaw.com

- **Julia Tarver Mason Wood**
  jwood@paulweiss.com,mao_fednational@paulweiss.com

- **Brian P. Murray**
  bmurray@glancylaw.com,brian-murray-4237@ecf.pacerpro.com

- **William H. Narwold**
  bnarwold@motleyrice.com,mjasinski@motleyrice.com,vlepine@motleyrice.com,ajanelle@motleyrice.com

- **Alexi Pfeffer-Gillett**
  agillett@rgrdlaw.com

- **David R. Schaefer**
  dschaefer@bswlaw.com,dmurray@bswlaw.com,jrivera@bswlaw.com

- **Daniel Sinnreich**
  dsinnreich@paulweiss.com,mao_fednational@paulweiss.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`