UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| LARRY LABUL, Individually and on Behalf of All Others Similarly Situated, | No. 3:18-cv-02062-SRU |
| Plaintiff, | CLASS ACTION |
| vs. | LEAD PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT |
| XPO LOGISTICS, INC., et al., | |
| Defendants. | |

ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................................1

ARGUMENT ......................................................................................................................3

I.  The FAC Sufficiently Pleads Actionable Material Misrepresentations and
    Omissions.................................................................................................................3

    A.  Defendants' Statements Tying XPO's Record Growth to Diversification
    Were Materially False Because One Customer, Amazon, Was the Main
    Driver of Growth...............................................................................................3

        1.  Jacobs's Statements Linking Growth to Diversification Satisfy
    Falsity, per the Court's Guidance ................................................4

        2.  Amazon's Impact on XPO's Growth Was Material ...................................6

            a.  Defendants Apply the Wrong Baseline for Materiality .................6

            b.  Amazon Was "Significant" to XPO's Growth................................8

            c.  "Widely-Known" News Available During the Class Period
    Bolsters the Allegations of Falsity and Materiality ......................11

    B.  The FAC Adequately Alleges that Defendants Materially Misstated the
    Reasons for XPO's Negative Tonnage Growth in the Second Quarter of
    2018...................................................................................................................14

        1.  Defendants' Statements Were Misleading Half-Truths............................14

        2.  Defendants' Misstatements Were Material................................................19

    C.  The FAC Adequately Alleges Defendants' "Outsourcing" Statements
    Were Materially Misleading ..............................................................................21

    D.  Defendants' 3Q18 Statements Were Materially False and Misleading................22

        1.  Lost Business from XPO's Two Small House of Fraser Fulfillment
    Centers Does Not Explain the Entire 3Q18 Miss ......................................22

        2.  Decreased Business at Four Amazon Fulfillment Centers Was a
    (Concealed) "but for" Cause of the 3Q18 Miss.........................................24

        3.  The 3Q18 Amazon Miss Is Quantitatively and Qualitatively
    Material ......................................................................................................27

    E.  The FAC Adequately Alleges Falsity as to Defendants' Statements that
    There Was "No Change" to Risk Factors ..........................................................29

**Page**

F.     Item 303 Provides an Independent Basis for Falsity ..............................................30

II.     The FAC Sufficiently Pleads Scienter ...........................................................................31

A.     Motive and Opportunity.........................................................................................31

1.     To "Double" Its Size, XPO Would Have to Issue New Stock..................31

2.     To "Double" Its Size, XPO Would Need to Pay an Acquisition
Price Close to Its Own Market Value, Requiring New Equity
Under Defendants' Own Argument............................................................32

3.     Even in Defendants' Implausible Scenario that XPO Could
"Double" Its Size by Paying a Large Discount and No Control
Premium, XPO Still Would Need New Equity............................................34

B.     Conscious Misbehavior and Recklessness.............................................................36

III.     The FAC Sufficiently Pleads Loss Causation..................................................................38

IV.     The FAC Sufficiently Pleads a §20(a) Violation............................................................39

CONCLUSION..................................................................................................................40

# TABLE OF AUTHORITIES

**Page**

## CASES

*Acticon AG v. China N.E. Petroleum Holdings, Ltd.*,
    692 F.3d 34 (2d Cir. 2012).................................................................................39

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)....................................................................31, 36, 39

*Burstyn v. Worldwide Xceed Grp., Inc.*,
    2002 WL 31191741 (S.D.N.Y. Sept. 30, 2002)................................................31, 32

*Christine Asia Co. v. Yun Ma*,
    718 F. App'x 20 (2d Cir. 2017) ..............................................................................13

*Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*,
    268 F. Supp. 3d 526 (S.D.N.Y. 2017).................................................................9, 20

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000)........................................................................ *passim*

*Hutchins v. NBTY, Inc.*,
    2012 WL 1078823 (E.D.N.Y. Mar. 30, 2012)..................................................21, 22

*In re Coty Inc. Sec. Litig.*,
    2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016) .......................................................27

*In re Gentiva Sec. Litig.*,
    932 F. Supp. 2d 352 (E.D.N.Y. 2013) ...................................................................27

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
    791 F.3d 90 (D.C. Cir. 2015)..................................................................................29

*In re MSC Indus. Direct Co., Inc.*,
    283 F. Supp. 2d 838 (E.D.N.Y. 2003) ...................................................................37

*In re Omnicom Grp., Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010)...................................................................................38

*In re Qudian Inc. Sec. Litig.*,
    2019 WL 4735376 (S.D.N.Y. Sept. 27, 2019)........................................................27

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001)...............................................................20, 28, 29, 37

**Page**

*In re Scottish Re Grp. Sec. Litig.*,
    524 F. Supp. 2d 370 (S.D.N.Y. 2007).................................................................38

*In re Signet Jewelers Ltd. Sec. Litig.*,
    2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018).................................................38

*In re Sturm, Ruger & Co., Inc. Sec. Litig.*,
    2011 WL 494753 (D. Conn. Feb. 7, 2011) .........................................................6

*In re SunEdison, Inc. Sec. Litig.*,
    300 F. Supp. 3d 444 (S.D.N.Y. 2018).............................................................12

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016)................................................................... *passim*

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)................................................................32, 34

*Lilly v. State Teachers Ret. Sys. of Ohio Pension Fund*,
    608 F.2d 55 (2d Cir. 1979)....................................................................20

*Litwin v. Blackstone Grp., L.P.*,
    634 F.3d 706 (2d Cir. 2011)................................................................. *passim*

*Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v.*
    *Am. Express Co.*,
    724 F. Supp. 2d 447 (S.D.N.Y. 2010), *aff'd*,
    430 F. App'x 63 (2d Cir. 2011) ..........................................................27

*Loreley Financing (Jersey) No. 3 Ltd. v.*
    *Wells Fargo Sec., LLC*,
    797 F.3d 160 (2d Cir. 2015)................................................................38

*NECA-IBEW Health & Welfare Fund v.*
    *Goldman Sachs & Co.*,
    693 F.3d 145 (2d Cir. 2012)..............................................................5, 27

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000).................................................15, 16, 17, 25

*Omnicare, Inc. v.*
    *Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)........................................................................14, 15

- iv -

Page

*Ontario Teachers' Pension Plan Board v.*
  *Teva Pharm. Indus. Ltd.*,
  2019 WL 4674839 (D. Conn. Sept. 25, 2019) ................................................................ *passim*

*Patel v. L-3 Commc'ns Holdings Inc.*,
  2016 WL 1629325 (S.D.N.Y. Apr. 21, 2016) ................................................................ 20

*Rex & Roberta Ling Living Tr. u/a Dec. 6, 1990 v. B Commc'ns Ltd.*,
  346 F. Supp. 3d 389 (S.D.N.Y. 2018) ........................................................................ 9

*Rothman v. Gregor*,
  220 F.3d 81 (2d Cir. 2000) .......................................................................... 31, 32, 36

*SEC v. Mayhew*,
  121 F.3d 44 (2d Cir. 1997) .......................................................................... 20

*Sheet Metal Workers Local 32 Pension Fund v.*
  *Terex Corp.*,
  2018 WL 1587457 (D. Conn. Mar. 31, 2018) ................................................. 29, 37

*Stratte-McClure v. Morgan Stanley*,
  776 F.3d 94 (2d Cir. 2015) .......................................................................... 30

*Teamsters Local 445 Freight Div. Pension Fund v.*
  *Dynex Capital, Inc.*,
  531 F.3d 190 (2d Cir. 2008) .......................................................................... 36, 37

*United States v. Rajaratnam*,
  802 F. Supp. 2d 491 (S.D.N.Y. 2011) .......................................................... 27

## STATUTES, RULES AND REGULATIONS

15 U.S.C. §78
  §10(b) ........................................................................................................ 39
  §20(a) ........................................................................................................ 39

17 C.F.R.
  §229.303(a)(3)(ii) ................................................................................... 30

64 Fed. Reg. 45,150 (1999) ....................................................................... 20

## INTRODUCTION

This case is not complicated. Amazon[1] is one the largest companies in the world and has been experiencing rapid growth for years. Companies fortunate enough to hitch their wagons to Amazon experienced rapid growth along with it. XPO Logistics, Inc. was one such company. As XPO's largest customer, Amazon propelled XPO from a money-losing company to one that was quickly growing and profitable. When Amazon started to decelerate the business it gave to XPO, XPO's growth suffered. Indeed, immediately after XPO disclosed the truth about its reliance on Amazon, XPO's CEO, defendant Bradley S. Jacobs, admitted that XPO "knew" Amazon's business was not permanent and that having "too much concentration" on Amazon had been a "mistake" that caused a "body blow" to XPO, with XPO being forced to lower its projected 2019 growth rate.

The Defendants in this case previously told this Court that it was "widely known" that Amazon had plans to take its transportation and logistics needs in-house and away from XPO and other companies. Indeed, *The Wall Street Journal* ("*WSJ*") reported Amazon's move on February 9, 2018. The financial media reported that investors reacted to this news by selling off shares in companies they expected to be negatively impacted from losing Amazon business. ¶¶27-32. XPO competitors UPS and FedEx, whom the market knew depended on Amazon for 1.5% to 3% of their revenues, saw their stock prices fall by 5% to 6% in the wake of the Amazon news, while XPO rose in value, as *Bloomberg* reported: "XPO [stock price was] up 3%, even as FDX [FedEx] and UPS both opened down after WSJ reported" the Amazon news. ¶29. That was a Friday.

On the following Monday, February 12, 2018, XPO issued its 2017 Annual Report and affirmatively deleted a fact it disclosed to the market in prior SEC filings: the size of its largest customer. Unlike the market's understanding of FedEx and UPS, investors at the time did not know

---

[1] All defined terms herein are identical to those in the First Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws, filed on January 3, 2020 (ECF No. 134) ("FAC"). Additionally, all "¶" and "¶¶" references are to the FAC unless otherwise indicated.

the size of Amazon's impact on XPO revenues because XPO **never** disclosed that Amazon was a material customer at any time, and its 2017 Annual Report deleted facts that would have allowed the market to infer that **a single** customer contributed to more than 50% of XPO's growth in 2017. In 2016, XPO had revealed that its "largest customer" accounted for 3% of its revenue. In 2017 – unbeknownst to the market – that number rose to 5.5%, an additional hundreds of millions of dollars, and contributed to over 50% of XPO's growth in 2017. Unfortunately for XPO investors, XPO deleted the disclosure about its "largest customer" immediately after FedEx and UPS experienced Amazon-related losses on February 9, 2018 and then proceeded to tout diversification as a key source of XPO's growth. This was not the whole truth.

Defendants had a powerful motive to conceal XPO's reliance on Amazon. They were admittedly pursuing a transformative acquisition during the Class Period that would have, in Jacobs's words, "doubled" XPO in size in "short order." But XPO did not have the financial resources to complete that acquisition and needed to keep its stock price high so it could issue common stock to fund the deal. That deal fell apart at the end of the Class Period, after XPO's stock price had suffered declines as the truth of XPO's dependence on Amazon began to come out.

As XPO pursued the transformative acquisition, Defendants told investors: (1) that diversification drove the Company's growth in 1Q18 and 2Q18; (2) that declining shipping growth rates in 2018 were part of an overarching strategy to grow profitability; (3) that XPO's top customers were following a trend to "outsource" their logistics and transportation needs to XPO in 3Q18 (as its very top customer was "in-sourcing" its needs away from XPO); and (4) in 3Q18, that but for disappointing results from a small customer, XPO would have reached analysts' consensus revenue and earnings targets. Throughout this period, XPO reported there was "no material change" to any risks facing XPO. Defendants affirmatively chose to speak on all of these topics and thereby assumed "'a duty to tell the whole truth.'" *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir.

2016).[2]  The whole truth was that Amazon had started to take away its business from XPO – a fact that would negatively impact its growth going forward.

The FAC responds to this Court's concerns about the original complaint – that it was too long, that it lacked quantitative detail and that its scienter theory was unclear.  The FAC is half as long, cuts the Class Period from three years to one year, cuts the number of individual defendants from three to one, significantly cuts the number of challenged statements, quantifies the factual allegations to the greatest extent possible absent discovery, and more clearly alleges Plaintiffs' "motive and opportunity" theory of scienter.  Defendants generally argue there are "no facts" supporting any of Plaintiffs' allegations.  This is not the case.  The FAC particularizes quantitative and qualitative facts showing Amazon's deceleration was a material part of the "whole truth" that Defendants' affirmative statements concealed.  Plaintiffs therefore ask the Court to deny Defendants' motion in full.

## ARGUMENT

I.    **The FAC Sufficiently Pleads Actionable Material Misrepresentations and Omissions**

A.    **Defendants' Statements Tying XPO's Record Growth to Diversification Were Materially False Because One Customer, Amazon, Was the Main Driver of Growth**

Public companies that generate broad-based "record" growth across thousands of customers in a variety of businesses generally present more favorable investments than businesses that rely primarily on one customer to fuel their growth, because the diversification generates more stable returns.  XPO repeatedly stated that it had tens of thousands of customers and represented that this diversification was the reason for its record growth, making XPO a highly-attractive investment opportunity.  When, at the end of the Class Period, XPO revealed its heavy reliance on one single

---

[2]    All citations and footnotes are omitted and emphasis is added unless otherwise noted.

customer to generate growth, professional securities analysts reacted negatively.  Responding with disappointment to that revelation, a Bank of America Merrill Lynch analyst told Jacobs: "[o]ne of the things that I think *XPO has touted* as one of its strengths is that it's not overly focused on any particular customer" to drive its growth.  ¶125.

As discussed below, Defendants materially misled the market by connecting XPO's growth to diversification while omitting the Company's heavy reliance on a single customer, Amazon, to fuel growth.  By choosing to publicly speak on the topic of XPO's growth and diversification, Defendants undertook "'a duty to tell the whole truth.'"  *Vivendi*, 838 F.3d at 258; *see also Ontario Teachers' Pension Plan Board v. Teva Pharm. Indus. Ltd.*, 2019 WL 4674839, at *18 (D. Conn. Sept. 25, 2019) ("The misstatements and omissions attributing the profit increases and decreases to things other than pricing were half-truths, ones that gave rise to a duty to disclose the whole truth.").

### 1. Jacobs's Statements Linking Growth to Diversification Satisfy Falsity, per the Court's Guidance

The FAC focuses on three sets of growth-related statements (and omissions triggered by those statements) creating liability.  First, on February 12, 2018, XPO deleted a disclosure in its publicly filed 2017 Annual Report about XPO's "largest customer" that would have enabled investors to figure out the customer's impact on XPO's growth.  ¶33.  The new language instead only disclosed the combined size of XPO's five largest customers and touted XPO's "diversified customer base."  *Id.*  The 2017 Annual Report also affirmatively stated that "revenue for 2017 [had] increased" and that this "increase was *primarily* driven by growth in our European contract logistics business" and a host of other non-Amazon drivers.  ¶34.  XPO also said nothing about Amazon's impact in its "Management's Discussion and Analysis" section of the 2017 Annual Report.  *Id.*

Second, Jacobs stated on May 2, 2018: "We delivered *record* first quarter results for revenue, net income, EPS and adjusted EBITDA.  Our 11% organic *revenue growth reflected a healthy diversification of customer verticals and service lines*."  ¶46.  Finally, on May 3, 2018, Jacobs

repeated the point about diversification, stating: "[W]e increased our adjusted EBITDA 14% year-over-year to a first quarter record of $330 million. ***The growth was broad-based across our operations***." ¶47.

These statements were false or misleading by omission because growth from Amazon ***alone*** had accounted for more than half (over 50%) of XPO's ***total*** record growth. ¶¶36, 51. Defendants' statements and omissions concerning Amazon's significant impact on XPO's growth are similar to many that the Court upheld in *Teva*, a decision that Defendants overlook. In *Teva*, the defendants' "misstatements and omissions attributing the profit increases and decreases to things other than pricing were half-truths, ones that gave rise to a duty to disclose the whole truth." 2019 WL 4674839, at *18. Here, Jacobs publicly attributed XPO's revenue and profit increases to things other than XPO's largest customer and primary growth-driver, Amazon, which similarly amounts to a misleading "half-truth." *See id.* at *19.

Defendants' misrepresentations are important because they address the degree of risk associated with XPO's existing and expected growth rates. *See NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 166 (2d Cir. 2012). When financial analysts asked Jacobs about the secret to the Company's success – *i.e.*, the ***reasons*** for XPO's growth – he did not simply decline to comment. Rather, the XPO CEO substantively responded that diversification drove the growth in several ways, while omitting Amazon's significant role. ¶¶33-34, 46. Jacobs thus failed to tell the "'whole truth.'" *See Vivendi*, 838 F.3d at 258.

Contrary to Defendants' arguments (*see* Memorandum of Law in Support of Defendants' Motion to Dismiss the First Amended Consolidated Class Action Complaint (ECF No. 137-1) ("Motion" or "Mot.") at 12), the challenged statements address this Court's specific concerns about substantive allegations in the previous complaint. For example, at the November 4, 2019 motion to dismiss hearing, the Court asked "Why is a statement about diversification misleading because you

have a company that's fueling your growth?  You still have 50,000 customers.  It's still diverse."
Transcript of November 4, 2019 motion to dismiss hearing ("Tr.") at 11:3-6.  Plaintiffs understand
the Court's concern that if Defendants had merely said, in unrelated statements, that (1) XPO was
highly diversified; and (2) XPO was experiencing record growth, these two stated facts might not be
misleading absent Defendants' drawing some direct link between them.  The FAC focuses on
Jacobs's statements because he chose to give investors the impression that XPO was achieving
record growth ***because of*** its variety of business lines, "healthy [customer] diversification" and
"broad-based" operations (¶¶33-34, 46-47), but he failed to say anything about XPO's dependence
upon one single business – Amazon – to fuel over 50% of its growth.

### 2.    Amazon's Impact on XPO's Growth Was Material

Investors viewed the sustainability of XPO's growth as an important metric and, as a result,
Defendants' "half-truths" as to why the Company's revenue was growing at the record rates are
materially misleading.  *See In re Sturm, Ruger & Co., Inc. Sec. Litig.*, 2011 WL 494753, at *6 (D.
Conn. Feb. 7, 2011) ("'The veracity of a statement or omission is measured not by its literal truth,
but by its ability to accurately inform rather than mislead prospective buyers.'").  The FAC provides
specific facts supporting the materiality of Defendants' omissions when discussing XPO's growth, as
well as a "quantification . . . suggest[ing] that [the] allegations reflect material changes in [XPO's]
business." Tr. at 15:10-11.  Defendants' attempts in their Motion to diminish Amazon's importance
in terms of overall revenues distract from XPO's specific public focus on ***growth*** during the Class
Period and run contrary to Second Circuit authority regarding the proper calculations for conducting
a materiality analysis.

### a.    Defendants Apply the Wrong Baseline for Materiality

Evaluating Defendants' falsity and materiality arguments requires a closer look at the
challenged statements and omissions.  Jacobs touted XPO's diversification of businesses and

customers not as the reason for XPO's total revenues but rather as the reason for XPO's **growth**, a percentage change in total revenues.  Thus, the amount of XPO's growth is the correct denominator for determining materiality as to the omission of the growth fueled by Amazon (the numerator).  For example, for Defendants' statements about XPO's 2017 revenue growth of 5.2% on February 12, 2018, the correct denominator would be roughly the dollar amount of that 5.2% growth, $780 million.  ¶34.[3]

The Second Circuit confirmed this approach to determining the appropriate denominator in *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000).  The *Ganino* court cited "ample authority" in reversing the district court's determination that the disputed fees at issue in that case were "immaterial as a matter of law because the [f]ees amounted to only **1.7%** of [defendants' annual] **total revenue**."  *Id.*  The *Ganino* court reasoned that "'**the increase** in income for the first six months of 1996 compared to the first six months of 1995 **was due entirely** to the income recognized from [the disputed source].'"  *Id.* at 166.  The *Ganino* defendants reported $85.10 million in income for the first six months of 1996 as compared to $75.84 million in income as to the first six months of 1995, for an increase of $9.26 million.  *Id.* at 158; *see also* Ex. A[4] (*Ganino* defendants' financial statements).  That $9.26 million "increase" was the baseline – the denominator – that the Second Circuit credited for materiality purposes.  This formula is structurally the same as XPO's $780 million increase (*i.e.*, growth) in 2017 revenue.

---

[3]  This figure is based on Defendants' own admissions.  Jacobs stated that a diverse array of businesses drove XPO's "5.2%" revenue growth in 2017 (¶34) – the 5.2% being the result of the percentage change formula:  $15,380.8 million minus $14,619.4 million is ***$761.4*** million; 761.4 divided by 14,619.4 is 0.052 or 5.2%.  ¶34.  For simplicity's sake the FAC rounds these numbers to two decimal points: $15.4 billion minus $14.6 billion is $780 million.  ¶35.  This rounding actually favors Defendants because it lowers Amazon's impact on XPO's revenue growth.

[4]  All lettered "Ex. _" references are to the Declaration of Jason C. Davis in Support of Lead Plaintiffs' Opposition being submitted herewith.

b.        Amazon Was "Significant" to XPO's Growth

Having established the correct baseline denominator, calculating Amazon's importance (the numerator) relative to those baselines is straightforward under *Ganino*.  The numerator in *Ganino* was income derived from a customer named HTCC, and here, similarly, the numerator is revenue derived from Amazon.  *See Ganino,* 228 F.3d at 166.  As compared to the $9.26 million baseline that the Second Circuit credited in *Ganino*, the HTCC disputed income of "approximately $10.1 million" (*id.* at 158) was just over 100%, or was the "***entire[]***" reason for the increase.  *Id.* at 166.  The Second Circuit therefore agreed with plaintiffs that the HTCC-derived income was material as a matter of law in the context of defendants' income growth statements, despite HTCC's relatively smaller impact on total revenues.  *Id.*

*Ganino*'s materiality model readily accommodates the FAC's allegations in light of the additional documentation that Defendants file to advance their theories:

|  | **Baseline** | **Single Customer Value** | **Percentage** |
|---|---|---|---|
| *Ganino* | $9.26 million | $10.1 million | Over 100% |
| XPO 2017 | $780 million | $845 million | Over 100% |
| XPO 2018 | $1.9 billion | $900 million | 47% |
| XPO 2019 | (631 million) | ($570 million) | 89% |

XPO's baselines reflect the increases (in 2017 and 2018) and decreases (in 2019) in annual revenue as reflected in its audited financial statements.  *E.g.*, ¶36 n.6; *see also* Ex. 1 at 32[5] (showing revenue over the 2016-2019 period).[6]  The percentage figures show that Amazon accounted for a major part (47% to over 100%) of XPO's growth, and indeed was the "primary driver" of XPO's overall growth

---

[5]    All numbered "Ex. _" references are to the Declaration of Daniel S. Sinnreich in Support of Defendants' Motion to Dismiss (ECF Nos. 137-2-137-16).

[6]    In 2016, XPO's largest customer had contributed $438 million to XPO revenue.  ¶36.  The FAC assumes this 2016 customer was Amazon, an inference that actually favors Defendants: if Amazon was not XPO's largest customer in 2016 and contributed less than $438 million, then the growth of XPO's dependence on Amazon in 2017 would be larger.  Assuming Amazon contributed $438 million or less in revenue to XPO in 2016, Amazon's growth nearly doubled in 2017, up to $845 million, accounting for more than 100% of XPO's total growth under the *Ganino* analysis.

performance (both positive and negative) during the Class Period, including as Amazon started

shutting down and decelerating businesses with XPO in 2018.  *See infra* §I.D.2.

In the face of these facts, Defendants argue that the "100%" figures are "misleading" based

on Amazon as a percentage of XPO's total revenues.  Mot. at 13.  But the Second Circuit in *Ganino*

considered and rejected a substantially similar argument.  Much like Defendants attempt to do here,

the defendants in *Ganino* had persuaded the district court that the $10.1 million increase was

immaterial because it was a mere "1.7%" of overall revenue.  *See Ganino*, 228 F.3d at 162; Mot. at 4

(in 2019, "[Amazon's] reduction resulted in no more than a 3.7% decline in XPO's overall revenue,

well below the established 5% threshold for materiality").  The Second Circuit reversed and rejected

such arguments: "it cannot be said that no reasonable investor would have considered the [disputed]

income to be significant or to have altered the total mix of information affecting their investment

decisions."  *Ganino,* 228 F.3d at 166.[7]

The key question is not the misstatements' relation to total revenues, but rather their relation

to the area upon which Defendants are choosing to comment – in this case, XPO's growth.  As noted

above, Amazon made up between 47% to over 100% of XPO's total growth during the Class Period.

The omission of this information from XPO's statements about its total growth is material under

Second Circuit authority.  Defendants' ***own*** admissions further prove how dramatic an impact this

single customer – out of 50,000 – had on XPO's growth rates.  As XPO admitted in February 2019:

"Our consolidated revenue for 2019 decreased by (3.7)% to $16.6 billion, from $17.3 billion in

2018.  The decrease was ***primarily impacted*** by a reduction in business from our largest customer,

---

[7]     *See also Rex & Roberta Ling Living Tr. u/a Dec. 6, 1990 v. B Commc'ns Ltd.*, 346 F. Supp. 3d 389, 402
(S.D.N.Y. 2018) (finding statements regarding subsidiary's free cash flow material, where the statements
artificially overstated the parent company's ***total free cash flow*** by up to 18.73%); *Fresno Cty. Emps.' Ret.
Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 550 (S.D.N.Y. 2017) (finding material company's "***revenue
growth*** – overstated by approximately 10.1%, 27.2%, and 17.8%" and noting that "***analysts highlighted
comScore's revenue growth as an important metric*** as did [the company's CFO], repeatedly").

resulting in approximately $570 million less revenue in 2019 . . . ." Ex. 1 at 34.  Defendants' public admission proves Plaintiffs' core investment point – Amazon materially altered XPO's growth rates.

Yet Defendants argue that Amazon's impact on XPO was immaterial, citing their own estimates for the importance of Amazon to XPO's overall revenue.  *See, e.g.*, Mot. at 12-13 (under 5%); *Id.* at 22 ("3.7%").  Defendants' arguments apply the wrong materiality framework and rest on meritless factual assumptions.  Defendants argue that a ***negative*** 3.7% growth rate is "well below" 5% of total revenues and thus immaterial as a matter of law.  *Id.* at 4.  Companies that grow at negative rates risk going out of business or selling off core business units, making negative growth rates especially significant and heavily scrutinized by the market.  *See, e.g.*, Ex. 1 at 34 ("XPO has commenced a review of strategic alternatives, including the possible sale or spin-off of one or more of our business units.").  Even single percentage point changes in growth rates dramatically impact an investment's value, as evidenced by the stock drops experienced by FedEx and UPS in the wake of disclosure about losing Amazon business.[8]  Thus, misstatements or omissions about negative rates are highly material.  *See Litwin v. Blackstone Grp., L.P.,* 634 F.3d 706, 720 (2d Cir. 2011) ("Even where a misstatement or omission may be quantitatively small compared to a registrant's firm-wide financial results, its significance to a particularly important segment of a registrant's business tends to show its materiality."); *accord Ganino*, 228 F.3d at 163.  Here, Amazon's impact on XPO's growth rates were material by any measure.

---

[8]   *See, e.g.*, Ex. B at 55 ("Practically all finance practitioners and students are familiar with the Rule of 72 and many have even used it at one time or another.  It is a convenient, accurate means of determining the effective rate of interest if it is known how many years it takes for a sum of money to double."); Ex. C at 2 (growth rate of 2% will cause an investment's value to double in 36 years versus 14 years at 5%).

> **c.** **"Widely-Known" News Available During the Class Period Bolsters the Allegations of Falsity and Materiality**

The importance of Amazon's contributions to XPO's growth is apparent when viewed in light of the facts reported by the *WSJ* on February 8, 2018. The *WSJ*'s reporting shows Amazon's contributions to XPO's revenue were "unsustainable and risky." *Teva*, 2019 WL 4674839, at *18 (such facts support a determination of material falsity). As the Court will recall, Jacobs argued that he ***"knew"*** Amazon's "stated business plans" during the Class Period because it was "***widely known*** by media and analysts ***throughout the Class Period***" that Amazon planned to take its logistics business "in-house ***to reduce its reliance*** on outside providers (***like FedEx and XPO***)." ECF No. 121-1 at 32. The *WSJ's* February 8, 2018 article is an example of relevant news available during the Class Period that was widely covered, mentioned FedEx as well as UPS, and concerned Amazon's plans to reduce its reliance on outside providers like FedEx and UPS. It therefore matches Jacobs's description.

The timing and content of the *WSJ* article is significant for falsity and materiality purposes. Before the market opened on February 8, 2018, Jacobs reported XPO's "record" growth for 2017 and gave growth projections for 2018. After the market closed that same day, the *WSJ* published its report. ¶¶27-32. When the market opened on February 9, 2019, the financial media circulated the *WSJ*'s report, noting that "FedEx" had disclosed that Amazon accounted for "***3%***" of its revenues, and the financial press reported that FedEx's stock fell 5% in response to the news. *Id.* UPS, whose reliance on Amazon was likewise known to the market, also experienced a notable drop in its stock price. The company's stock fell 6% in early trading following the news, despite Amazon accounting for "only 1.5%" of UPS's total revenues. ¶30. Analysts knew the relative importance of Amazon to FedEx and UPS but did not know XPO's reliance on Amazon. Tellingly, on the next business day, February 12, 2018, XPO ***deleted*** a disclosure in its annual report that had previously revealed the

- 11 -

size of XPO's "largest customer," which was Amazon, while the report continued to tout XPO's "diversified customer base." ¶33. Thus, the market had no way to know that Amazon's importance to XPO had grown from 3% of 2016 total revenue, or $438 million, to at least 5.5% ($845 million) in 2017, or that the increase in XPO's growth rate of 5.2% ($780 million) was entirely predicated on Amazon's $845 million contribution to that growth. ¶¶35-36.

At the same time and *in the same report*, Jacobs stated that XPO's growth was driven by many factors, "primarily" XPO's "European contract . . . business," with no mention of Amazon. ¶34. Jacobs repeated the substance of that that statement twice in May 2018. ¶¶46-47. These statements directing investors to factors other than Amazon show a fraudulent effort to convince the market that XPO's growth was safe and sustainable. *See Teva*, 2019 WL 4674839, at *4, *9.

That Defendants affirmatively struck out a disclosure that would have specifically quantified revenues from XPO's "largest customer" just *days* after FedEx and UPS stocks fell on the widely-circulated reports about Amazon identified above is additional strong evidence that Defendants' statements about XPO's growth fraudulently and materially misled the market. *See In re SunEdison, Inc. Sec. Litig.*, 300 F. Supp. 3d 444, 479-80 (S.D.N.Y. 2018) (holding CEO's statement about expectations for when company would begin generating cash actionable because complaint alleged that CEO received contrary information "six days" earlier). Investors knew that Amazon accounted for 3% of FedEx's revenue and 1.5% of UPS's revenue. ¶¶30-31. But because Defendants deleted information about XPO's largest customers' contributions to revenues, while simultaneously touting the importance of "diversification" to XPO's growth, investors reasonably did not discount XPO's stock price as they had XPO's competitors. ¶33. Given that Amazon's importance to XPO was *greater* than its importance to FedEx and UPS, and because FedEx and UPS's stock prices fell 5% and 6%, respectively, on the *WSJ*'s reporting, there is no question that Amazon's widely-stated business plans were "material" to investors in companies "like FedEx" (ECF No. 121-1 at 32), *i.e.*,

XPO.  *See Christine Asia Co. v. Yun Ma*, 718 F. App'x 20, 22 (2d Cir. 2017) ("stock drop[]" shows materiality).

Defendants attempt to minimize Amazon's impact on XPO relative to its impact on competitors FedEx and UPS by arguing that Amazon's impact on XPO's growth is "speculative." Mot. at 11.  This argument makes no sense because the numbers come from Defendants themselves. It is not difficult to determine the amount of revenue Amazon contributed to XPO in 2016 because the Company disclosed how much its "largest customer" (Amazon) contributed to revenue that year: 3% of revenue or $438 million.  ¶¶33-35.

Ascertaining the size of Amazon's impact in 2017 is possible but slightly more challenging because Defendants deleted that disclosure from their 2017 Annual Report.  When investors learned the truth about Amazon's relationship with XPO at the end of the Class Period in February 2019, however, securities analysts asked Jacobs questions that revealed how much Amazon contributed to XPO's revenue in 2017 and 2018.  The FAC quotes Jacobs's answers to those questions and cites the relevant transcripts.  ¶¶36 n.6, 125-126.  Regarding 2018, Jacobs stated that "in 2018, our top 5 customers represented about 11% of revenue, and you saw that in the [2018 10-]K . . . [t]he largest customer, however, represented roughly about 4%, 5% of that" and was reducing "2/3 of that business."  ¶125.  XPO's 2018 Annual Report on Form 10-K confirms: "Based on 2018 data, we estimate that the downsizing will negatively impact our full-year 2019 revenue by approximately $600 million, or approximately two-thirds of the revenue that this customer's business generated for our Company *in 2018*."  Ex. 4 at 32.  Amazon thus accounted for ***$900*** million, or 5.2%, of revenue in 2018.

Jacobs went on to provide investors with facts about Amazon's contribution to revenues in 2017.[9]  Jacobs's remark about Amazon's "*previous[]*" contribution being "a little more than 1/2" of 11%, or a little more than 5.5% was referring to 2017, as Defendants themselves publicly disclosed that XPO's biggest customer in 2016 accounted for only 3% of total revenues.  ¶36 n.6.  Thus, it is not an "assumption" that Amazon accounted for *a little more* than 5.5% of XPO's static revenue in 2017, but rather this is information Jacobs explicitly revealed to investors.  The "assumption" is that Amazon paid XPO *only* 5.5% in 2017, the minimum that would be "a little more than 1/2" of 11%, a conservative assumption that favors the defense by potentially understating Amazon's impact.

The FAC's allegations that Defendants' public statements about XPO's growth during the Class Period were materially misleading at the time they were made is supported by: (1) the timing of Defendants' statements in relation to negative news about competitors; (2) the FAC's quantification of Amazon's importance to XPO's overall growth; and (3) the subsequent drop in XPO stock value once Amazon's importance became publicly known.

### B.    The FAC Adequately Alleges that Defendants Materially Misstated the Reasons for XPO's Negative Tonnage Growth in the Second Quarter of 2018

#### 1.    Defendants' Statements Were Misleading Half-Truths

As the Supreme Court instructs, "literal accuracy is not enough: An issuer must also desist from misleading investors by saying one thing and holding back another."  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 192 (2015).  Here, the FAC alleges that Defendants gave misleading or half-true reasons for negative growth rates in one of XPO's key operating statistics called "tonnage" at the same time that the related business "missed"

---

9    *See* ¶126; *see also* ECF No. 121-23 at 10 ("We made a mistake letting one customer get $900 million of business with us [in 2018].  It was just too much.  [It was] too much concentration.  *Previously*, if you looked at our top 5 customers, it was about 11% of revenue and then *the biggest one was a little more than 1/2* of that.  So it was just too much concentration.").

both revenue and earnings projections for 2Q18, per analysts.  ¶¶69-71.  Specifically, Jacobs's responses to a Citigroup analyst's question about "***volume from a tonnage perspective [being] a little bit on the light side***," were misleading.  ¶69.  In stating that "our focus is not on tonnage growth . . . I would not guide you to expect[] some big tonnage increase because it's not what we're trying to do," Jacobs gave reasonable investors the misleading impression that the tonnage growth declines were the positive byproduct of an affirmative business strategy.  *Id.*  But this was not the "whole truth" that the XPO CEO had a duty to convey once he chose to publicly speak on this subject.  Amazon's winding down of the LTL business with XPO and consequent deceleration in business from the Company's largest customer throughout was the true cause of the "light" tonnage that the Citigroup analyst questioned.  *Compare* ¶69 *with* ¶¶40, 54-58, 61-75.  XPO was trying to keep growing tonnage at the levels that Amazon had sustained (¶¶54-55, 64) but these efforts were insufficient.

Contrary to Defendants' argument that "no facts" (Mot. at 22-23) show Amazon had anything to do with the negative tonnage growth and consequent revenue and earnings "misse[s]" (¶¶62, 71) in the LTL business in 2Q18, ample facts show the opposite.  ¶¶40, 54-58, 61-75.

***First***, although FE-1, a District General Manager, left XPO before the Class Period, this individual provided context that the LTL tonnage numbers were reviewed by Jacobs personally and that the numbers were discussed by District General Managers and Directors of Sales on a quarterly basis at meetings with the LTL President.  *See* ¶40.[10]  These facts go to business processes that XPO followed and corroborate the facts provided by other witnesses because they show tonnage trends were discussed in the ordinary course of business.

---

[10]   These facts are of "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."  *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000) (crediting former employee witness accounts under such circumstances).

**Second** – and as an example of the information flow that FE-1 discussed – FE-2, an XPO salesperson, explained that during May 2018, Amazon and XPO had decided to discontinue their LTL business relationship and that this "subject was frequently and routinely discussed" on internal XPO sales calls. ¶¶54-55. The end of the XPO-Amazon relationship shows the Amazon-related tonnage decline was across-the-board, which was one of the details the Court found lacking in the original complaint. Tr. at 23. FE-2 understood that the information about the end of the LTL relationship came from a Regional Vice-President who reported to the President of LTL (*i.e.*, Brooks). ¶¶54-55. The decision to terminate the LTL relationship was reflected in tonnage reports showing "massive declines" in Amazon's LTL business as sales commissions fell 50%-70%. *Id.* FE-2 was in a sales role. *Id.* It is probable that sales people would attend calls about material changes in sales trends. *See Novak*, 216 F.3d at 314 (crediting facts from person in position likely to possess the relevant information). These facts support falsity because they show the termination of the Amazon business was negative and that XPO senior management was indeed focused on trying to grow tonnage, but failed to do so, as the tonnage numbers show.

**Third,** FE-3, a Director of Operations at XPO further explained that XPO's problems with Amazon were "no secret" at XPO, and were discussed amongst XPO staff at meetings in 2018. ¶57. This information is relevant to falsity because it shows that lower tonnage growth was negative, not positive, and that its root cause was Amazon-related declines. FE-3 also corroborates FE-2 and FE-5 – both of whom were in sales roles. FE-3 was in a position to know the information provided. *Novak*, 216 F.3d at 314.

**Fourth,** FE-4, an XPO Operations Manager confirmed that seeing Amazon-related declines was not "rocket science" given the custom-built, in-house technology that made "very visible" reports showing the Amazon-driven declines, although senior management was "vague" about the reasons Amazon was lowering its "LTL business" and other business with XPO. *See* ¶59; *see also*

- 16 -

¶59 n.20.  FE-4 was a in a position to know these facts.  *See Novak*, 216 F.3d at 314.  They corroborate other employee accounts and support falsity by tending to show that the Amazon-related declines were occurring.  It is unsurprising that sales personnel knew the cause.

*Fifth,* before summer 2018, FE-5, another XPO salesperson saw a tonnage report showing tonnage was down in various territories and regions because of a drop in tonnage from Amazon. ¶64.  Similar to FE-2, who saw sales goals unchanged after the "massive declines" from Amazon, FE-5's team was asked to try to replace some of that business by *selling more tonnage* to other customers.  ¶¶54, 64.  FE-5 explained that she heard that (1) "Amazon left," cancelling its LTL contract; and (2) the manner of leaving was not an immediate cessation of all LTL business, but "a gradual thing."  ¶64.  These facts support falsity for the same reasons that the facts provided by FE-3 do: XPO's tonnage was down because Amazon was ending its LTL business relationship with the Company during 2018 and XPO had tried, but failed, to raise tonnage.

*Sixth,* an Amazon Area Manager read an "internal newsletter" at Amazon (in 1Q or 2Q18) that Amazon had decided to drop XPO as an LTL vendor.  ¶65.  This "internal newsletter" corroborates the reports from FE-2's and FE-5's accounts that there was an enterprise-level problem with the Amazon LTL business relationship, and that the end of the relationship at an enterprise level was driving down tonnage growth at that level.

*Seventh,* the FAC adduces circumstantial facts tending to show that the "light" tonnage growth in the LTL business was not part of a favorable strategic plan, as Jacobs presented on the August 2, 2018 call.  The facts show that the president of LTL (Brooks) was terminated in the summer of 2018 for growth-related reasons.  ¶¶65 n.31, 67-68.  Market conditions in the LTL sector were strong at the time, however, as evidenced by the fact that one of XPO's peers grew LTL tonnage by positive 14.6% in the 2Q18 versus XPO's negative 0.6% tonnage growth in 2Q18.  ¶62 n.25.  This information strengthens the plausibility of the facts (and reasonable inferences drawn

- 17 -

from them) from FE-2, who provided information evidencing that a Regional Vice President, who reported to Brooks, was the ultimate source of the information that Amazon was ending its XPO LTL business. That XPO terminated Brooks at the time provides further circumstantial support that the end of Amazon's LTL growth was negative for XPO.

*Eighth,* XPO's CSO provided retrospective information at the end of the Class Period showing Amazon's earnings margins were "slightly higher than company average EBITDA [earnings] margin." ¶36 n.8. This fact is relevant to falsity because it tends to show that the declining Amazon LTL business necessarily would have negatively impacted *both* tonnage (revenue) *and* yield (earnings); *both* "missed" analysts' consensus expectations in 2Q18. ¶71. These same facts are important to falsity because if, as the CSO stated, Amazon's margins were "slightly *higher*" than average, then making adjustments amongst customers to secure the "right mix" of tonnage that Jacobs discussed (¶¶36, 69) would not involve selling less tonnage to Amazon. To the contrary, it would involve selling *more* tonnage to Amazon. It is beside the point that XPO experienced "21.5%" LTL earnings growth later on, in *4Q18*, as Defendants note. Mot. at 8. This growth does not prove XPO would not have done better absent the loss of Amazon business. And, tellingly, XPO actually missed analysts' consensus forecasts for 4Q18, showing its strategy had not been as effective as Defendants now claim. ¶123. Moreover, one month after reporting 4Q18 results, XPO fired the LTL President (Wagers), whom XPO had installed to replace the other LTL President (Brooks), whom XPO had fired one month before issuing the August 2, 2018 report about LTL missing revenue, earnings, and showing negative tonnage growth in 2Q18. ¶¶45 n.14, 67.[11] This new termination in Amazon's LTL business tends to show that business was not growing at the rates that XPO needed, contrary to Defendants' arguments now.

---

[11]   ¶¶54, 67; Ex. D at 1.

Analyst reports also undermine Defendants' argument that the "'strategy' to target 'high-priced stuff, not low-priced stuff' . . . was working." Mot. at 3.  For example, a Morgan Stanley analyst wrote in December 2018 that XPO management had lowered financial guidance *that* month due to "lower than expected EBITDA [earnings] growth" (Ex. E at 445) and, after XPO published the 4Q18 numbers in February 2019, Morgan Stanley's analyses shows LTL "missed" that quarter and contributed to XPO's overall earnings "miss." Ex. F at 2.  The business missed growth targets "despite an extremely strong freight cycle," as Stephens analysts remarked directly to Jacobs in February 2019.  Ex. 2 at 7-8.  These Stephens analysts then wrote that LTL 4Q18 earnings were "lag[ging]" peers who saw earnings grow up to 50% despite the fact that XPO benefit[ted] from a "material tailwind" relative to peers.  Ex. G at 2.  These facts therefore demonstrate that Defendants' argument that the LTL strategy was a "success" is erroneous.  Mot. at 23.

## 2.    Defendants' Misstatements Were Material

Courts in this Circuit consistently recognize that "'a complaint may not properly be dismissed'" on materiality grounds unless the disputed facts are "'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *Teva,* 2019 WL 4674839, at *12.  Defendants generally argue that no reasonable investor would consider the reasons for the 2Q18 LTL tonnage growth declines important (Mot. at 22-23), but that argument fails.  Defendants' failure to disclose the "whole truth" behind the negative tonnage growth, focused on Amazon, was not "'"obviously unimportant to a reasonable investor"'" and as a result cannot be dismissed on materiality grounds.  *Litwin*, 634 F.3d at 717.

As the FAC alleges, securities analysts considered the tonnage growth numbers leading indicators of XPO's financial performance,[12] and those types of measures are significant in the

---

[12]    ¶63 (Quoting Jeffries analysts, "tonnage has proven to be a good early indicator"); s*ee also* Ex. H at 87 ("leading indicators yield better within and out-of-sample performance in forecasting" as compared to other methods).

financial markets. *See, e.g.*, *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001) ("criticism from industry analysts . . . indicates the weight given to information" and demonstrates materiality); *comScore*, 268 F. Supp. 3d at 550 (finding revenue growth numbers "material to investors" because "analysts highlighted comScore's revenue growth as an important metric as did [the company's CFO], repeatedly"). Furthermore, Defendants omitted Amazon's impact on tonnage in response to analysts' questions about this material consideration and therefore "'mask[ed] a change in earnings or other trends.'" *Litwin*, 634 F.3d at 720 (citing SAB No. 99, 64 Fed. Reg. at 45,152).[13] The fact that XPO repeatedly reported the statistics to investors (*see* ¶¶62 n.25, 63 nn.26-28) "implicitly acknowledge[s] the significance" of the information. *See Ganino*, 228 F.3d at 165 (company press release about the disputed information shows materiality).[14] XPO's peers in the industry published the same kinds of statistics. *See* ¶63 n.25.

Such numbers were important to XPO because they related to its largest customer overall and to the LTL business, which accounted for about a quarter of the Company's overall business. *See Litwin*, 634 F.3d at 720 ("[W]e cannot hold that the alleged loss of [defendant's] exclusive contract with its largest customer and the concomitant potential negative impact on one of the largest investments in Blackstone's Corporate Private Equity segment was immaterial.").[15] The impact of the decline was material: 7.7 percentage points relative to the same quarter the prior year resulting in the LTL negative growth, and Credit Suisse's calculations show pricing *also* fell in the second

---

[13]   None of the authorities that Defendants rely upon deal with any contemporaneous "miss," and "changes to financial results can be material even if they amount to less than a 5% change." *Patel v. L-3 Commc'ns Holdings Inc.*, 2016 WL 1629325, at *16 (S.D.N.Y. Apr. 21, 2016) (citing cases).

[14]   *See also SEC v. Mayhew,* 121 F.3d 44, 52 (2d Cir. 1997) ("[A] major factor in determining whether information was material is the importance attached to it by those who knew about it."); *Lilly v. State Teachers Ret. Sys. of Ohio Pension Fund*, 608 F.2d 55, 58 (2d Cir. 1979) ("[T]he manner in which the information was regarded by those privy to it and the importance attached to the information by the recipients . . . were entirely consistent with a conclusion that the information was material information.").

[15]   *Compare* ¶71 n.33 (second quarter "$988.5 mil" in LTL revenue) *with* Ex. 4 at 31 (total quarterly revenue "$4,192" million).

quarter from 1Q18, resulting in a "9%" earnings growth miss (*see* ¶¶62, 71) in the LTL business. These metrics are above the "presumptive 5% threshold of materiality." *Litwin*, 634 F.3d at 719; *see also Ganino*, 228 F.3d at 163 (information material where relates "to meet analysts' consensus expectations for the enterprise"). The "massive declines" (as reflected on routine conference calls originating from senior management (¶¶54-55)) contemporaneous with Amazon's decision to drop XPO as an LTL vendor shows materiality because of Amazon's importance to the LTL business in particular, and to XPO's growth prospects as a whole. *See Hutchins v. NBTY, Inc.*, 2012 WL 1078823, at *1-*2, *6 (E.D.N.Y. Mar. 30, 2012) (business metrics actionable given impending customer departure).

Defendants therefore fail to show that Amazon's impact on declining tonnage growth numbers was "obviously unimportant to a reasonable investor." *Teva*, 2019 WL 4674839, at *12.

### C.     The FAC Adequately Alleges Defendants' "Outsourcing" Statements Were Materially Misleading

On August 2, 2018, Defendants stated that XPO's "customers, particularly large companies" were moving to give their supply chains to XPO due to a "***trend toward outsourcing***" – particularly with regard to "e-commerce." ¶¶72, 74. This was misleading because Defendants failed to disclose that XPO's largest customer, and its key growth source, was doing the exact opposite: bringing its transportation and logistics needs in-house and taking away from XPO. *See* ¶¶54-58 (LTL); ¶¶81-93 (Logistics); ¶59 (last mile); ¶60 (brokerage). Jacobs's prior factual arguments in this case support the FAC's allegations: according to Jacobs, his statement at the end of the Class Period that he "'***knew***' Amazon would not stay [at XPO was] not an admission of scienter, but simply reflect[ed] the widely known reality that Amazon had '***stated business plans***' to increase its own shipping and logistics capabilities, and to take such matters ***in-house*** to reduce its reliance on outside providers (like FedEx and XPO)." *See* ECF No. 121-1 at 32. That argument rested, in part, on a June 28, 2018 Morgan Stanley report Defendants alleged was "widely" known, which stated that Amazon had

- 21 -

made its "most overt/public move yet in relation to building out its in-house Logistics network."
ECF No. 121-4 at 8.

These facts corroborate falsity and materiality because they demonstrate that the deceleration
in business across all Amazon business lines flowed from the "widely known reality" that Amazon
was taking its logistics business in-house, as Jacobs argued to the Court.

### D.    Defendants' 3Q18 Statements Were Materially False and Misleading

During a November 2018 earnings call with analysts and investors, Jacobs, referring to
XPO's 3Q18 top-line (revenue) and bottom line (earnings) "misses," stated that "on a long-term
basis, it's really just – ***it's nothing***.  It's a few million bucks."  ¶98.  Jacobs further told analysts and
investors that the deceleration in business from House of Fraser, which he called a "***rounding error***,"
was the only cause of the miss worth mentioning.  *Id.*  Because Jacobs chose to speak about the
"subject or issue" of causes of the miss, he assumed "a duty to tell the whole truth" about those
causes.  *See Teva*, 2019 WL 4674839, at *18.  Here, Defendants owed a duty to disclose that
Amazon was a material, "but for" cause of the miss.  *See Hutchins*, 2012 WL 1078823, at *1-*2, *6
(upholding statements about "sustainable" business metrics given impending customer departure).  It
is Plaintiffs' understanding that the Court's concern as to the alleged misstatements in the original
complaint was that the original complaint was too factually imprecise and that the lower-than-
expected earnings and revenue from House of Fraser was sufficient to explain the miss.  *E.g.*, Tr. at
39:21-24 ("***but for*** House of Fraser, they would have made" the quarter).  As discussed below, the
FAC addresses these concerns and shows that House of Fraser, alone, was not sufficient to explain
XPO's negative results.

### 1.    Lost Business from XPO's Two Small House of Fraser Fulfillment Centers Does Not Explain the Entire 3Q18 Miss

The allegations in the FAC demonstrate that Amazon-related losses were a "but for" cause of
the 3Q18 miss and that the House of Fraser alone did not cause the miss.  The allegations rest on

direct quotes from the Cowen securities analysts who found that "even adding [House of Fraser] back in" to results, XPO *still* would have missed. *See* ¶¶96-97. Defendants nonetheless argue that the 3Q18 revenue and adjusted EPS miss was "explained by the $15.6 million House of Fraser write-off." Mot. at 24. Defendants are wrong. As to revenue, XPO missed consensus expectations by $60 million in 3Q18. *See* ¶¶96, 99. Defendants argue the miss was "no more than $14 million." Mot. at 24 (fourth bullet point). They base that statement on the difference between the Cowen analysts' expected revenue of $4.48 billion, and the reported revenue $4.34 billion, which is $140 million – not "$14 million," as Defendants claim. *Id.*

Defendants' argument also fails conceptually. Courts and the markets measure a company's beats and misses based upon the gap between consensus and realized results: the consensus was $4.40 billion and reported was $4.34 billion, so the miss was $60 million. ¶¶96, 99; *see also infra* §I.D.3.[16] Revenue is the "top line" input to the adjusted EPS "bottom line" (*see, e.g.*, Ex. I at 2), and Amazon's margins were better than the average XPO margins, as XPO admitted. ¶36. Because Amazon materially contributed to the "bottom line" miss, it is reasonable to infer that it also contributed to the "top line" miss.

The FAC provides facts demonstrating that House of Fraser was not the sole, "but for" cause of XPO's 3Q18 adjusted EPS ("bottom line") miss. XPO's adjusted EPS expectation for 3Q18 was $0.98. ¶¶96-97. XPO reported $0.89 adjusted EPS for a "miss" of $0.09 per share, or 9.1%. Ex. I at 2. *Cowen securities analysts* analyzed that EPS miss and found that while the House of Fraser "bankruptcy hurt results; *even adding* [House of Fraser] back in, XPO would've missed on EPS." ¶96; *see also* Ex. J at 1. Defendants attempt to rebut this showing (Mot. at 24 (third bullet point)) by pointing to an XPO press release that states "adjusted EPS for the third quarter 2018 [] decreased by

---

[16]   In fact, JPMorgan carried out the revenue analysis to three decimal points showing the miss was $65 million at that degree of specificity ($4.399-$4.334). Ex. I at 2. The FAC is therefore conservative in Defendants' favor.

$0.07," due to House of Fraser.  Ex. 8 at 5.  But this proves Cowen's point: "even adding" that $0.07 to $0.89 results would raise adjusted EPS to $0.96, resulting in a "miss" of $0.02 per share versus analysts' consensus $0.98 forecast.  Yet Defendants argue it is "$0.01 below consensus expectation." Mot. at 24 (third bullet point).  That number is off by a factor of 2.  The $0.02 gap in the $0.09 miss is material.  *See infra* §I.D.3.

### 2. Decreased Business at Four Amazon Fulfillment Centers Was a (Concealed) "but for" Cause of the 3Q18 Miss

After the 3Q18 earnings call, JPMorgan analysts accepted Jacobs's factual explanations for the miss and wrote that "we do not believe this event is a signal of a systemic risk," but Stephens analysts wrote the explanation "raised more questions in investors' minds than it answered." ¶100. That professional analysts could not figure out the true cause of the miss shows that a "reasonable investor, who is not as well-versed at making sense" of the disclosures, could not be expected to ascertain the whole truth.  *Vivendi*, 838 F.3d at 248-49.  The FAC adduces facts showing Amazon was a material cause of the miss, quantifying Amazon's impact on the 3Q18 miss by applying an apples-to-apples comparison.  ¶¶81-103.  Defendants argue the comparison is "convoluted" (Mot. at 24), but it is clear.

First, the scale of the fulfillment centers that XPO operated for Amazon supports the FAC's allegations.  The FAC relies upon reports from the *WSJ* and securities analysts from Jeffries to explain what the relevant "fulfillment centers" were and how they fit into XPO's operations.  ¶¶81-82.  The centers that XPO operated for Amazon and House of Fraser were more like retail factories than typical warehouses storing goods.  *Id.*  The FAC compares the five centers to quotations from the *WSJ* and the Jeffries analysts showing Amazon and XPO had 75 centers in total, meaning the five centers at issue constituted 6.6% of each company's total.  This is one quantitative benchmark.

Further supporting this benchmark, FE-6, a Planning Analyst, was in a management position at one of the centers and explained that XPO operated five centers as part of one Amazon fulfillment

- 24 -

center program and therefore held a position within the Company to be aware of these facts. *See* ¶81; *see also Novak*, 216 F.3d at 314 (crediting such facts). The FAC alleges the locations of the four of the five centers based on reports from XPO employees (*id.*; *see also* ¶¶83-93) and media that surfaced toward the end of the Class Period. *See* ¶84.

Second, the FAC provides ample facts supporting the timing of the wind down and closure of the centers. These facts rest on a mix of public information (such as WARN notices, *see, e.g.*, ¶¶90, 92) and accounts from XPO employees who worked at the particular centers. *See, e.g.*, ¶¶85, 88. The bulk of the wind down started in summer 2018 with the largest center closing in October 2018 and the rest in January 2019. Defendants' prior factual assertions corroborate this timeline. *See* ECF No. 121-4 at 8.

Furthermore, Morgan Stanley analysts issued a report on June 28, 2018 that Amazon had taken actions revealing its "most overt/public move yet in relation to building out its in-house Logistics network." *Id.* That same month, an XPO employee at the Maryland XPO/Amazon center read an email from a Company Vice President stating, in substance, that Amazon was winding down and closing *that* facility, which it started to do in June 2018. *See* ¶87. In August 2018, XPO issued a mass-layoff notice to all employees at the Texas XPO/Amazon center; a center that was over a million square feet in size, eventually closing in October 2018, *before* the first of two House of Fraser centers closed. *See* ¶¶92, 102. Morgan Stanley's insights support Plaintiffs in this case.

Third, Defendants themselves disclosed the importance of the earnings margins that Amazon gave XPO to run centers, like those at issue, on Amazon's behalf. XPO's CSO at the time admitted Amazon's margins were better than the average customer's margins (*see* ¶¶36 n.6, 103) and other Amazon-related business generated favorable revenue but unfavorable margins. ¶¶59-60. The Amazon-related centers therefore had materially high margins.

- 25 -

Fourth, Amazon's larger impact – relative to House of Fraser – is clear.  Defendants do not dispute that: (1) XPO ran only *two* fulfillment centers for House of Fraser; (2) House of Fraser kept paying XPO to run those centers *after* declaring insolvency; (3) XPO kept running the centers until November 2018 and April 2019, respectively; (4) the two House of Fraser centers were tiny in comparison to the centers that XPO ran for Amazon; and (5) payment problems did not develop with House of Fraser until August 2018.  Defendants insist that the resulting lost revenue translated into "$11.4 million" adjusted EPS.  Mot. at 24 (third bullet point).

The FAC's facts and related inferences are sufficient to *allege* that the lost business from the Amazon centers was similar to or larger in size to this $11.4 million, as this summary shows:

|   | Center | Size (Sq. Ft.) | Winding Down | Closed | ¶¶ |
|---|---|---|---|---|---|
| | House of Fraser | | | | |
| | Wellingborough | 87,500 | August '18 | April '19 | 94-95 |
| **A** | Milton Keynes | **170,000** | August '18 | **November '18** | *Id.* |
| | Total | 257,500 | | | |

Lost earnings attributable to adjusted EPS in 3Q18  **"$11.4 million"**

|   | Center | Size (Sq. Ft.) | Winding Down | Closed | ¶¶ |
|---|---|---|---|---|---|
| | Amazon | | | | |
| | Kansas | 748,000 | May-Sept. '18 | January '19 | 83-85 |
| **B** | Maryland | 571,000 | June-Sept. '18 | January '19 | 86-91 |
| **C** | Texas | **1,076,400** | June-August '18 | **October '18** | 92 |
| | California | 543,000 | Pre-Oct. '18 | January '19 | 93 |
| | Total | 2,938,400 | | | |

XPO admitted that earnings margins from Amazon were better than average.

**D**  Lost in earnings attributable to adjusted EPS in 3Q18  (centers): Greater than "**$11.4 million**"

Additional earnings lost on account of lower tonnage from Amazon: **incremental**

Point "D" follows from all the facts alleged in the FAC.

Objectively, the 100% layoffs in the Texas facility ("C") followed by its complete closure *before* the first House of Fraser facility closed ("A") suggests that Texas, alone, had a bigger impact than House of Fraser issues.  ¶103.  Maryland ("B") was the subject of internal XPO emails discussing its closure. ¶87.  These two centers alone were more than *ten times* the size of the House of Fraser facilities and started winding down sooner than they did.  The Amazon centers were part of

a single program: their closure shows the program was ending, as accounts from the other centers corroborate. The employees at those centers were in positions to witness the declines of the centers as they processed physical goods, in contrast to some intangible asset that only a senior manager could perceive deteriorating. Defendants' confidential witness cases are distinguishable for this and other reasons.[17]

### 3. The 3Q18 Amazon Miss Is Quantitatively and Qualitatively Material

Amazon's contribution to XPO's disappointing 3Q18 results is not "'so obviously unimportant'" to be immaterial as a matter of law. *Teva*, 2019 WL 4674839, at *12.

It is well established that positive or negative earnings surprises are important to reasonable investors,[18] and the reasons for surprises are material because they help investors "discount[] future cash flows to their present value using a rate of interest reflecting the cash flows' risk." *NECA-IBEW*, 693 F.3d at 166; *see also United States v. Rajaratnam*, 802 F. Supp. 2d 491, 519 (S.D.N.Y. 2011) ("[T]he jury heard extensive testimony that Wall Street investors generally found earnings

---

[17]  *See In re Qudian Inc. Sec. Litig.*, 2019 WL 4735376, at *6 (S.D.N.Y. Sept. 27, 2019) (discrediting confidential witness who provided information for a period prior to the alleged fraud because the allegations concerned "***ongoing*** 'illegal' . . . activity" during the Class Period); *In re Coty Inc. Sec. Litig.*, 2016 WL 1271065, at *8 (S.D.N.Y. Mar. 29, 2016) (confidential witness described only that some products were being returned or destroyed without noting any larger-scale trend that products were being destocked in a "material way"); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 377-80 (E.D.N.Y. 2013) (***crediting*** confidential witness statements in regard to on-the-ground changes they witnessed, where complaint clearly identified the witnesses' positions and because the "CWs are from different ranks and from different geographies," but holding that allegations of executive knowledge were conclusory without more); *Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 461 (S.D.N.Y. 2010) (confidential witness identified "no specific report" reflecting the alleged negative business trends), *aff'd*, 430 F. App'x 63 (2d Cir. 2011). Here, the confidential witnesses' positions are clearly identified in the FAC and the geographically-dispersed witnesses all corroborate that XPO was experiencing material slowdowns at major Amazon-specific fulfillment centers during the Class Period.

[18]  *See* Ex. K at 193-94 ("It has long been established that postive (negative) stock returns are associated with positive (negative) surprises" because they impact standard "discount[] cash flow model" valuations.); *see also* Ex. L at 5 ("The financial press is replete with cases in which a firm misses an earnings benchmark (such as the analyst[] consensus estimate) ***by a cent*** per share and gets its stock price hammered."). In fact, 3Q17 – comparable to 3Q18 – Jacobs reported that "we beat expectations," analysts calculated that XPO beat adjusted EPS by ***$0.02***, and XPO's stock value immediately rose 2.67%. Ex. M at 3 ("we beat expectations"); Ex. N at 3; *see also* Ex. O (stock price rose on beat); *see also* Mot. at 5 n.2.

announcements important . . . .").  Here, Jacobs insisted on November 1, 2018, that the underlying "but for" factors causing the miss were inconsequential, stating, for example, "on a long-term basis, it's really just – it's nothing."  ¶98.  At the time Jacobs made these challenged statements and focused on decelerating business at *two* House of Fraser fulfillment centers, he did not disclose the *four* Amazon fulfillment centers decelerating – and the largest of these (Texas, over 1 million square feet in size) had ***closed permanently*** by October 2018.  There is no question that the whole cause of the miss is important to reasonable investors.  Having pointed to the rounding-error sized customer that caused ***part*** of the miss, Jacobs assumed a duty to disclose the fact that Amazon – XPO's largest customer – was the "but for" cause of the other part.  *See Vivendi*, 838 F.3d at 258.

Quantitatively, because Jacobs put the cause of the $0.09 adjusted EPS miss at issue, it is that particular measure that matters for the purpose of assessing materiality.  ¶98.  As in *Ganino,* where the Second Circuit focused just on the "miss" as the denominator in crediting the fact that the disputed sum accounted for the "entirety" of the amount necessary to meet analysts' consensus earnings expectations in that case (*see supra* §I.A.2.a), so it is in this case that the Amazon's $0.02 "but for" share of the miss, being 22% of the total miss, is well in excess of the "presumptive 5% threshold of materiality."  *Litwin*, 634 F.3d at 719.

Qualitatively, the FAC demonstrates the materiality of the omitted information about Amazon, noting that analysts wrote and asked about the reasons for the miss, with one analyst questioning whether the market was getting the full story and another viewing the explanation as reassurance that the miss was not a "signal of systemic risk."  ¶100.  This focus on the reasons for the miss demonstrates materiality.  *See Scholastic*, 252 F.3d at 76 ("Merrill Lynch boosted its rating of [the stock] based upon representations from the company.").  That analysts did not know Amazon was a material customer ***at all****,* and criticized Jacobs when that information came out, (¶125 ("[BofA

Merrill Lynch:] XPO has touted" no reliance on any particular customer)), further supports materiality.  *See Scholastic*, 252 F.3d at 76.

That Amazon was XPO's largest customer and ***closed*** its largest facility with XPO while winding down the rest, ***after*** Amazon took concrete steps to bring its logistics needs "in-house" – a fact that was, according to Jacobs's arguments to this Court, "widely known" – overwhelmingly supports the conclusion, standing alone, that a reasonable investor would consider Amazon's $0.02 "but for" contribution to the 3Q18 miss "material."  Investors in UPS and FedEx connected the dots between the "widely known" news and those two companies, which, even in the absence of any facts showing Amazon closed any business with them, suffered anticipatory stock drops.  ¶¶26-27.  These facts further show materiality.

E.     **The FAC Adequately Alleges Falsity as to Defendants' Statements that There Was "No Change" to Risk Factors**

"'[C]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.'"  *Sheet Metal Workers Local 32 Pension Fund v. Terex Corp.*, 2018 WL 1587457, at *13 (D. Conn. Mar. 31, 2018).  Thus, defendants are liable when "cautionary statements remained unchanged despite a significant change in circumstances of material importance to an investor."  *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 107 (D.C. Cir. 2015).  Here, Defendants provided generic risk disclosures that ***any*** customer ***might*** leave before and during the Class Period.[19]  Defendants did not, however, update the risk factors once such a risk materialized – namely that XPO's ***largest customer*** had ***already*** begun leaving.  In fact, Defendants repeatedly affirmed that there had been "no material changes to the risk factors" since XPO filed its prior-year Form 10-K on February 12, 2018, before Amazon had begun winding down its business.  ¶¶51, 73,

---

[19]   The 2017 Annual Report stated that XPO's profitability ***could*** decline ***if*** "'current or prospective customers . . . decide to develop or expand internal capabilities for some of the services that we provide'" (*see* Mot. at 7), which is the exact risk that the FAC alleges had ***already*** materialized.

104.  Having claimed no changes to risk factors, despite the risk warned of actually materializing, Defendants materially misled the market.

F.      **Item 303 Provides an Independent Basis for Falsity**

The failure to disclose known material trends or uncertainties is actionable under the securities laws because "a reasonable investor would interpret the absence of an Item 303 disclosure to imply the nonexistence of 'known trends or uncertainties . . . that the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income from continuing operations.'" *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 102 (2d Cir. 2015) (quoting 17 C.F.R. §229.303(a)(3)(ii).  The Second Circuit evaluates whether a trend or uncertainty is "material," and therefore requires disclosure, by weighing the likelihood of the event coming to fruition and the consequences of that event.  *Id.*

Here, the FAC alleges that the trend – the loss of Amazon business – was highly likely, if not certain, by the time Defendants certified the absence of Item 303 trends and uncertainties.  ¶¶34-35, 51, 72-73, 75.  The likelihood of decreased Amazon business became apparent immediately before the Class Period, when Amazon announced that it would be launching a delivery service to compete against shipping companies.  ¶27.  Jacobs confirmed after the Class Period that "we knew that . . . business wasn't going to stay forever and forever . . . because of [Amazon's] stated business plans." ¶124.  The combined inference from these facts and others (*see supra* §I.A-E) is that Amazon would be taking away business from any now-competitors whom it had previously patronized, including XPO.  There is no need to speculate about the consequences of this trend or uncertainty because they actually materialized.  Jacobs himself said the loss of Amazon was "a body blow," which "hurt[]" and was "only negative."  ¶125.  As discussed below (*see infra* §II), this trend was known to Defendants throughout the Class Period.  Having failed to disclose the known trend of losing

Amazon business, which was highly likely to have a major negative effect on XPO's profits, Defendants are liable under Item 303.

## II.      The FAC Sufficiently Pleads Scienter

A plaintiff may satisfy the PSLRA's scienter requirement by alleging facts "'(1) showing that the defendants had both motive and opportunity to commit the fraud *or* (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness.'" *See Teva*, 2019 WL 4674839, at *21 (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007)).   As discussed below, the FAC adequately alleges facts to support both theories.

### A.      Motive and Opportunity

#### 1.      To "Double" Its Size, XPO Would Have to Issue New Stock

Facts that Defendants needed to issue stock to fund a material acquisition satisfy the motive and opportunity test, and such facts are present here.  *See Rothman v. Gregor*, 220 F.3d 81, 94 (2d Cir. 2000) (facts showing corporate defendant had an "eye toward using its stock to acquire [third party corporation]" showed scienter on account of motive to "artificially inflate its stock price"); *Teva*, 2019 WL 4674839, at *22 (motive satisfied in context where facts show corporate defendant planned to use stock "as currency to acquire" another company); *Burstyn v. Worldwide Xceed Grp., Inc.*, 2002 WL 31191741, at *5 (S.D.N.Y. Sept. 30, 2002) ("Plaintiffs allege that defendants' 'specific goal' was to acquire companies. This motive is sufficiently concrete to support a strong inference of scienter.").

Throughout 2018, Jacobs commented on XPO's plans to make a large acquisition that year, and later told industry participants that XPO was close to completing an acquisition in December 2018 that would have "doubled" XPO's size.  *See e.g.*, ¶¶10, 41, 48, 77, 97, 105, 108.  Securities analysts reported XPO's market value at $10.1-$12.6 billion during the Class Period.  ¶¶41, 77.  The FAC infers that XPO would have to pay at least that much to buy a company that would double its

own size and that XPO did not have the internal financial resources to fund such an acquisition because XPO carried only about $361 to $425 million in cash and cash equivalents, according to XPO's own financial statements.   ¶77.   XPO's level of cash and cash equivalents supports an inference that XPO would have had to issue common stock as currency to fund acquisitions, giving XPO a motive to withhold facts about Amazon that would lower the Company's stock value.   *Id.* This motive is sufficient to show scienter.   *See infra* n.23.

Defendants erroneously argue that the case law does not support the FAC's theory as to Defendants' scienter.   *See* Mot. at 26.   But their own principal case, *Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001), illustrates that the FAC's scienter theory is perfectly sound: "this Court has ruled that stock price manipulation in the acquisition context may be sufficient to establish scienter."   *Id.* at 142 (citing *Rothman*, 220 F.3d at 94).   The rule did not apply in *Eichler* due to facts that are not present in this case, specifically, a defendant telecom company that received an offer to sell its stock to Comcast for $48 billion but later accepted AT&T's $58 billion offer.   *Id.* at 136-37.   There, the plaintiffs' scienter theory was that defendants had a motive to "***depress***" their stock price to make AT&T's offer "'appear more valuable,'" which made "no sense."   *Id.* at 140.   Here, Plaintiffs' theory follows *Rothman* and its progeny, alleging that Defendants had a motive to ***inflate*** their stock price to use that stock as a currency to fund an acquisition that would have transformed XPO by doubling it in size.

### 2. To "Double" Its Size, XPO Would Need to Pay an Acquisition Price Close to Its Own Market Value, Requiring New Equity Under Defendants' Own Argument

Defendants assume XPO could have paid at least $2 billion less than its own market value to "double" its size.   Mot. at 27.   This assumption, not Plaintiffs', "makes no [economic] sense." *Kalnit,* 264 F.3d at 140 (discarding such assumptions).

Defendants state in conclusory terms that XPO would not have to issue any new equity, quoting from the February 8, 2018 earnings call to that end. Mot. at 27 n.18. There, the Company's CFO stated: "We have dry powder **up to $8 billion** for another acquisition, and we think that's sufficient without raising any **additional equity**." Ex. 10 at 19; *see also* Mot. at 27 n.18. Defendants assume that the specified "$8 billion" represented a cap on the price that XPO was willing to pay for any target and that, as a result, XPO would never issue the "additional equity" mentioned in the same sentence. That reading is implausible because it completely ignores Jacobs's later admission about the size of the deal that he was, in fact, pursuing during the Class Period – one that would have "doubled" XPO's size. ¶108. That fact shows the more plausible reading of the CFO's February 8, 2018 comment is that XPO was considering an acquisition over an $8 billion purchase price, and knew it could not complete such an acquisition without issuing additional equity. Moreover, the notion that XPO would advertise its maximum willingness to pay to the world (including its target candidates) "is divorced from economic business realities." Mot. at 27. Jacobs revealed the target's size only after the deal fell apart.

After the Class Period, Jacobs told industry participants that XPO was close to completing an acquisition in December 2018 that would have "**doubled** XPO's $17 billion a year size 'in short order.'" ¶108. That $17 billion per year in revenue translated into a market value of $10.1-$12.6 billion, according to securities analysts' reports. ¶¶41, 76. This revenue and associated market value closely mirrored one of the companies that securities analysts from Jeffries had placed on XPO's shortlist of acquisition candidates, C.H. Robinson.[20] C.H. Robinson generated $16.6 billion in 2018 revenue and reported a market value of approximately $11.5 billion during that time. *Id.* This evidence shows the reasonableness of Plaintiffs' interpretation of Jacobs's admissions about

---

[20]   Ex. P at 29 ("we think potential takeover targets are likely among the leading logistics providers" and identifying "C.H. Robinson" as one of five targets with revenues equal to or greater than XPO's 2017 revenue); Ex. Q.

doubling XPO's size to a price that was close to equal to XPO's own market value.  It also shows that there was a publicly-traded company that fit Jacobs's description of the target that XPO was, in fact, pursuing in 2018.  C.H. Robinson's $11.5 billion market value figure means XPO would have had to pay well above $8 billion to complete such a major acquisition.

If anything, Plaintiffs' inferred target price range of $10.1-$12.6 billion is conservative in Defendants' favor because it does not account for the control premium that XPO would have to pay. XPO had purchased two companies in 2015 that illustrate this point.  It paid a 34% premium over the target's trading price for one company, and a 31.6% percent premium for the other.[21]  Market data confirm that median control premiums were approximately 30% in 2015 and a little under 30% in 2018, or roughly the same.  Ex. T at 12.  As applied to the type of target that it would take to "double" XPO's size – such as the C.H. Robinson company, which had an $11.5 billion market value – any control premium would be material standing alone.  Defendants' theory that XPO could pay less than $8 billion *including* a control premium *and* still double its size "makes no [economic] sense." *Kalnit,* 264 F.3d at 140.

### 3. Even in Defendants' Implausible Scenario that XPO Could "Double" Its Size by Paying a Large Discount and No Control Premium, XPO Still Would Need New Equity

There is another problem with Defendants' motive argument that concerns the amount of capital that XPO had available to fund any acquisition.  When quoting their CFO's February 8, 2018 remark that XPO had enough "dry powder" to buy an $8 billion company, Defendants overlook what their own CFO said about the source of those funds in the sentence that immediately precedes that remark.  Mot. at 27 n.18.  The CFO specified that the funds came from the "equity raise *last year*" (Ex. 10 at 19) when XPO registered 11 million new shares.  Ex. U at 1.  XPO sold 5 million of the

---

[21]   XPO agreed to pay "a premium of approximately 34 percent" (Ex. R at 2) over the most recent closing price for one company (Norbert) in 2015 and, the same year, agreed to pay "a premium of approximately 31.6 percent" over the most recent closing price of another (Con-Way).  Ex. S at 1 (same).

shares for approximately $302 million in July 2017 and the remaining 6 million shares of approximately $351 million in July 2018. *Id.*; *see also* Ex. V. XPO used the proceeds from the second sale to pay down debt (*id.*), meaning that larger piece of the 2017 equity raise was no longer available as "dry powder" to fund any deal. Applying the $351 million to pay down debt, however, did not bring XPO into a prudent debt range that would allow it to buy even an $8 billion company without new equity. Jacobs told the market that a leverage ratio of "2.6" to "3.4" times EBITDA was acceptable to XPO (Ex. 2 at 18), but securities analysts noted, shortly after XPO spent the $351 million to pay down debt, that "acquisition for $8 bn would increase [XPO's] leverage ratio to 4.6x EBITDA." Ex. P at 29. These facts show XPO did not have enough capital to even buy a company much smaller than one that would "double" its size by issuing new debt without also issuing new equity.

Relatedly, Defendants argue that Plaintiffs' motive theory is incorrect because it alleges XPO "did not have enough cash to make a pure cash deal." Mot. at 27. The FAC does not allege XPO had to do a "pure cash deal." *Id.* Nor does it allege that XPO had to do a "pure stock deal." Rather, the FAC cites XPO's financial statements to show XPO would need to issue new equity to complete an acquisition that would double XPO's size because it lacked the internal resources to do so. Plaintiffs do not doubt that XPO could borrow some amount of capital to fund an acquisition, but any bank would require an equity cushion to protect its loan.

For example, Morgan Stanley required equity cushions of about 27% and 30% in the two acquisitions of $3.53 billion and $3.0 billion that it financed for XPO in 2015 when XPO had more than $1-$1.2 billion *in cash on hand*.[22] By contrast, XPO had to issue new equity in 2017 to

---

[22]   Ex. R (2015 Norbert acquisition, "$2.6 billion" Morgan Stanley financing / "$3.53 billion" purchase price at a time when "XPO ha[d] over $1 billion in cash and an undrawn $415 million" in revolving credit); Ex. S (2015 Con-way acquisitions, "$2.0 billion" Morgan Stanley financing / "3.0 billion" purchase price at a time when XPO "ha[d] approximately $1.2 billion in cash and an undrawn $415 million" in revolving credit).

generate the $302 million in cash out of the just $361-$425 million that XPO had on hand in 2018. ¶77. XPO's cash on hand in 2018 therefore would have been insufficient to satisfy Morgan Stanley's historic equity requirements under the alleged target purchase price of $10.1-$12.6 billion, and even under Defendant's unrealistic purchase price of $8 billion. And that does not even take into account the additional control premium of at least $2.4 billion (30% of $8 billion). The same result occurs if one were to include the $1.5 billion in debt that Defendants cite. Mot. at 27. The roughly $1.925 billion combined debt and cash on hand would only suffice as an equity cushion to support a $6 billion deal. In that scenario, XPO would have little capital to run the business, a scenario that "is divorced from economic business realities." Mot. at 27. And, again, Defendants offer *no facts* to show XPO could "double" its size in short order by purchasing a company that was over 40% smaller, even excluding any control premium.

In short, Plaintiffs' motive theory is sound on the facts of this case and supported by the relevant authorities.[23] Plaintiffs thus satisfies the "motive and opportunity" test for alleging scienter without even reaching the alternative "conscious misbehavior or recklessness" test. *ATSI Commc'ns*, 493 F.3d at 99.

## B. Conscious Misbehavior and Recklessness

All the FAC must show at this stage is that Defendants "'knew facts or had access to information suggesting that their public statements were not accurate.'" *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). "In addition to actual intent, . . . recklessness is a sufficiently culpable mental state in the securities fraud context."

---

[23] To the extent that Defendants argue that only "all stock" deals trigger the stock currency theory as a matter of law, that argument fails. *See, e.g.*, *Rothman*, 220 F.3d at 94 (holding that under facts that "that [defendant corporation] acquired [target] for $ 5.4 million in cash *and* 700,000 shares of stock valued at $ 7.2 million," it "is strongly inferable that [defendant corporation] and its officers improperly refused to [disclose the alleged omitted facts] in order to artificially inflate its stock price with an eye toward using its stock to acquire [target]").

*Id*. Allegations of Defendants' access to "daily, weekly and monthly" reports that "painted a different picture" from Defendants' public statements are sufficient to plead an "inference of reckless intent." *Scholastic*, 252 F.3d at 76.

The FAC's allegations meet the Second Circuit's standard for conscious misbehavior or recklessness.[24] Jacobs's statements confirm that he monitored (1) XPO's diversification levels and sources of growth (*see, e.g.*, ¶¶6, 24, 46); and (2) XPO's 100 largest customers, of which Amazon was the biggest (*see, e.g.*, ¶38 (describing top 100 customers); ¶39 (Jacobs attended weekly meetings covering "customers won, lost and new entrants" and review of "volume" and other "key operating and financial metrics.")).

Given Jacobs's review of and access to information about its largest customer's business, Jacobs acted with at least recklessness by speaking on XPO's sources of growth, diversification, and customer mix without mentioning Amazon's importance to these metrics. *See Scholastic*, 252 F.3d at 76.[25] Jacobs's admissions the day after the Class Period further support scienter. He told investors that XPO "knew" Amazon was not going to stay a customer forever and that becoming so dependent on Amazon had been a "mistake." ¶¶125-126.[26] The resignations of CFO Hardig and

---

[24]  Defendants claim that "none of Plaintiffs' allegations contradict XPO's public statements." Mot. at 28. This is incorrect. For example, Defendants stated that the increase (*i.e.*, growth) in XPO's consolidated revenues for 2017 was "***primarily*** driven" by a combination of non-Amazon factors. ¶34. The FAC alleges that Amazon accounted for over half of XPO's total revenue growth in 2017 and therefore was the "primary driver" of growth. ¶36. Likewise, Jacobs attributed XPO's 3Q18 miss ***solely*** to House of Fraser's bankruptcy (¶¶97-98), while the FAC alleges that XPO would have missed expectations even without the House of Fraser bankruptcy and that Amazon was a material cause of the miss. *See supra* §I.D.

[25]  Defendants' reliance on *In re MSC Indus. Direct Co., Inc.*, 283 F. Supp. 2d 838, 848-49 (E.D.N.Y. 2003) is misplaced. There, executive knowledge of sales and inventory information was not sufficient to allege scienter as to accounting fraud. *Id. MSC* thus required an assumption that executives who know sales and inventory numbers would also know of fraudulent manipulation of those numbers. Such an assumption is not required here. The FAC alleges that Jacobs's knowledge of and access to sales and inventory information about XPO's largest customers raises a strong inference that he knew or had access to sales and inventory information about XPO's largest customer, Amazon.

[26]  The FAC draws on accounts from confidential witnesses for additional support. *See, e.g.*, ¶¶40, 54-59, 66-68; *see Terex*, 2018 WL 1587457, at *7 ("It is reasonable to infer that the CWs probably do have personal

CSO Malat, as Jacobs was misleading the market, further support scienter.  *See* ¶78; *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 394 n.176 (S.D.N.Y. 2007).

### III.    The FAC Sufficiently Pleads Loss Causation

In order to adequately plead loss causation, "[t]he complaint must simply give Defendants 'some indication' of the actual loss suffered and of a plausible causal link between that loss and the alleged misrepresentations." *Teva*, 2019 WL 4674839, at *25 (quoting *Loreley Financing* (*Jersey*) *No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015)).  That indication may be established by pleading either a corrective disclosure or a materialization of a concealed risk.  *See In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010).

Here, the FAC alleges that Defendants' misrepresentations and omissions inflated XPO's common stock price throughout the Class Period and that when "the relevant truth became known and/or the materialization of the risk that had been concealed by Defendants occurred, the price of XPO's common stock declined immediately." ¶129.  The truth and/or risks materialized in three phases.  XPO announced 3Q18 earnings and revenue "misses" on November 1, 2018 that were due, in material part, to Amazon's deceleration of business and the "uncertainties" that weighed on the market in response to Jacobs's incomplete explanations as to the underlying reasons for the misses, as analysts noted. ¶¶100-101; *see also In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *16 (S.D.N.Y. Nov. 26, 2018) (finding "'earnings misses'" and "disclosures from third-party analysts who questioned" the company's disclosures coupled with "decline[s] in response to each disclosure" sufficient to show materialization or risk).  XPO's stock fell 2.67% in direct response. ¶101.  XPO at the time told the market that the miss was "nothing." ¶98.  A Stephens analyst was concerned about why a "relatively small write-off [would] cause [XPO] to adjust guidance lower,"

---

knowledge of the information pleaded even if they were not involved in financial reporting and had little contact with the individual defendants.").  As discussed above, Defendants' criticism of XPO's confidential witnesses is misplaced.  *See supra* n.17.

but JPMorgan took XPO's explanation to mean there was no "systemic risk" with the Company's growth prospects.  ¶100.

Then, on December 11, 2018, XPO disclosed similar misses, again eliciting analyst concern and scrutiny, triggering a 33% stock drop from December 11 to December 13, 2018.  *See, e.g.*, ¶114 (analysts noting "missing" estimates); ¶117 (analysts noting lower earnings guidance causing stock to fall); ¶118.  These events give "some indication" that Amazon was a material factor in XPO's decelerating growth that materialized in losses to investors.

Finally, after a large acquisition fell apart that would have allowed XPO to bury or shift the blame for lower growth onto a target company, on February 14, 2019, XPO had to announce its standalone financial results and told the market that it lost a material amount of business from its "largest customer," Amazon.  This corrective disclosure triggered another 13% decline in XPO's stock value.  ¶¶122-127.  All of these facts are sufficient to plead loss causation.[27]

## IV.    The FAC Sufficiently Pleads a §20(a) Violation

Because the FAC sufficiently alleges that Defendants violated §10(b) of the Exchange Act and acted with control while participating in the fraud (¶137), the FAC pleads an actionable violation of §20(a) of the Exchange Act.  *See ATSI Commc'ns*, 493 F.3d at 108.

---

[27]    It is also irrelevant to the analysis of loss causation (or damages for that matter) at the pleading stage that XPO's stock price may have "quickly rebounded" (*see* Mot. at 40) two months after the Class Period ended. *See Acticon AG v. China N.E. Petroleum Holdings, Ltd.*, 692 F.3d 34, 39 (2d Cir. 2012) ("[T]he fact that the price rebounded does not . . . negate the plaintiff's showing of loss causation . . . .").

## CONCLUSION

The Court should deny Defendants' motion or grant Plaintiffs leave to amend.

DATED: May 4, 2020      Respectfully submitted,

          ROBBINS GELLER RUDMAN
           & DOWD LLP
          JASON C. DAVIS (phv10099)

             s/ Jason C. Davis
            JASON C. DAVIS

          Post Montgomery Center
          One Montgomery Street, Suite 1800
          San Francisco, CA  94104
          Telephone: 415/288-4545
          415/288-4534 (fax)
          jdavis@rgrdlaw.com

          ROBBINS GELLER RUDMAN
           & DOWD LLP
          SPENCER A. BURKHOLZ (phv01417)
          MATTHEW I. ALPERT (phv10035)
          ALEXI H. PFEFFER-GILLETT (phv10036)
          655 West Broadway, Suite 1900
          San Diego, CA  92101
          Telephone: 619/231-1058
          619/231-7423 (fax)
          spenceb@rgrdlaw.com
          malpert@rgrdlaw.com
          agillett@rgrdlaw.com

          Lead Counsel for Lead Plaintiff

          IZARD, KINDALL & RAABE, LLP
          ROBERT A. IZARD (ct01601)
          CHRISTOPHER M. BARRETT (ct30151)
          29 South Main Street, Suite 305
          West Hartford, CT  06107
          Telephone: 860/493-6292
          860/493-6290 (fax)
          rizard@ikrlaw.com
          cbarrett@ikrlaw.com

          Local Counsel

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on May 4, 2020, I authorized the electronic

filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send

notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List.

s/ Jason C. Davis
JASON C. DAVIS

ROBBINS GELLER RUDMAN
        & DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
E-mail:  jdavis@rgrdlaw.com

# Mailing Information for a Case 3:18-cv-02062-SRU Labul v. XPO Logistics, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Matthew Isaac Alpert**
  MAlpert@rgrdlaw.com,kathyj@rgrdlaw.com,e_file_sd@rgrdlaw.com,kwoods@rgrdlaw.com,MAlpert@ecf.courtdrive.com

- **Martin J. Auerbach**
  auerbach@mjaesq.com

- **Christopher M. Barrett**
  cbarrett@ikrlaw.com,7457869420@filings.docketbird.com

- **Spencer A. Burkholz**
  SpenceB@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Jason Davis**
  jdavis@rgrdlaw.com

- **Martin Flumenbaum**
  mflumenbaum@paulweiss.com,mao_fednational@paulweiss.com

- **James I. Glasser**
  jglasser@wiggin.com,yromero@wiggin.com,akalinowski@wiggin.com

- **J. Alexander Hood , II**
  ahood@pomlaw.com

- **Shannon L. Hopkins**
  shopkins@zlk.com,shalliday@zlk.com

- **Jeremy A. Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,lpvega@pomlaw.com

- **Brian P. Murray**
  bmurray@glancylaw.com,brian-murray-4237@ecf.pacerpro.com

- **William H. Narwold**
  bnarwold@motleyrice.com,mjasinski@motleyrice.com,vlepine@motleyrice.com,ajanelle@motleyrice.com

- **Alexi Pfeffer-Gillett**
  agillett@rgrdlaw.com

- **David R. Schaefer**
  dschaefer@bswlaw.com,dmurray@bswlaw.com,jrivera@bswlaw.com

- **Daniel Sinnreich**
  dsinnreich@paulweiss.com,mao_fednational@paulweiss.com

- **Julia Tarver Mason Wood**
  jwood@paulweiss.com,mao_fednational@paulweiss.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)