# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

LARRY LABUL, et al.,
    Plaintiffs,

     v.

XPO LOGISTICS, et al.,
    Defendants.

No. 3:18-cv-2062 (SRU)

## RULING ON MOTION TO DISMISS

Lead Plaintiffs Local 817 IBT Pension Fund, Local 272 Labor-Management Pension Fund, Local 282 Pension Trust Fund, and Local 282 Welfare Trust Fund, among others, (collectively, "Plaintiffs") filed the instant federal securities class action against XPO Logistics, Inc. ("XPO") and XPO's Chairman and CEO Bradley Jacobs (collectively, "Defendants"). The operative complaint raises claims under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5, as well as Section 20(a) of the Exchange Act. It principally alleges that Defendants made materially false and misleading statements that either (1) misrepresented the importance of Amazon, its largest customer, in driving XPO's financial growth leading up to and in the first quarter of 2018, or (2) concealed the fact that Amazon had started to sever ties with XPO around March 2018.

Defendants now move to dismiss the complaint on Rule 12(b)(6) grounds, arguing that Plaintiffs have failed to state a claim upon which relief can be granted for each count. They specifically argue that Plaintiffs have failed to advance a colorable claim under Section 10(a) of the Exchange Act because the complaint fails to plead (1) actionable misstatements or omissions, (2) scienter, (3) materiality, and (4) loss causation. They further contend that, because Plaintiffs

have failed to state a cognizable claim under Section 10(b), their claim under Section 20(a) of the Exchange Act also fails.

For the reasons that follow, I agree with Defendants and hold that the amended complaint does not cure the deficiencies I raised with respect to the initial complaint.  The motion to dismiss is therefore **granted**.

## I.      Standard of Review

### A.  Motion to Dismiss (Rule 12(b)(6))

A motion to dismiss for failure to state a claim under Rule 12(b)(6) is designed "merely to assess the legal feasibility of a complaint, not to assay the weight of evidence which might be offered in support thereof."  *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities*, 748 F.2d 774, 779 (2d Cir. 1984) (quoting *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980)). When deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiffs, and decide whether it is plausible that plaintiffs have a valid claim for relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007); *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996).

Under *Twombly*, "[f]actual allegations must be enough to raise a right to relief above the speculative level," and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face."  550 U.S. at 555, 570; *see also Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").  The plausibility standard set forth in *Twombly* and *Iqbal* obligates the plaintiff to "provide the grounds of his entitlement to relief" through more than "labels and conclusions, and a formulaic recitation of the elements of a cause of

action." *Twombly*, 550 U.S. at 555 (quotation marks omitted).  Plausibility at the pleading stage

is nonetheless distinct from probability, and "a well-pleaded complaint may proceed even if it

strikes a savvy judge that actual proof of [the claims] is improbable, and . . . recovery is very

remote and unlikely."  *Id.* at 556 (quotation marks omitted).

 B. <u>Heightened Pleading Requirements under FRCP 9(b) and the PSLRA</u>

 Although Federal Rule of Civil Procedure 8(a)(2) requires only a "short and plain

statement of the claim showing that the pleader is entitled to relief," claims asserting fraud under

the Exchange Act must also meet the "heightened pleading requirements" set forth in Federal

Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995, 15 U.S.C.

§ 78u–4(b) (the "PSLRA"), in order to survive a motion to dismiss.  *See Anschutz Corp. v.*

*Merrill Lynch & Co.,* 690 F.3d 98, 108 (2d Cir. 2012).

 Under Federal Rule of Civil Procedure 9(b), the claim must be pled "with particularity,"

that is, the plaintiff must:  "(1) specify the statements that the plaintiff contends were fraudulent,

(2) identify the speaker, (3) state where and when the statements were made, and (4) explain why

the statements were fraudulent."  *Id.* (citation omitted).  In addition, under the PSLRA, the

complaint must:  (1) "specify each misleading statement," (2) "set forth the facts on which a

belief that a statement is misleading was formed;" and (3) "state with particularity facts giving

rise to a strong inference that the defendant acted with the required state of mind."  *See id.* (citing

*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005)) (quotation marks and alterations

omitted).

## II.     Background

### A.     Factual Allegations[1]

Headquartered in Greenwich, Connecticut, XPO is a publicly-traded transportation and logistics company.  Am. Compl., Doc. No. 134, at ¶ 2.  XPO's transportation segment manages a network that offers customers a number of ways to transport their goods, and uses trucks to move most of its freight.  *Id*. at ¶ 22.  The services offered in the transportation segment include freight brokerage, less-than-truckload ("LTL"), and "last mile" services.  *Id*.  XPO's logistics segment offers services that help fulfill online orders, including warehousing and distributing services. *Id*. at ¶ 23.

Amazon hired XPO to run five warehouses as Amazon fulfillment centers.  *Id*. at ¶ 81. According to a former XPO Planning Analyst, the warehouses were part of a program through which XPO provided warehousing and logistics support to help fulfill Amazon orders.  *Id*. Securities analysts also reported that "XPO's U.S. footprint . . . had, as of September 2018, a 'shared-space distribution network of 75 warehouses and last mile hubs.'"  *Id*. at ¶ 82.  The five fulfillment centers therefore amounted to 6.6%—five out of 75—of XPO's centers in the United States.  *See id*.

XPO reported its first profitable quarter in the second quarter of 2016.  *Id*. at ¶ 24.  In discussing XPO's quarterly results, Jacobs boasted XPO's diverse customer base:

> We started the call with saying that we're at a positive inflection point in the evolution of our Company. And that we are reaping the rewards of the last five years. We have built a very well diversified, well functioning global business that provides significant value to our customers.

*Id*. (emphasis omitted).  Jacobs also addressed XPO's earnings target for 2018:

---

[1] The following facts are drawn primarily from the amended complaint, and for purposes of the present motion, I assume them to be true and draw all reasonable inferences in Plaintiffs' favor.  *See Ashcroft,* 556 U.S. at 678–79.

> Look at the numbers this quarter. We had record EBITDA, way above expectations. We had record cash flow from ops, way above expectations. Record free cash flow. We have a clearly defined action plan to go from $1.265 billion of EBITDA this year to our $1.7 billion target in 2018.

*Id*. at ¶ 24.  Jacobs revisited XPO's 2018 target during a February 8, 2018 conference call with investors and analysts.  *Id*. at ¶ 26.  He reported:  "As you saw from the press release, we had a very strong finish to 2017.  We posted record fourth quarter results across the board, with beats on revenue, earnings per share ("EPS"), adjusted EBITDA and free cash flow."  *Id*.  He added: "More immediately, in 2018, we're off to an excellent start.  We're confident in our ability to grow adjusted EBITDA by at least another 17% this year."  *Id*.

After the market closed that day, and before the market opened the following business day, *The Wall Street Journal* reported that Amazon was expecting to launch its own delivery service.  *See id*. at ¶ 27.  Even though the broader market rose, *Business Insider* reported on February 9, 2018 that UPS and FedEx shares thereafter fell 6% and 5%, respectively, in trading. *Id*. at ¶¶ 27, 30.  The same day, *Bloomberg* reported that an analyst at Cowen had raised Cowen's price target for XPO from $85 to $100, and that XPO's stock price gained three percent that day.  *See id*. at ¶¶ 28, 29.  Both FedEx and UPS had disclosed how much of their revenue Amazon accounted for, which was 3% and 1.5%, respectively.  *Id*. at ¶ 30.

The next business day, on Monday, February 12, 2018, XPO filed its 2017 Annual Report with the SEC.  *Id*. at ¶ 33.  The report did not disclose the percentage of revenue attributable to its largest customer—which Plaintiffs contend was Amazon—even though such information was included in XPO's previous annual report.  *See id*.

In a section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operation ('MD&A')," the report noted:  "Our consolidated revenue for 2017 increased 5.2% to $15,380.8 million from $14,619.4 million in 2016.  This increase was

primarily driven by growth in our European contract logistics business, improvement in LTL weight per day, and growth in North American truck brokerage and Last Mile operations." *Id*. at ¶ 34. XPO's stock price increased approximately 5.88% that day, from $85 per share to $90 per share. *Id*. at ¶ 42.

On May 2, 2018, XPO reported its results for the first quarter of 2018, and Jacobs remarked that its revenue growth in that quarter "reflected a healthy diversification of customer verticals and service lines." *Id*. at ¶ 46. At a May 3, 2018 conference call with analysts and investors, Jacobs reiterated XPO's broad-based growth: "We posted record first quarter revenue . . . [W]e increased our adjusted EBITDA 14% year-over-year to a first quarter record of $330 million. *The growth was broad-based across our operations.*" *Id*. at ¶ 47 (emphasis in original).

Around the same time, four of the five fulfillment centers that XPO ran for Amazon began to wind down operations. *See id*. at ¶¶ 81, 102. Specifically, the Kansas center started winding down by March/April 2018, the Maryland center started winding down by June 2018, the Texas center started winding down by August 2018, and the California center started winding down by October 2018. *Id*. at ¶¶ 83–93.

In August 2018, XPO temporarily stopped processing orders at two fulfillment centers located in the United Kingdom—in Wellingborough and Milton Keynes specifically—that it operated for another customer, the House of Fraser, as the House of Fraser underwent bankruptcy. *Id*. at ¶ 94. The House of Fraser had suffered financial losses in 2017 and announced a planned bankruptcy that would allow the company to continue to operate while finding a new owner. *Id*. XPO partially reopened those fulfillment centers toward the end of August 2018. *Id*.

On September 6, 2018, *The Guardian* reported that XPO reached an agreement with the company's new ownership to reopen the House of Fraser business. *Id*. Pursuant to that agreement, XPO's Milton Keynes warehouse would deliver goods for House of Fraser until November 2018, and the Wellingborough warehouse would remain open until at least March 2019. *See id*. XPO ultimately closed the Milton Keynes center in November 2018 and the Wellingborough center in April 2019. *Id*. at ¶ 95.

On October 31, 2018, XPO filed press releases and other materials revealing that XPO had missed revenue and earnings targets for the third quarter of 2018, and lowered earnings guidance for the year. *Id*. at ¶ 96. On a conference call with analysts and investors the next day, November 1, 2018, Jacobs explained that "[t]he revised target reflects the impact of the customer bankruptcy [in Europe]." *Id*. at ¶ 97. He reassured investors that "on a long-term basis, it's really just – it's nothing. It's a few million bucks." *Id*. at ¶ 98.

Around that time, XPO was pursuing a merger. *See id*. at ¶ 108. According to the complaint, the merger, if completed, would have helped XPO "bury the negative effects of Amazon's decision to leave XPO." *Id*. By the second week of December 2018, XPO was close to effectuating the merger and acquiring another company. *Id*. After XPO management accidentally disclosed material non-public information to several investors at a private lunch on December 11, 2018, however, the merger fell through. *See id*. at ¶¶ 109, 121. Trading authorities learned of the leak and stopped trading XPO stock on the NYSE when the market opened the following day, December 12, 2018, until XPO revealed the financial information to the entire market. *Id*. at ¶ 110.

As a result, XPO then reported publicly that it expects to use "substantially all" of its tax benefits for the 2018 tax year, which, according to the complaint, essentially revealed that XPO

could not generate $625 million in free cash flow in 2018 as predicted. *Id*. at ¶¶ 110–12. The disclosure also revealed a lowering of XPO's 2019 adjusted earnings before interest, depreciation, taxes, and amortization ("EBIDTA") guidance. *Id*. at ¶¶ 110, 114.

The new information triggered a two-day decline in stock prices, with XPO's share stock price falling from $66.69 on December 11, 2018 to $44.50 on December 13, 2018. *Id*. at ¶¶ 111, 118. The complaint avers that, following the company's devalued stock price and reputation, XPO's merger was no longer a viable option. *Id*. at ¶ 121. Jacobs later told participants at a conference that the deal "would have effectively doubled XPO's $17 billion a year size 'in short order.'" *Id*. at ¶ 108 (emphasis omitted).

On February 14, 2019, XPO filed its FY 2018 annual report. *Id*. at ¶ 12. The report provided that, "[d]uring the fourth quarter of 2018, our largest customer curtailed its business with us, resulting in a decrease in revenue of $46 million," and that, in "early 2019, this same customer further downsized the balance of its business" with XPO.[2] *See* Doc. No. 137-6, at 32. The report further stated that, in 2019, XPO would be losing two-thirds of $900 million projected business from its largest customer. Am. Compl., Doc. No. 134, at ¶ 12.

A day after XPO filed the report, Jacobs elaborated during a conference call with analysts that XPO missed targets for the quarter and that its "largest customer" had "pulled back their postal injection business," which had a "significant impact in December and in the quarter." *Id*. at ¶ 123. He remarked that "we knew that [our largest customer] wasn't going to stay forever and forever and ever and ever because of that particular customer's stated business plans and because that customer is transactional." *Id*. at ¶ 124. Jacobs also reported:

In 2018, our top 5 customers represented about 11% of revenue, and you saw that in the

_____

[2] Although that statement is drawn from the FY 2018 annual report rather than the complaint, I may consider it for purposes of the motion to dismiss because it is "incorporated by reference" into the complaint. *DiFolco v. MSNBC Cable L.L.C.,* 622 F.3d 104, 111 (2d Cir. 2010).

K. The largest customer, however, represented roughly about 4%, 5% of that. 2/3 of that business has gone away, so that's a body blow, no question about it.

*Id*. at ¶ 125 (emphasis omitted). He elaborated further:

Our customer concentration, it was too much. We made a mistake letting one customer get $900 million of business with us. [It was] just too much. [It was] too much concentration. Previously, if you looked at our top 5 customers, it was about 11% of revenue and the biggest one was a little more than 1/2 of that. So it was just too much concentration.

*Id*. at ¶ 126 (emphasis omitted). Following those announcements, XPO's stock price fell from a close of $59.55 the day prior to $51.97 at the close of trading, amounting to a loss of 12.73%. *Id.* at ¶ 127.

B. <u>Procedural History</u>

On December 14, 2018, Larry Labul, on behalf of all entities and persons who purchased XPO securities between February 26, 2014 and December 12, 2018, filed this case against XPO Logistics, Jacobs, and John Hardig, XPO's CFO, asserting violations of the Exchange Act. *See generally* Compl., Doc. No. 1. On February 12, 2019, six putative plaintiffs moved for appointment as lead plaintiff and for approval of lead counsel. Judge Vanessa L. Bryant granted the motions of Local # 817 IBT Pension Fund, Local 272 Labor-Management Pension Fund, and Local 282 Pension Fund and Local 282 Welfare Trust Fund (the "Pension Funds"), and therefore denied the remaining motions for appointment as moot. *See* Order, Doc. No. 82.

On June 3, 2019, the Pension Funds brought a consolidated federal securities class action complaint against XPO, Jacobs, and Hardig, as well as Scott Malat, XPO's former Chief Strategy Officer. *See generally* Am. Compl., Doc. No. 102. The complaint asserted violations under both the Exchange Act and the Securities Act. *Id*.

The case was transferred to me on June 6, 2019. *See* Doc. No. 105. On August 2, 2019, Jacobs and XPO filed a joint motion to dismiss the complaint. *See* Defs.' Mot. to Dismiss, Doc.

9

No. 121.  Hardig and Malat followed suit, filing separate motions to dismiss that same day.  *See* Doc. No. 123 (Hardig Motion to Dismiss), Doc. No. 125 (Malat Motion to Dismiss).  I heard oral argument on November 4, 2019.  In a ruling from the bench, I granted the motions to dismiss and permitted Plaintiffs to file an amended complaint within 60 days.  *See* Doc. No. 132.

On January 3, 2020, Plaintiffs filed an amended complaint.  Am. Compl., Doc. No. 134. The new complaint asserts only violations of the Exchange Act and removes two defendants, with XPO and Jacobs remaining as defendants.  *Id*.  It also contracts the proposed class, which now comprises "all purchasers and acquirers of XPO common stock between February 12, 2018 through and including February 14, 2019 (the 'Class Period')."  *Id*. at ¶ 1.

Jacobs and XPO filed the instant motion to dismiss on March 3, 2020 (doc. no. 137), which Plaintiffs opposed on May 4, 2020 (doc. no. 138).  Defendants replied on June 18, 2020. *See* Doc. No. 141.  A telephonic hearing was held on June 30, 2020.

## III.   Discussion

### A.   Section 10(b) of the Exchange Act

Section 10(b) of the Exchange Act renders it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance," as defined by the SEC.  15 U.S.C. § 78j(b).  Operating as a "broad prohibition against manipulation," Commission Rule 10b-5, which implements Section 10(b), proscribes any "'untrue statement of a material fact' or the omission of any material fact 'necessary in order to make the statements made . . . not misleading.'"  *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341 (2005) (citing 17 C.F.R. § 240.10b–5); *In re MF Global Holdings*, 982 F. Supp. 2d at 302–03 ("Section 10b-5 operates as a broad prohibition against manipulation, whether in the form of false statements or market manipulation.").

Rule 10b-5 requires "an actual *statement*, one that is either untrue outright or misleading by virtue of what it omits to state." *In re Vivendi, S.A. Securities Litigation*, 838 F.3d 223, 239 (2d Cir. 2016) (emphasis in original) (internal quotation marks omitted). Section 10(b) and Rule 10b-5(b) "do not create an affirmative duty to disclose any and all material information." *Id.* (citing *Matrixx Initiatives, Inc. v. Siracussano*, 563 U.S. 27, 44 (2011)). Instead, a "pure omission . . . is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts." *Id.* (internal quotation marks and citations omitted).

"Half-truths," defined as "statements that are misleading . . . by virtue of what they omit to disclosure," are distinct from "pure omissions" and are also actionable under federal securities laws. *Id.* at 239–40. It is well-established that, "once a company speaks on an issue or topic, there is a duty to tell the whole truth, [e]ven when there is no existing independent duty to disclose information on the issue or topic." *Id.* at 258 (internal quotation marks and citations omitted).

To state a claim under Section 10(b), a plaintiff must establish that the defendant: "(1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase and sale of securities, (4) upon which the plaintiff relied, (5) that the plaintiff's reliance was the proximate cause of its injury." *Setzer v. Omega Healthcare Inv'rs, Inc.,* 968 F.3d 204, 212 (2d Cir. 2020).

In the case at bar, the complaint challenges various statements that Defendants made in press releases, SEC filings (i.e., letters as well as quarterly (10-Q) and annual (10-K) statements), and conference calls with investors and analysts during the Class Period. Those statements can be grouped into two categories: (1) statements that allegedly misrepresented the importance of

Amazon, XPO's largest customer, in generating XPO's financial growth and (2) statements that allegedly concealed the fact that Amazon started to sever ties with XPO around March 2018.

In their motion to dismiss, Defendants argue that Plaintiffs have failed to plead (1) actionable misstatements or omissions, (2) materiality, (3) scienter, and (4) loss causation. *See* Mot. to Dismiss, Doc. No. 137-1, at 1–4. I address each prong for each of the two categories of statements below.

1. *Statements and Omissions Concerning Amazon's Contribution to XPO's Growth*

    a. Actionable Misstatement or Omission

The complaint challenges growth-related statements that XPO made on (a) February 12, 2018 in XPO's 2017 Annual Report, (b) May 2, 2018 in a press release, and (c) May 3, 2018 during a conference call. Specifically, Plaintiffs take issue with XPO's statements in its 2017 Annual Report that "revenue for 2017 [had] increased" and that the increase "was primarily driven by growth in our European contract logistics business, improvement in LTL weight per day, and growth in North American truck brokerage and Last Mile operations." Am. Compl., Doc. No. 134, at ¶ 34.

Plaintiffs also challenge Jacobs' statement on May 2, 2018 that XPO's revenue growth in the first quarter of 2018 "reflected a healthy diversification of customer verticals and service lines." *Id*. at ¶ 46. Finally, they contest Jacobs' statement on May 3, 2018 that: "We posted record first quarter revenue . . . [W]e increased our adjusted EBITDA 14% year-over-year to a first quarter record of $330 million. *The growth was broad-based across our operations*." *Id.* at ¶ 47 (emphasis in original).

Plaintiffs maintain that the foregoing statements were either false or misleading because they obscured the fact that XPO's largest customer, Amazon, "accounted for more than half" of

XPO's total growth at the time.  *See* Opp. to Mot. to Dismiss, Doc. No. 138, at 5, 7 (citing Doc. No. 134, at ¶¶ 35, 50).  For the following reasons, I disagree.

    i. <u>Part of The Argument's Premise—That Amazon Drove XPO's Growth in the First Quarter of 2018—Is Not Adequately Supported.</u>

  As an initial matter, although the allegation that Amazon was a primary driver of XPO's growth in 2017 is sufficiently supported after drawing all reasonable inferences in Plaintiffs' favor, the assertion that Amazon was a primary driver of XPO's growth in the first quarter of 2018 is without substantiation.  The complaint includes no factual allegations regarding Amazon's contribution to XPO's growth in the first quarter of 2018.  Rather, it merely alleges that Amazon contributed "approximately $900 million in revenue . . . [in] *2018*."  Am. Compl., Doc. No. 134, at ¶ 36 n.6 (emphasis added).  Plaintiffs' assertion that Amazon accounted for 47% of XPO's *revenue growth* in 2018 is based on Amazon's $900 million contribution to XPO's *total revenue* for the year.  Plaintiffs do not indicate how much Amazon contributed to XPO's growth in the first quarter of 2018, the relevant time period.

  To show the alleged importance of Amazon to XPO's growth rates, Plaintiffs also rely on the following statement that XPO made in February 2019:  "Our consolidated revenue for 2019 decreased by (3.7)% to $16.6 billion, from $17.3 billion in 2018. The decrease was primarily impacted by a reduction in business from our largest customer, resulting in approximately $570 million less revenue in 2019 . . . ."  *See* Opp. to Mot. to Dismiss, Doc. No. 136, at 9–10.  But that statement concerns XPO's revenue in 2019—not the first quarter of 2018—and thus is likewise not illuminating.

  For the foregoing reasons, the complaint fails to plead facts that plausibly show that Amazon was critical to XPO's growth in the first quarter of 2018, which alone warrants dismissal of the claims against the growth-related statements relating to that time period.  *See*

*Twombly*, 550 U.S. at 555 ("[f]actual allegations must be enough to raise a right to relief above the speculative level").

ii. <u>The Complaint Does Not Sufficiently Plead that the Growth-Related Statements Are False or Misleading in Nature.</u>

Even if the complaint did adequately allege that Amazon was largely responsible for XPO's growth in the first quarter of 2018, the challenged statements—with respect to both the 2017 and the first quarter of 2018 time periods—are not plausibly false or misleading. "When considering the misleading nature of a statement, the key question . . . is whether defendants' representations, taken together and in context, would have misled a reasonable investor." *In re World Wrestling Entm't, Inc. Sec. Litig.*, 180 F. Supp. 3d 157, 177 (D. Conn. 2016) (quotation marks omitted) (citing *McMahan & Co. v. Wherehouse Entm't, Inc*., 900 F.2d 576, 579 (2d Cir. 1990)). "A complaint must identify untrue statements specifically and, if applicable, it must identify the omitted facts that are 'necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading.'" *Marcus v. W2007 Grace Acquisition I, Inc.*, 203 F. Supp. 3d 332, 337–38 (S.D.N.Y. 2016) (internal citations omitted).

With respect to the first statement at issue—that the 2017 revenue increase "was primarily driven by growth in our European contract logistics business, improvement in LTL weight per day, and growth in North American truck brokerage and Last Mile operations"—that statement would not have plausibly misled a reasonable investor principally because, as the complaint acknowledges, Amazon *was* a customer of the three business lines mentioned in the statement: LTL, Last Mile, and Brokerage. *See* Am. Compl., Doc. No. 134, at ¶¶ 54–58 (LTL), ¶ 59 (Last Mile), ¶ 60 (Brokerage). Accordingly, the statement that the revenue increase was driven by growth in those three business lines is entirely consistent with the allegation that the revenue increase was fueled by Amazon.

14

That distinguishes the case from *Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, 432 F. Supp. 3d 131 (D. Conn. 2019), where I denied in substantial part a motion to dismiss a complaint asserting securities violations.  There, the complaint alleged that Teva attributed its financial success to, among other things, "exclusive launches," "higher sales," and a "significant reduction in selling and marketing expenses."  *See id.* at 162–64.  Those proffered reasons were wholly at odds with the actual reason allegedly driving Teva's strong financial performance:  a price-hike strategy.  *See id.*  Moreover, the company executives in *Teva* "routinely expressly denied that pricing had much of an effect on profits, even when asked by investors and analysts."  *Id.* at 162.  The complaint makes no comparable allegations here.

With respect to the second and third statements at issue—that revenue growth in the first quarter of 2018 "reflected a healthy diversification of customer verticals and service lines" and that "the growth was broad-based across our operations"—Plaintiffs have likewise failed to adequately establish that either statement is false or misleading.  As a preliminary matter, and as I noted during the first hearing, XPO's representation that it was diverse is not factually inaccurate; quite the opposite, XPO had approximately 50,000 customers.  Am. Compl., Doc. No. 134, at ¶ 36; Tr., Doc. No. 133, 11:3–6 ("Why is a statement about diversification misleading because you have a company that's fueling your growth? You still have 50,000 customers. It's still diverse.").  Moreover, those statements are "too general to cause a reasonable investor to rely upon them" and therefore constitute inactionable puffery.  *Abuhamdan v. Blyth, Inc.,* 9 F. Supp. 3d 175, 189–90 (D. Conn. 2014) (statements amounting to "corporate 'puffery[]' are considered to be inactionable under the securities laws regardless of whether they omit related information") (internal citations omitted); *see also River Birch Capital v. Jack Cooper Holdings Corp*, 2019 WL 1099943, at *5 (S.D.N.Y. 2019) (holding that optimistic statements

that a company had a "broad geographic footprint, breadth of services, and operating expertise" were "nonactionable puffery and expressions of corporate optimism").

In sum, the complaint has failed to raise a plausible inference that any of the growth-related statements or omissions were false, "half-truths," or in any way misleading, which supports dismissal. *See Umbach v. Carrington Inv. Partners*, 2011 WL 284590, at *4 (D. Conn. 2011).

      b. Materiality

Even if the foregoing statements or omissions were misleading, the complaint fails to plead that they were material. "To determine whether a misstatement or omission is material is an inherently fact-specific inquiry." *Hutchison v. Deutshe Bank Securities Inc.*, 647 F.3d 479, 485 (2d Cir. 2011) (internal quotation marks and citations omitted). "A fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]." *Id.* (internal citations and quotation marks omitted). That is, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Id.* (internal citations and quotation marks omitted).

Courts may not dismiss complaints on materiality grounds unless the alleged misrepresentations or omissions "are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (internal quotation marks and citations omitted). Nonetheless, materiality allegations must "comply with the particularity requirements of [Rule 9(b)] and the PSLRA; the materiality of the alleged misstatements or omissions cannot be pled in a conclusory or general fashion." *In re Axis*

*Capital Holdings Ltd. Securities Litigation*, 456 F. Supp. 2d 576, 585 (S.D.N.Y. 2006) (internal citations omitted).

Courts consider qualitative and quantitative factors in assessing materiality. *ECA, Local 134 IBEW Joint Pension Tr. of Chicago*, 553 F.3d at 204. With respect to financial statements, "the five percent numerical threshold is a good starting place for assessing the materiality of the alleged misstatement." *See id; see also IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 391 (2d Cir. 2015) ("The SEC's Staff Accounting Bulletin ('SAB') No. 99 provides that a misstatement related to less than 5% of a financial statement carries the preliminary assumption of immateriality."). Regarding the qualitative factors, courts weigh, among other things, whether the misstatement: (a) "arises from an item capable of precise measurement;" (b) "masks a change in earnings or other trends;" (c) "changes a loss into income or vice versa;" (d) "concerns a segment or other portion of the . . . business that has been identified as playing a significant role in the registrant's operations or profitability;" or (e) "involves concealment of an unlawful transaction." *IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund*, 783 F.3d at 391 (citing SEC Staff Account Bulletin No. 99, 64 Fed. Reg. 45150 (Aug. 1999)). Another factor is whether management expects that the misstatement "will result in a significant market reaction." *Hutchison,* 647 F.3d at 485 (citation omitted).

In this case, even if failing to disclose the extent to which Amazon generated XPO's growth was somehow misleading, Plaintiffs have failed to plead that such misrepresentations were material. As noted, Plaintiffs have failed to properly quantify the extent to which Amazon contributed to XPO's growth in the first quarter of 2018 in their briefing. Further, the complaint alleges that Amazon contributed only 52% to XPO's revenue growth in 2017, which

distinguishes XPO from the defendants in *Ganino*—a case on which Plaintiffs rely—whose income was "due entirely" to the income derived from one customer. *Ganino v. Citizens Utils. Co*., 228 F.3d 154, 166 (2d Cir. 2000). Moreover, because Plaintiffs have not pled that the affected business lines were "of distinct interest to investors," the quantitative significance is undercut by the fact that Amazon's ultimate departure impacted only 3.7% of XPO's total revenue, less than the 5% threshold. *See Hutchison*, 647 F.3d at 487–88.

In addition, Plaintiffs have not adequately shown that such information was qualitatively material. Although Amazon's contributions to XPO's growth could have perhaps been measured precisely, the complaint does not allege with particularity that the misrepresentation masked a change in earnings, changed a loss into income or vice versa, or concealed an unlawful transaction. *IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund*, 783 F.3d at 391. Further, even though Amazon might have been an important client, Plaintiffs have not persuasively asserted that a reasonable investor would have specifically considered Amazon's contribution to XPO's growth to be significant. *See IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 390–91 (2d Cir. 2015) (holding that the defendant's failure to disclose its exposure to subprime assets in a press release was immaterial and noting that "although [the defendant's] asset-backed securitization group was a driving factor in its profitability, this factor alone does not tip the scales in favor of finding the misstatements material").

To the extent Plaintiffs argue that materiality is demonstrated by the drop in XPO stock price that followed Jacobs's February 15, 2019 announcement that customer concentration "was too much," I am not convinced. Jacobs disclosed that same day that their "largest customer pulled back their postal injection business" and that they "missed the quarter." *See* Am. Compl.,

Doc. No. 134, at ¶ 123.  The subsequent drop in stock price therefore does not suggest that the disclosure of XPO's alleged reliance on Amazon, without more, would have triggered a similar market reaction.  *See Hutchison,* 647 F.3d at 489 (rejecting argument that materiality was supported by the fact that the company's stock price declined following a press release disclosing the alleged omission when the press release also disclosed other negative information).  As the SEC cautioned, "[c]onsideration of potential market reaction to disclosure of a misstatement is by itself too blunt an instrument to be depended on in considering whether a fact is material." SAB No. 99, 64 Fed. Reg. at *4 (internal quotation marks); *see also JP Morgan*, 553 F.3d at 205 ("SAB No. 99 limits the usefulness of [market volatility] to instances where management expects 'that a known misstatement may result in a significant positive or negative market reaction.'") (citation omitted).

 For similar reasons, materiality is also not supported by the allegations that FedEx and UPS, both of which also had Amazon as a customer, experienced drops in stock price following the announcement that Amazon was bringing its delivery service in-house.  As an initial matter, FedEx and UPS allegedly disclosed how much Amazon contributed to their total revenues—not the extent to which Amazon contributed to their revenue growth, which is the omission with which Plaintiffs take issue here.  *See* Opp. to Mot. to Dismiss, Doc. No. 138, at 9 ("The key question is not the misstatements' relation to total revenues, but rather their relation to the area upon which Defendants are choosing to comment – in this case, XPO's growth."); *id*. at 6 ("Defendants' attempts in their Motion to diminish Amazon's importance in terms of overall revenues distract from XPO's specific public focus on *growth* during the Class Period . . . .") (emphasis in original).

In any event, the complaint does not plausibly allege that the stock prices decreased because of those revenue disclosures.  Instead, the only reasonable inference that I can draw from the complaint is that their stocks decreased because Amazon was reportedly launching an in-house delivery service that would "vie with" FedEx and UPS.  *See* Doc. No. 134, at ¶ 27. Indeed, the complaint cites articles that suggest that the disclosures concerning revenue were not material.  For example, according to the complaint, *Business Insider* reported that, although UPS and FedEx stocks were down 6 and 5%, respectively, "[i]t wasn't immediately clear how much of an effect losing Amazon's business will have on FedEx and UPS" because Amazon only amounted to a small percentage of the companies' revenues.  *Id*. at ¶ 30.

In sum, as in *JP Morgan*, Plaintiffs have failed to plead facts "that would permit the inference that [XPO] expected that the alleged [misrepresentations concerning Amazon's role in driving XPO's growth] might result in a significant market reaction."  *JP Morgan*, 553 F.3d at 205.  The market's reaction to the announcements that Amazon was bringing its delivery service in-house or that XPO's customer concentration was "too much" therefore does not "point towards qualitative materiality under SAB No. 99."  *Id*.

Finally, the fact that Defendants disclosed Amazon's contribution to XPO's revenue in its 2016 annual report does not plausibly support the materiality of Amazon's contribution to XPO's growth.  Nor does it render the omission of Amazon's contribution to XPO's revenue from its subsequent reports materially misleading.  Although "once a company speaks on an issue or topic, there is a duty to tell the whole truth," *In re Vivendi, S.A. Sec. Litig*., 838 F.3d at 258 (citation omitted), that duty is "not boundless," *Plumbers & Steamfitters Local 137 Pension Fund v. Am. Express Co*., 2017 WL 4403314, at *13 (S.D.N.Y. Sept. 30, 2017) (citation omitted).  Accordingly, "revealing one fact about a subject does not trigger a duty to reveal all

facts on a subject." *Id.* (internal citations omitted).  The proper analysis instead encompasses "an examination of defendants' representations, taken together and in context." *Id.* at *13 (citations omitted).

Here, particularly because XPO disclosed in its 2017 annual report that 10% of its revenue was attributable to its top five customers, I do not believe the complaint pleads a "substantial likelihood" that disclosing Amazon's specific contribution to XPO's revenue "would have been viewed by [a] reasonable investor as having significantly altered the total mix of information made available." *Hutchison,* 647 F.3d at 485 (internal quotation marks and citations omitted).

For the above reasons, I conclude that the complaint fails to state with particularity that the growth-related misstatements or omissions were material.

c.   Scienter

I further conclude that Plaintiffs have failed to plead scienter, that is, "the defendant's intention to deceive, manipulat[e], or defraud." *Singh v. Cigna Corp.*, 277 F. Supp. 3d 291, 316 (D. Conn. 2017), *aff'd*, 918 F.3d 57 (2d Cir. 2019) (internal citations omitted).  The PSLRA requires that plaintiffs "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *S. Cherry St.*, *LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 110 (2d Cir. 2009) (citing 15 U.S.C. § 78u–4(b)(2)) (emphasis omitted).  Under that heightened standard, an inference of scienter must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id*. at 111 (emphasis and citations omitted).

Plaintiffs can satisfy the requirement by alleging facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial

evidence of conscious misbehavior or recklessness." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (citations omitted). Allegations demonstrating that "defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation" suffice to establish a claim of recklessness. *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000). Scienter can therefore be pled by alleging that defendants "knew facts or had access to non-public information contradicting their public statements." *In re Dynex Capital, Inc. Sec. Litig.*, 2009 WL 3380621, at *12 (S.D.N.Y. Oct. 19, 2009). When a defendant is a corporation, "the pleaded facts must create a strong inference" of scienter as to "someone whose intent could be imputed to the corporation." *Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).

i. Motive

Plaintiffs allege that Defendants were motivated to conceal from investors XPO's alleged reliance on Amazon because XPO was pursuing an acquisition at the time. *See* Am. Compl., Doc. No. 134, at ¶ 41. The amended complaint specifically alleges that, as early as February 2018, XPO had been planning to execute an acquisition that would have "doubled" XPO in size. *See id.* According to the complaint, XPO would therefore have needed to issue stock as currency to fund the purchase, and inflated stock prices would have made the acquisition less costly and more feasible. *See id.* That, in turn, motivated XPO to withhold facts—such as its reliance on Amazon in fueling its growth—that would have lowered the company's stock value. *See id.* at ¶¶ 41–42.

The allegation that XPO would have needed to issue stock to fund an acquisition rests on unfounded assumptions and broad inferences. As Plaintiffs' briefing makes clear, the complaint assumes that XPO would have had to pay a price close to its own market value for the

acquisition; that assumption is based on Jacobs' December 2018 statement that the size of the deal "would have effectively doubled XPO's $17 billion a year size." *Id.* at ¶ 108; Opp. to Mot. to Dismiss, Doc. No. 138, at 32–34. Because XPO's estimated market value at the time was around $10.1 to $12.2 billion, and because XPO had cash and cash equivalents of approximately $396.9 million as of December 31, 2017, Plaintiffs conclude that XPO could not have funded an acquisition with its existing resources. *See* Doc. No. 134, at ¶¶ 41, 77. But Plaintiffs proffer no facts to support the contention that acquisitions that double the acquiring company's size carry a price tag of the acquiring company's market value; the allegations are therefore speculative. *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) ("A plaintiff cannot base securities fraud claims on speculation and conclusory allegations.").

Moreover, Defendants dispute that XPO could not have completed an acquisition with existing resources, maintaining that XPO would not have had to issue any new equity. *See* Mot., Doc. No. 137, at 27. As support, they cite to the following statement by XPO's CFO on a February 8, 2018 earnings call: "We have dry powder up to $8 billion for another acquisition, and we think that's sufficient without raising any additional equity." *Id.*; *see also* Earnings Call Trs., Doc. No. 137-12, at 19.[3] Although Plaintiffs counter that XPO ended up using $351 million of that $8 billion to pay down debt, that would still leave about $7.5 billion available as "dry powder" to fund a deal. *See* Opp., Doc. No. 138, at 34–35. Defendants further note that XPO had access to $1.5 billion in credit facilities during the Class Period. *Id.* at 27; *see also* Ex. 4, Form 10-K, Doc. No. 121-9, at 40.[4] That total available funding would have more than covered

---

[3] Because the complaint references the earnings call, I may consider the transcript of that call here. *See DiFolco*, 622 F.3d at 111.

[4] I may also consider such financial statements for purposes of the motion. *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) ("When a district court decides a motion to dismiss a complaint alleging securities fraud, it may review and consider public disclosure documents required by law to be and which actually have been filed with the SEC, particularly where plaintiff has been put on notice by defendant's proffer of these public documents.").

$7.65 billion, which Defendants contend was XPO's true market capitalization on December 12, 2018. *See* Reply, Doc. No. 141, at 10 (citing Doc. No. 141-8, at 2). The connection alleged between the challenged misstatements and XPO's acquisition goals is therefore tenuous. *See ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 201, 201 n.6 (2d Cir. 2009) (rejecting the merger motive as insufficient when the plaintiffs failed to allege "a unique connection between the fraud and the acquisition").

At any rate, the complaint is legally insufficient because it fails to allege that Defendants could have realized "concrete benefits" by failing to disclose XPO's reliance on Amazon. *See Kalnit*, 264 F.3d at 139. As the Second Circuit has instructed, "[m]otives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud." *Id*. at 139. Although "stock price manipulation in the acquisition context may be sufficient to establish scienter" in certain circumstances, the Second Circuit has observed that "achieving a superior merger" benefits all shareholders, and that "the desire to achieve the most lucrative acquisition proposal can be attributed to virtually every company seeking to be acquired." *Id.* at 141. For that reason, the Second Circuit noted that "[s]uch generalized desires do not establish scienter." *Id*.

Here, the complaint alleges only that XPO had a "generalized desire" to achieve a lucrative acquisition, which never ultimately transpired. That defect distinguishes the case from those on which Defendants rely. *See Rothman v. Gregor*, 220 F.3d 81, 92–94 (2d Cir. 2000) (involving an acquisition that was executed with corporate shares and concluding that such acquisition, "in combination with the other allegations," supported scienter); *Ontario Teachers' Pension Plan Bd.*, 432 F. Supp. 3d at 169–70 (holding that the complaint "likely" sufficiently

24

alleged motive when the defendants' price-hike strategy was implemented to "increase revenue and inflate the price of their stocks to use as currency to acquire Actavis" and when the CEO and CFO allegedly represented that the company's "stock price would increase in such a way to allow for its use as currency to fund transactions").[5]

Moreover, "[t]here are no allegations that defendants sold their own shares, or otherwise personally profited" from the "inflated" stock price during the Class Period. *Decicco v. United Rentals, Inc.*, 602 F. Supp. 2d 325, 339 (D. Conn. 2009). Furthermore, in December 2018, before XPO announced that Amazon was cutting ties in February 2019, XPO "purchased and retired 10 million shares of [its] common stock having an aggregate value of $536 million at an average price of $53.46 per share." *See* XPO 2018 10-K, Doc. No. 137-6, at 19–20. And in January and February 2019, XPO "purchased and retired 8 million shares of [its] common stock having an aggregate value of $464 million at an average price of $59.47 per share." *Id.* Such "substantial share repurchases tend to negate a finding of scienter because it would make no economic sense for a company to buy back its stock at a price it knows to be inflated." *Frankfurt-Tr. Inv. Luxemburg AG* v. *United Techs. Corp.*, 336 F. Supp. 3d 196, 225 (S.D.N.Y. 2018) (internal quotation marks omitted).

For those reasons, I conclude that the complaint fails to plead with particularity facts giving rise to a strong inference that Defendants had a motive to conceal Amazon's contribution to XPO's growth.

---

[5] Plaintiffs also rely on *Burstyn v. Worldwide Xceed Grp., Inc.*, 2002 WL 31191741 (S.D.N.Y. Sept. 30, 2002). There, the court stated, without further analysis, that because "defendants' 'specific goal' was to acquire companies," the motive was "sufficiently concrete to support a strong inference of scienter." *Id.* at *5. That case is not controlling and is distinguishable in any event because the acquisition there was completed. *See id.* at *3.

ii.  Conscious Behavior or Recklessness

I additionally conclude that the complaint fails to plead with particularity conscious

behavior or recklessness.  To allege conscious recklessness, the complaint must suggest that the

defendant's nondisclosure was at least "highly unreasonable and . . . represent[ed] an extreme

departure from the standards of ordinary care to the extent that the danger was either known to

the defendant or so obvious that the defendant must have been aware of it."  *Setzer v. Omega*

*Healthcare Inv'rs, Inc.*, 968 F.3d 204, 215 (2d Cir. 2020).  Recklessness can be pled by alleging

that the defendants "knew facts or had access to information suggesting that their public

statements were not accurate."  *Teamsters Local 445 Freight Div. Pension Fund v. Dynex*

*Capital, Inc.*, 531 F.3d 190, 194 (2d Cir. 2008) (citation omitted).  "Under such circumstances,

defendants knew or, more importantly, should have known that they were misrepresenting

material facts related to the corporation."  *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)

(citation omitted).

To establish that Jacobs knew that Amazon played a key role in driving XPO's growth, or

had access to information to that effect, the complaint alleges that Jacobs made public statements

about XPO's customers, attended meetings that discussed XPO's customers, and met with

Amazon representatives.  The allegations are as follows:

1. Jacobs discussed XPO's "top 100 customers" on a February 8, 2018 conference call.
   Am. Compl., Doc. No. 134, at ¶ 38 ("If you look at our top 100 customers, 94 of
   them now are using us for multiple service lines. . . . So it's a natural evolution. It's
   something we've been focusing on now intensely . . . .") (emphasis omitted).

2. Jacobs boasted about XPO's growth on May 2, 2018 and remarked how XPO's "11%
   organic revenue growth reflected a healthy diversification of customer verticals and
   service lines." *Id*. at ¶ 6.  At a different time, he similarly noted that XPO "built a

very well diversified, well functioning global business." *Id*. at ¶ 24 (emphasis omitted).

3. Jacobs attended weekly meetings that covered "customers won, lost and new entrants" and that discussed "a review of 'volume' and other 'key operating and financial metrics.'" *Id*. at ¶ 39.

4. A former XPO District General Manager, who left XPO the summer of 2017, believed that Jacobs would "personally interface with representatives of Amazon." *Id*. at ¶ 40.

5. On February 15, 2019, Jacobs told investors that "we knew that, that business wasn't going to stay forever and forever and ever because of that particular customer's stated business plans." *Id*. at ¶ 124.

Although the allegations may establish that Jacobs had a broad understanding of XPO's diversification levels, sources of growth, and XPO's largest customers, none specifically reference Amazon's role in fueling XPO's growth. The allegation that Jacobs met with Amazon representatives, for instance, falls short because it does not mention what was discussed, much less that XPO's reliance on Amazon with respect to its growth was discussed. *See Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Exp. Co.*, 724 F. Supp. 2d 447, 461–62 (S.D.N.Y. 2010), *aff'd.*, 430 F. App'x 63 (2d Cir. 2011) (explaining that the allegation that certain contradictory information "would have been" reported to the company's CFO in monthly meetings did not establish scienter). For those reasons, the complaint does not raise a strong inference that Jacobs was aware of the extent to which XPO's growth in 2017 and the first quarter of 2018 was attributable to Amazon. *See In re MSC Indus. Direct Co., Inc.*, 283 F. Supp. 2d 838, 848–49 (E.D.N.Y. 2003) (concluding that "general knowledge of MSC's sales and inventory does not show conscious misbehavior or recklessness").

The allegations also do not sufficiently demonstrate that Jacobs had access to information that conveyed the importance of Amazon to XPO's growth during the relevant time periods. As

the Second Circuit noted, "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) (quoting *Novak*, 216 F.3d at 309). Here, the complaint points to no particular statements or internal reports discussing XPO's reliance on Amazon in terms of growth. And "[w]here motive is not apparent . . . the strength of the circumstantial allegations must be correspondingly greater." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001).

For the foregoing reasons, the statements or omissions alleged in the complaint do not plausibly reflect a "sufficiently extreme departure from the standards of ordinary care." *See Setzer*, 968 F.3d at 215. The complaint therefore fails to adequately allege scienter under the heightened pleading standard.

> d.   Loss Causation

I further conclude that Plaintiffs have failed to sufficiently allege loss causation. Under the PSLRA, the plaintiff bears the burden of establishing that "the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages." *Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 172 (2d Cir. 2005) (citing 15 U.S.C. § 78u-4(b)(4)). Allegations of loss causation are not subject to a heightened pleading standard. *See Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010).

A plaintiff can plead loss causation by either alleging (1) "that the market reacted negatively to a corrective disclosure of the fraud" or (2) "a foreseeable materialization of the risk concealed by the fraudulent statement." *See In re Omnicom Grp., Inc. Sec. Litig.,* 597 F.3d 501, 511 (2d Cir. 2010); *see also Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 179 (2d Cir. 2020) ("Generally, plaintiffs sufficiently plead loss causation when they allege that their share's

'price fell significantly after the truth became known' through an express, corrective disclosure or 'through events constructively disclosing the fraud' like the 'materialization of [the] risk' concealed.") (citation omitted).

The causation pleading standard does not require "a corrective disclosure be a 'mirror image' tantamount to a confession of fraud." *Freudenberg*, 712 F. Supp. 2d at 202.  Indeed, "[b]ecause corporate wrongdoers rarely admit that they committed fraud, it cannot ordinarily be said that a drop in the value of a security is 'caused' by the misstatements or omissions made about it, as opposed to the underlying circumstance that is concealed or misstated." *Id*. (citing *Lentell v. Merrill Lynch & C*o., 396 F.3d 161, 173 (2d Cir. 2005)).  Accordingly, "the 'relevant truth' required . . . is not that a fraud was committed per se, but that the 'truth' about the company's underlying condition, when revealed, causes the 'economic loss.'"  *Id*.  Moreover, "partial disclosures can satisfy the loss causation requirement."  *Id*.

Here, Plaintiffs appear to allege loss causation through a series of partial disclosures. Specifically, Plaintiffs aver that, on November 1, 2018, Jacobs disclosed XPO's miss in the third quarter of 2018, which resulted in a stock decline of 2.67%.  Am. Compl., Doc. No. 134, at ¶¶ 96–101.  In addition, on December 12, 2018, XPO allegedly disclosed that it expects to use "substantially all" of its $188 million in tax benefits, which Plaintiffs contend implied that XPO could not generate "$625 million in free cash flow" as predicted.  *Id*. at ¶¶ 110, 112.  That disclosure resulted in a 33% decrease of XPO's market value.  *Id*. at ¶ 111.  Finally, on February 15, 2019, Jacobs allegedly disclosed that its customer concentration was "too much" and that its largest customer "pulled back their postal injection business."  *Id*. at ¶¶ 123–26.  Following that disclosure, XPO's stock price fell approximately 13%.  *Id*. at ¶ 127.

Because Plaintiffs have not alleged that the announcements regarding XPO's miss in the third quarter of 2018 or its revised December 12, 2018 guidance mentioned any aspect of Amazon's role in generating XPO's growth, Plaintiffs have failed to establish a sufficient connection between Defendants' alleged misrepresentations and any losses suffered following those two announcements. The complaint also does not plead facts supporting an inference that the February 15, 2019 disclosure exposed the role of Amazon in fueling XPO's growth. Nor did the announcement that XPO's customer concentration was "too much"—that is, that XPO's largest customer accounted for a considerable percentage of XPO's revenue—plausibly disclose that Amazon was a primary driver of XPO's growth. Jacobs's remark that XPO "grew up a lot" with Amazon "over the last few years," also does not specifically reveal that XPO's revenue growth was primarily generated by Amazon.

Plaintiffs have also failed to plead loss causation through the materialization of the risk theory. Because Plaintiffs have not adequately quantified the extent to which XPO's reliance on Amazon in driving its growth contributed to XPO's miss in the third quarter of 2018 or to its revised December 12, 2018 guidance, Plaintiffs have failed to allege that the risk that caused those losses "was within the zone of risk concealed" by the alleged misrepresentations. *See Lentell,* 396 F.3d at 173 ("[A] misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor."). Plaintiffs have likewise failed to plead that the risk of Amazon's departure was "within the zone of risk concealed" by any misrepresentations concerning XPO's reliance on Amazon in generating its growth. *See id.* Indeed, if I were to hold otherwise, "loss causation as an element of § 10(b) liability would be

completely subsumed by the element of misstatement." *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 157 (2d Cir. 2007).

For the foregoing reasons, the complaint fails to sufficiently link the alleged losses to the growth-related misrepresentations. I therefore conclude that Plaintiffs have not sufficiently pled loss causation.

2. *Statements and Omissions Relating to Amazon's Declining Business*

Plaintiffs additionally allege that XPO violated Section 10(b) of the Exchange Act by (a) reaffirming its 2018 financial targets, (b) failing to update the "risk factors" section in its quarterly SEC filings, and (c) attributing its declining financial performance to factors other than Amazon's departure. Plaintiffs claim that such misstatements and omissions were misleading because Amazon had long planned to bring the business that it gave to XPO "in house" and, toward that end, began to decelerate its business with XPO as early as March 2018. *See, e.g.,* Am. Compl., Doc. No. 134, at ¶¶ 51, 73, 75, 104.

More specifically, regarding the "risk factors" section in the SEC filings, Plaintiffs argue that the deceleration of business from Amazon "presented known risks or uncertainties that should have been disclosed" in the filings. *Id*. at ¶ 104. Plaintiffs also argue that Jacobs' statements attributing XPO's miss of its financial targets for the third quarter of 2018 to the House of Fraser customer bankruptcy was misleading because, in reality, Amazon was at least a material contributing factor to the quarter's miss. *Id*. at ¶¶ 97–104. They further claim that Jacobs' statements attributing the declining tonnage numbers to a strategy to selectively target more profitable freight was misleading because "XPO was working hard to grow tonnage volume" and "the lower LTL volume was taking a negative toll." *Id* at ¶ 74.

In addition, Plaintiffs take issue with the following statement in XPO's August 3, 2018 10-Q report: "Many customers, particularly large companies, are moving to large, single-source relationships with multi-modal providers to handle their supply chain requirements. We have built XPO to capitalize on this trend, as well as the trend toward outsourcing in transportation and logistics, the growth of e-commerce, and the adoption of just-in-time inventory practices." *Id*. at ¶ 72.  Plaintiffs argue that the statement was misleading because Defendants failed to disclose that their largest customer "was doing the exact opposite: bringing its transportation and logistics needs in-house and taking away from XPO."  Opp. to Mot. to Dismiss, Doc. No. 138, at 21.  The specific statements with which Plaintiffs take issue are set forth below.

1.  <u>Statements reaffirming XPO's financial targets:</u>

o  Jacobs, speaking to revenue outlook:  "We've always been saying for the last few months, high single digits, low-double digits, and nothing's slowed down at all in terms of that guidance."  *See* Am. Compl., Doc. No. 134, at ¶ 70 (August 2, 2018).

o  In response to a report entitled the "Spruce Point Report" that criticized XPO: "The facts demonstrate that [Spruce Point Report] claims, most of which have been previously floated and refuted, are largely baseless and an attempt to string together unrelated pieces of incorrect information to paint an inaccurate impression of the company . . . XPO's long-term financial outlook remains positive."  *See* Am. Compl., Doc. No. 134, at ¶ 119 (December 14, 2018).

2.  <u>Statements concerning XPO's risk factors:</u>

o  "There are no material changes to the risk factors previously disclosed in Part I, Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2017." Am. Compl., Doc. No. 134, at ¶ 51 (May 7, 2018 10-Q).

o  "There are no material changes to the risk factors previously disclosed in Part I, Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2017."  Am. Compl., Doc. No. 134, at ¶ 73, ¶ 73 n.7 (August 3, 2018 and November 5, 2018 10-Qs).

3.  <u>Statements explaining XPO's declining tonnage numbers and miss in the third quarter of 2018:</u>

o   Jacobs, in response to an analyst's question why XPO's LTL tonnage numbers were falling:  XPO's "focus is not on tonnage growth" but on "selecting the right tonnage that matches our network and deselecting freight that doesn't match our network and to get the right price, the right yield for the premium service that we provide. So I would not guide you to expecting some big tonnage increase because it's not what we're trying to do.  We're trying to get the right mix of tonnage."  Am. Compl., Doc. No. 134, at ¶ 69 (August 2, 2018).

o   Jacobs:  "Tonnage was down 1.5%, which is in-line with recent quarters and consistent with our strategy of selectively targeting the more – the freight that fits our network the best, more profitable freight."  *See id*. at ¶ 71 n.34 (November 1, 2018).

o   Jacobs, discussing the miss in the third quarter of 2018 and revised 2018 target: "The revised target reflects the impact of the [House of Fraser] bankruptcy." Am. Compl., Doc. No. 134, at ¶ 97 (November 1, 2018).

o   Jacobs: "[The House of Fraser bankruptcy] is a rounding error, but it made us miss the quarter – it's nothing.  It's a few million bucks."  Am. Compl., Doc. No. 134, at ¶ 98 (November 1, 2018).

o   XPO's CSO, Malat:  The House of Fraser was the cause why XPO's "operating income for logistics globally was $60 million compared with $67 million a year ago, and our adjusted EBITDA was flat."  Am. Compl., Doc. No. 134, at ¶ 99 (November 1, 2018).

4.   <u>Statement Concerning Outsourcing</u>

o    "Many customers, particularly large companies, are moving to large, single-source relationships with multi-modal providers to handle their supply chain requirements. We have built XPO to capitalize on this trend, as well as the trend toward outsourcing in transportation and logistics, the growth of e-commerce, and the adoption of just-in-time inventory practices." Am. Compl., Doc. No. 134, at ¶ 72 (August 3, 2018 XPO 10-Q).

a.   Actionable Misstatements or Omissions

i.   <u>The Complaint Pleads Facts that Raise a Reasonable Inference that Amazon was Discontinuing its LTL Business Starting in March 2018, and that Its Last Mile and Brokerage Businesses Were Slowing Down in 2018.</u>

As an initial matter, Plaintiffs have sufficiently pled the bases underlying their argument that the above statements were misleading.  First, the complaint adequately states that Amazon started to discontinue its LTL business with XPO during and prior to May 2018.  For instance,

the complaint alleges that, according to a former employee in the sales division, during and prior to May 2018, the Directors of Sales "explained that the volume of goods that XPO would be shipping in the LTL business was declining because XPO and Amazon were discontinuing their LTL business relationship." Am. Compl., Doc. No. 134, at ¶ 54; *see also id.* at ¶ 64 (alleging that a former employee heard that Amazon had cancelled its LTL contract with XPO and "that Amazon left").

Although the complaint fails to plead sufficient facts illustrating that Amazon began to sever its ties with XPO's Last Mile or Brokerage businesses in 2018, the complaint does plead enough facts showing that Amazon's Last Mile and Brokerage business with XPO was slowing down. For example, the complaint alleges that a former XPO employee, an Operations Manager, "understood" from various "conference calls" that "Amazon's last mile business had been declining throughout 2018 and fell significantly going into the holiday season." *Id.* at ¶ 59. With respect to the Brokerage business, the complaint also alleges that, "prior to 2018, there had also been a 'steady decline' in activity related to Amazon" and, "over time," XPO "was only handling the largest and least profitable pieces for Amazon." *Id.* at ¶ 60.

      ii.  <u>Regardless, The Complaint Does Not Sufficiently Plead that Statements Were False or Misleading.</u>

In any event, I conclude that the complaint fails to sufficiently plead that the challenged statements were false or misleading. The complaint pleads no facts tending to show that the discontinuation of Amazon's business with XPO's LTL line, or the slowdown of Amazon's business with XPO's Last Mile or Brokerage lines, in 2018 (a) revealed that XPO would not reach its 2018 financial projections and threatened its overall financial health and (b) was responsible for the miss in third quarter of 2018 or XPO's overall declining tonnage numbers. As was the case with the initial complaint, the amended complaint does not tie the alleged

discontinuation or slowdown of Amazon's business to the overall financial health of XPO, a multibillion-dollar global business.  In other words, the complaint fails to quantify the scale of those developments.  *See In re Nokia Ojy (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 408 (S.D.N.Y. 2006) (dismissing securities fraud complaint that was based in part on improper accounting practices when it did not "approximate the magnitude or degree of the alleged misstatements in relation to Nokia's total financial picture, a company with net sales over $37 billion").  Once again, Plaintiffs are "using the local to reflect the global."  Tr., Doc. No. 133, at 21:21-22.

The allegation that certain employees received a "tonnage report" showing that tonnage was down "in various territories and regions" because of a "drop in tonnage from Amazon" does not compel a conclusion to the contrary.  Am. Compl., Doc. No. 134, at ¶ 64.  Tonnage measures the weight shipped in the LTL line, and the complaint does not adduce facts suggesting that the metric is an indicator of overall financial performance.  *Id.* at ¶¶ 61–63.  That an analyst observed that truck tonnage "has proven to be a good early indicator for (LTL) *truck loads and yields*" does not show otherwise.  *Id.* at ¶ 63 (emphasis added).

The complaint purports to convey the significance of Amazon as a customer to XPO's LTL line by alleging that XPO had 75 warehouses in the United States, and that the five fulfillment centers that XPO operated exclusively for Amazon thus amounted to 6.6% of XPO's fulfillment centers in the United States.  *See id.* at ¶ 82.  But that figure is misleading because XPO is a global company.  As Defendants note, XPO had 332 logistics warehouses in North America and 801 worldwide.  *See* Reply, Doc. No. 141, at 7 (citing Form 10-K, Doc. No. 137-6, at 7).  XPO also had 520 transportation facilities in North America and 724 worldwide.  *See* Form 10-K, Doc. No. 137-6, at 7.  The five Amazon facilities, therefore, reflected approximately

only 0.6% of XPO's total logistics warehouses, or 0.7% of XPO's total transportation warehouses.

Regarding the miss in the third quarter of 2018 in particular, Plaintiffs additionally allege that the House of Fraser bankruptcy that allegedly cut $15.6 million from adjusted EBITDA in the third quarter of 2018 could not alone have been responsible for the miss in that quarter, and that Amazon-related losses were a "but for" cause of the miss. *See* Opp., Doc. No. 138, at 22–23. Plaintiffs principally rely on one analyst who reported that "[e]ven adding [the House of Fraser bankruptcy] back in, XPO would've missed on EPS [earnings per share]." Am. Comp, Doc. No. 134, at ¶ 96. As noted in the complaint, however, that analyst also reported that XPO would have "narrowly beat on EBIDTA" after adding the bankruptcy back in. *Id*. The complaint further alleges that the adjusted EBIDTA of $415MM was below the forecasts of $428MM to $429MM—a difference of around $14 million, which is less than the $15.6 million cut. *See id*. That is significant because Jacobs attributed the House of Fraser bankruptcy to the miss in EBITDA, not EPS. He specifically reported: "We've updated our full year 2018 target for *adjusted EBITDA* to approximately $1.585 billion. The revised target reflects the impact of the customer bankruptcy I mentioned earlier." *Id*. at ¶ 97 (emphasis added). Plaintiffs' argument that the House of Fraser bankruptcy also did not fully cover the miss in the third quarter of 2018 in terms of *revenue* is unavailing for the same reason: neither Jacobs nor Malat mentioned revenue in the statements at issue. Accordingly, as I noted during the first hearing, the customer bankruptcy "more than covers the drop that [Plaintiffs are] talking about." Tr., Doc. No. 133, at 37:2–4. Plaintiffs have therefore failed to show that the statements concerning the House of Fraser "taken together and in context, would have misled a reasonable investor." *In re World Wrestling Entm't, Inc. Sec. Litig.*, 180 F. Supp. 3d at 177 (citation omitted).

Plaintiffs also argue that Amazon contributed to the miss in the third quarter of 2018 on the ground that several Amazon facilities had more square footage than the House of Fraser facilities and started to wind down earlier. Opp. to Mot. to Dismiss, Doc. No. 138, at 24–27. The complaint, however, sets forth no factual allegations to support how warehouse square footage is indicative of overall financial performance, or how the winding down of those facilities impacted XPO's EBITDA in the third quarter of 2018.

With respect to the August 2, 2018 and November 1, 2018 statements that XPO's lower overall tonnage reflected a strategic decision to target more profitable freight, Plaintiffs argue that no such strategy existed and that the decline was attributable to "lower LTL volume from Amazon." *See* Am. Compl., Doc. No. 134, at ¶ 74. They note, *inter alia*, that: (a) a sales team was asked, *prior to May 2018*, to replace some of Amazon's lost business by "selling more tonnage" to other customers; (b) the president of XPO's LTL line, Tony Brooks, was replaced by an "interim" president in July 2018, when tonnage rates were purportedly falling; and (c) Amazon's earnings margins were "slightly higher than average XPO margins." *Id*. at ¶¶ 36, 64, 65.

In my view, the foregoing allegations do not sufficiently suggest that the lower tonnage numbers were not a product of XPO's strategic decision-making. That is particularly so because XPO's LTL business reported a 21.5% increase in profit from 2017 to 2018 when tonnage weight allegedly declined. XPO Form 8-K (Feb. 14, 2019), Ex. 5, Doc. No. 137-7, at 17. Moreover, because none of the allegations quantify the extent to which Amazon used the LTL line, the allegations also do not show how Amazon's lower tonnage numbers were responsible for XPO's overall tonnage decrease.

Finally, with respect to XPO's August 3, 2018 statement that XPO has "capitalized" on the trend of "many customers" moving to "large single-source relationships . . . to handle their supply chain requirements," as well as on the "trend toward outsourcing in transportation and logistics," the complaint pleads no facts demonstrating how XPO had not capitalized on those trends, or that "many customers" were not moving in those directions. That Amazon might have been moving in a different direction does not render the statement misleading, even if Amazon was XPO's largest customer. The statement that XPO had been "built to capitalize" on such a trend, further, is more akin to non-actionable puffery.

Considering the statements in their entirety, the complaint fails to raise a reasonable inference that they were false at the time they were made or "would have misled a reasonable investor." *In re World Wrestling Entm't, Inc. Sec. Litig.*, 180 F. Supp. 3d at 177 (citation omitted). I therefore conclude that the complaint has failed to sufficiently establish that the statements in question were actionable misstatements or omissions.

### b. Materiality

I further conclude that Plaintiffs have failed to plead with particularity that the challenged statements or omissions were materially misleading. As noted, "[a] fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]." *Hutchison*, 647 F.3d at 485 (internal citations and quotation marks omitted). Stated differently, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Id.* (internal citations and quotation marks omitted). Critically, "given the particularity requirements of securities fraud pleading, the materiality of allegedly false financials may not be pled in a conclusory or general fashion; a complaint must contain

allegations tending to demonstrate the materiality of the alleged overstatements in light of the defendant's total financial picture." *See Gavish v. Revlon, Inc.*, 2004 WL 2210269, at *16 (S.D.N.Y. Sept. 30, 2004).

Here, even if XPO's failure to report the discontinuation of Amazon's business with XPO's LTL line, or the slowdown of Amazon's business with XPO's Last Mile or Brokerage lines was misleading, the quantitative and qualitative factors weigh against materiality.  As I noted above, the amended complaint fails to quantify the scale of the alleged discontinuation or slowdown of Amazon's business.  *See Gavish*, 2004 WL 2210269, at *16 (holding that financial misstatements were not materially misleading when the complaint failed to "attempt to approximate the magnitude or degree of those misstatements in relation to Revlon's total financial picture").  Also as noted, the ultimate reduction in business from Amazon decreased XPO's overall revenue only by 3.7% in 2019, well below the 5% threshold.

Further, even if Amazon's slow-down or discontinuation of business could have been measured precisely, the complaint does not allege with particularity that the omission masked a change in earnings, changed a loss into income or vice versa, or concealed an unlawful transaction.  And although Amazon might have been a significant customer, I conclude that the "factor alone does not tip the scales in favor of finding the misstatements material."  *See IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund*, 783 F.3d at 390–91.  In addition, the complaint does not plead facts "that would permit the inference that [XPO] expected that the alleged [omissions regarding Amazon would] result in a significant market reaction*." See Hutchison,* 647 F.3d at 490 (citation omitted).  Accordingly, the market's reaction to XPO's announcements on November 1, 2018, December 12, 2018, or February 15, 2019 does not signify qualitative materiality.  *See id*. (citation and quotation marks omitted).

The arguments Plaintiffs raise in their opposition are unavailing.  They note that XPO's tonnage volume decreased in the second quarter of 2018 by 7.7 percentage points relative to the same quarter in the prior year, and that Credit Suisse's calculations show that pricing also fell in the second quarter from the first quarter of 2018.  Opp. to Mot. to Dismiss, Doc. No. 138, at 20–21.  The complaint, however, does not tie that 7.7% company-wide decline, or that drop in pricing, to a decline in tonnage volume or business from Amazon specifically.

To the extent Plaintiffs challenge XPO's failure to disclose Amazon's "stated business plans" to bring in-house some of the business it gave to XPO, the complaint fails to plead with particularity the materiality of that disclosure as well.  "[T]he materiality of an allegedly required forward-looking disclosure is determined by 'a *balancing* of both the *indicated probability* that the event will occur and the *anticipated magnitude* of the event in light of the totality of the company activity.'"  *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 102–03 (2d Cir. 2015) (emphasis in original) (quoting *Basic Inc. v. Levinson,* 485 U.S. 224, 238 (1998)).

With respect to magnitude, Plaintiffs allege that XPO "would be losing two-thirds of $900 million projected business" in 2019 from Amazon.  Compl., Doc. No. 134, at ¶ 12.  Again, however, the ultimate reduction in business from Amazon decreased XPO's overall revenue only by 3.7% in 2019.  With respect to probability, the complaint does not shed adequate light on the likelihood of Amazon pulling two-thirds of its business from XPO prior to the February 2019 disclosure.  Moreover, at least one court in this circuit has indicated that companies do not have a duty to disclose the risk of possible customer loss in the absence of a "definitive statement" that the customer no longer intends to do business with it, and the complaint does not allege that Amazon provided XPO with any such statement prior to February 2019.  *See In re Express Scripts Holding Co. Sec. Litig.,* 2017 WL 3278930, at *13 (S.D.N.Y. Aug. 1, 2017).  It is also

noteworthy that XPO warned in its 2017 10k that "customers may decide to develop or expand internal capabilities for some of the services that we provide." Ex. 3, Doc. No. 137-5, at 14.

For the foregoing reasons, I conclude that the complaint does not plead with particularity that the challenged statements or omissions were materially misleading.

### i. Item 303

Plaintiffs further allege that Defendants' failure to disclose Amazon's discontinuation of its business with XPO in its SEC filings is independently actionable under Item 303 of Regulation S-K, 17 C.F.R. § 229.303(a)(3)(ii).  *See* Opp. to Mot. to Dismiss, Doc. No. 138, at 30; Am. Compl., Doc. No. 134, at ¶¶ 51, 73, 75, 119–20.  I disagree.

Item 303 "imposes disclosure requirements on companies filing SEC-mandated reports, including quarterly Form 10–Q reports."  *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015).  One of those requirements obligates an issuer to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii).  The SEC has clarified that disclosure under Item 303 is required "where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial conditions or results of operations."  *Stratte-McClure*, 776 F.3d at 101 (citation omitted).

"The failure to make a required disclosure under Item 303, however, is not by itself sufficient to state a claim for securities fraud under Section 10(b)."  *Id*. at 102.  That is because "Rule 10b–5 makes only 'material' omissions actionable."  *Id.*  Accordingly, because the complaint has not sufficiently pled that the discontinuation of Amazon's business with XPO's LTL line, or the slowdown of Amazon's business with XPO's Last Mile and Brokerage lines,

was material, it follows that XPO's failure to disclose such information in the SEC filings is not actionable.

Also of significance, Item 303 applies only to "*known* trends or uncertainties," and Plaintiffs have failed to allege "actual knowledge" of a trend, for the reasons discussed below. *See Martin v. Quartermain*, 732. F. App'x 37, 42 n.3 (2d Cir. 2018) (citation omitted) (emphasis in original). For those reasons, the complaint does not plausibly allege that the SEC filings violated the requirements of Item 303.

       c. Scienter

         i. <u>Motive</u>

Plaintiffs repeat the argument that XPO had a motive to "conceal the risks and operating issues Amazon presented" because XPO was "actively engaged in discussions with acquisition targets" and "would have needed to issue common stock as a currency to fund the acquisition of the size that XPO was contemplating." Am. Compl., Doc. No. 134, at ¶¶ 76, 105–06. As I discussed above, that argument fails because Plaintiffs have not presented facts giving rise to a strong inference that XPO could not have funded the acquisition with its existing resources, and because the generalized desire to achieve a lucrative acquisition is insufficient.

         ii. <u>Conscious Behavior or Recklessness</u>

Plaintiffs have also failed to sufficiently allege that Defendants "knew facts or had access to information suggesting that their public statements were not accurate." *Teamsters Local 445 Freight Div. Pension Fund*, 531 F.3d at 194 (citation omitted). For instance, to show that Jacobs knew that Amazon could bring its business in-house and had plans to eventually leave XPO, Plaintiffs note that Jacobs launched a service that competed with Amazon while hiring a top Amazon executive. Those allegations are as follows:

1. In a press release dated April 23, 2018 that introduced one of Amazon's former top executives, Kenneth Wagers III, as XPO's new COO, Jacobs commented that, while Wagers was at Amazon, "he had executive oversight of Amazon's WorldWide Transportation and Logistic Business."  Am. Compl., Doc. No. 143, at ¶ 43.

2. On March 11, 2019, an industry publication stated that Wagers "was considered critical to the expansion of [Amazon's] transportation and logistics services."  *Id.* at ¶ 44.

3. On April 25, 2018, Jacobs and Wagers together rang the NYSE opening bell to announce a new business launched by XPO.  *Id.* at ¶ 45.

Although the complaint contends that one could infer from those allegations that "Jacobs easily could have ascertained Amazon's business plans and capabilities relative to XPO from Wagers," *id.* at ¶ 45, it does not comport with the heightened pleading requirements for several reasons.  First, the allegations do not suggest that Wagers shared any insight about Amazon's "plans" to leave XPO with Jacobs.  Accordingly, the allegations do not give rise to a strong inference that Jacobs "knew facts" contrary to what he represented in public.  *Teamsters Local 445 Freight Div. Pension Fund*, 531 F.3d at 194; *see also City of Brockton Ret. Sys.* v. *Avon Prods., Inc.*, 2014 WL 4832321, at *19 (S.D.N.Y. Sept. 29, 2014) ("[A]ccusations founded on nothing more than a defendant's corporate position are entitled to no weight" in assessing scienter).  That Jacobs vaguely mentioned to investors on February 15, 2019 that "we knew that, that business wasn't going to *stay forever and forever and ever* because of that particular customer's stated business plans," *id.* at ¶ 124 (emphasis added), does not compel a concussion to the contrary because it does not indicate that Jacobs knew of such plans "at the time he made the allegedly misleading statements."  *City of Brockton Ret. Sys.,* 2014 WL 4832321, at *21.  Notably, the complaint even acknowledges that Jacobs also remarked that XPO "didn't think it was going to come to end so quickly" or "so abruptly."  Am. Compl., Doc. No. 134, at ¶ 124.

43

Second, the allegations do not suggest that Jacobs had access to contrary information.  As discussed, the Second Circuit has observed that "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."  *Teamsters Local 445 Freight Div. Pension Fund,* 531 F.3d at 197 (citation omitted).  Here, because the complaint fails to point to a statement or report memorializing Amazon's plans to leave XPO*,* those allegations are not sufficiently particularized to raise a strong inference of scienter on the part of Jacobs.

Plaintiffs further claim that Jacobs knew or should have known about the ongoing deceleration of Amazon's business with XPO.  They cite to the following allegations in support:

1.  According to XPO's February 14, 2018 letter to the SEC, Jacobs reviewed tonnage growth numbers on a weekly basis.  Am. Compl., Doc. No. 134, at ¶ 66.

2.  A former District General Manager recalled that Jacobs "100%" would review XPO's tonnage reports.  *Id.*

3.  A former director stated that Jacobs could access a "a battery" of reports and data reflecting "the dynamics of the Amazon LTL business."  *Id.* at ¶¶ 56, 66.

4.  Jacobs met with Wagers one week before Wagers replaced Brooks on July 16, 2018 and was named as the interim president of the LTL business.  *See id.* at ¶ 67.

5.  Jacobs attended meetings that might have covered growth and customers.  *See id.* at ¶ 68.

Those allegations, however, do not reference any specific reports or statements with information revealing that Amazon's business with XPO was slowing.  As I explained above, the fact that Jacobs had access to reports providing overall tonnage numbers is irrelevant because the complaint does not plead facts showing that those declining tonnage numbers indicated that Amazon was cutting ties with XPO.  The complaint also acknowledges that tonnage reports "[a]re not customer specific."  Am. Compl., Doc. No. 134, at ¶¶ 61 n.24.

In addition, the complaint sets forth no facts showing that Jacobs knew that his public statements were inaccurate. That employees on the ground observed a reduced volume of Amazon-related business at XPO warehouses or heard about Amazon's departure does not indicate otherwise, particularly because the complaint does not suggest that such information was conveyed to Jacobs or any other senior executives at XPO. *See In re Hertz Global Holding, Inc. Securities Litigation,* 2015 WL 4469143, at *18–20 (D.N.J. July 22, 2015), *aff'd*, 905 F.3d 106 (3d Cir. 2018) (holding that the allegations did not support a strong inference of scienter when they rested in part on information provided by one "outside accounting consultant" and seven "low-level Hertz employees in various regions of the country," because the plaintiffs established "no connection whatsoever between the [witnesses'] personal knowledge and that of [the individual defendants] or any other senior executives at Hertz").

Moreover, the allegation that XPO selected an "interim president" to replace Brooks, then-President of the LTL business, when the LTL business was allegedly declining in July 2018, does not reasonably suggest that Jacobs terminated Brooks because of a decline in Amazon tonnage. The complaint in no way ties Brooks' termination to a decline in Amazon's business, and, further, does not allege that Amazon was a significant LTL customer.

To be sure, the allegation that Malat, XPO's Chief Strategy Officer, and Hardig, XPO's CFO, resigned from XPO abruptly and around the same time in 2018 does suggest scienter. *Id.* at ¶ 78- 79. But that is not enough on its own to establish scienter. *In re BISYS Sec. Litig.,* 397 F. Supp. 2d 430, 446–47 (S.D.N.Y. 2005) ("[A]bsent any alleged facts linking the two resignations and the alleged fraud, the resignations of [the CEO and CFO] do not support an inference of conscious misbehavior or recklessness.").

For the foregoing reasons, the complaint fails to raise a strong inference of scienter.

      d.   Loss Causation

For reasons similar to the growth-related statements, I conclude that Plaintiffs have failed to allege loss causation. As noted, under the PSLRA, the plaintiff bears the burden of establishing that "the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages." *Lentell,* 396 F.3d at 172. Also as discussed, Plaintiffs seem to allege loss causation through a series of partial disclosures made on November 1, 2018, December 12, 108, and February 15, 2019.

Here, because the disclosures regarding XPO's miss in the third quarter of 2018 or the revised December 12, 2018 guidance did not mention the decline in Amazon's business, they do not constitute corrective disclosures. Whether the February 2019 announcement amounted to a corrective disclosure, however, presents a closer question. But I need not, and do not, reach that question because Plaintiffs have failed to plead the other elements. For that same reason, I do not address whether Plaintiffs have adequately pled loss causation through the materialization of the risk theory.

For all the foregoing reasons, I conclude that the complaint falls short of the heightened pleading requirements and fails to state a cognizable claim under Section 10(b).

B.  <u>Section 20(a) of the Exchange Act</u>

Plaintiffs also assert violations of Section 20(a) of the Exchange Act, citing Jacobs' control over XPO and vice-versa. *See* Am. Compl., Doc. No. 134, at ¶ 137. Specifically, Plaintiffs contend that "[b]ecause of his position of control and authority as Chairman and CEO, Jacobs was able to, and did control the contents of the various reports, press releases, and public filings that XPO disseminated in the marketplace during the Class Period concerning XPO's

results and operations." *Id*. They further allege that "XPO, in turn, controlled the Individual Defendants and all of its employees." *Id*.

Section 20(a) of the Exchange Act provides, in pertinent part, that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996) (citing 15 U.S.C. § 78t).

"To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Communications*, 493 F.3d at 108. The definition of "control" under Section 20(b) of the Exchange Act is the same as under Section 15(a) of the Securities Act, and is defined as "the power to direct or cause the direction of the management and policies of [the primary violators], whether through the ownership of voting securities, by contract, or otherwise." *In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 185 (2d Cir. 2011) (citations omitted).

In this case, because Plaintiffs have failed to plead a primary violation, the control person claim also cannot withstand the motion to dismiss. *Bui v. Indus. Enterprises of Am., Inc.*, 594 F. Supp. 2d 364, 372 (S.D.N.Y. 2009) ("To the extent that Plaintiffs have failed to sufficiently allege predicate violations of § 10(b), the control person claims under § 20(a) of the Exchange Act also fail.").

**IV.     Conclusion**

For the foregoing reasons, the complaint does not comport with the exacting pleading requirements set forth by Rule 9(b) and the PSLRA.  I therefore **grant** Defendants' motion to dismiss, and because I have previously granted a motion to dismiss without prejudice and have allowed the filing of an amended complaint, I dismiss the complaint with prejudice.

So ordered.

Dated at Bridgeport, Connecticut, this 19th day of March 2021.

<u>/s/ STEFAN R. UNDERHILL</u>
Stefan R. Underhill
United States District Judge