

21-986
*Local #817 IBT Pension Fund, Local et al. v. XPO Logistics, Inc.*

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

## SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 30th day of June, two thousand twenty-two.

Present:
            DEBRA ANN LIVINGSTON,
                    *Chief Judge*,
            BARRINGTON D. PARKER,
            BETH ROBINSON,
                    *Circuit Judges*.

_____

LOCAL #817 IBT PENSION FUND, LOCAL 272 LABOR-
MANAGEMENT PENSION FUND, LOCAL 282 PENSION
TRUST FUND AND LOCAL 282 WELFARE TRUST
FUND,

            *Plaintiffs-Appellants*,

LARRY LABUL, individually and on behalf of all other
similarly situated, RIVIERA BEACH POLICE PENSION
FUND, NORFOLK COUNTY RETIREMENT SYSTEM,

            *Plaintiffs*,

            v.                                                  21-986

XPO LOGISTICS, INC., BRADLEY S. JACOBS,

            *Defendants-Appellees*,

JOHN J. HARDIG, SCOTT B. MALAT,

MANDATE

MANDATE ISSUED ON 08/01/2022

*Defendants.*[*]

_____

For Plaintiffs-Appellants:        JOSEPH DALEY (Spencer A. Burkholz & Jason C. Davis, *on the brief*), Robbins Geller Rudman & Dowd LLP, San Diego & San Francisco, CA.

For Defendants-Appellees:        JULIA TARVER WOOD (Martin Flumenbaum & Daniel S. Sinnreich, *on the brief*), Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY.

James I. Glasser, *on the brief*, Wiggin and Dana LLP, New Haven, CT.

Appeal from a judgment of the United States District Court for the District of Connecticut (Underhill, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED**.

Plaintiffs-Appellants Local #817 IBT Pension Fund *et al.* ("Plaintiffs") appeal from a judgment of the United States District Court for the District of Connecticut dismissing their first amended consolidated class action complaint ("Complaint") alleging violations of sections 10(b) ("Section 10(b)") and 20(a) ("Section 20a") of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 ("Rule 10b-5"), 17 C.F.R. § 240.10b-5, against Defendants-Appellees XPO Logistics, Inc. ("XPO") and XPO CEO Bradley S. Jacobs ("Jacobs," and together with XPO, "Defendants").[1]    *See Labul v. XPO Logistics*, 2021 WL 1056828 (D. Conn.

_____

[*] The Clerk of Court is respectfully directed to amend the caption as set forth above.

[1] John J. Hardig and Scott B. Malat were named as defendants in the district court, but they are not appellees here.

Mar. 19, 2021).[2]   XPO is a publicly traded transportation and logistics company.   Joint App'x 83.   Plaintiffs allege that Amazon.com, Inc. ("Amazon") was XPO's largest customer.   *Id.* at 84.[3]   In February 2018, the day before XPO was due to release its 2017 SEC annual report ("2017 10-K"), the *Wall Street Journal* reported that Amazon planned to announce the launch of an in-house delivery service.   *Id.* at 83–84, 90–91.   A year later, XPO announced that Amazon had "pulled back" on its business with XPO.   *Id.* at 131.   Plaintiffs assert that Amazon, XPO's largest customer, started to sever ties with XPO around March 2018 and that, in the year between the *Journal* article and the XPO announcement, Defendants concealed this pullback and its impact on XPO through various "misstatements and omissions relating to Amazon's outsized effect upon XPO's growth and revenues."   *See* Appellants' Br. 27–28 (cataloging statements which Plaintiffs argue are false or misleading on appeal).   In a thorough opinion, Judge Underhill dismissed the complaint for failure to plausibly allege a misrepresentation or omission, scienter, materiality, or loss causation.   *See Labul*, 2021 WL 1056828, at *6–23.

"We review the district court's grant of a motion to dismiss de novo."   *IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scot. Grp.*, 783 F.3d 383, 389 (2d Cir. 2015).   To state a claim for a violation of Section 10(b) and Rule 10b-5, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon

---

[2]  Unless otherwise indicated, we omit all citations, quotation marks, alterations, emphases, and footnotes from citations.

[3]  We draw the facts from the Complaint, "assuming [that] all well-pleaded, nonconclusory factual allegations in the complaint [are] true."   *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 124 (2d Cir. 2010).   On a motion to dismiss, we "evince no views concerning whether the[se] 'facts' . . . are *actually* true.   Our task is limited to determining whether, *if* [the plaintiff's] allegations were true, they would state a . . . claim."   *Menaker v. Hofstra Univ.*, 935 F.3d 20, 26 n.1 (2d Cir. 2019).

the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Amgen Inc. v. Conn. Ret. Plan & Tr. Fund*s, 568 U.S. 455, 460–61 (2013). Assuming the parties' familiarity with the underlying facts, the procedural history of the case, and the issues on appeal, we chiefly address the first of these elements in explaining our decision to affirm.

## I. False or Misleading Statement or Omission

Under Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995, a plaintiff must "stat[e] with particularity the circumstances constituting fraud," including by "specify[ing] each statement alleged to have been misleading, and the reason or reasons why the statement is misleading." *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase, Co.*, 553 F.3d 187, 196 (2d Cir. 2009); *see* 15 U.S.C. § 78u-4(b)(1)(B). For omissions, the plaintiff must specifically identify "the omitted facts that are necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading." *Kleinman v. Elan Corp. plc*, 706 F.3d 145, 152 (2d Cir. 2013). In conducting this inquiry, we ask whether the statements and omissions "taken together and in context, would have misled a reasonable investor." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010).

### A. Statements and Omissions Concerning Amazon's Contributions to XPO's Growth

Plaintiffs first contend that they plausibly alleged that Defendants' May 2018 statements that "revenue growth" in the first quarter of 2018 "reflected a healthy diversification of customer verticals and service lines" and that "growth was broad-based across our operations" were false or misleading. Joint App'x 98–99. We disagree. The Complaint fails to allege facts suggesting that these statements were inaccurate; it instead alleges that the revenue that Amazon contributed to XPO in 2017 "accounted for approximately 52% of its revenue growth for the year, with approximately 50,000 customers accounting for the other 48%." *Id.* at 94; *see also Labul*, 2021

4

WL 1056828, at *8.   Plaintiffs object that even if these statements are literally true, a reasonable investor would have understood that Amazon's business was not as important to XPO as, in fact, it was.   But we are unpersuaded that a reasonable investor would have believed anything about XPO's relationship with Amazon based on these statements alone—which do not even mention Amazon.

Taking another tack, Plaintiffs also contend that having chosen to address the topics of "diversification" and "broad-based" growth, Joint App'x 98–99, Defendants failed "to tell the whole truth" by failing to disclose more information about XPO's relationship with Amazon, *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016).   We disagree.   At least without more allegations tending to show the particular importance of Amazon to XPO's success, XPO did not undertake a duty to disclose anything about its relationship with Amazon by making general (and, Plaintiffs seem to concede, truthful) statements about the "diversity" of its customers or the "broad-based growth" of its business.   Indeed, we agree with the district court that these statements are "too general to cause a reasonable investor to rely upon them."   *Labul*, 2021 WL 1056828, at *8; *see In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 170 (2d Cir. 2021).

Plaintiffs next argue that XPO's statement in its 2017 10-K that its revenue increase "was primarily driven by growth in our European contract logistics business, improvement in LTL weight per day, and growth in North American truck brokerage and Last Mile operations" was false or misleading because this statement concealed the degree to which Amazon drove this revenue growth.   Joint App'x 93.   We again agree with the district court that the Complaint lacks sufficient factual allegations to show that this statement misrepresented Amazon's contribution to XPO's growth.   As the district court noted, the statement would not plausibly have misled a reasonable investor "principally because, as the complaint acknowledges, Amazon *was* a customer of

the three business lines mentioned in the statement: LTL, Last Mile, and Brokerage." *Labul*, 2021 WL 1056828, at \*8.

### B. Statements that Allegedly Concealed that Amazon Started to Sever Ties With XPO Around March 2018

Plaintiffs also rely on a series of statements that they argue concealed the fact that Amazon had begun to sever ties with XPO. They point first to XPO's claim in its 2018 quarterly SEC Form 10-Qs ("10-Qs") that "[t]here are no material changes to the risk factors previously disclosed" in its 2017 10-K. Joint App'x 100, 112. Plaintiffs contend that Amazon's decelerating business represented a materially adverse change to XPO's previously disclosed risk factors. But XPO reported in its SEC Form 10-K that its profitability could decline if "current or prospective customers . . . decide to develop or expand internal capabilities for some of the services that we provide." *Id.* at 201. And the Complaint lacks specific allegations to show how this disclosure—of precisely the risk that allegedly materialized when Amazon began to pull back on its business—was deficient.

Plaintiffs next contend that XPO's statement in its August 2018 10-Q that it had "capitalize[d]" on the "trend" of "[m]any customers, particularly large companies" moving to "large, single-source relationships . . . to handle their supply chain requirements" and on a similar "trend toward outsourcing in transportation and logistics" was false or misleading. *Id.* at 112. We disagree. As the district court concluded,

> the complaint pleads no facts demonstrating how XPO had not capitalized on those trends, or that "many customers" were not moving in those directions. That Amazon might have been moving in a different direction does not render the statement misleading, even if Amazon was XPO's largest customer. The statement that XPO had been "built to capitalize" on such a trend, further, is more akin to non-actionable puffery.

*Labul*, 2021 WL 1056828, at \*18.

Plaintiffs also assert that Jacobs's statement, made in response to a question about figures showing a decline in the tonnage XPO shipped, that XPO was focused not on overall tonnage figures but on selecting the "right"—that is, the most profitable—"tonnage" was misleading because the lighter tonnage figures actually reflected Amazon's decelerating business. Joint App'x 110–11. But the district court properly rejected that argument because Plaintiffs failed to plausibly allege "that the lower tonnage numbers were not a product of XPO's strategic decision-making." *Labul*, 2021 WL 1056828, at *18. In fact, "XPO's LTL business reported a 21.5% increase in profit from 2017 to 2018 when tonnage weight allegedly declined." *Id.* (citing XPO Form 8-K (Feb. 14, 2019), at 17); *see also* Joint App'x 251.[4] That fact suggests that XPO was indeed targeting a more profitable tonnage mix. And for that reason, Plaintiffs have not plausibly pleaded that Jacobs's assertion that XPO was targeting the "right tonnage" was false or misleading.

Plaintiffs next argue that Jacobs's August 2018 statement that "nothing's slowed down at all in terms of [XPO's revenue] guidance" was misleading because Amazon's ongoing deceleration of its business with XPO had materially altered XPO's financial outlook. Joint App'x 111.[5] But Jacobs made the challenged statement in response to a line of questions about XPO's LTL

---

[4] This information is drawn from a press release, dated February 14, 2019, issued by XPO and included as an exhibit in XPO's Form 8-K report, which XPO submitted to the SEC on February 14, 2019. Joint App'x 235–59. XPO filed the Form 8-K report and press release in support of its motion to dismiss. *Id.* at 143. Because Plaintiffs referred to these materials in the Complaint, *see id.* at 86, 106, 131, and filed them with the SEC, the district court properly considered them on XPO's motion to dismiss. *See, e.g.*, *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (explaining that when "review[ing] a district court's dismissal of a complaint pursuant to [Rule 12(b)(6)] . . . we may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit").

[5] Jacobs said that XPO had been projecting "high single digits, low-double digits" for revenue growth for "the last few months" and that XPO was not revising its guidance. *Id.*

tonnage, which the analyst described as "a little bit on the light side."   *See id.* at 376–77.   As noted above, Plaintiffs have failed to plausibly allege that the lighter tonnage was *not* the result of XPO's strategic choice to target more profitable tonnage.   So they have similarly failed to allege that Jacobs's statement that XPO would not be revising its revenue guidance in response to a small decrease in tonnage weight was false or misleading.

Plaintiffs finally contend that after XPO missed earnings targets in Fall 2018, Jacobs's statement to investors that the miss was "nothing" and that it was caused by the bankruptcy of a smaller customer, House of Fraser, was misleading because the miss was in fact due to several Amazon-focused fulfillment centers winding down in 2018.   *Id.* at 85, 121–22.   But Jacobs specifically attributed the House of Fraser bankruptcy to the miss in EBIDTA.   *Id.* at 122.   And Plaintiffs' Complaint contained an excerpt from an October 2018 analyst report stating that the House of Fraser bankruptcy "hurt [XPO's] results" and projecting that "adding" the House of Fraser "back in," XPO would have "narrowly beat" its EBIDTA projections.   *Id.* at 121; *see also Labul*, 2021 WL 1056828, at *18.

Plaintiffs counter that the House of Fraser bankruptcy was not the "sole reason" for XPO "missing 3Q18 guidance" because "[i]t is reasonable to infer that the wind down of [] three Amazon facilities . . . had a larger financial impact on XPO than the wind down of the two House of Fraser fulfillment centers."   Joint App'x 124.   Plaintiffs allege that the three facilities that XPO ran for Amazon collectively comprised over 2.3 million square feet in size, and that the Texas fulfillment center that announced mass layoffs in August 2018 alone was more than four times the combined size of the House of Fraser fulfillment centers.   *Id.*   But as the district court recognized, "[t]he complaint . . . sets forth no factual allegations to support how warehouse square footage is indicative of overall financial performance, or how the winding down of those facilities

impacted XPO's EBITDA in the third quarter of 2018." *Labul*, 2021 WL 1056828, at *18. For these reasons, Plaintiffs have again failed to plausibly allege that this statement was false or misleading.

## II.   Item 303

Last, Plaintiffs argue that Defendants violated Item 303 of SEC Regulation S-K by failing to "'[d]escribe a[] known [Amazon-related] trend[] or uncertaint[y] . . . that [XPO] reasonably expect[ed] w[ould] have a material unfavorable impact on revenues or income from continuing operations." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) (quoting 17 C.F.R. § 229.303(a)(3)(ii)). Because Plaintiffs have failed to adequately plead scienter as to the Item 303 violation, we need not decide whether they have adequately alleged any "known trends or uncertainties" that gave rise to a "duty to disclose." *Id.*

To plead scienter for an Item 303 claim, we have held that the plaintiff's allegations must "support the inference that [the defendant] acted with at least a reckless disregard of a known or obvious duty to disclose." *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 96 (2d Cir. 2016), *cert. granted sub nom. Leidos, Inc. v. Ind. Pub. Ret. Sys.*, 137 S. Ct. 1395 (2017) *and cert. dismissed* 138 S. Ct. 2670 (2018). Plaintiffs do not argue that Defendants had actual knowledge of a duty to disclose Amazon-related information. The issue is therefore whether, accepting Plaintiffs' well-pleaded factual allegations as true, those facts give rise to a strong inference that Defendants were subject to a duty to disclose so obvious that the failure to disclose was a "highly unreasonable" and "extreme departure from the standards of ordinary care." *Advanced Battery Techs. v. Bagell*, 781 F.3d 638, 644 (2d Cir. 2015).

Plaintiffs have not alleged facts to satisfy this standard. We are not persuaded that any duty to disclose was so obvious that Defendants' failure to disclose any Amazon-related trend or

uncertainty was "*highly* unreasonable" or an "*extreme* departure from the standards of ordinary care." *Id.* (emphasis added). The most compelling inference based on Plaintiffs' alleged facts is that Defendants were "*at worst* negligent" in failing to disclose any such trend or uncertainty. *Stratte-McClure*, 776 F.3d at 107.[6] So we also affirm the district court's dismissal of the Item 303 claim.

\*    \*    \*

We have considered Plaintiffs' remaining arguments and conclude that they lack merit. We therefore **AFFIRM** the judgment of the district court.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court



A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

---

[6] Given our conclusions as to falsity (and scienter as to the Item 303 claim), we need not address whether Plaintiffs have plausibly alleged that Defendants' alleged misstatements were material or whether Plaintiffs pleaded loss causation. We also affirm the district court's dismissal of Plaintiffs' Section 20(a) claim for failure to plead a primary violation. *See Labul*, 2021 WL 1056828, at \*23 (citing *In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 185 (2d Cir. 2011)).